IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CARA PAYNE,

      Plaintiff,

vs.                                                                                                   No. CIV 16-0312 JB/GJF

LEE WILDER; MAYFRITZ BUCAG and
DAVID CEBALLES,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Ceballes' Motion and Memorandum to Dismiss Plaintiff's Declaratory and Injunctive Relief Claims, filed September 27, 2016 (Doc. 10)("MTD").  The primary issues are: (i) whether Plaintiff Cara Payne has demonstrated that she has standing to bring her claims for prospective injunctive relief against Defendant David Ceballes, the District Attorney for the State of New Mexico in Otero County, where her alleged injury is the threat of prosecution by Ceballes pursuant to NMSA § 30-6-4; and (ii) whether Payne has stated a claim that § 30-6-4 is either unconstitutional on its face or is unconstitutional as applied to Payne.  Because the Court concludes that Payne's claim against Ceballes is not ripe for review, the Court will dismiss Ceballes from this case.

## FACTUAL BACKGROUND

The Court draws its recitation of the relevant facts from Payne's Amended Complaint for Damages and Petition for Declaratory and Injunctive Relief, filed April 19, 2016 (Doc. 1-2)("Complaint").  On July 8, 2015, Defendant Lee Wilder, a law enforcement officer in Otero County, New Mexico, stopped and seized Payne in Alamogordo, New Mexico, for driving with a suspended license.  See Complaint ¶ 7, at 1.  Wilder represented that he was conducting a child

abuse investigation, forced Payne to do a field sobriety test, and attempted to force Payne to allow him to search a home that Payne was house sitting.  See Complaint ¶¶ 7-11, at 2-3. Wilder, Payne alleges, did not have reasonable suspicion to support the notion that Payne was intoxicated.  See Complaint ¶¶ 8-9, at 2.  Regarding the home search, Payne refused to allow the search, and told Wilder that she had previously been under investigation by the State of New Mexico Children, Youth, and Families Department, but that the investigation did not support allegations of abuse.  See Complaint ¶¶ 10-11, at 2-3.  Upon the refusal, Wilder contacted Defendant Mayfritz Bucag, a CYFD investigator, who then contacted Payne's ex-husband and ordered him to not allow Payne custody of their children.  See Complaint ¶¶ 12-14, at 3.  Payne did not have custody or visitation rights after this traffic stop, despite having the right to custody and visitation.  See Complaint ¶¶ 15-16, at 3.

Wilder and Bucag then petitioned the district attorney's office in Otero County to file criminal charges against Payne for refusing to allow the search of the house where she was house sitting.  See Complaint ¶¶ 18, at 4.  In particular, the criminal charges would flow pursuant to § 30-6-4, which relates to obstruction of reporting or investigating child abuse or neglect.  See Complaint ¶¶ 19, at 4.  Wilder expects that charges will be filed against Payne.  See Complaint ¶ 20, at 4.

## PROCEDURAL BACKGROUND

With respect to Ceballes, Payne has petitioned the Twelfth Judicial District Court, County of Otero, for declaratory and injunctive relief against Ceballes' filing of criminal charges against her under § 30-6-4.  See Complaint at 1.  Wilder, one of Ceballes' co-Defendants, removed the case to federal court.  See Notice of Removal, filed April 19, 2016 (Doc. 1).  Payne alleges that Wilder and Bucag have committed a violation of her due process rights under the

Constitution of the United States of America and the Constitution of the State of New Mexico. See Complaint ¶¶ 22-32, at 4-6.  Payne also alleges that § 30-6-4 is unconstitutional, because it violates the Fourth Amendment to the Constitution of the United States of America and Article II, § 10, of the New Mexico Constitution.  See Complaint ¶ 21, at 4.  Additionally, in response, Ceballes has filed his MTD, arguing that Payne lacks an injury in fact, and therefore standing, to bring this suit against him, and also that Payne has failed to state a claim of § 30-6-4's unconstitutionality.  See MTD at 1.

    1.    **The MTD.**

    The MTD argues that, pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court should dismiss Payne's Complaint against Ceballes requesting injunctive and declaratory relief from Ceballes' filing of criminal charges against her under § 30-6-4.  See MTD at 1-2.  According to the MTD, Payne lacks "standing to petition this Court for prospective injunctive and declaratory relief" against Ceballes, because Payne has not established an injury in fact.  MTD at 2-3.  Such standing is lacking, the MTD argues, because "[c]oncrete fear of prosecution that has a chilling effect on one's freedom is insufficient to support standing, unless there is a credible threat of prosecution."  MTD at 3 (citing Winsness v. Yocom, 433 F.3d 727, 732 (10th Cir. 2006)).  The MTD provides that, in Winsness v. Yocom, the United States Court of Appeals for the Tenth Circuit

> ruled that mere fear of prosecution was not enough without a credible threat of prosecution. . . .  [and that] brief prosecution does not change the fact that he faces no credible threat of future prosecution [because] it is no more than speculation to predict that Mr. Winsness will again face criminal proceedings for altering the flag.

MTD at 4 (citing Winsness v. Yocom, 433 F.3d at 733).  Accordingly, the MTD argues that Payne has similarly "pled insufficient facts of actual or imminent threat of prosecution."  MTD at

4.  Payne "has not alleged that (1) she has been arrested; (2) there is an actual or imminent threat of prosecution; (3) Defendant Ceballes, or anyone on his behalf, has filed charges or even threatened charges; or (4) Plaintiff has received threats of any kind from Defendant Ceballes." MTD at 4.

The MTD next argues that, while Payne has not shown that she has suffered an injury in fact, she has also pled insufficient facts to satisfy the second requirement of standing, causation. See MTD at 4.  The MTD argues that because Payne has "merely pled that Defendants Wilder and Bucag have asked Defendant Ceballes to file charges," and "has not alleged that Ceballes performed or took any action that can be traced back to Plaintiff's alleged injury," Payne has failed to plead sufficient facts that her alleged injuries are traceable to Ceballes.  MTD at 5. Accordingly, the MTD also argues that, because Payne has suffered no injury in fact that is traceable to Ceballes, she cannot "show that an injunction or declaratory relief will redress a non-existent injury."  MTD at 5.

The MTD last argues that Payne "has failed to plead sufficient facts to support that" § 30-6-4 "is unconstitutional" on its face or as applied to Payne.  MTD at 5.  Ceballes argues: "Rather, Plaintiff only alleges that [§] 30-6-4 is unconstitutional on its face because, according to Plaintiff, the statute allows for law enforcement to perform illegal searches of a residence without probable cause or risk criminal prosecution."  MTD at 5.

### 2.      The Response.

The Plaintiff's Response to Defendant Ceballes' Motion to Dismiss, filed October 10, 2016 (Doc. 11)("Response"), argues that Payne "has proven standing in this case as there has been a credible threat made against Plaintiff."   Response at 1.  The Response argues that, in Payne's Complaint, she alleged that "[s]ince Wilder and Bucag's interactions with this case, both

have petitioned the district attorney's office for the Twelfth Judicial District to file criminal charges against Plaintiff for Plaintiff failing to allow a search of the house that she was house sitting."  Response at 1.  The Response also provides that "Wilder expects that charges will be filed against Plaintiff."  Response at 2.  Thus, the Response argues, "the allegations show that Wilder and Bucag have petitioned the District Attorney's Office and that Wilder expects that charges will be filed."  Response at 2.  Accordingly, the Response argues that Payne has demonstrated standing.  See Response at 1.

Next, the Response argues that the "allegations in the complaint support a claim having been stated for the statute being unconstitutional."  Response at 2.  This adequacy is so, the Response argues, because the Complaint alleges that § 30-6-4 "violates the New Mexico Constitution on its face and as it is applied to Plaintiff as it requires Plaintiff to allow a search of the home in which she is staying without a warrant and without probable cause or any proper justification."  Response at 2.  Last, the Response requests that, should the Court determine that the Complaint has not stated a claim, it allow Payne to amend her Complaint to meet the federal standard of pleading instead of the state standard, under which Payne originally pled the Complaint.  See Response at 3.

### 3.      The Reply.

The Reply of Defendant David Ceballes in Support of his Motion to Dismiss Plaintiff's Declaratory and Injunctive Relief Claims, filed October 11, 2016 (Doc. 12)("Reply"), argues, again, that the "Plaintiff lacks standing to petition this court for prospective injunctive and declaratory relief . . . against Defendant Ceballes," because Payne has not proved standing.  Reply at 1.  The Reply insists that the Response's assertion that Payne proved standing by pleading  "that co-defendants Wilder and Bucag have petitioned the district attorney's office to

file charges against Plaintiff . . . [and] Wilder expects that charges will be filed," fails to satisfy the standard for demonstrating an injury in fact that is traceable to Ceballes.  Reply at 1.  The Reply reiterates that Payne has not "alleged that Defendant Ceballes has taken any action, much less threatened prosecution."  Reply at 2.

The Reply also reiterates that the "Plaintiff has failed to plead sufficient facts to support that" § 30-6-4 "is unconstitutional."  Reply at 2.  With respect to the Response, the Reply argues that Payne has not responded to Ceballes' arguments and has only repeated the allegations that the MTD argues pleaded insufficient facts.  See Reply at 3.  With respect to the Response's request for leave to amend, the Reply argues that any such amendment would be futile, because the request identifies no additional facts that would support a claim that § 30-6-4 is unconstitutional.  See Reply at 3.

**4.    The Hearing.**

The Court held a hearing on October 28, 2016.  See Transcript of Hearing, taken October 28, 2016 ("Tr.").[1]  At the hearing, Ceballes reiterated his position that "the plaintiff does not have any standing to sue the district attorney for the prospective injunctive relief that she seeks, because she has not suffered any injury in fact, which is the first of three prongs under the standing analysis."  Tr. at 3:18-24 (Evans).  Ceballes argued that "the reason that she has not suffered any injury in fact . . . is there is in the complaint no clear credible imminent threat of prosecution."  Tr. at 3:25-4:2 (Evans).  According to Ceballes, all "the complaint says is that the district attorney has been asked by investigating officers over a year ago to bring charges."  Tr. at 4: 2-5 (Evans).  Accordingly, Ceballes concluded that "there is according to the face of the

_____

[1]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

complaint no clear imminent threat of prosecution, therefore Ms. Payne has not suffered injury in fact." Tr. at 4:9-12 (Evans).  The Court then confirmed with Ceballes that, although his MTD was called a rule 12(b)(6) motion, it was really a rule 12(b)(1) motion alleging that the Court lacked jurisdiction over this case.  See Tr. at 4:15-19 (Court).  Ceballes then explained that the claims against Wilder and Bucag are under 42 U.S.C. § 1983, whereas the only claim against Ceballes is for prospective injunctive relief.  See Tr. at 5:3-6 (Evans).  According to Ceballes, then, "in a situation like this, where . . . in the complaint there is nothing more than the investigating officers asking that charges be brought . . . the plaintiff has not established standing." Tr at 6:6-10 (Evans).  That conclusion is important, Ceballes argued, because

> I would hazard to guess that the investigating officers in almost every situation where a person is involved with the criminal law asked the DA to bring charges and if that were enough to allow a person to move for injunctive relief against being charged, then we would have, could have a lawsuit similar to this in every situation.

Tr. at 6:10-17 (Evans).  Then, in response to the Court's query why the prosecutorial office had not simply said it was not going to bring these charges, Ceballes' attorney said that he had not yet heard from Ceballes on this matter, and could not, as of yet, tell the Court why the prosecution had not happened.  See Tr. at 7:21-8:2 (Evans).

Payne then took up argument, and told the Court that "we made a claim against the district attorney, based upon the deposition testimony of deputy Wilder who had stated that he had presented these charges to the district attorney for charging, and expected that those charges would be filed."  Tr. at 8:20-25 (Garcia).  Payne then reiterated her argument in the Response that she had pled sufficient facts to demonstrate that there is a credible threat of prosecution, because investigating officers asked Ceballes to bring the charges and expected that he would.  See Tr. at 9:1-25 (Garcia).  Payne argues that she has pled a credible threat of prosecution,

because, until Ceballes files the charges, this situation is the closest one may come to a credible threat that the charges will indeed be filed against Payne.  <u>See</u> Tr. at 10:3-9 (Garcia).  Payne then turned to her constitutional argument, explaining that "we alleged that any prosecution under this statute as it is applied to plaintiff would violate the Fourth Amendment," because the statute authorizes a search by officers on a lesser modicum of evidence than is typically required when executing a warrant.  Tr. at 10:22-11:10 (Garcia).

The Court then gave its inclination, stating that "I'm skeptical you can bring a case like this.  I don't know if it's a standing issue but it seems to me not many people poke a sleeping dog and say hey are you going to charge me about a criminal proceeding."  Tr. at 12: 2-6 (Court).  Further, the Court said it would not have any power to do much with a pending state case, so "it would surprise me that I've got any more power to start enjoining state prosecutors . . . from bringing a state case."  Tr. at 12:10-14 (Court).  The Court also indicated that the state courts were an effective forum to voice the constitutional claims should charges ultimately be filed.  <u>See</u> Tr. at 12:14-25 (Court).  "It's going to surprise me if this case survives."  Tr. at 12:25 (Court).  The Court then took the MTD under advisement, indicating that it was not certain standing was the problem, but that it was skeptical a claim such as this one could survive.  <u>See</u> Tr. at 14:10-15:9 (Court).

## LAW REGARDING RULE 12(b)(1) MOTIONS TO DISMISS

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress."  <u>Henry v. Office of Thrift Supervision</u>, 43 F.3d 507, 511 (10th Cir. 1994)(citations omitted).  A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims.  <u>See</u> <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83,

104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence."). "[Because] federal courts are courts of limited jurisdiction, we presume no jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction." United States ex rel. Hafter v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1160 (10th Cir. 1999). Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to raise by motion the defense of the court's "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). The Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject-matter jurisdiction is based." Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002).

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true. See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981). But when the attack is aimed at the jurisdictional facts themselves, a district court may not presume the truthfulness of those allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 [summary-judgment] motion.

Alto Eldorado Partners v. City of Santa Fe, 2009 WL 1312856, at *8-9 (D.N.M. 2009)(Browning, J.)(citations omitted), aff'd on other grounds by 634 F.3d 1170 (10th Cir. 2011). The United States Court of Appeals for the Fifth Circuit has stated:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very power to hear the case -- there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the complaint's allegations to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or other evidence properly before the court.  See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995).  In those instances, a court's reference to evidence outside the pleadings does not necessarily convert the motion to a rule 56 motion for summary judgment.  See Holt v. United States, 46 F.3d at 1003 (citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)).  Where, however, the court determines that jurisdictional issues raised in a rule 12(b)(1) motion are intertwined with the case's merits, the court should resolve the motion under either rule 12(b)(6) or rule 56.  See Franklin Sav. Corp. v. United States, 180 F.3d 1124, 1129 (10th Cir. 1999); Tippett v. United States, 108 F.3d 1194, 1196 (10th Cir. 1997).  "When deciding whether jurisdiction is intertwined with the merits of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim.'"  Davis ex rel. Davis v. United States, 343 F.3d 1282, 1296 (10th Cir. 2003)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th Cir. 2002)).

## LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.).  The complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a

court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010)(Seymour, J.). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere

metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d at 1177 (emphasis omitted).  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(citations omitted).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009) and Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").

## LAW REGARDING STANDING

A federal court may hear cases only where the plaintiff has standing to sue.  Standing has two components.  First, standing has a constitutional component arising from Article III's

requirement that federal courts hear only genuine cases or controversies.  Second, standing has a prudential component.  See Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1224 n.7 (10th Cir. 2008)(Lucero, J.)(noting that prudential standing concerns may prevent judicial resolution of a case even where constitutional standing exists).  The burden of establishing standing rests on the plaintiff.  See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998).  The plaintiff must "allege . . . facts essential to show jurisdiction.  If they fail to make the necessary allegations, they have no standing."  FW/PBS v. City of Dallas, 493 U.S. 215, 231 (1990)(internal citations and quotations omitted).  Moreover, where the defendant challenges standing, a court must presume lack of jurisdiction "unless the contrary appears affirmatively from the record."  Renne v. Geary, 501 U.S. 312, 316 (1991)(quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 (1986))(internal quotation marks omitted).  "It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record."  Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)(Henry, J.)(quoting FW/PBS v. City of Dallas, 493 U.S. at 231)(citations omitted)(internal quotation marks omitted).

1.    **Article III Standing.**

"Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies."  San Juan Cty., Utah v. United States, 503 F.3d 1163, 1171 (10th Cir. 2007)(en banc).  See U.S. Const. art. III, § 2.  "In general, this inquiry seeks to determine 'whether [the plaintiff has] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'"  Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241 (10th Cir. 2008)(Ebel, J.)(quoting Massachusetts v. EPA, 549 U.S. 497, 539 (2007))(internal quotation

marks omitted).  "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing."  San Juan Cty., Utah v. United States, 503 F.3d at 1171. To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision."  Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(Hartz, J.)(internal quotation marks omitted).

"Standing is determined as of the time the action is brought."  Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(Seymour, J.)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)(Ebel, J.)).  In Smith v. U.S. Court of Appeals, for the Tenth Circuit, the Tenth Circuit rejected a plaintiff's standing to challenge the Colorado appellate courts' practice of deciding cases in non-precedential, unpublished opinions, which the plaintiff asserted allowed courts to affirm incorrect decisions without interfering with official, "published" law.  484 F.3d at 1285.  The Tenth Circuit noted that the plaintiff had recently taken his state appeal and, therefore,

> was in no position to challenge the adequacy of state appellate review in cases culminating in unpublished opinions unless he could show that he would in fact receive such review from the state court of appeals (and from the state supreme court as well, if it took the case on certiorari).

484 F.3d at 1285.

By contrast, in Nova Health Sys. v. Gandy, the Tenth Circuit found that abortion providers had standing to challenge an Oklahoma parental-notification law on the grounds that they were in imminent danger of losing patients because of the new law.  See 416 F.3d 1154. Although finding standing, the Tenth Circuit was careful to frame the issue as whether, "as of

- 14 -

June 2001 [the time the lawsuit was filed]," Nova Health faced any imminent likelihood that it would lose some minor patients seeking abortions.  416 F.3d at 1155.  Moreover, while focusing on the time of filing, the Tenth Circuit allowed the use of evidence from later events -- prospective patients lost because of the notification law after the lawsuit began -- to demonstrate that the plaintiff faced an imminent threat as of the time of filing.  See 416 F.3d at 1155.

The mere presence on the books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct that the statute prohibits. See Winsness v. Yocom, 433 F.3d at 732.  "This does not necessarily mean that a statute must be enforced against the plaintiff before he can sue."  Winsness v. Yocom, 433 F.3d at 732 (quoting Ward v. Utah, 321 F.3d 1263, 1267 (10th Cir. 2003)).  Where a plaintiff can show a "credible threat of prosecution," they can sue for prospective relief against enforcement.  Winsness v. Yocom, 433 F.3d at 732 (quoting Ward v. Utah, 321 F.3d at 1267).  Thus, to satisfy Article III, the "plaintiff's expressive activities must be inhibited by an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or other consequences following from the statute's enforcement."  Winsness v. Yocom, 433 F.3d at 732 (internal quotations omitted).  See Wilson v. Stocker, 819 F.2d 943, 946 (10th Cir.1987)(holding that the plaintiff has standing where he suffers "an ongoing injury resulting from the statute's chilling effect on his desire to exercise his First Amendment rights").

    **2.**    **Prudential Standing.**

"Prudential standing is not jurisdictional in the same sense as Article III standing." Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir. 2007)(Ebel, J.).  Prudential standing consists of "a judicially-created set of principles that, like constitutional standing, places limits

on the class of persons who may invoke the courts' decisional and remedial powers." Bd. of Cty. Comm'rs v. Geringer, 297 F.3d 1108, 1112 (10th Cir. 2002)(Ebel, J.)(internal quotation marks omitted). Generally, there are three prudential-standing requirements: (i) "a plaintiff must assert his own rights, rather than those belonging to third parties"; (ii) "the plaintiff's claim must not be a generalized grievance shared in substantially equal measure by all or a large class of citizens"; and (iii) "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Bd. of Cty. Comm'rs v. Geringer, 297 F.3d at 1112 (internal quotation marks and citations omitted).

Traditionally, federal courts framed the zone-of-interests test as an issue of prudential standing. The Supreme Court recently clarified that the zone-of-interests analysis "is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Lexmark Int'l v. Static Control Components, 134 S. Ct. 1377, 1387 (2014). Statutory standing "extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." Lexmark Int'l v. Static Control Components, 134 S. Ct. at 1387. Notably, the Supreme Court stated that it "often 'conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff.'" Lexmark Int'l v. Static Control Components, 134 S. Ct. at 1389 (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 132 S. Ct. 2199 (2012)). Moreover, the test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." Lexmark Int'l v. Static Control Components, 134 S. Ct. at 1389 (internal quotation marks and citations omitted). This

"lenient approach" preserves the APA's flexible judicial-review provisions.  Lexmark Int'l v. Static Control Components, 134 S. Ct. at 1389.

## LAW REGARDING RIPENESS

"In order for a claim to be justiciable under Article III, it must be shown to be a ripe controversy."  New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995).  Ripeness pertains to the timing of a case and is intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1499 (citation omitted)(internal quotation marks omitted).  Ripeness is a component of the Article III requirement that limits judicial review to "cases or controversies."  U.S. Const. art. III, § 2.  See U.S. West, Inc. v. Tristani, 182 F.3d 1202, 1208 (10th Cir. 1999).  A controversy must be "definite and concrete, touching the legal relations of parties having adverse legal interests," and "a real and substantial controversy admitting of specific relief through a decree of a conclusive character."  Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41 (1937).  "[T]he question in each case is whether the facts alleged, under all circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007)(citation omitted).

In MedImmune, Inc. v. Genentech, Inc., a patent licensee, who continued to pay royalties for use of the patent, brought a declaratory-judgment action against the patent holder to determine whether the patent was invalid or unenforceable.  See 549 U.S. at 121-25.  What appeared to be missing in the case was the requisite immediacy -- there was little likelihood that the patent holder would ever bring suit against the licensee, because the licensee was continuing

to pay royalties.  See 549 U.S. at 121-25.  Nevertheless, the Supreme Court held that there was

an actual case or controversy, because the looming threat of the licensee having to pay treble

damages, if it halted payments and the patent was ultimately upheld, "coerced" the licensee's

payment of royalties.  549 U.S. at 129.  Avoidance of such dilemmas "was the very purpose of

the Declaratory Judgment Act."  MedImmune, Inc. v. Genentech, Inc., 549 U.S. at 129.  See 28

U.S. Code § 2201.  Two cases concerning foreign policy illustrate the need for the facts to

mature before declaratory-judgment jurisdiction arises.  In Rabinowitz v. Kennedy, 376 U.S. 605

(1964), the Supreme Court held that the petitioner attorneys were not exempt from registration

under the Foreign Agents Registration Act, but it refused to consider whether the questions asked

on the registration forms were proper.  See 376 U.S. at 610.  See also 22 U.S.C. § 611.  Noting

that the forms advised registrants that federal regulations allowed them to apply for waivers of

inappropriate or unduly burdensome requirements, it said: "Since petitioners have made no

attempt to determine which questions must be answered and how much information disclosed,

this issue is not ripe for adjudication."  Rabinowitz v. Kennedy, 376 U.S. at 610.  In Zemel v.

Rusk, 381 U.S. 1 (1965), the Supreme Court refused to consider Zemel's claim that he was

constitutionally entitled to travel to Cuba.  See 381 U.S. at 3.  The Supreme Court explained that

it would need to know the specifics of the travel:

> The complaint filed in this case does not specify the sort of travel to Cuba
> appellant has in mind -- e.g., whether he plans to proceed to Cuba directly or
> travel there via one or more other countries.  Nor can we tell from the papers filed
> whether the Government will, in the event appellant journeys to Cuba, charge him
> under § 215(b) with leaving the United States on a carrier bound for Cuba with a
> passport not validated for Cuba; leaving the United States with such a passport
> with the intent of traveling to Cuba before he returns home; leaving the United
> States with such a passport on a journey which in fact takes him to Cuba;
> re-entering the United States with such a passport after having visited Cuba; some
> other act -- or whether it will charge him at all.  Whether each or any of these
> gradations of fact or charge would make a difference as to criminal liability is an

- 18 -

> issue on which the District Court wisely took no position.  Nor do we.  For if we
> are to avoid rendering a series of advisory opinions, adjudication of the reach and
> constitutionality of § 215(b) must await a concrete fact situation.

381 U.S. at 19-20.

In Eccles v. Peoples Bank, 333 U.S. 426 (1948), the Supreme Court held that a declaratory-judgment action was not ripe.  See 333 U.S. at 427.  The bank sought to challenge a condition imposed on its membership in the Federal Reserve System that restricted Transamerica Corporation's ownership of its stock.  See 333 U.S. at 428-29.  Transamerica Corporation had acquired a few shares of stock, but only for investment, and not to obtain any control over the bank, which was what the membership condition was meant to prevent.  See 333 U.S. at 430-31. The bank filed suit, because it feared that, if it lost its membership, its deposits would not be insured.  See 333 U.S. at 427.  When the bank brought suit, however, the bank failed to show "[t]he actuality of the plaintiff's need for a declaration of his rights."  333 U.S. at 432.  The Federal Reserve Board "disavow[ed] any action to terminate the Bank's membership" under the existing circumstances.  333 U.S. at 432.  The Supreme Court described the suit:

> [T]he Bank seeks a declaration of its rights if it should lose its independence
> [from Transamerica Corporation], or if the Board of Governors should reverse its
> policy and seek to invoke the condition even though the Bank remains
> independent and if then the Directors of the Federal Deposit Insurance
> Corporation should not change their policy not to grant deposit insurance to the
> Bank as a non-member of the Federal Reserve System.

333 U.S. at 432.  In the Supreme Court's view, "[t]he concurrence of these contingent events, necessary for injury to be realized, is too speculative to warrant anticipatory judicial determinations."  333 U.S. at 432.  It concluded: "[The] Bank's grievance here is too remote and insubstantial, too speculative in nature, to justify an injunction against the Board of Governors, and therefore equally inappropriate for a declaration of rights."  333 U.S. at 434.  Addressing

these Supreme Court cases, the Tenth Circuit has held: "The Court made clear that generally one cannot bring a declaratory judgment action just to resolve one isolated issue in a possible future controversy." Columbian Fin. Corp. v. BancInsure, Inc., 650 F.3d 1372, 1380 (10th Cir. 2011).

In Plant Oil Powered Diesel Fuel Systems, Inc. v. ExxonMobil Corp., 801 F. Supp. 2d 1163 (D.N.M. 2011)(Browning, J.), the Court held that certain claims that a proposed fit-for-purpose guideline violated antitrust principles was not ripe, because the plaintiff had not shown a hardship, and because the claims were based on "uncertain or contingent future events."  801 F. Supp. 2d at 1184.  The Court found that, "[b]ecause the Fit-for-Purpose Guidelines are both in their early stages and because their development is on-going, creating uncertainty what form they will ultimately take if and when they are submitted for approval, the Court concludes that POP Diesel's claims based on the Fit-for-Purpose Guidelines are premature."  Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp, 801 F. Supp. 2d at 1185.  In Carroll v. Los Alamos National Security, LLC, 704 F. Supp. 2d 1200 (D.N.M. 2010)(Browning, J.), the Court concluded that negligent misrepresentation claims were ripe for adjudication.  See 704 F. Supp. 2d at 1219.   There, the defendant conceded that an employee gave the plaintiff incorrect information when the plaintiff was deciding on a pension plan.  See 704 F. Supp. 2d at 1219. The Court concluded that the plaintiff had a legally protected interest in being given correct information regarding his pension-plan options and in making a fully informed selection. See 704 F. Supp. 2d at 1220.  The Court held that, because the plaintiff had a legally protected interest in receiving accurate information and there was no dispute that he did not, he was injured, and the matter was ripe for adjudication.  See 704 F. Supp. 2d at 1220.  With respect to the cause of action's accrual, the Court concluded that the claim had accrued, because the plaintiff had suffered an injury, which gave rise to a claim, even though he had not yet suffered

damages.  See 704 F. Supp. 2d at 1221.  Ultimately, however, the Court granted the defendants'

motion for summary judgment on the negligent misrepresentation claims, because the plaintiff

had not established that the defendants caused him harm or that the defendants' conduct would

harm him in the future.  See 704 F. Supp. 2d at 1226.

## LAW REGARDING EXERCISE OF DISCRETIONARY JURISDICTION OVER DECLARATORY JUDGMENT ACTIONS

The Federal Declaratory Judgment Act provides that "[i]n a case of actual controversy

within its jurisdiction . . . any court of the United States, upon the filing of an appropriate

pleading, may declare the rights and other legal relations of any interested party seeking such

declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  "[D]istrict

courts possess discretion in determining whether and when to entertain an action under the

Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional

prerequisites."  Wilton v. Seven Falls Co., 515 U.S. 277, 282 (1995).  In Brillhart v. Excess

Insurance Co. of America, 316 U.S. 491 (1942), the Supreme Court explained that district courts

are "under no compulsion to exercise . . . jurisdiction" under the Federal Declaratory Judgment

Act.  316 U.S. at 494.  The Supreme Court explained:

> Ordinarily it would be uneconomical as well as vexatious for a federal court to
> proceed in a declaratory judgment suit where another suit is pending in a state
> court presenting the same issues, not governed by federal law, between the same
> parties.  Gratuitous interference with the orderly and comprehensive disposition
> of a state court litigation should be avoided.

316 U.S. at 495.  A court should determine whether the lawsuit "can be better settled in the

proceeding pending in the state court."  Brillhart v. Excess Ins. Co. of Am., 316 U.S. at 495.

The Tenth Circuit has adopted a five-factor test for evaluating whether a district court

should exercise its discretionary jurisdiction over a declaratory judgment action:

> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race to res judicata "; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.

St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d 1167, 1169 (10th Cir. 1995)(quoting State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 983 (10th Cir. 1994)).  In St. Paul Fire and Marine Insurance Co. v. Runyon, the plaintiff, an insurance company, sought a declaratory judgment that it had no obligation to defend the defendant under the terms of a professional liability insurance policy.  See 53 F.3d at 1168.  The defendant sought indemnification and defense for claims that his coworkers brought.  See 53 F.3d at 1168.  The insurance-company plaintiff refused to provide a defense.  See 53 F.3d at 1168.  After three years of negotiation, the defendant told the insurance-company plaintiff that he would initiate a state court suit for breach of contract and bad faith by February 18, 1994 if it did not assume his defense.  See 53 F.3d at 1168.  On February 17, 1994, the insurance-company plaintiff filed a federal court diversity action for declaratory judgment.  See 53 F.3d at 1168.  The defendant filed a complaint for bad faith and breach of contract in state court on February 18, 1994.  See 53 F.3d at 1168.

The Tenth Circuit noted that the federal declaratory-judgment statute, 28 U.S.C. § 2201, "vests the federal courts with power and competence to issue a declaration of rights."  St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1168.  "[W]hether this power should be exercised in a particular case is vested in the sound discretion of the district courts."  53 F.3d at 1168.  The federal district court in St. Paul Fire and Marine Insurance Co. v. Runyon had abstained from exercising jurisdiction, "because the same issues were involved in the pending state proceeding, and therefore, there existed a more effective alternative remedy."  53 F.3d at 1169.

The Tenth Circuit explained in St. Paul Fire and Marine Insurance Co. v. Runyon:

> The parties have a pending state contract action, which incorporates the identical issue involved in the declaratory judgment action. [The defendant's] state breach of contract complaint against [the insurance-company plaintiff] alleges the coworkers' lawsuit is a "covered claim" pursuant to the insurance policy. In resolving the insurance contract, the state court will necessarily determine rights and obligations under the contract. [The insurance-company plaintiff] is seeking a declaration by the federal court that the coworkers' lawsuit is not a covered claim. The issue in the federal declaratory judgment action is identical to what would be a defense to the state court contract action -- whether [the defendant]'s insurance contract with [the insurance-company plaintiff] protects him from the coworkers' lawsuit. Because the state court will determine, under state contract law, whether the tort action is covered by the insurance contract, it is not necessary for the federal court to issue a declaration on the insurance contract.

53 F.3d at 1169. A federal court is not required to refuse jurisdiction, but it "should not entertain a declaratory judgment action over which it has jurisdiction if the same fact-dependent issues are likely to be decided in another pending proceeding." 53 F.3d at 1170. A federal court may abstain from exercising jurisdiction over a declaratory judgment action if "the plaintiff is using the action for procedural fencing." 53 F.3d at 1170. The Tenth Circuit noted that the insurance-company plaintiff's timing of filing suit "may not necessarily be bad faith on [its] part," but found that the insurance-company plaintiff was unable to show error in the district court's perception that it was using the declaratory judgment action for procedural fencing or "to provide an arena for a race to res judicata." 53 F.3d at 1170 (emphasis in original).

In State Farm Fire & Casualty Co. v. Mhoon, Robert Mhoon's shooting of Takuro Fujiwara resulted in three lawsuits. See 31 F.3d at 981. Fujiwara and his wife filed suit in state court on November 2, 1990, alleging that Mhoon committed intentional torts against them. See 31 F.3d at 982. State Farm, Mhoon's insurer, agreed to defend him against the Fujiwaras, "but only under a reservation of rights which left State Farm free to seek a judicial determination of its contractual obligations to Mhoon." 31 F.3d at 982. On June 12, 1991, State Farm filed a

declaratory judgment action under 28 U.S.C. § 2201 and sought declaration that the policy did

not cover Mhoon because he shot Fujiwara intentionally.   See State Farm Fire & Cas. Co. v.

Mhoon, 31 F.3d at 982.   "Though the state tort suit between Mhoon and [Fujiwara] was still in

progress at the time, the federal district judge agreed to hear State Farm's declaratory action."   31

F.3d at 982.   The federal district court ruled, as a matter of law, that Mhoon intentionally shot

Fujiwara.   See 31 F.3d at 982.

> The critical question whether Mhoon acted intentionally was before both the state
> and federal courts simultaneously and the federal court's failure to await the state
> court's resolution of the issue opened the possibility that the state court would be
> foreclosed from deciding that Mhoon behaved only negligently and was, thus,
> entitled to be insured and defended.

31 F.3d at 983.

The Tenth Circuit in State Farm Fire and Casualty Co v. Mhoon held that the federal

district court did not abuse its discretion by hearing the case, because "a live need for declaration

of State Farm's rights and duties did, in fact, exist."   31 F.3d at 983-84.   The Tenth Circuit based

its decision on three factors: (i) neither party suggested that State Farm could have been or was a

party to the state tort action, "thus obviating the need for an independent declaratory action and

providing a simpler and more efficient resolution of State Farm's obligations towards Mhoon";

(ii) there was substantial interest in deciding the question of duty to defendant without delay; and

(iii) the federal district court was an available forum to State Farm.   31 F.3d at 984.   The Tenth

Circuit noted that the federal court's exercise of jurisdiction did not unduly interfere with the

state proceeding.   See 31 F.3d at 984.   The federal court's decision on State Farm's duty

"involved no matter, factual or legal, at issue in the state case."   31 F.3d at 984.   The coverage

issue was not a complicated one and involved only a search of the record to determine whether

Mhoon's conduct was accidental under the insurance policy.   See 31 F.3d at 984.   "[It] was not a

case, therefore, where the district court found a material factual dispute and proceeded to resolve it in the face of ongoing state proceedings on the same subject." 31 F.3d at 984. The Tenth Circuit stated that this scenario would have presented a different issue, especially if the state proceedings were quite far along. See 31 F.3d at 984. Under those circumstances, a stay or dismissal might be proper. See 31 F.3d at 984.

In 2006, the Honorable Bobby Baldock, Senior United States Circuit Judge, sitting by designation on the United States District Court for the District of New Mexico, denied the defendants' motion to dismiss, but granted the defendants' request to stay the proceedings. See Progressive Specialty Ins. Co. v. Thakur, Order Denying Defendants' Motion to Dismiss But Allowing Defendants' Alternative Motion to Stay Proceedings, No. CIV 06-0542 BRB/RHS (D.N.M. November 14, 2006)(Doc. 14)("Thakur Order"). In Progressive Specialty Ins. Co. v. Thakur, the insurance company sought declaratory judgment that the total amount of coverage owed to the insured was $50,000.00. See Thakur Order at 2. The insured counterclaimed, seeking a declaration of rights and obligations, reformation of the insurance contract, and monetary damages for breach of contract, negligence, bad-faith dealing, and violation of the New Mexico Insurance Code and Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1 et seq., 59A-16-20. See Thakur Order at 2. The insured also responded to the insurance company's suit in federal court by filing his own suit against the insurance company in state court. See Thakur Order at 2. The insured named an additional defendant that he contended was a necessary and indispensable party to the federal lawsuit. See Thakur Order at 2. The additional defendant was the insurance agency that sold the insurance policy to the insured. See Thakur Order at 2. Both the insured and the agency were New Mexico residents, and the joinder of the insurance agency "effectively destroyed diversity jurisdiction and the possibility of removal from state court."

<u>Thakur</u> Order at 2.  Although the insured's state lawsuit was "broader in scope," it essentially raised issues identical to the insurance company's federal lawsuit.  <u>Thakur</u> Order at 3.

Judge Baldock determined that "the state proceeding, unlike [the federal lawsuit], appear[s] to encompass the entire controversy by addressing both [the insurance company's] and [the insurance agent's] potential liability to [the insured]."  <u>Thakur</u> Order at 5.  "In other words, the rights and obligations of <u>all</u> concerned parties may be adjudicated only in the state action," while the federal lawsuit "might lead to piecemeal litigation thereby undermining both federal and state interests in practicality and wise judicial administration."  <u>Thakur</u> Order at 5 (internal quotations omitted and emphasis in original).  Judge Baldock explained that, for the same reasons, "the state remedy appears to be the most effective.  Because the state action [would] likely decide the rights of all interested parties, including the parties to the [federal action], such remedy necessarily is more comprehensive and cohesive."  <u>Thakur</u> Order at 6.  Judge Baldock did not believe that the federal lawsuit provided the insured with an effective remedy, "because he might very well have to argue factually and legally similar issues against [the insurance agency] in state court."  <u>Thakur</u> Order at 6.

More importantly, Judge Baldock explained that the case presented "purely questions of state law including the interpretation of the state's insurance code."  <u>Thakur</u> Order at 6.  "The State of New Mexico has the predominant interest in deciding a matter involving an insurance policy issued within the state to a state resident involved in an auto accident on a state thoroughfare."  <u>Thakur</u> Order at 6.  Judge Baldock did not dismiss the case, but stayed it, because "a stay avoids problems which might arise if application of a time bar might prevent [the insurance company] from refiling its federal action."  <u>Thakur</u> Order at 7.

The Supreme Court resolved a dispute among the Courts of Appeals concerning whether

the discretionary standard of <u>Brillhart v. Excess Insurance Co.</u> or the "exceptional circumstances" test in <u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800 (1976), governs a district court's decision to dismiss a federal declaratory judgment action in favor of parallel state litigation.   See <u>Wilton v. Seven Falls Co.</u>, 515 U.S. 277, 285 (1995)("Wilton"); <u>Youell v. Exxon Corp.</u>, 74 F.3d 373, 375 (2d Cir. 1996).  The Supreme Court held that district courts should apply the test in <u>Brillhart v. Excess Insurance Co.</u>, concluding that "[d]istinct features of the Declaratory Judgment Act . . . justify a standard vesting district courts with greater discretion in declaratory judgment actions than that permitted under the 'exceptional circumstances' test of <u>Colorado River</u>."  <u>Wilton</u>, 515 U.S. at 286.

## <u>LAW REGARDING YOUNGER ABSTENTION</u>

Under the abstention doctrine that the Supreme Court articulated in <u>Younger v. Harris</u>, 401 U.S. 37 (1970)("<u>Younger</u>"), "federal courts should not 'interfere with state court proceedings' by granting equitable relief -- such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings" -- when the state forum provides an adequate avenue for relief.   <u>Weitzel v. Div. of Occupational & Prof'l Licensing</u>, 240 F.3d 871, 875 (10th Cir. 2001)(quoting <u>Rienhardt v. Kelly</u>, 164 F.3d 1296, 1302 (10th Cir. 1999)).   <u>Younger</u> abstention is not a doctrine only belonging to courts of equity, although the doctrine arose from parties seeking equitable relief from state court proceedings in federal court.   The Tenth Circuit has "not treated abstention as a 'technical rule of equity procedure,' [r]ather, [it has] recognized that the authority of a federal court to abstain from exercising its jurisdiction extends to all cases in which the court has discretion to grant or deny relief."   <u>Morrow v. Winslow</u>, 94 F.3d 1386, 1392 (10th Cir. 1996)(quoting <u>Quackenbush v. Allstate Ins. Co.</u>, 517 U.S. 706, 716-17 (1996)).   This refusal to exercise federal jurisdiction

arises from a desire to "avoid undue interference with states' conduct of their own affairs." J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1291 (10th Cir. 1999)(quoting Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d 709, 711 (10th Cir. 1989)).

For Younger abstention to be appropriate, the Tenth Circuit has ruled that three elements must be present: (i) interference with an ongoing state judicial proceeding; (ii) involvement of important state interests; and (iii) an adequate opportunity afforded in the state court proceedings to raise the federal claims. See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432 (1982)("Middlesex")); Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d 1162, 1177-78 (10th Cir. 2001). When all of the elements mandating abstention clearly exist in the record, courts may and should address application of the Younger abstention doctrine sua sponte. See Bellotti v. Baird, 428 U.S. 132, 143 n.10 (1976)(stating that "abstention may be raised by the court sua sponte"); Morrow v. Winslow, 94 F.3d 1386, 1390-91 & n.3 (10th Cir. 1996)(raising and applying Younger abstention doctrine sua sponte, and holding that parties need not raise the Younger abstention doctrine to preserve its applicability).

"Younger abstention is not discretionary once the [three] conditions are met, absent extraordinary circumstances that render a state court unable to give state litigants a full and fair hearing on their federal claims." Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d 709, 711 (10th Cir. 1989)(citation omitted). See Taylor v. Jaquez, 126 F.3d 1294, 1296 (10th Cir. 1997)(holding that, because "'application of the Younger doctrine is absolute . . . when a case meets the Younger criteria,' there is no discretion for the district court to exercise."). When the Younger abstention elements are met, a district court should dismiss the claims before it, unless a petitioner has brought claims which "cannot be redressed in the state proceeding," in which case

the district court should stay the federal proceedings pending the conclusion of the state litigation. Deakins v. Monaghan, 484 U.S. 198, 202 (1988). For example, where a party brings a claim for damages under 42 U.S.C. § 1983, as well as a request for equitable relief from a state court proceeding, a federal district court should dismiss the claims for equitable relief under Younger, but stay the complaint with respect to the damages claim, because § 1983 is a federal cause of action. See Myers v. Garff, 876 F.2d 79, 81 (10th Cir. 1989)(holding that a district court was right to dismiss claims for declaratory and injunctive relief, but that the district court should have stayed claims for damages under § 1983 against defendants until the state court proceedings ended). See also Younger, 401 U.S. at 43 (holding that the federal courts must dismiss suits requesting declaratory or injunctive relief when there are pending state criminal proceedings).

On the other hand, where a state court can address a plaintiff's causes of action, a federal court should abstain and dismiss the case even if the plaintiff requests monetary damages in addition to injunctive relief against the state court proceeding. In Wideman v. Colorado, 242 F. App'x 611 (10th Cir. 2007), the Tenth Circuit considered a parent's complaints alleging ongoing violations arising from the Colorado state courts' adjudication of his child custody rights. See 242 F. App'x at 613. The parent had requested a federal district court to issue an order regarding his parental rights and rights to child support payments, and to award the parent monetary damages recompensing him for his past child support payments. See 242 F. App'x at 611. Additionally, the parent alleged that the Colorado state trial and appellate courts had treated him with "disrespect" on account of his gender and race, and he brought a § 1983 case in federal court seeking money damages from the state court officials adjudicating his state custody case. 242 F. App'x at 613. The Tenth Circuit ruled that the district court was right to abstain from

hearing the parent's case under <u>Younger</u>.  <u>See</u> <u>Wideman v. Colorado</u>, 242 F. App'x at 614.  The Tenth Circuit explained that the parent's "complaints assert claims that involve matters still pending in Colorado state courts," as the custody proceedings were ongoing.  242 F. App'x at 614.  Further, the dispute implicated "important state interests," because the parent's complaints covered domestic relations issues.  242 F. App'x at 614.  Last, the Tenth Circuit found that the parent had "an adequate opportunity to litigant any federal constitutional issues that may arise . . . in the Colorado state proceedings."  242 F. App'x at 614.  Thus, where the <u>Younger</u> abstention criteria are otherwise met, even if a party requests monetary damages, a federal court in the Tenth Circuit must abstain from adjudicating the entire case while state proceedings are ongoing.

## RELEVANT LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."  <u>United States v. Jones</u>, 132 S. Ct. 945, 950 (2012)(Scalia, J.)(alteration in original)(quoting <u>Kyllo v. United States</u>, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant.  The hallmark of the Fourth Amendment is reasonableness."  <u>United States v. Harmon</u>, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.).  <u>See</u> <u>United States v. McHugh</u>, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting

Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)).  "In the criminal context, reasonableness usually requires a showing of probable cause."  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 828 (2002)).  The Supreme Court has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions."  Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

  **1. United States v. Jones.**

  The defendant in United States v. Jones was suspected of drug trafficking, and a joint Federal Bureau of Investigation and District of Columbia Metropolitan Police Department task force obtained a warrant authorizing installation in Washington, D.C., within ten days, of a Global Positioning System device to the defendant's car.  See 132 S. Ct. at 948.  On the eleventh day, task force agents attached the GPS device to the bottom of the defendant's car while the car was in Maryland.  The agents then used the GPS device to track the defendant's movements over the next twenty-eight days, replacing the battery once, and collecting over two-thousand pages of data sent from the device.  See 132 S. Ct. at 948.

  The Honorable Antonin G. Scalia, Associate Justice of the Supreme Court, writing for the majority, in which Chief Justice Roberts and Justices Kennedy, Thomas, and Sotomayor joined, held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'"  132 S. Ct. at 949.  Justice Scalia reasoned that the United States' conduct was a Fourth Amendment search, because the government trespassed on a constitutionally protected area.  See 132 S. Ct. at 949 ("The Fourth

Amendment provides . . . that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'   It is beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment.").   Such a physical intrusion, Justice Scalia opined, would have come within the Framers' intended definition of a "search": "It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information.   We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted."   132 S. Ct. at 949.   Justice Scalia reconciled the Supreme Court's conclusion that attaching a GPS device to track a Jeep in plain view was a Fourth Amendment search with New York v. Class, 475 U.S. 106 (1986), in which the Supreme Court concluded that a visual examination of the outside of a vehicle while in plain view does not constitute a search, by noting that "[i]n Class itself we suggested that this [physical invasion] would make a difference, for we concluded that an officer's momentary reaching into the interior of a vehicle did constitute a search."   132 S. Ct. at 952.

Justice Scalia reasoned that the Fourth Amendment's text supports taking a property law based approach to determine whether there is a search, but did not shy away from the fact that, in recent history, the Supreme Court had deviated from this approach:

> The text of the Fourth Amendment reflects its close connection to property, since otherwise it would have referred simply to "the right of the people to be secure against unreasonable searches and seizures"; the phrase "in their persons, houses, papers, and effects" would have been superfluous.

> Consistent with this understanding, our Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century. Kyllo v. United States, 533 U.S. [at] 31 . . . .   Our later cases, of course, have deviated from that exclusively property-based approach. . . . [and] have applied the analysis of Justice Harlan's concurrence in [Katz v. United States], which said

that a violation occurs when government officers violate a person's "reasonable expectation of privacy," id., at 464 . . . .

132 S. Ct. at 949-50.

The United States had contended that, under the "Harlan standard" -- i.e., the Katz v. United States reasonable-expectation-of-privacy approach -- "no search occurred here, since Jones had 'no reasonable expectation of privacy' in the area of the Jeep accessed by the Government agents (its underbody) and in the locations of the Jeep on the public roads, which were visible to all." 132 S. Ct. at 950. Justice Scalia concluded, however, that the Supreme Court "need not address the Government's contentions" in relation to the Katz v. United States reasonable-expectation-of-privacy test analysis, because the trespass-based search approach, which existed at the time of the Fourth Amendment's adoption, disposed of the issue:

> Jones's Fourth Amendment rights do not rise or fall with the Katz formulation. At bottom, we must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." Kyllo[ v. United States, 533 U.S. at 34]. As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates. Katz did not repudiate that understanding. Less than two years later the Court upheld defendants' contention that the Government could not introduce against them conversations between other people obtained by warrantless placement of electronic surveillance devices in their homes. The opinion rejected the dissent's contention that there was no Fourth Amendment violation "unless the conversational privacy of the homeowner himself is invaded." Alderman v. United States, 394 U.S. 165, 176 . . . (1969). "[W]e [do not] believe that Katz, by holding that the Fourth Amendment protects persons and their private conversations, was intended to withdraw any of the protection which the Amendment extends to the home . . . ." Id., at 180.

132 S. Ct. at 950-51 (some alteration in original)(footnotes omitted).

In her concurrence, Justice Sotomayor agreed that "the trespassory test applied in the majority's opinion reflects an irreducible constitutional minimum: When the Government physically invades personal property to gather information, a search occurs. The reaffirmation of

that principle suffices to decide this case."  132 S. Ct. at 955 (Sotomayor, J., concurring).  She

continued:

> Of course, the Fourth Amendment is not concerned only with trespassory
> intrusions on property.  See, e.g., Kyllo v. United States, 533 U.S. [at] 31-33 . . . .
> Rather, even in the absence of a trespass, "a Fourth Amendment search occurs
> when the government violates a subjective expectation of privacy that society
> recognizes as reasonable." Id., at 33; see also Smith v. Maryland, 442 U.S. 735,
> 740-741 . . . (1979); Katz v. United States, 389 U.S. [at] 361 . . . (Harlan, J.,
> concurring).

132 S. Ct. at 954-55 (Sotomayor, J., concurring).  Justice Sotomayor's concurrence focused on

the reality, in her view, that,

> physical intrusion is now unnecessary to many forms of surveillance. . . .   In
> cases of electronic or other novel modes of surveillance that do not depend upon a
> physical invasion on property, the majority opinion's trespassory test may provide
> little guidance. But "[s]ituations involving merely the transmission of electronic
> signals without trespass would remain subject to Katz analysis."

132 S. Ct. at 955 (Sotomayor, J., concurring)(alteration in original)(quoting the majority opinion,

132 S. Ct. at 953).

Justice Alito, joined by Justices Ginsburg, Breyer, and Kagan, concurred in the judgment

only, reasoning that, although he agreed with the result, given the use of twenty-first century

technology, he would have analyzed whether the government's long-term monitoring of the

defendant violated the Katz v. United States reasonable-expectation-of-privacy test:

> This case requires us to apply the Fourth Amendment's prohibition of
> unreasonable searches and seizures to a 21st-century surveillance technique, the
> use of a Global Positioning System (GPS) device to monitor a vehicle's
> movements for an extended period of time.  Ironically, the Court has chosen to
> decide this case based on 18th-century tort law.  By attaching a small GPS device
> to the underside of the vehicle that respondent drove, the law enforcement officers
> in this case engaged in conduct that might have provided grounds in 1791 for a
> suit for trespass to chattels.  And for this reason, the Court concludes, the
> installation and use of the GPS device constituted a search. [132 S. Ct.] at 948-
> 949.

> This holding, in my judgment, is unwise.  It strains the language of the Fourth Amendment; it has little if any support in current Fourth Amendment case law; and it is highly artificial.

> I would analyze the question presented in this case by asking whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove.

132 S. Ct. at 957-58 (Alito, J., concurring in the judgment).  Justice Alito first took issue with what he called the majority's "questionable proposition that the[] two procedures [of attaching and using a GPS device] cannot be separated for Fourth amendment purposes."  132 S. Ct. at 958.  Justice Alito submitted that, "[i]f these two procedures are analyzed separately, it is not at all clear from the Court's opinion why either should be regarded as a search."  132 S. Ct. at 958.

Justice Alito contended that the majority's opinion suggests that "the concept of a search, as originally understood, comprehended any technical trespass that led to the gathering of evidence," but disagreed with the majority, stating: "[W]e know this is incorrect."  132 S. Ct at 958.  Justice Alito pointed out that the open-fields doctrine grew out of the distinction between a physical intrusion of any private property and property that is part of a home: "At common law, any unauthorized intrusion on private property was actionable, but a trespass on open fields . . . does not fall within the scope of the Fourth Amendment because private property outside the curtilage is not part of a 'hous[e]' within the meaning of the Fourth Amendment."  132 S. Ct. at 958-959 (Alito, J., concurring in the judgment)(quoting Oliver v. United States, 466 U.S. 170 (1984)).

Justice Alito asserted that the trespass-based approach that the majority used was "repeatedly criticized" and ultimately "repudiated," based largely on its incompatibility with cases involving wiretapping and eavesdropping surveillance.  United States v. Jones, 132 S. Ct. at 959, 960 (Alito, J., concurring in the judgment).  Justice Alito contended that "the majority is

hard pressed to find support in post-Katz cases for its trespass-based" decision that, when the United States attached the GPS device to Jones' Jeep, it trespassed on his effects and performed a Fourth Amendment search.  132 S. Ct. at 960-61.  Justice Alito pointed to multiple problems that he believes the majority's trespass-based approach creates.  First, he asserted that the majority's analysis is irreconcilable with the element of the United States' conduct that he contends society would find offensive -- the GPS-monitoring and not the attachment of the device.  If the United States could follow a car without physically trespassing on a person, home, paper, or effect, such as remotely monitoring a car via an internal GPS device, this monitoring would not constitute a Fourth Amendment search under the majority's analysis.  See 132 S. Ct. at 961.  Second, along the same lines, Justice Alito pointed out an "incongruous result[]" from the majority's opinion that a short-term tracking of a vehicle with a GPS device, merely tracking a vehicle down a single street, is a Fourth Amendment search, while, "if the police follow the same car for a much longer period using unmarked cars and aerial assistance, this tracking is not subject to any Fourth Amendment constraints."  132 S. Ct. at 961.  Justice Alito also asserted that, by tying Fourth Amendment searches to property law and trespass concepts, the Fourth Amendment's protections "may vary from State to State," based on different property and contract laws in the various states.  132 S. Ct. at 961-62.

> ## 2.     Florida v. Jardines.

In Florida v. Jardines, 133 S. Ct. 1409 (2013), Justice Scalia, writing for the majority once again, held that using a drug-sniffing dog to sniff a person's "home and its immediate surroundings" is a Fourth Amendment search.  133 S. Ct. at 1417-18.   Justices Thomas, Ginsburg, Sotomayor, and Kagan joined Justice Scalia's majority opinion in Florida v. Jardines. The Honorable Elena Kagan, Associate Justice, filed a separate concurring opinion, in which

Justices Ginsburg and Sotomayor joined, adding "further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e] easy' twice over," but "join[ing] the Court's opinion in full."  133 S. Ct. at 1420 (Kagan, J., concurring).  Justice Alito dissented, and Chief Justice Roberts, Justice Kennedy, and Justice Breyer joined his opinion.

In Florida v. Jardines, based on a tip that the defendant, Jardines, was growing marijuana in his home, the Miami-Dade, Florida, police department and the Drug Enforcement Administration sent a surveillance team to Jardines' home.  See 133 S. Ct. at 1413.  Observing nothing of note in the first fifteen minutes watching the home, two detectives approached the home accompanied by a dog trained to detect marijuana, cocaine, heroin, and several other drugs by alerting the detectives with behavioral changes.  See 133 S. Ct. at 1413.  As the dog approached Jardines' front porch, the dog "apparently sensed one of the odors he had been trained to detect," and after tracking back and forth, sat at the base of the front door, "which is the trained behavior upon discovering the odor's strongest point." 133 S. Ct. at 1413.  The dog's handler then immediately left the porch, and told the other agents and officers at the scene that there had been a positive alert for drugs, at which time the officers applied for and received a search warrant for the residence, the execution of which revealed marijuana plants.  See 133 S. Ct. at 1413.  Jardines was arrested for trafficking in marijuana and moved to suppress the evidence based on an illegal search.  See 133 S. Ct. at 1413.

Justice Scalia held that the use of a drug-sniffing dog was a Fourth Amendment search, reasoning:

> [T]his case [is] a straightforward one.  The officers were gathering information in an area belonging to Jardines and immediately surrounding his house -- in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying

the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

133 S. Ct. at 1414. Justice Scalia noted that "[t]he Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." 133 S. Ct. at 1414 (quoting Oliver v. United States, 466 U.S. at 176). Thus, the Fourth Amendment does not cover every "investigation[] on private property; for example, an officer may (subject to Katz) gather information in what we have called 'open fields' -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text." 133 S. Ct. at 1414.

Justice Scalia held that "the officers' investigation took place in a constitutionally protected area," the home, as the front porch is the home's curtilage. See 133 S. Ct. at 1414-15. Justice Scalia then "turn[ed] to the question of whether it was accomplished through an unlicensed physical intrusion," 133 S. Ct. at 1415, and reasoned that it was:

> While law enforcement officers need not "shield their eyes" when passing by the home "on public thoroughfares," [California v. Ciraolo, 476 U.S. 207, 213 (1986)], an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas. In permitting, for example, visual observation of the home from "public navigable airspace," we were careful to note that it was done "in a physically nonintrusive manner." Id. Entick v. Carrington, 2 Wils. K.B. 275, 95 Eng. Rep. 807 (K.B. 1765), a case "undoubtedly familiar" to "every American statesman" at the time of the Founding, Boyd v. United States, 116 U.S. 616, 626 . . . (1886)[, abrogated by Warden, Md. Penitentiary v. Hayden, 387 U.S. 294 (1967)], states the general rule clearly: "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave." 2 Wils. K.B., at 291. As it is undisputed that the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of Jardines' home, the only question is whether he had given his leave (even implicitly) for them to do so. He had not.

133 S. Ct. at 1415. Justice Scalia noted that, while society recognizes an implicit license which "typically permits the visitor to approach the home by the front path, knock promptly, wait

briefly to be received, and then (absent invitation to linger longer) leave," he concluded that

"introducing a trained police dog to explore the area around the home in hopes of discovering

incriminating evidence is something else. There is no customary invitation to do <u>that</u>."  133 S.

Ct. at 1415-16 (emphasis in original).  Justice Scalia explained:

> An invitation to engage in canine forensic investigation assuredly does not inhere
> in the very act of hanging a knocker.  To find a visitor knocking on the door is
> routine (even if sometimes unwelcome); to spot that same visitor exploring the
> front path with a metal detector, or marching his bloodhound into the garden
> before saying hello and asking permission, would inspire most of us to -- well,
> call the police.  The scope of a license -- express or implied -- is limited not only
> to a particular area but also to a specific purpose.  Consent at a traffic stop to an
> officer's checking out an anonymous tip that there is a body in the trunk does not
> permit the officer to rummage through the trunk for narcotics.   Here, the
> background social norms that invite a visitor to the front door do not invite him
> there to conduct a search.

133 S. Ct. at 1416.

The State of Florida argued "that investigation by a forensic narcotics dog by definition

cannot implicate any legitimate privacy interest."  133 S. Ct. at 1417.  The State of Florida cited

to <u>United States v. Place</u>, 462 U.S. 696 (1983), <u>United States v. Jacobsen</u>, 466 U.S. 109 (1984),

and <u>Illinois v. Caballes</u>, 543 U.S. 405 (2005), "which held, respectively, that canine inspection of

luggage in an airport, chemical testing of a substance that had fallen from a parcel in transit, and

canine inspection of an automobile during a lawful traffic stop, do not violate the 'reasonable

expectation of privacy' described in <u>Katz</u>."  133 S. Ct. at 1417.  Justice Scalia pointed out that, in

<u>United States v. Jones</u>, the Supreme Court had already concluded that "[t]he <u>Katz</u> reasonable-

expectations test 'has been <u>added to</u>, not <u>substituted for</u>,' the traditional property-based

understanding of the Fourth Amendment, and so it is unnecessary to consider [the test under

<u>Katz v. United States</u>] when the government gains evidence by physically intruding on

constitutionally protected areas."  133 S. Ct. at 1417 (quoting <u>United States v. Jones</u>, 132 S. Ct.

at 951-52).  Because the Supreme Court had already concluded that the conduct was a Fourth

Amendment search under the trespass-based analysis, therefore, it held that it was unnecessary to

consider whether the conduct amounts to a search under the Katz v. United States reasonable-

expectation-of-privacy analysis:

> Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under Katz.  One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy.  That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.

133 S. Ct. at 1417.

Justice Kagan wrote a concurring opinion, noting: "The Court today treats this case under

a property rubric; I write separately to note that I could just as happily have decided it by looking

to Jardines' privacy interests."  133 S. Ct. at 1418 (Kagan, J., concurring).  Justice Kagan

analogized the government's conduct in using a drug sniffing dog on Jardines' porch to a

stranger coming to the front door, who "doesn't knock or say hello," but instead, peers through

the windows "into your home's furthest corners" with "super-high-powered binoculars," and "in

just a couple of minutes, his uncommon behavior allows him to learn details of your life you

disclose to no one."  133 S. Ct. at 1418 (Kagan, J., concurring).  This conduct, she posited, is a

trespass which exceeds any implied license and is also an invasion of reasonable expectations of

privacy; she argued that, like her analogy, the facts in Florida v. Jardines likewise involved a

trespass and a violation of privacy expectations:

> That case is this case in every way that matters.  Here, police officers came to Joelis Jardines' door with a super-sensitive instrument, which they deployed to detect things inside that they could not perceive unassisted.  The equipment they used was animal, not mineral.  But contra the dissent, see [133 S. Ct.] at 1420 (opinion of Alito, J.)(noting the ubiquity of dogs in American households), that is of no significance in determining whether a search occurred.

133 S. Ct. at 1418 (Kagan, J., concurring).   According to Justice Kagan, had she written the

majority opinion based on the <u>Katz v. United States</u> reasonable-expectations-of-privacy search

test,

> [a] decision along those lines would have looked . . . well, much like this one.  It
> would have talked about "'the right of a man to retreat into his own home and
> there be free from unreasonable governmental intrusion.'"  [133 S. Ct.] at 1414
> (quoting <u>Silverman v. United States</u>, 365 U.S. 505, 511 . . . (1961)).  It would
> have insisted on maintaining the "practical value" of that right by preventing
> police officers from standing in an adjacent space and "trawl[ing] for evidence
> with impunity."  [133 S. Ct.] at 1414.  It would have explained that "'privacy
> expectations are most heightened'" in the home and the surrounding area.  [133 S.
> Ct.] at 1414-15 (quoting <u>California v. Ciraolo</u>, 476 U.S. [at] 213 . . . ).  And it
> would have determined that police officers invade those shared expectations when
> they use trained canine assistants to reveal within the confines of a home what
> they could not otherwise have found there.  <u>See</u> [133 S. Ct.] at 1415-16, and n.2-
> 3.

133 S. Ct. 1409, 1418-19 (Kagan, J., concurring).

Justice Alito's dissenting opinion, in which Chief Justice Roberts, and Justices Kennedy

and Breyer, joined, submitted that "[t]he Court's decision in this important Fourth Amendment

case is based on a putative rule of trespass law that is nowhere to be found in the annals of

Anglo-American jurisprudence."  133 S. Ct. at 1420 (Alito, J., dissenting).   Justice Alito noted

that general trespass law permits a license to public members to use a walkway to approach a

house's door, including strangers such as mailmen and solicitors, and the majority's conclusion

that "the police officer in this case, Detective Bartelt, committed a trespass because he was

accompanied during his otherwise lawful visit to the front door of respondent's house by his dog,

Franky," is without a sound basis in trespass law.  133 S. Ct. at 1420-21 (Alito, J., dissenting).

Justice Alito also asserted that decision is inconsistent with the <u>Katz v. United States</u>'

reasonable-expectations-of-privacy test: "A reasonable person understands that odors emanating

from a house may be detected from locations that are open to the public, and a reasonable person

will not count on the strength of those odors remaining within the range that, while detectible by a dog, cannot be smelled by a human." Florida v. Jardines, 133 S. Ct. at 1421 (Alito, J., dissenting).

Justice Alito contended that the majority's opinion that the detective "exceeded the boundaries of the license to approach the house that is recognized by the law of trespass, . . . is unfounded." 133 S. Ct. at 1421 (Alito, J., dissenting). Justice Alito pointed out that the law of trespass does not distinguish between visitors or reasons for the visit in granting an implied license to approach a house's front door. See 133 S. Ct. at 1421-22 (Alito, J., dissenting). He also asserted: "As I understand the law of trespass and the scope of the implied license, a visitor who adheres to these limitations is not necessarily required to ring the doorbell, knock on the door, or attempt to speak with an occupant," and uses mail carriers as an example of such a visitor. 133 S. Ct. at 1423 (Alito, J., dissenting). Justice Alito pointed out that the implied license also applies to law enforcement and cited to Kentucky v. King, 131 S. Ct. 1849 (2011), in which the Supreme Court held that law enforcement officers approaching the front door of a residence to conduct a "knock and talk" is not a Fourth Amendment search. Florida v. Jardines, 133 S. Ct. at 1423 (Alito, J., concurring). Given that "Detective Bartelt did not exceed the scope of the license to approach respondent's front door," Justice Alito took issue with the majority's conclusion "that Detective Bartelt went too far because he had the '*objectiv[e]* . . . *purpose* to conduct a search.'" 133 S. Ct. at 1423 (Alito, J., dissenting)(emphasis in original). According to Justice Alito, because approaching a house to conduct a knock and talk is not a search,

> [w]hat the Court must fall back on, then, is the particular instrument that Detective Bartelt used to detect the odor of marijuana, namely, his dog. But in the entire body of common-law decisions, the Court has not found a single case holding that a visitor to the front door of a home commits a trespass if the visitor

is accompanied by a dog on a leash.  On the contrary, the common law allowed even unleashed dogs to wander on private property without committing a trespass.

The Court responds that "[i]t is not the dog that is the problem, but the behavior that here involved use of the dog."  But where is the support in the law of trespass for this proposition?  Dogs' keen sense of smell has been used in law enforcement for centuries.  The antiquity of this practice is evidenced by a Scottish law from 1318 that made it a crime to "disturb a tracking dog or the men coming with it for pursuing thieves or seizing malefactors."  If bringing a tracking dog to the front door of a home constituted a trespass, one would expect at least one case to have arisen during the past 800 years.  But the Court has found none.

133 S. Ct. at 1424 (Alito, J., dissenting)(emphasis in original)(internal citations omitted).  Justice Alito thus concluded: "For these reasons, the real law of trespass provides no support for the Court's holding today.  While the Court claims that its reasoning has 'ancient and durable roots,' its trespass rule is really a newly struck counterfeit."   133 S. Ct. at 1424 (Alito, J., dissenting)(internal citations omitted).

Justice Alito did not look any more favorably upon Justice Kagan's conclusion that Detective Bartelt's conduct violated Jardines' reasonable privacy expectations, asserting:

[W]e have already rejected a very similar, if not identical argument, see Illinois v. Caballes, . . . and in any event I see no basis for concluding that the occupants of a dwelling have a reasonable expectation of privacy in odors that emanate from the dwelling and reach spots where members of the public may lawfully stand.

133 S. Ct. at 1424 (Alito, J., dissenting).  Justice Kagan asserted that Detective Bartelt's use of Franky, the drug-sniffing dog, was an invasion of Jardines' privacy in his home, because the government's conduct was similar to the conduct in Kyllo v. United States, in which the Supreme Court held that using a thermal imaging device to monitor movements in a home was a Fourth Amendment search.  Justice Alito pointed out that "[t]his Court . . . has already rejected the argument that the use of a drug-sniffing dog is the same as the use of a thermal imaging device.  The very argument now advanced by the concurrence appears in Justice Souter's

<u>Caballes</u> dissent.   But the Court was not persuaded."   133 S. Ct. at 1425 (Alito, J., dissenting)(internal citations omitted)(citing <u>Illinois v. Caballes</u>, 543 U.S. at 409-10 and 413 n.3).   Justice Alito contended that "<u>Kyllo</u> is best understood as a decision about the use of new technology. . . .  A dog, however, is not a new form of 'technology' or a 'device.'  And, as noted, the use of dogs' acute sense of smell in law enforcement dates back many centuries."  133 S. Ct. at 1425 (Alito, J., dissenting).  Justice Alito therefore concluded that the government's conduct in <u>Florida v. Jardines</u> "did not constitute a trespass and did not violate respondent's reasonable expectations of privacy.   I would hold that this conduct was not a search, and I therefore respectfully dissent." 133 S. Ct. at 1426.

> **3.    Standing.**

The Tenth Circuit has referred to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy expectation -- as one of "standing."  <u>E.g.</u>, <u>United States v. Creighton</u>, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation of privacy in the [item searched] that society is prepared to recognize as reasonable."); <u>United States v. Poe</u>, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search.")(citing <u>United States v. Rubio-Rivera</u>, 917 F.2d 1271, 1274 (10th Cir. 1990)); <u>United States v. Shareef</u>, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched.").   Accordingly, the Court, tracing the Tenth Circuit's language has also referred to this test as one of standing.  <u>See</u>, <u>e.g.</u>, <u>United States v. Harmon</u>, 785 F. Supp. 2d at 1157 ("Standing requires the defendant to show 'that he had a subjective expectation of privacy

in the premises searched and that society is prepared to recognize that expectation as reasonable.'")(quoting United States v. Poe, 556 F.3d at 1121).  The Supreme Court's decisions in United States v. Jones and Florida v. Jardines, however, suggest that this test has now expressly been designated a substantive Fourth Amendment analysis alongside the trespass-based Fourth Amendment analysis, rather than a distinct analysis under the rubric entitled standing.

In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproved of labeling the inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge."  439 U.S. at 133.  Dispensing with this label, the Supreme Court noted:

> Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain Jones [v. United States, 362 U.S. 257 (1960), overruled by United States v. Salvucci, 448 U.S. 83 (1980)]' use of standing in Fourth Amendment analysis.  Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant.  However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure," Simmons v. United States, 390 U.S. at 389 . . . , the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim.  We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in Jones and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine.  Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional

> situations in which evidence must be excluded.  The inquiry under either approach is the same.  But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.  The Court in <u>Jones</u> also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks.  362 U.S. at 261, 263, 265 . . . .

439 U.S. at 138-39.  The Supreme Court emphasized:

> [N]othing we say here casts the least doubt on cases which recognize . . . as a general proposition, the issue of standing [generally.] . . .  But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.

439 U.S. at 139-40.  In <u>Minnesota v. Carter</u>, the Supreme Court recognized that <u>Rakas v. Illinois</u>

put an end to the Fourth Amendment standing analysis as separate from the substantive Fourth

Amendment search analysis:

> The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in <u>Rakas</u> . . . .  Central to our analysis [in <u>Rakas v. Illinois</u>] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing."  <u>Id.</u>, at 140 . . . .

525 U.S. at 87-88.  The Supreme Court has thus noted that the analysis under either approach --

the substantive Fourth Amendment doctrine that the rights that the Amendment secures are

personal versus the separate notion of "standing" -- is the same and that <u>Katz v. United States</u>'

reasonable-expectation-of-privacy analysis has now been classified as a substantive Fourth

Amendment test, as opposed to a standing test.  <u>Rakas v. Illinois</u>, 439 U.S. at 139.

> Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded.  But we think the better

- 46 -

> analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.

Rakas v. Illinois, 439 U.S. at 139 (footnote omitted).  This development is in line with the Supreme Court's guidance that the analysis "is more properly subsumed under substantive Fourth Amendment doctrine."  Rakas v. Illinois, 439 U.S. at 139.

### 4.  Whether a Fourth Amendment Search Occurred.

A Fourth Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government, to collect information, violates a person's subjective expectation of privacy that society recognizes as reasonable.  See United States v. Jones, 132 S. Ct. at 947.  "[T]he Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test."  United States v. Jones, 132 S. Ct. at 947 (emphasis in original)(citing Alderman v. United States, 394 U.S. 165, 176 (1969); Soldal v. Cook Cnty., 506 U.S. 56, 64 (1992)).  "When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3).

### a.  Trespass-Based Analysis.

The Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3 ("[A] 'search' within the original meaning of the Fourth Amendment" occurs "[w]here . . . the Government obtains information by

physically intruding on a constitutionally protected area.")).  "[A]n actual trespass," however, "is neither necessary nor sufficient to establish a constitutional violation."  United States v. Jones, 132 S. Ct. at 951 n.5 (Scalia, J.)(emphasis omitted)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)).

In determining whether a search has occurred, "[t]resspass alone does not qualify, but there must be conjoined with that . . . an attempt to find something or to obtain information." United States v. Jones, 132 S. Ct. at 951 n.5.  The Supreme Court has also noted that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection."  Bond v. United States, 529 U.S. 334, 337 (2000).  Moreover, the Supreme Court in Florida v. Jardines suggested that the trespass-based analysis applies only when the trespass occurs in one of the four places or things listed in the Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects. The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to Katz) gather information in what we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text. . . .  But when it comes to the Fourth Amendment, the home is first among equals.

133 S. Ct. at 1414.

In United States v. Alabi, 943 F. Supp. 2d 1201 (D.N.M. 2013)(Browning, J.), the Court analyzed whether the Secret Service's digital scan of electronic information contained in the defendants' credit and debit cards' magnetic strips was a Fourth Amendment search under a trespass-based analysis, concluding that it was not, because the Secret Service properly possessed the credit and debit cards, and the additional act of scanning the cards to read the virtual data contained on the strips did not involve a physical intrusion or physical penetration of space.  See 943 F. Supp. 2d at 1264-65.  The Court noted that, "[e]ven if the Supreme Court were

to extend the trespass-based analysis for Fourth Amendment searches to virtual invasions, the Secret Service's conduct scanning the thirty-one credit and debit cards still would not amount to a Fourth Amendment search," because the magnetic strip, as opposed to the credit or debit card separately, is not a constitutionally protected area. 943 F. Supp. 2d at 1267-68.

> When a law enforcement officer sees only the exterior of a credit or debit card, however, given that the financial institution which issues the card places the same information on the magnetic strip as embossed on the card's exterior, the only instances in which the information inside the credit or debit card is not information already seen by and known to the officer is when the information has been reencoded for unlawful purposes. In these instances, not only does the person asserting his or her Fourth Amendment right not own or otherwise lawfully possess the information contained inside the card on the magnetic strip, but the person has stolen the information with the intent to use that information to steal further from the person whose information is on the magnetic strip. Protecting this area from law enforcement search and seizure would thus not further the Fourth Amendment's express purpose of protecting "[t]he right of the people to be secure in their persons, houses, papers, and effects . . . ." U.S. Const. amend IV.

943 F. Supp. 2d at 1273 (alteration in original).

> **b.      Katz v. United States' <u>Reasonable-Expectations-of-Privacy Search Test Remains Good Law</u>.**

The Court has noted that, in light of the Supreme Court's recent decisions in <u>Florida v. Jardines</u> and <u>United States v. Jones</u>, both of which Justice Scalia wrote for the majority, and both of which analyze whether government conduct constituted a Fourth Amendment search using the trespass-based approach, "the question arises whether the <u>Katz v. United States</u> reasonable-expectation-of-privacy test is still good law." <u>United States v. Alabi</u>, 943 F. Supp. 2d at 1242 (citing <u>Minnesota v. Carter</u>, 525 U.S. 83, 97-98 (1998)(Scalia, J. concurring)). Justice Scalia has consistently criticized this "notoriously unhelpful test":

> In my view, the only thing the past three decades have established about the <u>Katz</u> test (which has come to mean the test enunciated by Justice Harlan's separate concurrence in <u>Katz</u> . . .) is that, unsurprisingly, those "actual (subjective)

expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'" bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable.  When that self-indulgent test is employed (as the dissent would employ it here) to determine whether a "search or seizure" within the meaning of the Constitution has <u>occurred</u> (as opposed to whether that "search or seizure" is an "unreasonable" one), it has no plausible foundation in the text of the Fourth Amendment.  That provision did not guarantee some generalized "right of privacy" and leave it to this Court to determine which particular manifestations of the value of privacy "society is prepared to recognize as 'reasonable.'"  Rather, it enumerated ("persons, houses, papers, and effects") the objects of privacy protection to which the <u>Constitution</u> would extend, leaving further expansion to the good judgment, not of this Court, but of the people through their representatives in the legislature.

<u>Minnesota v. Carter</u>, 525 U.S. at 97-98 (Scalia, J., concurring)(emphasis in original)(internal citations omitted).[2]  In both <u>United States v. Jones</u> and <u>Florida v. Jardines</u>, however, Justice Scalia, writing for the majority, never stated that the Supreme Court was substituting the trespass-based analysis for <u>Katz v. United States</u>' reasonable-expectation-of-privacy analysis.  Rather, his majority opinions asserted that the <u>Katz v. United States</u> reasonable-expectation-of-privacy analysis added to the trespass-based analysis.  <u>See</u> <u>Florida v. Jardines</u>, 133 S. Ct. at 1417 ("The <u>Katz</u> reasonable-expectations test 'has been <u>added to</u>, not <u>substituted for</u>,' the traditional property-based understanding of the Fourth Amendment." (emphasis in original))(quoting <u>United States v. Jones</u>, 132 S. Ct. at 952).  The Court concluded in <u>United States v. Alabi</u> that, "as the Supreme Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere to application of the <u>Katz v. United States</u> reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-based approach."  2013 WL 1876791, at *35.

---

[2]The Honorable Clarence Thomas, Associate Justice, was the only other Justice to join Justice Scalia's <u>Minnesota v. Carter</u> concurrence.

In June, 2013, Justice Scalia dissented from the Supreme Court's decision in Maryland v. King, 133 S. Ct. 1958 (2013), in which the Supreme Court held that "DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure," 133 S. Ct. at 1980.  Justice Scalia criticized the majority's opinion for analogizing DNA testing to taking an arrestee's photograph by citing to Katz v. United States and pointing out that "we have never held that merely taking a person's photograph invades any recognized 'expectation of privacy.'"  Maryland v. King, 133 S. Ct. at 1986 (Scalia, J., dissenting).  Justice Scalia also pointed out that a person's "privacy-related concerns" in their body are weighty:

> We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee."  But why are the "privacy-related concerns" not also "weighty" when an intrusion into the body is at stake? (The Fourth Amendment lists "persons" first among the entities protected against unreasonable searches and seizures.)

Maryland v. King, 133 S. Ct. at 1982 (Scalia J., dissenting)(emphasis in original).  Justice Scalia also suggested that the Founders would have shared these privacy-related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or attends a public school.  Perhaps the construction of such a genetic panopticon is wise. But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

Maryland v. King, 133 S. Ct. at 1989 (Scalia J., dissenting).  The Court therefore concludes that Justice Scalia and the Supreme Court may still rely on a person's privacy expectation when determining whether a search is reasonable for Fourth Amendment purposes, although Justice Scalia may not turn to the expectations prong until he runs the facts through the trespass prong.

See Apodaca v. New Mexico Adult Probation and Parole, No. CIV 13-0113 JB/SMV, 2014 WL

712588, at *14 (D.N.M. Feb. 13, 2014)(Browning, J.)(reaching this conclusion).

<strong>c.        Katz v. United States<u>' Reasonable-Expectations-of-Privacy Analysis.</u></strong>

"'Fourth Amendment rights are personal rights which, like some other constitutional

rights, may not be vicariously asserted.'"   Rakas v. Illinois, 439 U.S. at 133-34 (quoting

Alderman v. United States, 394 U.S. at 174).   "A district court cannot suppress evidence unless

the movant proves that a search implicates personal Fourth Amendment interests."   United States

v. Jones, 44 F.3d 860, 871 (10th Cir. 1995)(emphasis in original).   "'[N]o interest legitimately

protected by the Fourth Amendment' is implicated by governmental investigative activities

unless there is an intrusion into a zone of privacy, into 'the security a man relies upon when he

places himself or his property within a constitutionally protected area.'"   United States v. Miller,

425 U.S. 435, 440 (1976)(Hoffa v. United States, 385 U.S. 293, 301-02 (1966)).[3]   The Tenth

---

[3]The Court has previously stated: "[T]he Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area.'"   Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.)(quoting Katz. V. United States, 389 U.S. at 351).   In support for this proposition, the Court relied on the majority's decision in Katz v. United States, where the Supreme Court stated that focusing on whether the area is a "constitutionally protected area . . . . deflects attention from the problem," as it focuses attention on the place, rather than the person:

> Because of the misleading way the issues have been formulated, the parties have attached great significance to the characterization of the telephone booth from which the petitioner placed his calls.   The petitioner has strenuously argued that the booth was a "constitutionally protected area."   The Government has maintained with equal vigor that it was not.   But this effort to decide whether or not a given "area," viewed in the abstract, is "constitutionally protected" deflects attention from the problem presented by this case.   For the Fourth Amendment protects people, not places.   What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.   See Lewis v. United States, 385 U.S. 206, 210 [1966]; United States v. Lee, 274 U.S. 559, 563 . . . (1927).   But what he seeks to preserve as private, even in an area

Circuit has thus noted that "[a]n illegal search or seizure only harms those with legitimate expectations of privacy in the premises searched."  United States v. Jones, 44 F.3d at 871 (citing United States v. Roper, 918 F.2d 885, 886-87 (10th Cir. 1990)).  Thus, "[t]he proper inquiry" to determine whether a search implicates a defendant's Fourth Amendment interests still depends, after conducting a trespass-based analysis, on "whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable."  Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.).

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment."  Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123).  The Supreme Court has thus recognized that, rather than determining whether law enforcement conduct was a search, it sometimes proves easier to "assess[] when a search is not a search."  Kyllo v. United States, 533 U.S. at 32.

---

accessible to the public, may be constitutionally protected.  See Rios v. United States, 364 U.S. 253 . . . [1960]; Ex parte Jackson, 96 U.S. 727, 733 . . . [1877].

Katz v. United States, 389 U.S. at 351-52.  The Supreme Court appears to have changed course in its two most recent opinions on Fourth Amendment searches.  In Florida v. Jardines, the particular place at which the search occurred weighs heavily on the Supreme Court's holding, reasoning that "[t]he [Fourth] Amendment establishes [as] a simple baseline . . . . protections 'when the Government does engage in a physical intrusion of a constitutionally protected area.'" 133 S. Ct. at 1414 (original alterations and original emphasis omitted)(emphasis added)(quoting United States v. Knotts, 460 U.S. 276, 286 (1983)(Brennan, J., concurring)).  See United States v. Jones, 132 S. Ct. at 951 ("Katz did not erode the principle 'that, when the Government does engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment. . . .  Katz did not narrow the Fourth Amendment's scope.'"  (emphasis added)).  The Court thus concludes that, while it may be true that the analysis does not turn on the place searched, the Court's prior statement -- "the Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area,'" Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d at 1219 -- may no longer accurately reflect the Supreme Court's recent reversion to property-based analysis as a Fourth Amendment analysis baseline.

- 53 -

In assessing when a search is not a search, we have applied somewhat in reverse the principle first enunciated in <u>Katz v. United States</u>.  <u>Katz</u> involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth -- a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches. We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he "justifiably relied" upon the privacy of the telephone booth.   As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

<u>Kyllo v. United States</u>, 533 U.S. at 32-33.  The Supreme Court thus articulated the <u>Katz v. United States</u> rule -- which Professor Wayne R. LaFave has noted is "somewhat inaccurately stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> § 2.1(b), at 435 (4th ed. 2004)(citing Anthony G. Amsterdam, <u>Perspectives on the Fourth Amendment</u>, 58 Minn. L. Rev. 349, 383-388 (1974)(criticizing this formulation of the standard and explaining that "the common formula for <u>Katz</u> fails to capture <u>Katz</u> at any point because the <u>Katz</u> decision was written to resist captivation in any formula") --  which posits: "[A] Fourth Amendment search does <u>not</u> occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" <u>Kyllo v. United States</u>, 533 U.S. at 33 (emphasis in original)(quoting <u>California v. Ciraolo</u>, 476 U.S. at 211).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" <u>United States v. Jones</u>, 132 S. Ct. at 951.  <u>See</u> <u>United States v. Harmon</u>, 785 F. Supp. 2d at 1157 ("To decide whether a reasonable expectation of privacy exists, courts consider concepts of real or personal property law . . . .").   In analyzing whether an expectation of privacy is reasonable in the Fourth

Amendment context based on property law, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." Rakas v. Illinois, 439 U.S. at 143 & n.12.  While ownership or lawful possession is not determinative under the Katz v. United States reasonable-expectation-of-privacy test, it is often a dispositive factor; because the Fourth Amendment is a personal right, a defendant bears the burden of demonstrating "that he gained possession [of the area searched] from the owner or someone with the authority to grant possession."  United States v. Arango, 912 F.2d 441, 445-46 (10th Cir. 1990).

### i.    Subjective Expectation of Privacy.

A defendant maintains a subjective expectation of privacy when the defendant "has shown that 'he sought to preserve something as private.'"  Bond v. United States, 529 U.S. at 338 (internal alterations omitted)(quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)).  Thus, there is no reasonable expectation of privacy in otherwise private information disclosed to a third party.  Under the Katz v. United States expectation-of-privacy test -- although perhaps not under United States v. Jones and Florida v. Jardines -- "[t]he Fourth Amendment protects people, not places.   What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."  Katz v. United States, 389 U.S. at 351.  The Supreme Court has noted:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

United States v. Miller, 425 U.S. at 443.

The Supreme Court has recognized, however, that subjective expectations of privacy do not always coincide with the interests that the Fourth Amendment is universally thought to

protect.  In <u>Smith v. Maryland</u>, for instance, the Supreme Court identified situations in which it

would not follow the subjective approach:

> Situations can be imagined, of course, in which <u>Katz</u>' two-pronged inquiry would provide an inadequate index of Fourth Amendment protection.  For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation or [sic] privacy regarding their homes, papers, and effects.  Similarly, if a refugee from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy regarding the contents of his calls might be lacking as well. In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was.   In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.

442 U.S. at 740 n.5.  Most recently, in <u>Jones v. United States</u>, Justice Sotomayor commented

that, given the reality of technology in the twenty-first century, it may no longer be sound to

universally hold to the third-party disclosure rule to determine whether a subjective expectation

of privacy exists:

> [I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties.  This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks.  People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers.[4]  Perhaps, as Justice Alito notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and perhaps not.  I for one doubt that people would accept without complaint the

---

[4]URL is the abbreviation for a "uniform resource locator, . . . .  URLs occur most commonly to reference web pages (http), but are also used for file transfer (ftp), email (mailto), database access (JDBC), and many other applications."   <u>Uniform Resource Locator</u>, Wikipedia.org,  http://en.wikipedia.org/wiki/Uniform_resource_locator (last visited January 1, 2017).

> warrantless disclosure to the Government of a list of every Web site they had
> visited in the last week, or month, or year. But whatever the societal expectations,
> they can attain constitutionally protected status only if our Fourth Amendment
> jurisprudence ceases to treat secrecy as a prerequisite for privacy.  I would not
> assume that all information voluntarily disclosed to some member of the public
> for a limited purpose is, for that reason alone, disentitled to Fourth Amendment
> protection.

132 S. Ct. at 957 (Sotomayor, J., concurring)(internal citations omitted).  Regardless what the

Supreme Court decides to do with social media on the internet, only the most ignorant or gullible

think what they post on the internet is or remains private.  See United States v. Meregildo, 883 F.

Supp. 2d 523, 526 (S.D.N.Y. 2012)(Pauley, J.)(holding that a person posting to his Facebook

profile had "no justifiable expectation that his 'friends' would keep his profile private").

> ### ii.     Privacy Expectation that Society is Prepared to Recognize as Reasonable.

Under the second step of Katz v. United States' reasonable-expectation-of-privacy

approach, courts must determine "whether society is prepared to recognize that [subjective

privacy] expectation as objectively reasonable."  United States v. Ruiz, 664 F.3d at 838.  The

Supreme Court has cautioned: "The concept of an interest in privacy that society is prepared to

recognize as reasonable is, by its very nature, critically different from the mere expectation,

however well justified, that certain facts will not come to the attention of the authorities."  United

States v. Jacobsen, 466 U.S. 109, 122 (1984).  Determining whether society would view the

expectation as objectively reasonable turns on whether the government's intrusion infringes on a

legitimate interest, based on the values which the Fourth Amendment protects.  See California v.

Ciraolo, 476 U.S. at 212 (explaining that "[t]he test of legitimacy is not whether the individual

chooses to conceal assertedly 'private' activity," but instead "whether the government's intrusion

infringes upon the personal and societal values protected by the Fourth Amendment")(quoting

Oliver v. United States, 466 U.S. at 181-83).  This second factor of the Katz v. United States reasonable-expectation-of-privacy analysis developed from Justice Harlan's "attempt to give content to the word 'justifiably' in the majority's assertion that eavesdropping on Katz was a search because it 'violated the privacy upon which he justifiably relied while using the telephone booth.'"  LaFave, supra §2.1(d), at 439 (quoting Katz v. United States, 389 U.S. at 353).  Thus, whether society will recognize a certain expectation of privacy does not turn on whether the hypothetical reasonable person would hold the same expectation of privacy, but rather whether the expectation of privacy is justified or legitimate.  The Supreme Court has provided that, while no single factor determines legitimacy, whether society recognizes a privacy interest as reasonable is determined based on our societal understanding regarding what deserves protection from government invasion:

> No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant.  In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. at 177-78 (internal citations omitted).

The Supreme Court has held that "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment."  Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123).  In United States v. Place, the Supreme Court held that the "canine sniff" of a drug-sniffing dog does "not constitute a 'search' within the meaning of the Fourth Amendment."  United States v. Place, 462 U.S. at 707.  The case arose when law enforcement seized the luggage of an airline passenger and transported it to another location, where a drug-sniffing dog could sniff it.  See 462 U.S. at

699.  The drug sniffing dog alerted the officers that drugs were in the luggage, the officers

obtained a search warrant, and, upon opening the bags, the officers found over one-thousand

grams of cocaine.  See 462 U.S. at 699.  While recognizing that a person has a reasonable

expectation of privacy in the contents of his or her luggage, the Supreme Court held that the

dog's sniff test was not a Fourth Amendment search and emphasized the unique nature of the

investigative technique, which could disclose only criminal activity:

> We have affirmed that a person possesses a privacy interest in the contents of
> personal luggage that is protected by the Fourth Amendment.  A "canine sniff" by
> a well-trained narcotics detection dog, however, does not require opening the
> luggage. It does not expose noncontraband items that otherwise would remain
> hidden from public view, as does, for example, an officer's rummaging through
> the contents of the luggage.  Thus, the manner in which information is obtained
> through this investigative technique is much less intrusive than a typical search.
> Moreover, the sniff discloses only the presence or absence of narcotics, a
> contraband item.   Thus, despite the fact that the sniff tells the authorities
> something about the contents of the luggage, the information obtained is limited.
> This limited disclosure also ensures that the owner of the property is not subjected
> to the embarrassment and inconvenience entailed in less discriminate and more
> intrusive investigative methods.
>
> In these respects, the canine sniff is *sui generis*.  We are aware of no other
> investigative procedure that is so limited both in the manner in which the
> information is obtained and in the content of the information revealed by the
> procedure.  Therefore, we conclude that the particular course of investigation that
> the agents intended to pursue here -- exposure of respondent's luggage, which
> was located in a public place, to a trained canine -- did not constitute a "search"
> within the meaning of the Fourth Amendment.

462 U.S. at 707.

In United States v. Jacobsen, the Supreme Court extended this holding to the chemical

field test of a white powdery substance to reveal that the substance was cocaine.  See 466 U.S. at

122-24.  A Federal Express employee and supervisor had opened a damaged package, and

exposed four zip-lock plastic bags containing six and one-half ounces of white powder.  See 466

U.S. at 111.  They then called the DEA and repacked the contents in the original packaging,

before they provided the package to the DEA officers.  See 466 U.S. at 111.  When the agents

arrived, the agents removed the exposed plastic bags from the broken package, opened each of

the four bags, and field-tested the white powder, identifying the powder as cocaine.  See 466

U.S. at 111-12.  The Supreme Court first held that removal of the plastic bags from the tubes and

the agent's visual inspection were not Fourth Amendment searches:

> The removal of the plastic bags from the tube and the agent's visual inspection of
> their contents enabled the agent to learn nothing that had not previously been
> learned during the private search.  It infringed no legitimate expectation of
> privacy and hence was not a "search" within the meaning of the Fourth
> Amendment.

466 U.S. at 120 (footnote omitted).  The Supreme Court noted: "The question remains whether

the additional intrusion occasioned by the field test, which had not been conducted by the

Federal Express agents and therefore exceeded the scope of the private search, was an unlawful

'search' or 'seizure' within the meaning of the Fourth Amendment."  United States v. Jacobsen,

466 U.S. at 122.  The Supreme Court, relying on United States v. Place, held that the additional

digital scan of the white substance was not a Fourth Amendment search, because the test

discloses only whether the substance is cocaine and "nothing [else] of special interest":

> The field test at issue could disclose only one fact previously unknown to
> the agent -- whether or not a suspicious white powder was cocaine.  It could tell
> him nothing more, not even whether the substance was sugar or talcum powder.
> We must first determine whether this can be considered a "search" subject to the
> Fourth Amendment -- did it infringe an expectation of privacy that society is
> prepared to consider reasonable?
>
> . . . .
>
> A chemical test that merely discloses whether or not a particular substance
> is cocaine does not compromise any legitimate interest in privacy.  This
> conclusion is not dependent on the result of any particular test.  It is probably safe
> to assume that virtually all of the tests conducted under circumstances comparable
> to those disclosed by this record would result in a positive finding; in such cases,
> no legitimate interest has been compromised.  But even if the results are negative

-- merely disclosing that the substance is something other than cocaine -- such a result reveals nothing of special interest.  Congress has decided -- and there is no question about its power to do so -- to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.

. . . .

Here, as in Place, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.

United States v. Jacobsen, 466 U.S. at 122-24.

Most recently, where a "dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," the Supreme Court, again relying on United States v. Place and also on United States v. Jacobsen, held that "[a]ny intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement." Illinois v. Caballes, 543 U.S. at 409.[5]  The Supreme Court reasoned that the dog sniff in Illinois v. Caballes fell squarely in line with the line of cases holding "that any interest in possessing contraband cannot be deemed 'legitimate,' and th[at] governmental conduct that only reveals the possession of contraband 'compromises no legitimate privacy interests.'"  Illinois v. Caballes, 543 U.S. at 408 (quoting United States v. Jacobsen, 466 U.S. at 123)(emphasis in original).  The Supreme Court explained: "This is because the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable.'"  Illinois v. Caballes, 543 U.S. at 408-09 (quoting United States v.

_____

[5]The Honorable John Paul Stevens, former Associate Justice of the Supreme Court, penned the majority's opinion in Illinois v. Caballes.  Out of the current Supreme Court Justices, Justices Kennedy, Thomas, and Breyer joined Justice Stevens' majority opinion, while Justice Ginsburg dissented.  See 543 U.S. at 405.

- 61 -

Jacobsen, 466 U.S. at 122).  The Supreme Court in Illinois v. Caballes noted that its decision was

consistent with Kyllo v. United States, as the thermal imaging device in Kyllo v. United States

could detect lawful, "intimate details" in a home:

> This conclusion is entirely consistent with our recent decision that the use of a
> thermal-imaging device to detect the growth of marijuana in a home constituted
> an unlawful search.  Kyllo v. United States, 533 U.S. 27 . . . .  Critical to that
> decision was the fact that the device was capable of detecting lawful activity -- in
> that case, intimate details in a home, such as "at what hour each night the lady of
> the house takes her daily sauna and bath."  Id., at 38 . . . .  The legitimate
> expectation that information about perfectly lawful activity will remain private is
> categorically distinguishable from respondent's hopes or expectations concerning
> the nondetection of contraband in the trunk of his car.  A dog sniff conducted
> during a concededly lawful traffic stop that reveals no information other than the
> location of a substance that no individual has any right to possess does not violate
> the Fourth Amendment.

Illinois v. Caballes, 543 U.S. at 409-10.

In United States v. Alabi, the defendants possessed thirty-one credit and debit cards,

"many of them in their own names, several of which had information on the magnetic strips that

related to persons other than the Defendants."  943 F. Supp. 2d at 1275.  The Court reluctantly

accepted the defendants' assertion that they "subjectively intended not to disclose this

information to a third party -- i.e., intended not to use the cards," 943 F. Supp. 2d at 1275, but

determined that "a privacy expectation in the account information stored on credit and debit

cards' magnetic strips -- separate and beyond the credit and debit cards themselves -- is not

objectively reasonable," 943 F. Supp. 2d at 1280.  The Court explained that the Secret Service's

scan of the cards' magnetic strips "reveals only the same information revealed in a private search

when the card is used as intended," and, further, that, even if the cards had never been used, the

scan "discloses only information known by viewing the outside of the card, or information that

the cards and account information are possessed unlawfully . . . ."  943 F. Supp. 2d at 1281.

Noting the Supreme Court's decision in <u>Rakas v. Illinois</u>, in which the Supreme Court "reasoned that society is not prepared to recognize as reasonable an expectation of privacy in a burglar robbing a summer cabin during the offseason," the Court concluded that society would not recognize "as reasonable a privacy expectation which, at least in contemporary society, would benefit only criminals."  943 F. Supp. 2d at 1287.

### 5.    <u>Reasonable Government Searches.</u>

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.  <u>Kentucky v. King</u>, 131 S. Ct. at 1856 (quoting <u>Brigham City v. Stuart</u>, 547 U.S. 398, 403 (2006)).   <u>See</u> <u>Samson v. California</u>, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting <u>United States v. Knights</u>, 534 U.S. 112, 118 (2001)).   "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."  <u>United States v. Knights</u>, 534 U.S. at 121 (citing, as an <u>e.g.</u> cite, <u>Terry v. Ohio</u>, 392 U.S. 1 (1968)).  The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'"  <u>Vernonia Sch. Dist. 47J v. Acton</u>, 515 U.S. 646, 654 (1995)(quoting <u>New Jersey v. T.L.O.</u>, 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is

needed for the promotion of legitimate governmental interests.'" Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118). See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20).

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness." At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617 (1989)). The Supreme Court has held that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts and the Tenth Circuit look to the individual's privacy expectations. See, e.g., United States v. Knights, 534 U.S. at 119-120 (noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his

apartment without notice or probable cause, and because he was clearly notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, noting: "Those who have never been convicted of a felony are the last distinct category. What is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population."); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure.  This is so in light of an inmate's diminished privacy rights . . . .")

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align.  The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions."    Florida v. Jardines, 133 S. Ct. at 1419 (Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)).  Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia, writing for the majority noted: "What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park."  515 U.S. at 654 (internal citations omitted).

      **6.**    **Consensual Searches.**

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is

"freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government (i) "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given'"; and (ii) "the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave."  United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997)](citing and quoting numerous sources).  Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer."  United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo,2010 WL 965743, at *12 (D.N.M. 2010) (Browning, J)(some alterations in original).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no

one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232.  Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individual] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.  As such, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

### 7.    The Probable Cause Requirement for Search Warrants.

Probable cause must support a search warrant, which requires "more than mere suspicion but less evidence than is necessary to convict."  United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980).  To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity."  United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000).  "Probable cause undoubtedly requires a nexus between

suspected criminal activity and the place to be searched."  United States v. Corral-Corral, 899

F.2d 927, 937 (10th Cir. 1990).  The task of the Magistrate Judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)(quoting Illinois v.

Gates, 462 U.S. 213, 238 (1983)).   See United States v. Glover, 104 F.3d 1570, 1578

(10th Cir. 1997)(finding that, in determining whether an affidavit supports a finding of probable

cause, the court must review the affidavit as a whole and look to the totality of the information

contained therein), abrogated on other grounds by Corley v. United States, 556 U.S. 303 (2009).

In making his or her determination, the Magistrate Judge "may draw reasonable inferences from

the material provided in the warrant application."  United States v. Rowland, 145 F.3d 1194,

1205 (10th Cir. 1998).

"A reviewing court should accord great deference to a magistrate's determination of

probable cause."  United States v. Reed, 195 F. App'x at 822. The court's duty is "simply to

ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause

existed."  Illinois v. Gates, 462 U.S. at 236, 238-39.  This deference is appropriate to further the

Fourth Amendment's strong preference for warrants.  See Massachusetts v. Upton, 466 U.S. 727,

733 (1984); United States v. Ventresca, 380 U.S. 102, 105-06 (1965)("An evaluation of the

constitutionality of a search warrant should begin with the rule that the informed and deliberate

determinations of magistrates empowered to issue warrants . . . are to be preferred over the

hurried action of office[r]s . . . .").  Because of the strong preference for warrants, "in a doubtful

or marginal case a search under a warrant may be sustainable where without one it would fall."
United States v. Ventresca, 380 U.S. at 106.

The deference accorded a Magistrate Judge's probable cause determination, however, is not boundless. See United States v. Leon, 468 U.S. 897, 914 (1984). The Court should not defer to a Magistrate Judge's probable cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause. See United States v. Danhauer, 229 F.3d at 1006. Specifically, the Court should not defer to a Magistrate Judge's probable cause determination if it "is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances." United States v. Reed, 195 F. App'x at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. 727, 734 (1984); Illinois v. Gates, 462 U.S. at 239).

### 8.  The Particularity Requirement for Search Warrants.

The Supreme Court has stated that "those searches deemed necessary should be as limited as possible." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). The Tenth Circuit has explained that "the Fourth Amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized." Cassady v. Goering, 567 F.3d 628, 635 (10th Cir. 2009)(quoting United States v. Leary, 846 F.2d 592, 600 (10th Cir. 1988)). The particularity requirement prevents general searches and strictly limits the discretion of the officer executing the warrant. See Voss v. Bergsgaard, 774 F.2d 402, 404 (10th Cir. 1985)("The particularity requirement ensures that a search is confined in scope to particularly described

evidence relating to a specific crime for which there is demonstrated probable cause."); United States v. Janus Indus., 48 F.3d 1548, 1553 (10th Cir. 1995)("'As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.'")(quoting Stanford v. Texas, 379 U.S. 476, 485 (1965))).  "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized."  United States v. Janus Indus., 48 F.3d at 1553 ("The test applied to the description of the items to be seized is a practical one.").

In Cassady v. Goering, the search warrant authorized the search of the plaintiff's entire farm, including his house, and the seizure of "[a]ny & all narcotics," "[a]ny and all illegal contraband," and various specific items mostly related to a narcotics operation, as well as the search and seizure of "all other evidence of criminal activity" and all personal property that was stolen, embezzled, or otherwise illegal.  567 F.3d at 635.  The Tenth Circuit found that the warrant violated the plaintiff's Fourth Amendment rights, because "[t]he warrant[] allowed precisely the kind of rummaging through a person's belongings, in search of evidence of even previously unsuspected crimes or of no crime at all, that the Fourth Amendment proscribes." 567 F.3d at 635 (quoting Voss v. Bergsgaard, 774 F.2d at 405).  The Tenth Circuit in Cassady v. Goering explained that it had previously "applied a blanket suppression where officers *conducted a general search for evidence* of crimes not specifically listed in the warrant," 567 F.3d at 643 (emphasis in original)(citing United States v. Foster, 100 F.3d 846, 851-52 (10th Cir. 1996); United States v. Medlin, 842 F.2d 1194, 1199-1200 (10th Cir. 1988)); given that line of cases, the Tenth Circuit said "it would be an odd result not to suppress *warrants that expressly authorize* a general search and seizure," Cassady v. Goering, 567 F.3d at 643 (emphasis in original).

9.      **Warrantless Searches of Homes**.

"[T]he warrantless entry of the home is 'the chief evil against which . . . the Fourth Amendment is directed.'"   United States v. Lowe, 999 F.2d 448, 451 (10th Cir. 1993)(quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)).  "A warrantless search of a defendant's home is unreasonable absent exigent circumstances or consent."   United States v. Pikyavit, 527 F.3d 1126, 1130 (10th Cir. 2008).  The Fourth Amendment's protection of the home against warrantless searches extends to a home's curtilage.  See United States v. Dunn, 480 U.S. 294 (1987); Oliver v. United States, 466 U.S. 170 (1984).

a.      **Curtilage**.

In United States v. Dunn, the Supreme Court articulated four factors that should be used when determining whether an area is within the curtilage of a house for Fourth Amendment purposes.  These factors are

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

480 U.S. at 301.  Backyards that are enclosed and adjacent to a house are generally considered to be part of the curtilage.  See United States v. Hatfield, 333 F.3d 1189, 1196 (10th Cir. 2003); United States v. Jenkins, 124 F.3d 768, 772-73 (6th Cir. 1997).  Even partially enclosed backyards have been found to be part of a home's curtilage.  See, e.g., United States v. Swepston, 987 F.2d 1510, 1515 (10th Cir. 1993)(holding partial enclosure consistent with area being curtilage), overruled in part on other grounds by United States v. Cousins, 455 F.3d 1116 (10th Cir. 2006); United States v. Jenkins, 124 F.3d at 773 (same).

b.   **Consent.**

A warrantless search is constitutional if consent is given for the search.   Consent to a search must be unequivocal, specific, and freely given.   See United States v. Guerrero, 472 F.3d 784, 789 (10th Cir. 2007); United States v. Davis, 197 F.3d 1048, 1052 (10th Cir. 1999); United States v. Butler, 966 F.2d 559, 562 (10th Cir. 1992).   Consent does not need to be spoken, but "may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."   United States v. Guerrero, 472 F.3d at 789-90.   "Non-verbal conduct, considered with other factors, can constitute voluntary consent to search."   United States v. Gordon, 173 F.3d 761, 766 (10th Cir. 1999).   In United States v. Gordon, for example, the Tenth Circuit found implied consent when, in response to an officer's question whether the defendant could open a locked bag, the defendant handed the officer the key.   See 173 F.3d at 766.

One strategy to gain consent to a search is a knock and talk, and the knock and talk itself is not a search.   "[P]olice officers do not engage in a search when they approach the front door of a residence and seek to engage in what is termed a 'knock and talk,' *i.e.*, knocking on the door and seeking to speak to an occupant for the purpose of gathering evidence."   Florida v. Jardines, 133 S. Ct. at 1423 (Alito, J., dissenting).

> When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do.   And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak.

Kentucky v. King, 131 S. Ct. 1849, 1862 (2011).   The Tenth Circuit has explained that reasonable suspicion is unnecessary for a knock-and-talk investigation, because, "[a]s commonly understood, a 'knock and talk' is a consensual encounter and therefore does not contravene the

Fourth Amendment, even absent reasonable suspicion." United States v. Cruz-Mendez, 467 F.3d 1260, 1264 (10th Cir. 2006).   Police officers may approach a home, entering the curtilage surrounding that home that would be the normal route of access to the home, and knock, "precisely because that is 'no more than any private citizen might do,'" United States v. Shuck, 713 F.3d 563, 568 (10th Cir. 2013)(quoting Florida v. Jardines, 133 S. Ct. at 1416)).

### c.   Exigent Circumstances.

A warrantless search of a home can also be constitutional when there are exigent circumstances.   For exigent circumstances regarding safety to justify a warrantless search of a home: "(1) the officers [must have] had an objectively reasonable basis to believe that there was an immediate need to enter to protect the safety of themselves or others, and (2) the conduct of the entry [must have been] reasonable." United States v. Reeves, 524 F.3d 1161, 1169 (10th Cir. 2008).  See United States v. Smith, 797 F.2d 836, 840 (10th Cir. 1986).   While officers do not need probable cause to establish that exigent circumstances existed, "there must be some reasonable basis, approaching probable cause," supporting the search of the area.  United States v. Smith, 797 F.2d at 840 (internal quotation marks omitted).

### ANALYSIS

Payne argues that, once her case comes before the district attorney, she will be criminally prosecuted under § 30-6-4.   The evidence in support of her fear of prosecution is that investigating officers have requested the prosecution and believe the prosecution will occur. Unlike the balance of case law considering preenforcement challenges to state prosecution of allegedly unconstitutional statutes, the prosecuting office -- here, Ceballes, the acting district attorney in Otero County -- has remained silent regarding intent to prosecute.  Accordingly, the Court concludes that this case can be distinguished from Wisness v. Yocom.  See Wisness v.

<u>Yocom</u>, 433 F.3d at 733 ("District Attorney David Yocom has filed an affidavit stating that '[u]nless and until the constitutional doubts about the Utah statute are eliminated through a constitutional amendment or a new decision of the United States Supreme Court, I have no intention of prosecuting Ken Larsen or anyone else under the statute.'").

The Court is not convinced, however, that the case Payne has brought against Ceballes is ripe for judicial review.  Ripeness pertains to the timing of a case and is intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  <u>New Mexicans for Bill Richardson v. Gonzales</u>, 64 F.3d at 1499.  At this point, despite the Court's conclusion that Payne has demonstrated an injury in fact through her fear of a credible threat of prosecution, it is far from certain that Ceballes will actually choose to prosecute Payne under § 30-6-4.  Accordingly, the Court will dismiss Ceballes, without prejudice, from this case, until such time as when the matter is ripe for judicial review.  With respect to Ceballes' argument in the MTD that Payne has failed to plead sufficient facts to support her claim that § 30-6-4 is unconstitutional, the Court will not reach that argument as it relates to Ceballes, given its ruling on the jurisdictional matter -- the Court does comment, however, on the constitutionality of § 30-6-4 given Payne's claims against the other Defendants in this case.

**I.      PAYNE HAS DEMONSTRATED A CREDIBLE THREAT OF PROSECUTION, <u>SUFFICING ARTICLE III's STANDING REQUIREMENT.</u>**

The Court concludes that Payne has shown an injury in fact sufficient to demonstrate standing.  To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by

a favorable decision." Protocols, LLC v. Leavitt, 549 F.3d at 1298 (internal quotation marks omitted). In addition, "[s]tanding is determined as of the time the action is brought." Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d at 1285 (quoting Nova Health Sys. v. Gandy, 416 F.3d at 1154). At the outset, regarding the second and third elements, here there is a causal relationship between the alleged injury and the challenged conduct, because Ceballes holds the office that might prosecute Payne and, further, enjoining Payne's prosecution would redress the alleged injury -- her credible fear of prosecution. See Protocols, LLC v. Leavitt, 549 F.3d at 1298. Ceballes' MTD, then, instead argues that Payne has not demonstrated that she has suffered an injury in fact, because there exists no credible threat of prosecution by his office. See MTD at 1. Regarding standing in such preenforcement contexts, "[t]he mere presence on the books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct prohibited by the statute." Winsness v. Yocom, 433 F.3d at 732. Still, "'[t]his does not necessarily mean that a statute must be enforced against the plaintiff before he [or she] can sue.'" Winsness v. Yocom, 433 F.3d at 732 (quoting Ward v. Utah, 321 F.3d 1263, 1267 (10th Cir. 2003)). Where Payne can show a "'credible threat of prosecution,'" she can sue for prospective relief against enforcement. Winsness v. Yocom, 433 F.3d at 732 (quoting Ward v. Utah, 321 F.3d at 1267). Thus, to satisfy Article III, Payne must be "inhibited by an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or other consequences following from the statute's enforcement." Winsness v. Yocom, 433 F.3d at 732 (internal quotation marks omitted). See Wilson v. Stocker, 819 F.2d 943, 946 (10th Cir. 1987)(holding that plaintiff has standing where he suffers "an

ongoing injury resulting from the statute's chilling effect on his desire to exercise his First Amendment rights").

An outcome determinative fact before the Court at this time is that, as of the hearing, Ceballes had not yet explicitly foresworn Payne's prosecution under § 30-6-4, unlike the scenarios in the aforementioned case law upon which the MTD relies.  In Wisness v. Yocom, 433 F.3d at 733, the case that Ceballes cites in favor of his MTD on standing grounds, the "District Attorney . . . filed an affidavit stating that . . . [u]nless and until the constitutional doubts about the Utah statute are eliminated through a constitutional amendment or a new decision of the United States Supreme Court, I have no intention of prosecuting . . . anyone . . . under the statute.").  Accordingly, the plaintiffs in Wisness v. Yocom were in a different position than is Payne, because they could not allege a cognizable injury in fact, given that there was no credible threat of prosecution, making their request for declaratory and injunctive relief meaningless with respect to rectifying their alleged harm.  See 433 F.3d at 733.  The Court thus agrees with Payne's argument at the hearing, which was that she has pled a credible threat of prosecution, because, until Ceballes files the charges, this situation is the closest one may come to a credible threat that the charges will indeed be filed against Payne.  See Tr. at 10:3-9 (Garcia).  The Court concludes, then, that, given that Ceballes' office declines to express its intent not to prosecute, Payne has demonstrated an injury in fact in the form of a credible threat of prosecution sufficient to satisfy Article III's standing requirements.  See Winsness v. Yocom, 433 F.3d at 732.

## II.   PAYNE'S CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF AGAINST DISTRICT ATTORNEY CEBALLES ARE NOT, AT THE PRESENT TIME, RIPE FOR JUDICIAL REVIEW.

Simply demonstrating an injury in fact is not enough to confer jurisdiction in the Court

over Payne's claim against Ceballes -- ripeness, too, is a necessary component of the Article III requirement limiting judicial review to "cases or controversies."   U.S. Const. art. III, § 2.   See U.S. West, Inc. v. Tristani, 182 F.3d at 1208.   Ripeness pertains to the timing of a case and is intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."   New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1499.   "[T]he question in each case is whether the facts alleged, under all circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007)(citation omitted).

Unlike New Mexicans for Bill Richardson v. Gonzales, where the statute at issue "created a direct and immediate dilemma for Congressman Richardson and . . . he should not have to risk prosecution, under a statute whose scope is unclear, before his challenge to the constitutionality of that statute is ripe," no such dilemma exists for Payne.   Payne has not, for instance, alleged that the conduct for which she might be prosecuted has persisted or even that it actually occurred.   The Court, accordingly, concludes that, at the present time, Payne's claim is of too abstract a nature to create a substantial and immediate controversy that is ripe for judicial review.   See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1499.

Indeed, the Tenth Circuit has held, in a similar matter, that "[a]lthough the state certainly appears intent on charging [the defendant] under § 1021(B), we have difficulty considering a double jeopardy claim in the absence of a second information.   Without a specific charging document to review, our double jeopardy analysis would be necessarily hypothetical." Jackson v. Whetsel, 388 Fed. App'x 795, 802 (10th Cir. 2010).   In Jackson v. Whetsel, a defendant in habeas proceedings successfully argued that the prosecuting state, Oklahoma, had unlawfully

convicted him under an Oklahoma statute regarding indecent exposure toward a minor.  See 388

Fed. App'x at 800.

> The state wisely concedes that solicitation of a minor to perform or prepare any
> obscene material or child pornography in violation of Okla. Stat. tit. 21, §
> 1021(B) is not a lesser included offense of making a lewd or indecent proposal to
> a child under sixteen in violation of Okla. Stat. tit. 21, § 1123.  The state further
> admits that the jury was never instructed on the elements of § 1021(B).  In so
> doing, it has conceded that [it] violated Jackson's clearly established Sixth
> Amendment rights.").

388 Fed. App'x at 800.  The defendant in Jackson v. Whetsel further argued that "a subsequent

charge under § 1021(B) would violate his rights under the Double Jeopardy Clause, and

accordingly seeks an injunction against future prosecution."  388 Fed. App'x at 801.  The Tenth

Circuit, however, refused to consider the defendant's argument, because "[w]e cannot address

Jackson's double jeopardy claim on the merits because it is not yet ripe."  388 Fed. App'x at 801.

Applying, then, the ripeness doctrine to those facts, the Tenth Circuit provided:

> With respect to the first factor, we consider "whether the case involves uncertain
> or contingent future events that may not occur as anticipated, or indeed may not
> occur at all."  Although the state certainly appears intent on charging Jackson
> under § 1021(B), we have difficulty considering a double jeopardy claim in the
> absence of a second information.  Without a specific charging document to
> review, our double jeopardy analysis would be necessarily hypothetical.

Jackson v. Whetsel, 388 Fed. App'x at 802 (internal citations omitted).  See United States v.

Brown, 155 F.3d 431, 435 (4th Cir. 1998)(Mullen, J.)(declining to address unripe double

jeopardy claim, because second charge might fall into exception permitting successive

prosecution "when the lesser charge is instituted because the additional facts needed to prosecute

the more serious crime have not yet occurred or have not been discovered despite the exercise of

due diligence"); United States v. Tovar-Rico, 61 F.3d 1529, 1532 (11th Cir. 1995)("If the

government decides to proceed with another trial of [defendant], she may raise the double

jeopardy issue which would then be ripe for decision. We cannot speculate what further proceedings, if any, will take place."). The Tenth Circuit further provided:

> As to the second ripeness factor, we must ask "whether the challenged action creates a direct and immediate dilemma for the parties." Although our conclusion that Jackson's double jeopardy claim is unripe certainly places him in an uncomfortable position, it does not impose an immediate dilemma. If Jackson is charged with a violation of § 1021(B), he will have an opportunity to advance his double jeopardy argument before the trial court. We recognize "that the Double Jeopardy Clause protects an individual against more than being subjected to double punishments. It is a guarantee against being twice put to trial for the same offense." But Jackson will be able to interpose his claim prior to trial.

Jackson v. Whetsel, 388 Fed. App'x at 802 (internal citations omitted). Accordingly, because of the "hypothetical nature of Jackson's double jeopardy claim and the availability of multiple layers of review for that claim should he be charged under § 1021(B)," the Tenth Circuit held that it did not yet have jurisdiction over the defendant's claim. Jackson v. Whetsel, 388 Fed. App'x at 803.

The Court thus concludes that, consequently, there must be a more immediate threat to Payne's constitutional rights to consider this case sufficiently ripe for judicial review. The Court cannot accept Payne's request, at this time, to wade into the affairs of the district attorney for Otero County, because her claim is not yet ripe for review. Should the matter create a more direct and immediate threat to her alleged constitutional rights, by perhaps the filing of criminal charges, then the Court might be authorized under Article III to consider her claim.

## III.    N.M. STAT. ANN. § 30-6-4 IS NOT FACIALLY UNCONSTITUTIONAL.

As mentioned, Payne in part alleges that § 30-6-4 is unconstitutional, because it violates the Fourth Amendment to the Constitution of the United States and Article II, § 10, of the New Mexico Constitution. See Complaint ¶ 21, at 4. Ceballes, in the MTD, argues that -- should the Court conclude that it has jurisdiction to hear the claims Payne brings against him -- § 30-6-4 is

facially constitutional.  See MTD at 4-5.[6]  Indeed, Ceballes argues that Payne has not made a specific allegation that § 30-6-4 is unconstitutional: "Rather, Plaintiff only alleges that 30-6-4 is unconstitutional on its face because, according to Plaintiff, the statute allows for law enforcement to perform illegal searches of a residence without probable cause or risk criminal prosecution."  MTD at 5.  Section 30-6-4 provides:

> Obstruction of reporting or investigation of child abuse or neglect consists of:
>
> A.  knowingly inhibiting, preventing, obstructing or intimidating another from reporting, pursuant to Section 32A-4-3 NMSA 1978, child abuse or neglect, including child sexual abuse; or
>
> B.  knowingly obstructing, delaying, interfering with or denying access to a law enforcement officer or child protective services social worker in the investigation of a report of child abuse or sexual abuse.
>
> Whoever commits obstruction of reporting or investigation of child abuse or neglect is guilty of a misdemeanor.

N.M. Stat. Ann. § 30-6-4.  The Court, at this time, cannot discern how § 30-6-4, on its face, violates the Fourth Amendment to the Constitution of the United States and Article II, § 10, of the New Mexico Constitution.  Payne is ostensibly arguing that because § 30-6-4 criminalizes "knowingly obstructing, delaying, interfering with or denying access to a law enforcement officer or child protective services social worker in the investigation of a report of child abuse or sexual abuse," law enforcement officers or child protective services social workers investigating reports of child abuse or sexual abuse are somehow free to ignore ever-present constitutional requirements.  N.M. Stat. Ann. § 30-6-4.  The Court construes the statute to make it

_____

[6]The Court does not have jurisdiction to decide the issue as to Ceballes, because it has already decided to dismiss the case against him.  The Court continues to have jurisdiction over Bucag and Wilder, however, and the claims against them allege and presuppose the unconstitutionality of § 30-6-4.  Thus, the Court will proceed to decide that issue as to Bucag and Wilder.

constitutional, see Parrish v. Valero Retail Holdings, Inc., 727 F. Supp. 2d 1266, 1279 n.2 (D.N.M. 2010)(Browning, J.)("All the Court is suggesting here is that the serious constitutional or supremacy question that lurks in the background counsels that the Court should not construe New Mexico law in a way that it has not heretofore been construed . . . ."), a task that is not difficult here: law enforcement officers still have to comply with the federal and state Constitutions and must conduct a search pursuant to a warrant unless the search falls within one of the narrow exceptions for a warrantless search.  See, e.g., United States v. Lowe, 999 F.2d at 451 ("[T]he warrantless entry of the home is the chief evil against which . . . the Fourth Amendment is directed.")(internal quotation marks omitted);  United States v. Pikyavit, 527 F.3d at 1130 ("A warrantless search of a defendant's home is unreasonable absent exigent circumstances or consent.").  On its face, § 30-6-4 does not allow any search at all, and certainly does not authorize a warrantless search, or one that does not fall within the narrow exceptions for a warrantless search.  Accordingly, with respect to Payne's Complaint against the remaining Defendants, as premised on the unconstitutionality of § 30-6-4, the Court dismisses Payne's claim without prejudice to her bringing forth additional evidence regarding § 30-6-4's unconstitutionality.

IT IS ORDERED that requests in Defendant Ceballes' Motion and Memorandum to Dismiss Plaintiff's Declaratory and Injunctive Relief Claims, filed September 27, 2016 (Doc. 10), are granted.  Defendant David Ceballes is dismissed from this case, without prejudice to Plaintiff Payne bringing a similar action when the claims have become ripe.  Payne's claims against remaining Defendants, as premised on the unconstitutionality of § 30-6-4, are also dismissed without prejudice.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Miguel Garcia
John R. Hakanson, P.C.
Alamogordo, New Mexico

      *Attorneys for the Plaintiff*

Damian L. Martinez
Holt Mynatt Martinez, P.C.
Las Cruces, New Mexico

      *Attorneys for Defendant Lee Wilder*

Lee M. Rogers
Carla Neush Williams
Atwood, Malone, Turner, & Sabin, P.A.
Roswell, New Mexico

      *Attorneys for Defendants David Ceballes and Mayfritz Bucag*