# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

CARA PAYNE,

     Plaintiff,

vs.                                                No. CIV 16-0312 JB/GJF

LEE WILDER; MAYFRITZ BUCAG and
DAVID CEBALLES,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment on the Basis of Qualified Immunity, filed February 23, 2017 (Doc. 38)("MSJ"). The Court held a hearing on June 5, 2017. The primary issues are: (i) whether the undisputed material facts entitle the Defendant Lee Wilder to qualified immunity, because the Plaintiff Cara Payne ("C. Payne") has not demonstrated that Wilder violated her clearly-established constitutional rights when he executed a traffic stop of C. Payne for a suspended driver's license and further discussed with her -- and her ex-husband -- his investigation into allegations against her for child abuse, allegations which he considered to be cause to not entitle her to custody of her children in accordance with a civil custody agreement; and (ii) whether Wilder is entitled to summary judgment on C. Payne's claims brought pursuant to the New Mexico Constitution and premised in Wilder's same conduct. Because the Court concludes that, on this record of undisputed material fact, Wilder is entitled to qualified immunity on C. Payne's claims sounding in federal due process and unreasonable search and seizure theories, the Court will grant summary judgment as to those federal claims. The Court further concludes that Wilder is entitled to summary judgment as to C. Payne's claims sounding in New Mexico substantive due process

and unreasonable search and seizure, because this record of undisputed material facts demonstrates that Wilder did not commit such constitutional violations in the course of his alleged conduct. The Court concludes, however, that this record of undisputed material facts does not entitle Wilder to summary judgment as to C. Payne's claims sounding in New Mexico procedural due process, because C. Payne has asserted facts creating a genuine dispute whether Wilder's conduct resulted in a state-deprivation of her custody over her children without meaningful process before -- or after -- the deprivation. Accordingly, the Court grants in part and denies in part Wilder's MSJ.

## FACTUAL BACKGROUND

Before the Court addresses the MSJ's proffer of undisputed facts, the Court provides a brief synopsis of the background facts giving rise to C. Payne's case. The Court provides this background only for ease of readership and context. The Court draws recitation of the relevant background facts from the Plaintiff's Amended Complaint for Damages and Petition for Declaratory and Injunctive Relief, filed April 19, 2016 (Doc. 1-2)("Complaint").

### 1.      Background Facts Giving Rise to the Complaint.

The Complaint alleges that, on July 8, 2015, Wilder, a law enforcement officer in Otero County, New Mexico, stopped and seized C. Payne in Alamogordo, New Mexico, for driving with a suspended license. See Complaint ¶ 7, at 1. Wilder represented that he was conducting a child abuse investigation, forced C. Payne to do a field sobriety test, and attempted to force C. Payne to allow him to search a home where C. Payne was staying as a house sitter for the owner of the home. See Complaint ¶¶ 7-11, at 2-3. Wilder -- C. Payne alleges -- did not have reasonable suspicion to support the notion that Payne was intoxicated. See Complaint ¶¶ 8-9, at 2. Regarding the home search, C. Payne refused to allow the search, and told Wilder that she

had previously been under investigation by the State of New Mexico Children, Youth, and Families Department ("CYFD"), but that the investigation did not support allegations of abuse. See Complaint ¶¶ 10-11, at 2-3. Upon her refusal, Wilder contacted Defendant Mayfritz Bucag, a CYFD investigator, who C. Payne alleges then contacted C. Payne's ex-husband and ordered him to not allow C. Payne custody of their children. See Complaint ¶¶ 12-14, at 3. C. Payne did not have custody or visitation rights after this traffic stop, as a consequence of Wilder and Bucag's directive, despite having the legal right to custody and visitation. See Complaint ¶¶ 15-16, at 3.

Wilder and Bucag then petitioned the district attorney's office in Otero County to file criminal charges against C. Payne for refusing to allow the search of a house where she was staying as a house sitter for the home's owner. See Complaint ¶ 18, at 4. In particular, the criminal charges would flow pursuant to N.M. Stat. Ann. § 30-6-4, which relates to obstruction of reporting or investigating child abuse or neglect. See Complaint ¶ 19, at 4. Wilder expects that charges will be filed against C. Payne. See Complaint ¶ 20, at 4. Defendant David Ceballes was the District Attorney for Otero County when C. Payne filed her Complaint. See Complaint ¶ 6, at 2.

### 2. The Undisputed Facts That Wilder's MSJ and the Record Establish.

"Deputy Lee Wilder was a Deputy Sheriff with the Otero County Sheriff's Officer ('OCSO') at the time of the July 8, 2015, incident." MSJ ¶ 1, at 3 (asserting this fact). See Plaintiff's Response to Defendant Wilder's Motion for Summary Judgment ¶ 1, at 1, filed March 27, 2017 (Doc. 50)("Response")(not disputing this fact). "Deputy Wilder has never been employed by the New Mexico [CYFD]." MSJ ¶ 2, at 3 (asserting this fact). See Response ¶ 2, at 1 (not disputing this fact). "On July 8, 2015, Deputy Wilder received a referral from CYFD

and Intake Report as part of an investigation into an anonymous tip alleging child abuse and

neglect of Plaintiff Cara Payne's two children." MSJ ¶ 3, at 3 (asserting this fact). See Response

¶ 3, at 1 (not disputing this fact). "Upon receipt of the CYFD referral and Intake Report, Deputy

Wilder ran a background check on Plaintiff, Plaintiff's ex-husband, Robert Payne [('R. Payne')],

and Richard Herndon, including a check on the status of their driver's licenses and determined

that Plaintiff's driver's license was suspended." MSJ ¶ 4, at 3 (asserting this fact). See

Response ¶ 4, at 1 (not disputing this fact). "As part of the CYFD investigation, Deputy Wilder

visited with Robert Payne, the children's father, to assess the validity of the facts in the

anonymous tip." MSJ ¶ 5, at 3 (asserting this fact)(citing Deposition of Lee Wilder at 10:19-21

(taken November 16, 2015), filed February 23, 2017 (Doc. 38-1)("Wilder Depo.").[1]

---

[1]C. Payne purports to dispute this assertion of fact, stating: "Plaintiff denies the allegations in Paragraph Five. The portion of the record cited explains that Mr. Payne was contacted but does not supply a basis for the reason of the contact." Response ¶ 5, at 1. The cited portions of the Wilder Depo. provide: "So then I contacted the second location listed which is the father, Robert Payne, at 708 and a half Adams." Wilder then, in Defendant Lee Wilder's Reply in Support of Motion for Summary Judgment on the Basis of Qualified Immunity (Doc. 38), filed April 17, 2017 (Doc. 49)("Reply"), asserts that, "[i]n context, Deputy Wilder's deposition clearly reveals that the entire investigation started with an anonymous tip, which Deputy Wilder followed up with to obtain background information, as provided in [MSJ ¶¶ 3-4, at 3]. On this fact, Plaintiff presents no material dispute." Reply ¶ 1, at 2. Regarding the litigants' tasks when litigating a motion for summary judgment, the D.N.M. LR-Civ require:

> **Statement of Material Facts.** The moving party must file with the motion a written memorandum containing a short, concise statement of the reasons in support of the motion with a list of authorities relied upon (the "Memorandum"). A party opposing the motion must file a written memorandum containing a short, concise statement of the reasons in opposition to the motion with authorities (the "Response"). The moving party may file a written reply memorandum with authorities (the "Reply").
>
> - The Memorandum must set out a concise statement of all of the material facts as to which the movant contends no genuine issue exists. The facts must be numbered and must refer with particularity to those portions of the record upon which the movant relies.

- The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted. The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.

- The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection. Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact. All material facts set forth in the Response will be deemed undisputed unless specifically controverted.

D.N.M. LR-Civ. 56.1(b). At the outset, in this case, neither the Response nor the Reply "letter[]" their paragraphs as required; the Court, however, is -- without extra effort -- nonetheless capable of attributing each assertion to its response. Regarding the present dispute, whereby C. Payne disputes that Wilder has adequately supported his assertions that Wilder contacted R. Payne "[a]s part of the CYFD investigation," MSJ ¶ 5, at 3, and "to assess the validity of the facts in the anonymous tip," MSJ ¶ 5, at 3, the Court notes that C. Payne proffers no evidence which creates a dispute of these assertions and instead only argues that the assertions lack support in the record, see Response ¶ 5, at 1. The Court is not persuaded, however, that the assertions lack support in the record, because the course of the Wilder Depo. appears to be his chronological detailing of his investigation into the anonymous tip regarding C. Payne's alleged child abuse. See Wilder Depo. at 8:8-15:16. Wilder discussed his actions at the "beginning in order to start the investigation," Wilder Depo. at 8:17-20, that he discovered R. Payne's contact information after running the license plate for C. Payne's vehicle, and that he then contacted R. Payne and discussed how he had observed C. Payne's home, and had run C. Payne's license plate, and as a result had discovered R. Payne's address, see Wilder Depo. at 9:17-11:10. Wilder explained that he next discussed the anonymous tip and C. Payne's whereabouts with R. Payne. See Wilder Depo. at 11:10-21. The Court concludes, then, that the record supports Wilder's assertions, because C. Payne has not specifically controverted the assertions with evidence in the record, leaving the Court without the ability to question the assertion's veracity in light of the context. The Court deems the assertions -- that Wilder contacted R. Payne "[a]s part of the CYFD investigation," MSJ ¶ 5, at 3, and "to assess the validity of the facts in the anonymous tip," MSJ

The anonymous tip explained that the reporting party believed Plaintiff's children may 1) be subject to abuse, neglect, and potential physically harm, because Plaintiff resided with a felon wanted by other felons and law enforcement; 2) Plaintiff was likely using methamphetamine based upon her appearance; and 3) predicted Plaintiff might be found at 10 Coyote Run in La Luz, New Mexico.

MSJ ¶ 6, at 3-4 (asserting this fact).  See Response ¶ 6, at 1 (not disputing this fact).  "Mr. Payne corroborated most of the information in the tip explaining that he suspected Plaintiff was on methamphetamine, was covered in scabs, suffered severe moods swings, and that Plaintiff's husband Richard Herndon was a felon living with Plaintiff."  MSJ ¶ 6, at 3-4 (asserting this fact)(citing Wilder Depo. at 12:1-25).[2]  "Deputy Wilder traveled to the house Plaintiff was then

_____

¶ 5, at 3 -- undisputed.

[2]C. Payne purports to dispute this assertion of fact, stating: "Plaintiff denies the allegations in Paragraph Seven.  The portion of the record cited shows that Mr. Payne had suspicions but no facts to corroborate any suspicions listed in the anonymous report."  Response ¶ 7, at 1.  Wilder, in Defendant Lee Wilder's Reply in Support of Motion for Summary Judgment on the Basis of Qualified Immunity (Doc. 38) ¶ 2, at 2, filed April 17, 2017 (Doc. 49)("Reply"), provides: "Deputy Wilder stated only that Mr. Payne presented facts that corroborated the anonymous tip" and therefore maintains his assertion.  Reply ¶ 2, at 2.  The cited portions of the Wilder Depo. indicate that, based on Wilder's impression of his conversation with R. Payne, "he basically confirmed his suspicions of most of the things" that C. Payne was doing.  Wilder Depo. at 12:1-12.  According to Wilder, R. Payne "told me that he suspected that she was on drugs.  And he told me that he knew that Richard . . . is the person that's wanted on the felony charges, [and] was staying with her."  Wilder Depo. at 12:16-19.  Wilder also indicated that R. Payne "confirmed that she -- the scabs and the severe mood swings, and that she was extremely thin."  Wilder Depo. at 12:22-24.  Black's Law Dictionary defines "corroborate" to mean "[t]o strengthen or confirm; to make more certain."  Corroborate, Black's Law Dictionary at 397 (9th ed. 2009).  Wilder is asserting only that "Mr. Payne corroborated most of the information in the tip explaining that he suspected Plaintiff was on methamphetamine, was covered in scabs, suffered severe moods swings, and that Plaintiff's husband Richard Herndon was a felon living with Plaintiff."  MSJ ¶ 6, at 3-4.  C. Payne does not create a genuine dispute by arguing -- without providing alternative evidence -- that "the record cites shows that Mr. Payne had suspicions but no facts to corroborate any suspicions listed in the anonymous report."  Response ¶ 7, at 1.  Instead, it appears C. Payne is asking the Court to weigh the evidence, and conclude that there is a genuine dispute of fact on this issue, because the alignment of R. Payne's suspicions regarding C. Payne's conduct with the allegations made by the anonymous tip is not sufficient corroboration.  In that regard, C. Payne has not specifically controverted Wilder's assertion that "Mr. Payne corroborated most of the information in the tip explaining that he

residing at located at #10 Coyote Run in La Luz, New Mexico to continue the investigation but no one answered the door." MSJ ¶ 8, at 4 (asserting this fact). <u>See</u> Response ¶ 8, at 1 (not disputing this fact). "Later on July [8], 2015, Deputy Wilder stopped Plaintiff's vehicle knowing Plaintiff was driving with a suspended driver's license, to follow up with her on the investigation, and because he suspected Mr. Herndon could be hiding behind the tinted windows in the vehicle." MSJ ¶ 9, at 4 (asserting this fact). <u>See</u> Response ¶ 9, at 2 (not disputing this fact).

> During the traffic stop, Deputy Wilder came to believe Plaintiff was under the influence of methamphetamines relying on the information in the anonymous tip, his knowledge that she had been associated with methamphetamine users in the past, and because she appeared covered in scabs, shaking, and extremely thin consistent with methamphetamine usage.

MSJ ¶ 10, at 4 (asserting this fact)(citing Wilder Depo. at 39:3-8; July 8, 2015, Traffic Stop Video, filed in Clerk's Office on May 25, 2017 ("Traffic Stop Video"), <u>see</u> Notice of Filing Audio/Visual Material as Exhibit C to Defendant Lee Wilder's Motion for Summary Judgment on the Basis of Qualified Immunity and Memorandum in Support Thereof [Doc. 38], filed May 25, 2017 (Doc. 57)).[3] "Also during the traffic stop, Deputy Wilder informed Plaintiff that she

---

suspected Plaintiff was on methamphetamine, was covered in scabs, suffered severe moods swings, and that Plaintiff's husband Richard Herndon was a felon living with Plaintiff," MSJ ¶ 6, at 3-4, so the Court deems the assertion undisputed.

[3]C. Payne purports to dispute this assertion of fact, stating:

> Defendant stated that Plaintiff was shaky, had scabs all over her body, and [was] extremely thin. First, Defendant must show that he **reasonably** believed that Plaintiff was under the influence of methamphetamines. Second, Defendant stated that Plaintiff had scabs all over body when she was obviously clothed and he could not see her entire body. Third, Defendant had not known Plaintiff before the encounter and could not gauge her thinness. Finally, in order for Defendant's belief to be "reasonable" it would have to be based on some type of training or experience but was not.

Response ¶ 10, at 2 (emphasis in original).  Wilder testified:

> I was still very suspicious.  She was shaking, extremely thin.  She did have scabs all over her body, that is obviously indication[] of methamphetamine usage.  The fact she had been around methamphetamine in the past in reference to these search warrants.  Obviously I did not believe it was enough to arrest her otherwise I would have.

Wilder Depo. at 39:3-9.  In the video of the traffic stop, C. Payne is wearing a shirt and shorts, leaving much of her body exposed.  See Traffic Stop Video at 7:57-:58.  Accordingly, Wilder surmises that C. Payne is first disputing that "Wilder provided a proper basis for his conclusion that she was under the influence of methamphetamine during the traffic stop."  Defendant Lee Wilder's Reply in Support of Motion for Summary Judgment on the Basis of Qualified Immunity (Doc. 38) ¶ 3, at 2, filed April 17, 2017 (Doc. 49)("Reply").  In that regard, Wilder maintains his ultimate legal argument that the stop was, indeed, reasonable, but the Court notes that the reasonableness of the stop is not a factual issue which Wilder has asserted in the MSJ.  Wilder has asserted, as undisputed fact, his subjective impressions of C. Payne during the traffic stop, and a few of his observations.  See MSJ ¶ 10, at 4.  To the extent that C. Payne disputes whether Wilder's inferences were "reasonabl[e]" in the Response, or supported by training and experience, the Court concludes that such a dispute does not specifically controvert Wilder's instant assertion of fact.  Response ¶ 10, at 2.

Turning, then, to C. Payne's attempt to identify a genuine issue of fact in response to MSJ ¶ 10, at 4, Wilder states that, where the "Plaintiff also argues that Deputy Wilder could not have known whether she was covered in scabs at the time of the traffic stop because she was clothed," the case was that the "Plaintiff wore shorts and a t-shirt leaving enough of her person exposed to allow Deputy Wilder to determine she had scabs covering a significant portion of her body."  Reply ¶ 3, at 2.  See Traffic Stop Video at 7:57-:58.  In that sense, it appears to the Court that C. Payne is disputing that "she appeared covered in scabs," by arguing that Wilder has not supported his assertion with evidence in the record, because clothing covered C. Payne's body.  Response ¶ 10, at 2.  The record evidence, however, supports Wilder's assertion that C. Payne was wearing clothing which exposed "her person . . . to allow Deputy Wilder to determine she had scabs covering" the exposed parts of her body.  Digging deeper, the Court notes that Wilder is actually only asserting that the observable, exposed, portions of C. Payne's body were "covered in scabs"; Wilder asserts that she "appeared covered in scabs."  MSJ ¶ 10, at 4 (emphasis added).  Wilder is only making an assertion regarding his subjective observations of fact, and, in this regard C. Payne has not specifically controverted his assertion with evidence in the record.  Having failed to identify a genuine issue of fact regarding Wilder's assertion -- by, for example, identifying evidence in the record suggesting C. Payne had no visible scabs -- the Court deems undisputed Wilder's assertion that C. Payne "appeared covered in scabs."  MSJ ¶ 10, at 4.  The Court recognizes, too, however, that it remains disputed whether C. Payne's entire body was covered in scabs.  Next, regarding C. Payne's dispute that "Wilder could not fairly attribute her thinness with methamphetamine use because he did not know her before the traffic stop," Reply ¶ 3, at 2, Wilder concedes he did not know her before the traffic stop, but that he "relied on sources who were familiar with Plaintiff's appearance," Reply ¶ 3, at 2, to support his

could not see her children if she did not cooperate with the CYFD investigation." MSJ ¶ 11, at 4 (asserting this fact). See Response ¶ 11, at 2. "Despite his conversation with Plaintiff, Deputy Wilder never removed the children from Plaintiff's [physical custody]."[4] MSJ ¶ 12, at 5 (asserting this fact)(alterations added using language from the Response)(citing Wilder Depo. at 27:23-25; id. at 28:1-24; id. at 29:1-6). See Response ¶ 12, at 2 (not disputing the fact as altered). "Based on Plaintiff's appearance and Deputy Wilder's knowledge of her prior association with methamphetamine users, Deputy Wilder administered a field sobriety test and she passed, [performing well]."[5] MSJ ¶ 13, at 5 (asserting this fact)(alterations added using

_____

inference and assertion. Again, C. Payne has not identified record evidence which specifically controverts Wilder's assertion that "she appeared . . . extremely thin consistent with methamphetamine usage." MSJ ¶ 10, at 4. Instead, the Court considers C. Payne to be arguing that the assertion -- which is, essentially, Wilder asserting his observations at the time of the traffic stop -- was not the basis of a reasonable inference and is therefore genuinely disputed. The Court disagrees, and concludes that C. Payne has not meaningfully, and with evidence on the record, disputed the assertion of fact that -- to Wilder -- C. Payne "appeared covered in scabs, shaking, and extremely thin consistent with methamphetamine usage." Whether Wilder's inferences were reasonable is a matter of law that the Court will measure, against the undisputed facts -- which includes Wilder's assertions regarding his observations and inferences about C. Payne at the time of the stop -- in the Court's Analysis section. See O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1058 n.1 (D.N.M. 2012)(Browning, J.)(stating that the proper course is to determine relevance in the analysis section rather than in the factual background section).

[4]Wilder's MSJ asserts: "Despite his conversation with Plaintiff, Deputy Wilder never removed the children from Plaintiff's control." MSJ ¶ 12, at 5 (emphasis added). C. Payne's Response purports to dispute this fact by "admit[ting] that Defendant never removed the children from her physical custody," but providing: "The portions cited by Defendant, however, show that Plaintiff was not allowed to control any aspect of her children's lives until she had performed the acts that Defendant wanted her to perform." Response ¶ 12, at 2 (emphasis added). Because Wilder does not object to the proposed alteration to the proffered fact, the Court deems undisputed the asserted fact as C. Payne's Response alters them. See Defendant Lee Wilder's Reply in Support of Motion for Summary Judgment on the Basis of Qualified Immunity (Doc. 38), filed April 17, 2017 (Doc. 49).

[5]C. Payne's Response states: "Plaintiff admits the allegations . . . [and] would add that the cited material shows that Plaintiff performed 'well' on her tests." Response ¶ 13, at 5. Because Wilder does not object to the proposed alteration to the proffered fact, the Court deems

language from the Response)(citing Wilder Depo. at 37:21-23; id. at 38:14-17; id. at 39:3-16).

See Response ¶ 12, at 2 (not disputing the fact as altered).[6] "Plaintiff and Mr. Payne shared joint

_____

undisputed the asserted fact as C. Payne's Response alters it.  See Defendant Lee Wilder's Reply in Support of Motion for Summary Judgment on the Basis of Qualified Immunity (Doc. 38), filed April 17, 2017 (Doc. 49).

[6]Wilder next asserts: "After the July 8, 2015 incident, Plaintiff never attempted to challenge Deputy Wilder's  assertions that she could not see her children unless she cooperated with the investigation through CYFD, OCSO, or a court."  MSJ ¶ 14, at 5 (citing Deposition of Cara Payne at 52:16-25 (taken November 16, 2015), filed February 23, 2017 (Doc. 38-2)("C. Payne Depo.")(responding to whether at any "point did you go and talk to an attorney and say open up my custody because this is wrong that [R. Payne] is keeping custody of my kids," by testifying that "I didn't need a custody agreement.  There was one in place.  He wasn't following it.  Is that a criminal matter? . . .  I'd been to the police department."); id. at 53:1-25 (testifying that she agreed one could "move the court to enforce the custody agreement," and that she did not file a motion to enforce custody, but also testifying that if R. Payne "wasn't following the current one, why is he gonna" change his conduct, and that although "a judge could put some people in line," "I didn't know -- I guess I didn't know what I was supposed to do. I did what I thought," and "I called a lawyer. . . .  Gail Brownfield"); id. at 54:1-8 (testifying that she did not go back to CYFD "to see if they even had an open case," because "[a]fter what they told me, that the deputy was the one who said -- I figured I was waiting for the deputy.")).  C. Payne disputes Wilder's assertion by stating:

> The lower court record filed in this removal action shows that this very case was filed by Plaintiff against Defendant and her ex-husband Robert Payne on July 23, 2015.  The initial complaint filed in state court pled a Habeas Corpus claim against Defendant in an attempt to reclaim her children.  That claim was denied by the state court.

Response ¶ 14, at 2 (citing, generally, the Honorable Judge Jerry H. Ritter's, New Mexico District Judge for the State of New Mexico, Order Denying *Ex Parte* Writ of Habeas Corpus (dated July 30, 2015), filed April 19, 2016 (Doc. 1-2)("Ritter Order")(considering C. Payne's allegations, in C. Payne's "proposed Writ of Habeas Corpus together with Plaintiff s unverified Petition for Writ of Habeas Corpus and Complaint for Damages under the New Mexico Tort Claims Act," that the "Defendants [Wilder, Sheriff Benny House, and R. Payne] have wrongfully deprived her of the physical custody and companionship of her biological children, and asks for this Court to order the Defendants to have the children 'imprisoned and detained' until the Court otherwise acts")).  In reply, Wilder concedes that the "Plaintiff filed a habeas petition against him," but argues, "[h]owever, the habeas petition was an improper device to regain custody or control of her children and when the court dismissed the petition she never attempted to regain custody or access to [the] children."  Defendant Lee Wilder's Reply in Support of Motion for Summary Judgment on the Basis of Qualified Immunity (Doc. 38) ¶ 4, at 3, filed April 17, 2017

custody over the children per a custody order." MSJ ¶ 15, at 5 (asserting this fact). See

Response ¶ 15, at 2 (not disputing this fact).[7]

---

(Doc. 49). In the Court's review of the record, it is apparent that C. Payne has cited evidence refuting Wilder's assertion that, "[a]fter the July 8, 2015 incident, Plaintiff never attempted to challenge Deputy Wilder's assertions that she could not see her children unless she cooperated with the investigation through CYFD, OCSO, or a court," MSJ ¶ 14, at 5. See Response ¶ 14, at 2. C. Payne has proffered evidence that she sought relief and custody through New Mexico's courts, see Response ¶ 14, at 2, and the Court will not punish -- by deeming Wilder's assertion of fact undisputed -- C. Payne, who, admittedly did not know what avenue she should pursue, see C. Payne Depo. at 53:1-25, for approaching her problem in the manner she chose. Regardless, that she did seek relief in state court is sufficient to specifically controvert and dispute Wilder's assertion that, "[a]fter the July 8, 2015 incident, Plaintiff never attempted to challenge Deputy Wilder's assertions that she could not see her children unless she cooperated with the investigation through CYFD, OCSO, or a court." MSJ ¶ 14, at 5.

[7]"Throughout the course of the investigation, Deputy Wilder believed he acted pursuant to statutory authority to prevent interference and delay with the investigation." MSJ ¶ 16, at 5 (asserting this fact)(citing Wilder Depo. at 44:4-24). C. Payne disputes this fact, stating: "The material cited by Defendant does not stand for the proposition that he believed that he was acting under statutory authority to prevent interference or delay with the investigation." Response ¶ 16, at 2-3. Wilder testified that the "District Attorney's Office" had "trained that if you go to somebody's house and they require a warrant to either get the kids or to go into the house that's a violation of 30-6-4," and that,

> if we are conducting a child abuse investigation . . . if the person interferes or delays our ability to inspect the premises then they've potentially committed a crime. That doesn't mean we can grab them, arrest them and walk in. We then have to make further determination on how we proceed. Obviously if the kids are in danger inside the house or there's reasonable suspicion to believe then you have to take immediate steps to make sure the kids are safe.

Wilder Depo. at 44:4-24. In reply, Wilder argues that his assertion is that "he specifically relied upon **N.M. Stat. Ann. § 30-6-4(C)** [sic] **(2005)** and its requirement that he investigate and protect against child abuse and neglect." Defendant Lee Wilder's Reply in Support of Motion for Summary Judgment on the Basis of Qualified Immunity (Doc. 38) ¶ 5, at 3, filed April 17, 2017 (Doc. 49)(emphasis in original). The Court notes that Wilder has testified that he knew about N.M. Stat. Ann. § 30-6-4 -- which criminalizes as a misdemeanor the "obstruction of reporting or investigation of child abuse or neglect," N.M. Stat. Ann. § 30-6-4 -- and that he had considered how enforcement of N.M. Stat. Ann. § 30-6-4 would proceed should a violator be in the same home as the children allegedly being abused or neglected, see Wilder Depo. at 44:7; 44:14-24. Again, Wilder's assertion is that, "[t]hroughout the course of the investigation, [he] believed he acted pursuant to statutory authority to prevent interference and delay with the

During the traffic stop Wilder said that he had been looking for Plaintiff. She told him that she did not have her children, that they were with their dad. Plaintiff handed Defendant her driver's license and her lawyer's card and asked for her lawyer. Defendant told Plaintiff that he needed to search a residence located a 10 Coyote. Defendant took Plaintiff's license and returned to his car. When he returned, he stated that Plaintiff needed to do a sobriety test and she performed the test.

Response ¶ 1, at 3 (asserting these facts)(citing Affidavit of Cara Payne ¶ 2, at 1 (executed September 9, 2015), filed March 27, 2017 (Doc. 46-1)("C. Payne Aff."). See Defendant Lee Wilder's Reply in Support of Motion for Summary Judgment on the Basis of Qualified Immunity (Doc. 38) ¶ 1, at 3, filed April 17, 2017 (Doc. 49)("Reply")(not disputing these facts).[8] After the

---

investigation." MSJ ¶ 16, at 5. C. Payne has not proffered any record evidence which refutes this assertion and disputes this assertion only by arguing that the Wilder Depo. does not provide evidence which supports an assertion concerning Wilder's "belief[s]" at the time of the investigation. The Court agrees with C. Payne, because the cited portions of the Wilder Depo. -- and the testimony directly thereafter, see Wilder Depo. at 45:1-3 -- appear to discuss only Wilder's conduct after the traffic stop, when he suggested to the District Attorney's office the filing of N.M. Stat. Ann. § 30-6-4 charges against C. Payne. The Court is not in a place, based upon the cited record evidence, to conclude that it is an undisputed fact that, "[t]hroughout the course of the investigation, Deputy Wilder believed he acted pursuant to statutory authority to prevent interference and delay with the investigation." MSJ ¶ 16, at 5. Essentially, by her dispute, C. Payne has identified a lack of record evidence in support of Wilder's assertion, and the Court concludes that there is a genuine dispute, on this record, regarding whether Wilder believed that he was investigating pursuant to a "statutory authority to prevent interference and delay with the investigation," and points to his statutory authority to prevent the crime of child abuse itself. MSJ ¶ 16, at 5. The Court deems this assertion disputed. Whether it is a material dispute, however, is a matter for the Court's Analysis section. See O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1058 n.1 (D.N.M. 2012)(Browning, J.)(stating that the proper course is to determine relevance in the analysis section rather than in the factual background section).

[8]Wilder purports only to dispute C. Payne's assertions that, during the traffic stop, "Wilder said that he had been looking for Plaintiff. She told him that she did not have her children, that they were with their dad." Response ¶ 1, at 3. In support, C. Payne cites the C. Payne Aff., which provides, in full:

On July 8, 2015 , I was pulled over by Defendant Wilder. During the traffic stop, Wilder said that he had been looking for me. I told him that I did not have my children that they were with their dad. I handed my driver's license and my lawyers card and asked for my lawyer. He told me that he needed to search a

field sobriety test, and at the conclusion of the traffic stop, Wilder reiterated to C. Payne that, because of the open child abuse investigation, he needed to conduct an investigation of the home at 10 Coyote Run before he could allow the children back there, at which point C. Payne asserted "she did not live there but was housesitting the residence."  Response ¶ 2, at 3.[9]  Wilder "told

---

residence located a 10 Coyote.  He took my license and  returned to  his car. When he returned, he stated that I needed to do a sobriety test.  I performed the test.

C. Payne Aff. ¶ 2, at 1.  Wilder disputes those assertions, however, arguing: "Deputy Wilder denies that he told Plaintiff he had been looking for her or that she stated that her children were with their father but admits the remaining allegations in Paragraph 1."  Reply ¶ 1, at 3 (citing MSJ ¶ 10, at 4; Response ¶ 1, at 3).  The material to which Wilder cites, in the MSJ, is the Wilder Depo. at 39:3-8, and the Traffic Stop Video at 7:40-15:45.  The material to which Wilder cites, in the Response, is the C. Payne Aff. ¶ 2, at 1, supra, which the Court notes does not support Wilder's argument that neither he, nor she, said what C. Payne asserts he, and she, said during the traffic stop.  Regarding the first cited material, the Wilder Depo. at 39:3-8, Wilder testified:

I was still very suspicious.  She was shaking, extremely thin.  She did have scabs all over her body, that is obviously indication[] of methamphetamine usage.  The fact she had been around methamphetamine in the past in reference to these search warrants.  Obviously I did not believe it was enough to arrest her otherwise I would have.

Wilder Depo. at 39:3-9.  The Court notes that this material, too, does not appear to support Wilder's denial that "he told Plaintiff he had been looking for her or that she stated that her children were with their father."  Reply ¶ 1, at 3.  Turning last, then, to the Traffic Stop Video, the Court, having reviewed the video, confirms that Wilder in fact told C. Payne: "I've been looking for you" at the very beginning of the traffic stop.  Traffic Stop Video at 1:20-:30. Accordingly, the record evidence confirms C. Payne's assertion, and Wilder has not specifically controverted her assertion that "he told Plaintiff he had been looking for her."  Reply ¶ 1, at 3. The Court deems that assertion undisputed.  The Court also notes, upon having reviewed the Traffic Stop Video, that C. Payne and Wilder discuss the location of her kids, and that she says: "Of course they're with their dad."  Traffic Stop Video at 2:50-3:00.  Accordingly, the record evidence confirms C. Payne's assertion, and Wilder has not specifically controverted her assertion that "she stated that her children were with their father."  Reply ¶ 1, at 3.  The Court deems that assertion undisputed.

[9]C. Payne's Response asserts: "After the test, Defendant asked if Plaintiff was going to take him to 10 Coyote because he needed to search the house.  She told him that she was not

- 13 -

because she did not live there but was housesitting the residence." Response ¶ 2, at 3 (citing C. Payne Aff. ¶ 3, at 2 (attesting that: "After the test, he asked if I was going to take him to 10 Coyote because he needed to search the house. I told him that I was not because I did not live but was housesitting the residence.")). Wilder purports to dispute C. Payne's account of the end of the traffic stop, arguing:

> As clearly depicted in the video of the traffic stop, Deputy Wilder informed Plaintiff that he believed she was not under the influence and that he was citing her for driving under a suspended license, then asked whether she had someone who could pick her up and allowed her to wait in her vehicle.

Response ¶ 2, at 3 (citing MSJ ¶ 10, at 4 (citing Wilder Depo. at 39:3-8, and the Traffic Stop Video at 7:40-15:45); Traffic Stop Video at 15:15-:35; Scott v. Harris, 550 U.S. 372, 279-81 (2007)(reversing a denial of summary judgment, because the court improperly relied on the plaintiff's account rather that reliable footage of a police chase)). The Court first notes that the Wilder Depo. at 39:38 provides:

> I was still very suspicious. She was shaking, extremely thin. She did have scabs all over her body, that is obviously indication[] of methamphetamine usage. The fact she had been around methamphetamine in the past in reference to these search warrants. Obviously I did not believe it was enough to arrest her otherwise I would have.

Wilder Depo. at 39:3-9. That evidence does not support Wilder's dispute regarding the dialogue between he and C. Payne after the field sobriety test, and thus does specifically controvert the assertion that, "[a]fter the test, Defendant asked if Plaintiff was going to take him to 10 Coyote because he needed to search the house. She told him that she was not because she did not live there but was housesitting the residence." Response ¶ 2, at 3. The Court has reviewed the Traffic Stop Video, and, at the outset, notes that Wilder has accurately cited the segment of the Traffic Stop Video wherein the viewer can watch and hear the conclusion of the field sobriety test. See Traffic Stop Video at 15:15-:35. The Traffic Stop Video confirms everything that Wilder argues in response to C. Payne's assertion, regarding what transpired immediately after Wilder concluded the field sobriety test. See Traffic Stop Video at 15:15-:35. That sobriety test was not the traffic stop's conclusion; Wilder then continued to his vehicle, wrote a citation for C. Payne's suspended license and reapproached C. Payne's vehicle to issue the citation. See Traffic Stop Video at 15:35-25:00. While C. Payne's assertion begins with "[a]fter the test," the Court notes that C. Payne did not restrict the timing of her assertion to, for example, that time coming immediately after the test. Response ¶ 2, at 3. The Court, accordingly, must still investigate that dialogue between C. Payne and Wilder as he issued the citation to ascertain whether C. Payne's assertion is nonetheless controverted by the record evidence in totality. After Wilder reaches C. Payne's car, he begins by explaining the reason for issuing the citation for C. Payne's suspended license, and the responsibilities that C. Payne would now have to adequately respond to the citation. See Traffic Stop Video at 23:07-:55. C. Payne then makes an inaudible statement, in response to which Wilder begins talking about the child abuse investigation. See Traffic Stop

- 14 -

her, during the stop, that he had talked with her ex-husband and that she did not get to see her kids pending the investigation." Response ¶ 3, at 3 (asserting this fact). See Reply ¶ 3, at 3 (not disputing this fact). "After the stop, Wilder called Plaintiff's cell phone twice. In both

_____

Video at 23:56-24:21. Wilder explained that the child abuse allegations were that she was doing drugs inside her house and that he needed to conduct an investigation of the home on "Coyote Run" before he could allow the children back into that home, and if she would not allow him into the home to conduct the investigation, Wilder stated "then I cannot allow the children to go over there." Traffic Stop Video at 23:56-24:21. C. Payne then makes one more inaudible statement, at which point Wilder hands her a copy of the citation, her driver's license, and her insurance, then instructs her not to wait next to, or reenter, the busy highway next to which he has stopped her, and then walks away. See Traffic Stop Video at 24:22-:49.

      By reviewing the Traffic Stop Video, the Court has fully reviewed the record evidence and notes that Wilder has specifically controverted C. Payne's assertion that, "[a]fter the test, Defendant asked if Plaintiff was going to take him to 10 Coyote because he needed to search the house." Response ¶ 2, at 3. The Traffic Stop Video indicates that Wilder, in relevant part, indicated only that he needed to investigate 10 Coyote Run before he could allow the children "to go over there." Traffic Stop Video at 23:56-24:21. He did not ask if she was going to take him there at that time, as the C. Payne Aff. suggests. Wilder made comments regarding needing to investigate the home at the close of the traffic stop -- which C. Payne appears to have misheard -- so the Court will deem undisputed the accurate content of Wilder's statements as the Traffic Stop Video portrays: "After the field sobriety test, and at the conclusion of the traffic stop, Wilder reiterated to C. Payne that, because of the open child abuse investigation, he needed to conduct an investigation of the home at 10 Coyote Run before he could allow the children back there." Supra at 12-13. Regarding the latter part of C. Payne's assertion -- "[s]he told him that she was not because she did not live there but was housesitting the residence," Response ¶ 2, at 3 -- the Court concludes that Wilder has not disputed this assertion with record evidence, because C. Payne's statements in the Traffic Stop Video, see Traffic Stop Video at 23:56-24:49, were inaudible. Wilder has not specifically controverted C. Payne's assertion as the record evidence in the C. Payne Aff. ¶ 3, at 2 supports, that "[s]he told him that she was not because she did not live there but was housesitting the residence," Response ¶ 2, at 3. The Court deems this asserted fact undisputed. In sum, the Court rewrites -- in light of the record evidence -- and deems undisputed C. Payne's assertion as follows:

        After the field sobriety test, and at the conclusion of the traffic stop, Wilder reiterated to C. Payne that, because of the open child abuse investigation, he needed to conduct an investigation of the home at 10 Coyote Run before he could allow the children back there, at which point C. Payne asserted "she did not live there but was housesitting the residence."

Supra at 12-13 (quoting Response ¶ 2, at 3).

messages, he asked if she was ready to cooperate with the investigation so that she could get her kids back." Response ¶ 4, at 3 (asserting this fact)(citing C. Payne Aff. ¶ 5, at 2).[10] "From July 8, 2015 until December 25, 2015, Plaintiff was only allowed to see her kids at her ex-husband's house on two occasions." Response ¶ 5, at 3 (asserting this fact)(citing C. Payne Aff. ¶ 6, at 2).[11]

## PROCEDURAL BACKGROUND

C. Payne originally filed her Complaint in the Twelfth Judicial District Court, County of Otero, State of New Mexico. See Complaint at 1. Wilder removed the case to federal court on April 19, 2016. See Notice of Removal, filed April 19, 2016 (Doc. 1). C. Payne alleges in Count I that Wilder and Bucag violated her substantive and procedural due-process rights, and her right to be free from unreasonable search and seizure, pursuant to the Constitution of the

---

[10]Wilder does not dispute this fact, but instead argues: "The facts in Paragraph 4 are immaterial as the Complaint only concerns Deputy Wilder's conduct prior to and during the traffic stop." Reply ¶ 4, at 3. The argument that C. Payne's assertion is not material does not create a genuine issue of fact. See Walton v. N.M. State Land Office, 49 F. Supp. 3d 920, 924 n.2 (D.N.M. 2014)(Browning, J.)("Contending that a fact is not relevant is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.")(citing D.N.M.LR-Civ. 56.1(b)), aff'd sub nom., Walton v. Powell, 821 F.3d 1204 (10th Cir. 2016). Materiality is a legal question and not a factual one, and, if necessary, the Court will later address materiality in its Analysis, but will deem C. Payne's assertion here undisputed for the purposes of the Factual Background. See O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1058 n.1 (D.N.M. 2012)(Browning, J.)(stating that the proper course is to determine relevance in the analysis section rather than in the factual background section).

[11]Wilder does not dispute this fact, but instead argues: "The facts in Paragraph 5 are also immaterial because Deputy Wilder never interfered with Plaintiff's control or custody over her children." Reply ¶ 5, at 3. The argument that C. Payne's assertion is not material does not create a genuine issue of fact. See Walton v. N.M. State Land Office, 49 F. Supp. 3d 920, 924 n.2 (D.N.M. 2014)(Browning, J.)("Contending that a fact is not relevant is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.")(citing D.N.M.LR-Civ. 56.1(b)), aff'd sub nom., Walton v. Powell, 821 F.3d 1204 (10th Cir. 2016). Materiality is a legal question and not a factual one, and, if necessary, the Court will later address materiality in its Analysis, but will deem C. Payne's assertion here undisputed for purposes of the Factual Background. See O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1058 n.1 (D.N.M. 2012)(Browning, J.)(stating that the proper course is to determine relevance in the analysis section rather than in the factual background section).

United States of America and "New Mexico Statutory law," by depriving her of custody and visitation of her children, and by Wilder's "prolonged . . . traffic stop and . . . field sobriety tests when he lacked reasonable suspicion . . . ." Complaint ¶¶ 22-28, at 4-6. C. Payne also alleges in Count II that Wilder violated her due-process rights and her right to be free from unreasonable search and seizure under Article II, Sections 10 and 18 of the Constitution of the State of New Mexico. See Complaint ¶¶ 26-32, at 6-7. Payne last alleges, in Count III, that N.M. Stat. Ann. § 30-6-4 is unconstitutional, because it violates the Fourth Amendment to the Constitution of the United States of America and Article II, § 10, of the New Mexico Constitution, supporting her request for injunctive and declaratory relief regarding Ceballes' potential prosecution of her. See Complaint ¶ 21, at 4. On January 3, 2017, the Court concluded that the allegations in the Complaint implicating Ceballes were not ripe for review, and thus granted Defendant David Ceballes [sic] Motion and Memorandum to Dismiss Plaintiff's Declaratory and Injunctive Relief Claims, filed September 27, 2016 (Doc. 10)("Motion to Dismiss"), which asked that the Court dismiss C. Payne's allegations against Ceballes, see Memorandum Opinion and Order at 1, filed January 3, 2017 (Doc. 36)("Ripeness MOO"). The Court has also issued a Memorandum Opinion and Order at 1, filed July 7, 2017 (Doc. 60)("Default MOO"), setting aside the Clerk's Entry of Default, filed November 16, 2016 (Doc. 22), which was entered against Bucag.

1.    **The MSJ.**

Wilder filed the MSJ on February 23, 2017. See MSJ at 1. After making his proffer of undisputed facts, Wilder explains that, because he is a law enforcement officer, "the plaintiff must first satisfy a 'strict two-part test' by establishing (1) 'the defendant's actions violated a constitutional or statutory right' and (2) that 'right was clearly established at the time of the defendant's unlawful conduct.'" MSJ at 5 (quoting Gutierrez v. Cobos, 841 F.3d 895, 900 (10th

Cir. 2016)).  Wilder also explains that the Court has the discretion to analyze either qualified-immunity prong first.  See MSJ at 6.  Wilder argues that C. Payne's claims against him must fail, because, first, his "actions are consistent with Plaintiff's Fourteenth Amendment Due Process rights under the Constitution because he did not interfere with Plaintiff's parental rights. Therefore, his conduct did not violate clearly established law and he is entitled to qualified immunity."  MSJ at 8.  In support, Wilder provides that "[n]either the United States Supreme Court nor the Tenth Circuit have articulated any specific prohibition against a public official's statement about a parent's custody rights during a child abuse or neglect investigation."  MSJ at 8.  In that regard, Wilder maintains that Wilder afforded C. Payne "all rights pursuant to her substantive due process right to have control and custody over her children.  Likewise, Deputy Wilder never interfered with Plaintiff's procedural due process right to challenge any perceived obstruction of her parental rights or Deputy Wilder's statement that she could not see her children."  MSJ at 8.  Wilder also contends that, C. Payne's parental rights aside, "the State of New Mexico may temporarily interfere with a parent's rights to ensure the health and safety of children," and that here Wilder "did not knowingly or intentionally attempt to obstruct Plaintiff's relationship with her children. If Plaintiff believed CYFD deprived her of a parental right during the investigation, she should have exercised her rights through CYFD."  MSJ at 8.  Wilder then specifically addresses his qualified immunity to C. Payne's claims sounding in federal due process.  See MSJ at 9.

Wilder explains: "Substantive due process 'protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."  MSJ at 9 (quoting Starkey v. Boulder Cnty. Soc. Servs., 569 F.3d 1244, 1253 (10th Cir. 2009)).  Also, Wilder explains: "States possess their own 'traditional and transcendent interest in protecting children

from abuse.'" MSJ at 9 (quoting <u>Gomes v. Wood</u>, 451 F.3d 1122, 1127 (10th Cir. 2006)).

Wilder further explains, then, that: "The Tenth Circuit recognizes 'that the constitutional right to

familial integrity is amorphous and always must be balanced against the governmental interest

involved.'" MSJ at 9 (quoting <u>Martinez v. Mafchir</u>, 35 F.3d 1486, 1490 (10th Cir. 1994)).

Wilder then cites to <u>Cordova v. Albuquerque</u>, 816 F.3d 645 (10th Cir. 2015), which provides that

the "Plaintiff must prove this balance favors her constitutional right and that the state official

"intended to deprive [the plaintiff] of that interest.'" MSJ at 9-10 (quoting <u>Cordova v.

Albuquerque</u>, 816 F.3d at 645). Wilder continues:

> Any conduct, or statement made, by Wilder must be willful and intentional
> "directed at the intimate relationship with knowledge that the statements or
> conduct will adversely affect that relationship." [<u>Cordova v. Albuquerque</u>, 816
> F.3d at 645]. Courts must also "examine the evidence to determine the severity of
> the alleged infringement [on the parent's right], the need for the defendant's
> conduct, and any possible alternatives." *Id.*; *accord Parham v. J.R.*, 442 U.S.
> 442, 603 (1979)("[A] state is not without constitutional control over parental
> discretion in dealing with children when their physical or mental health is
> jeopardized."); <u>P.J. v. Wagner</u>, 603 F.3d 1182, 1198 (10th Cir. 2010)("[W]hen a
> child's life or health is endangered by her parents' decisions, in some
> circumstances a state may intervene without violating the parents' constitutional
> rights.").

MSJ at 10. Here, Wilder maintains that he did not "act with knowledge or intent, even if his

words interfered with plaintiff's parental rights," because: (i) he "acted pursuant to another

entity's directive," -- which was a "referral from CYFD requiring that he follow up on an

anonymous tip"; (ii) he did "not interfere with Plaintiff's access to her children," and only

informed her that she would be prevented from seeing her children until the investigation was

complete; (iii) any of his "interference was justified by facts amounting to reasonable suspicion

that the children faced imminent threats to their safety"; and (iv) he "only intended to pursue the

investigation." MSJ at 11. According to Wilder, these actions do not show the "requisite

knowledge or intent amounting to a substantive due process violation." MSJ at 10-11 (citing <u>J.B.

v. Wash. Cnty., 127 F.3d 919, 922, 927-28 (10th Cir. 1997)(considering a child abuse investigation where county officials removed a child for eighteen hours but eventually concluded that, through the course of their investigation, there was no evidence of child abuse, and holding that, although removal of the child for eighteen hours practically interfered with her parent's rights of familial association, the officials committed no substantive due-process violation, because -- Wilder contends -- the officials had no knowledge that their conduct violated the parents' rights, and could not act with the requisite knowledge or intent amounting to a substantive due-process violation). Wilder avers that he did not, at any point, "exercise[] any authority to prevent Plaintiff from the control and custody over her children," and that he only investigated the report of child abuse as it was his duty. MSJ at 11-12. Wilder also contends that, should his words to C. Payne constitute interference, that interference is "minimal and outweighed by the risks described in the anonymous tip." MSJ at 12. Wilder requests that the Court balance the interests at stake and thereby conclude: "Plainly, Deputy Wilder did not violate Plaintiff's substantive due process rights and any intrusion was justified by the need to assure the children's safety and well-being," because his only intent was to "pursue the investigation and assure the children's safety, not to sever or obstruct Plaintiff's relationship with her children." MSJ at 12-13. Wilder also notes, for the Court's information:

> No pertinent federal case law prohibits a law enforcement officer from assisting in a child abuse investigation nor informing a parent that they do not have custody or visitation rights over their children. On the contrary, law enforcement has an affirmative duty to the public's safety. Given what Deputy Wilder knew at the time, no reasonable officer would have second guessed that he was empowered to pursue the investigation. For similar reasons, no reasonable officer would have believed he acted unreasonably when he mistakenly informed Plaintiff that she lacked custody rights to her children. Any reasonable officer knows that their actions cannot set aside a court order. At most, Deputy Wilder's actions were misinformed, not a constitutional violation.

MSJ at 13.

Wilder next argues regarding C. Payne's allegations regarding procedural due process. See MSJ at 14. Wilder provides that he "did not interfere with any right to challenge the terms of the CYFD investigation and he could not have violated Plaintiff's procedural due process rights." MSJ at 14. Wilder then explains that states may take children from parents only after fair process, which in this context requires

> "prior notice and a hearing, except in extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Gomes v. Woods*, 451 F.3d at 1128. State officials may remove a child without a hearing with reasonable suspicion that the child faces an immediate threat to their safety if they remain with the parent. *Id.* at 1130. To be clear, reasonable suspicion does not include the mere possibility of danger. *Roska v. Peterson*, 328 F.3d 1230, 1245 (10th Cir. 2003)(internal citations omitted). Further, when an agency removes a child before a hearing, the state remains obligated to provide a hearing post-removal. *Gomes v. Woods*, 451 P.3d at 1128.

MSJ at 14-15. In that respect, Wilder asserts that he "never interfered with that right, much less her procedural right to contest any related intrusion." MSJ at 15. Essentially, Wilder maintains C. Payne could have, and should have, contacted CYFD about the anonymous tip and subsequent investigation. See MSJ at 15. Regardless, Wilder further argues that, even if he controlled the procedures of which C. Payne argues he deprived her, "he never removed or interfered with Plaintiff's control or custody over her children." MSJ at 15. Wilder also contends that, "[i]f he had removed the children with a prior hearing, he would have been justified by reasonable suspicion based upon 1) the information in the anonymous tip; 2) Mr. Payne's corroboration of those facts; and 3) Deputy Wilder's awareness of Ms. Payne's association with methamphetamine users." MSJ at 15. In sum, Wilder reiterates that no "reasonable officer would know that mere words violate a plaintiff's procedural due process rights . . . or could have known that sharing misinformation about a plaintiff's parental rights interferes with the right to contest the deprivation." MSJ at 16.

Next, Wilder addresses C. Payne's traffic stop and argues that he acted consistent with her rights under the Fourth Amendment. See MSJ at 16. Wilder maintains that he acted with reasonable suspicion in executing his stop of C. Payne's vehicle, because: (i) her license was suspended, a fact which Wilder had learned from a previous review of her driving record; (ii) his belief that her license was suspended was "reasonable suspicion that she was committing a traffic violation"; (iii) once he stopped her vehicle, he reasonably inquired about her license status; and (iv) he acted "with independently supported reasonable suspicion that Plaintiff was driving while impaired justifying the field sobriety test." MSJ at 17. Regarding Wilder's reasonable suspicion that C. Payne was under the influence, Wilder explains that if "a prudent officer can reasonably conclude from the totality of the circumstances that a driver is inebriated during the traffic stop, the officer retains reasonable suspicion to perform a sobriety test. *See Wilder v. Turner*, 490 F.3d 810, 815 (10th Cir. 2007)." MSJ at 17. During his stop of C. Payne, then, Wilder avers that she "appeared shaky, had scabs all over her body, and was very thin," which is indicative of methamphetamine use and which was consistent with the anonymous tip making child abuse allegations against C. Payne -- causing him to reasonably believe "that she was driving impaired under the influence of methamphetamine." MSJ at 18. Wilder concludes by reiterating that "[n]o reasonable officer would have acted differently when confronted with the signs that Plaintiff was under the influence of methamphetamine." MSJ at 19.

Turning next to C. Payne's allegations brought pursuant to New Mexico state law, Wilder argues that he "did not violate Plaintiff's Due Process or Search and Seizure rights pursuant to Article II, Sections 10 and 18 of the New Mexico Constitution. Therefore, he is entitled to summary judgment on Count II." MSJ at 19. Addressing first the "search and seizure" claim, Wilder explains that, "[s]imilar to the Fourth Amendment to the United States Constitution, the

New Mexico Constitution provides 'the people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures.'" MSJ at 19-20 (quoting N.M. Const. Art. II § 10). In New Mexico, Wilder provides, the "inquiry to determine whether a traffic stop meets the constitutional reasonableness requirement include[s] 1) whether the officer's actions are justified at their inception and 2) whether those actions are reasonably related in scope to the circumstances justifying the initial interference." MSJ at 20. Wilder also provides that, in New Mexico, an officer can extend a traffic stop by "asking questions unrelated to the original traffic stop if the questions are supported by the officer's independent reasonable suspicion of a crime," and that "[f]ield sobriety tests, however, require independent reasonable suspicion that would otherwise support extension of a traffic stop." MSJ at 20. According to Wilder,

> [i]n this case, at the time of the traffic stop, Plaintiff appeared consistent with the tip and Mr. Payne's description of Plaintiff. . . . The tip and Mr. Payne described Plaintiff as covered in scabs, very thin, and stated that she suffered from severe mood swings typical of a methamphetamine user. . . . When Deputy Wilder encountered Plaintiff, she appeared to be under the influence of methamphetamine. . . . Plaintiff was shaky and very thin. . . . Judging her appearance, behavior, the tip, and Deputy Wilder's knowledge of her association with methamphetamine users, he administered a field sobriety test based on his valid reasonable suspicion that she was under the influence of methamphetamine.

MSJ at 21. Wilder then concludes that he acted to protect public safety, because the facts strongly indicated that C. Payne was inebriated, and any reasonable officer would have had reasonable suspicion to administer the field sobriety test during the traffic stop. See MSJ at 22.

Last, Wilder argues that he "did not violate Plaintiff's Procedural Due Process rights pursuant to Article II, Section 18 of the New Mexico Constitution," because he did not interfere with any of C. Payne's procedural rights. MSJ at 22. In this context, Wilder explains that New Mexico recognizes parents' fundamental rights to relationships with their children and that deprivation of that fundamental right requires due process, but that due process rights are

"flexible, subject to the particular circumstances in a given case."  MSJ at 22.  Wilder maintains that he did nothing which stopped C. Payne from contesting the deprivation of her fundamental rights with CYFD and asserts that he "cannot be held liable for her failure to exercise her own procedural due process rights."  MSJ at 22-23.  In conclusion, Wilder asserts that he is entitled to qualified immunity and summary judgment on all federal constitutional counts, and that the Court should also grant summary judgment on the state claims.  See MSJ at 23.

2. **The Response.**

In response, C. Payne -- after addressing Wilder's proffer of undisputed facts -- begins by arguing that Wilder "lacked reasonable suspicion to require Plaintiff to perform field sobriety tests."  Response at 5.  C. Payne maintains that Wilder did not possess reasonable suspicion that she was impaired, because he "has not shown that any training or experience dictates that" C. Payne's nervousness and scabs "indicate presently being under the influence of methamphetamines."  Response at 5.  According to C. Payne, Wilder's proffer does not support reasonable suspicion under state or federal law.  See Response at 5-6.  C. Payne then turns to her rights to substantive due process, and argues that, even though the right to familial association yields "when a child is in imminent or immediate danger of neglect or abuse," here Wilder "virtually terminated" C. Payne's rights to see her children "without anything other than an anonymous tip concluding that Plaintiff was living with a wanted individual . . . [and] was using drugs."  Response at 6 (citing Florida v. J.L., 529 U.S. 266 (2000)).  Further, C. Payne contends that the "anonymous tip showed no indicia of reliability" and that the information Wilder gained from speaking with C. Payne's ex-husband was similarly unreliable, because he offered only his factually unsupported "suspicions."  Response at 6.  C. Payne then reiterates that she has pursued

her case in state court and that she has not disavailed herself of "process" to regain custody.

Response at 6-7. In conclusion, C. Payne states that she

> was able to show that she had a right not to be subjected to field sobriety testing by Defendant without reasonable suspicion. She showed that she was so subjected and that Defendant lacked reasonable suspicion thereby violating the United States Constitution and the New Mexico Constitution. Plaintiff was able to show that she had a right to the custody of her children. She showed that Defendant violated that right when he virtually terminated that right without reasonable suspicion to do so.

Response at 7.

### 3. **The Reply**.

In reply, Wilder argues that C. Payne fails "to meet her two-part burden to prove Deputy Wilder is not entitled to qualified immunity." Reply at 4. According to Wilder, C. Payne needs to "demonstrate that her constitutional rights were violated and that those rights were clearly established at the time of his actions," but she has failed "to cite any law on qualified immunity" or "supply specific analogous law demonstrating Deputy Wilder is not entitled to qualified immunity." Reply at 4. Wilder maintains that C. Payne has not identified support for her contention that Wilder lacked reasonable suspicion during his investigation and traffic stop, and that she has omitted discussion in her Response of her "procedural due process claim under the Fourteenth Amendment or her due process claim under the New Mexico Constitution, effectively conceding that Deputy Wilder is entitled to qualified immunity and summary judgment." Reply at 4-5. Wilder accordingly argues that "the Tenth Circuit has unambiguously held that a Plaintiff cannot meet their heavy two-part burden without supporting legal precedent," particularly where, as here, C. Payne has not presented "at least one case in which an officer's conduct was held violative under obviously similar circumstances to those in this case." Reply at 5-6 (citing White v. Pauly, 137 S. Ct. 548, 552 (2017); Gutierrez v. Cobos, 841 F.3d 895, 900-01 (10th Cir. 2016)).

Wilder then turns to argument regarding C. Payne's substantive due-process claim, and makes the same assertion: the "Plaintiff has not cited any cases with specific facts demonstrating that Deputy Wilder violated her clearly established substantive due process right to her children . . . ." Reply at 6. Wilder reiterates that he was acting upon a CYFD directive for him to investigate an anonymous tip involving C. Payne, and that C. Payne "fails to show [that] Deputy Wilder violated any clearly established law when he told her she could not visit with her children until she cooperated with the CYFD investigation or when he administered the field sobriety test." Reply at 7. Wilder then revisits the standards for state interference with parental rights, and reasserts that, although Wilder did nothing to interfere with C. Payne's parental rights, he nonetheless acted lawfully by making the statements he made during the traffic stop. See Reply at 7. Wilder also contends that he acted upon reasonable suspicion -- premised on the anonymous tip -- to stop C. Payne, and also upon independent reasonable suspicion that C. Payne was under the influence of methamphetamine when he chose to extend the traffic stop with a field sobriety test. See Reply at 7-9 (citing Navarette v. California, 134 S. Ct. 1683, 1688 (2014)(discussing the viability of an anonymous tip for supporting reasonable suspicion to make a traffic stop)). Because C. Payne has apparently not cited any law that suffices her two-part burden to beat Wilder's qualified immunity to all of her claims, Wilder requests the Court grant summary judgment on all of those claims. See Reply at 10.

Wilder next argues that C. Payne has failed "to offer facts disputing the reasonableness of Deputy Wilder's actions." Reply at 10. In that regard, Wilder asserts that C. Payne has not presented any facts which suggest that Wilder acted unreasonably in the context of any of her federal or state claims. See Reply at 10-11. According to Wilder, C. Payne

> asserts factual distinctions that fail to present any material dispute as to the
> constitutionality of Deputy Wilder's actions. Ignoring the other sources Deputy

Wilder relied upon in his investigation, Plaintiff asserts that Deputy Wilder only considered the anonymous tip. She also contends that Mr. Payne's statements regarding her appearance are unfounded. . . . Finally, Plaintiff cites the results of her field sobriety test for the proposition that she does not use methamphetamine.

Reply at 11. Wilder, then, argues that

Deputy Wilder relied upon three different sources before he told Plaintiff she could not see her children until she cooperated with the investigation. . . . Moreover, Mr. Payne confirmed Plaintiff's physical appearance, as described in the tip, and that Plaintiff resided with a wanted felon. . . . Deputy Wilder's conclusion that Plaintiff was not under the influence after her field sobriety test is immaterial. . . . Plaintiff manifested side-effects of methamphetamine usage, whether she was under the influence during the traffic stop or not.

Reply at 11-12. Wilder asserts that, in view of the undisputed facts, he "properly balanced the state's interest in protecting Plaintiff's children against her right to her children . . . [and] reacted reasonably in light of the facts" when he extended the traffic stop with a field sobriety test. Reply at 11-12. Wilder concludes by asserting his qualified immunity and entitlement to summary judgment on all counts against him. See Reply at 12.

### 4. **The Hearing.**

The Court held a hearing on June 5, 2017. See Transcript of Hearing, taken June 5, 2017 ("Tr.").[12] At the hearing, the Court heard argument on a variety of issues and, regarding the MSJ, heard argument first from Wilder. See Tr. at 18:1-4 (Court). The Court also heard argument from Bucag, in tandem, which it will address in its resolution of Bucag's motions at a later date. Wilder, then, began by explaining that C. Payne has, as to Wilder, brought a

[Fourteenth] amendment claim for a substantive due process violation, a Fourteenth Amendment claim for procedural due process violation, also a Fourth Amendment claim for a field sobriety test that was given to the plaintiff, Ms. Payne. And has also, under count two, brought what appears to be the state constitutional analog to the substantive due process familial integrity claim.

---

[12]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

Tr. at 18:12-20 (Martinez).  Wilder then indicated that "the plaintiff must meet [her] two part burden to show a violation of a constitutional right that was clearly established.  [U]nder either prong . . . either under the first prong or the second prong . . . defendant is entitled to qualified immunity."  Tr. at 18:23-19:4 (Martinez).  Beginning with the federal substantive due process claims, Wilder conceded that there was a federal "constitutional right to familial integrity," but that the "right is amorphous, because we have to balance the state's interests in the child's safety."  Tr. at 19:14-18 (Martinez).  Wilder continued, however, by explaining:

> [W]hen you look at the second prong of the qualified immunity analysis, that being the clearly established prong, the plaintiff would have to show that by using similar case law that Deputy Wilder's actions were prohibited.  And if you look at the actions that Deputy Wilder took on that day they're really simple.  CYFD involved him in an investigation based on an anonymous tip that Ms. Payne may be either using methamphetamines or selling methamphetamines out of the her residence.  Now, at the time the children were with their father.  And Deputy Wilder gets this anonymous complaint from CYFD. . . .  CYFD got the anonymous tip, Your Honor and Mr. Bucag then enlisted Deputy Wilder to assist in the investigation.  And based on the anonymous tip, what Mr. Wilder did is he did a background investigation on Ms. Payne, found that she had a suspended license.  He also went to Ms. Payne's ex-husband's house, who was initially in the state case a defendant to this case, Robert Payne. . . .  Defendant Wilder actually went to talk . . . and talked to the father.  Now, when you look at this anonymous tip, they said this Ms. Payne may be [selling] drugs and using drugs around the children.  The record evidence shows that Deputy Wilder spoke with Mr. Payne, and he corroborated.  And Mr. Payne relayed to Deputy Wilder that Ms. Payne was skinny, had scabs on her body, information that was consistent at least in the deputy's mind with methamphetamine use. . . .  So based on this investigation, Deputy Wilder ultimately sees Ms. Payne driving on White Sands Boulevard in Alamogordo, New Mexico.

Tr. at 19:18-22:1 (Martinez).  Wilder explained that, as a result of his investigation into C. Payne, he knew that she had a suspended driver's license, which supplied his reasonable suspicion to execute the traffic stop.  See Tr. at 22:12-13 (Martinez).  According to Wilder, the traffic stop "relates to the familial substantive due process right," because

> [h]e asked her to, if he could go do a home visit to ensure that the house was safe.

> And he did tell her as the record and the video will show that if she did not
> comply and allow him to look into the home that she would not be able to see her
> children. He also told this to Mr. Payne. That is the basis for the familial
> integrity claim [against Wilder].

Tr. at 22:16-24 (Martinez). Upon that proffer of fact, Wilder then argued that, under the clearly-established prong, C. Payne's Response

> has wholly failed to p[o]int out any cases that were similar that would put beyond
> debate that the verbal statement that Ms. Payne could not see her children violated
> her constitutional right to familial integrity, and because the plaintiff's response
> whol[l]ly fails [to] discuss any cases that are similar to the circumstances faced by
> Deputy Wilder, the Court is within its power to grant qualified immunity.

Tr. at 23:2-10 (Martinez). The Court inquired, at this point, what the effect of Wilder's statements about C. Payne's custody were subsequent to the traffic stop, to which Wilder explained:

> [T]he children stayed with Mr. Payne at their house. My understanding is based
> on the visitation agreement entered into by the state court that [it] was Mr.
> Payne's weekend, or time to have the children, if you will. So Deputy Wilder
> never physically took control of the children, never placed them in state custody.
> There is nothing in the record that would show that CYFD ever placed these
> children in state custody[;] the only thing that Deputy Wilder did was assist in a
> CYFD investigation that was later found as, they closed that investigation for lack
> of cooperation by Ms. Payne. So Deputy Wilder assists in this investigation and
> makes a verbal statement that she cannot see the children. That is it. That is all
> he did. He never placed the children in state custody.

Tr. at 23:17-24:7 (Martinez). Wilder also indicated that, on one occasion, after the traffic stop, he attempted once more to make a safety check of the home, but was refused. See Tr. at 24:22-25:3 (Martinez). Further, Wilder reiterated that criminal charges were not brought against C. Payne. See Tr. at 26:11-12 (Martinez).

As to Wilder's MSJ, the Court began by inquiring: "I'm just trying to get a handle on what the law is here. What do you understand the standard to be, is it still this shock the conscience or do you think there is a different standard for this particular right?" Tr. at 31:13-15

(Court).  C. Payne stated that

> the general description of the right with regard to Deputy Wilder is that parental
> rights are rights that may not be interfered with without due process of law.  The
> specifics are set out in the cases that I have cited [and w]hen you go through those
> cases, those cases set out the standard that Your Honor seeks.  And that is for a
> law enforcement officer to interfere with those parent rights you'll see different
> terms used, reasonable belief, reasonable cause, reasonable grounds, reasonable
> facts et cetera, et cetera, but I think what they're all pointing towards is just
> reasonable suspicion, what we term as reasonable suspicion.   That's what's
> required for the state to interfere with that relationship.  There [are] some factual
> issues that have been inaccurately described to Your Honor and I want to clear
> those up before we get too lost down the way.  When these complaints come in
> they go to both CYFD and then CYFD sends them to the law enforcement agency
> as New Mexico statute requires them.  I don't believe that Bucag called and said,
> hey, Wilder come help me on this.  I think it just went to the sheriff's department;
> Wilder was assigned that case, and he started his investigation.

Tr. at 31:25-33:1 (Garcia).  C. Payne also stated that Wilder misrepresented that all he

> did as far as interference goes was just to tell her at that traffic stop, and the words
> he used was [sic] either you're going to allow me to inspect that house or you're
> not going to see your kids again until we get this inspection done -- I need to
> make sure that the house is okay.  In our factual presentation set out to the Court,
> the allegations that we made in our material fact statement was that not only did
> he make that statement there, but continued to call my client and leave messages
> on her cellphone saying he wanted to get that inspection done, and she's not going
> to see her kids until he allows her to do that.  It wasn't just one instance.  He
> continued this on until eventually he stopped.  I don't know what made these two
> individuals stop, we just know through the record eventually CYFD closed the
> file with a no substantial findings notation on the file.

Tr. at 33:7-23 (Garcia).   The Court pushed C. Payne, however, whether she was arguing to

expand the familial substantive due-process right -- an important inquiry in the clearly

established prong of qualified immunity analysis -- because all Wilder did here was make

statements, never having actually removed C. Payne's kids from her person.  See Tr. at 34:11-14

(Court).  C. Payne resisted the Court's characterization, arguing instead that the

> argument that I am making or attempting to make is that the law is clear that
> custody, a parent and then he can even s[ay] it backwards, a child, both the parent
> and child.  But especially the parent is entitled to the custody of their [sic]
> children.  When you issue an order both to the mother and in a meeting with the

father, where you tell the father do not let her have the kids, but you can let her see the kids, do not let her have these kids until I call you and tell you [that] you can do so because she's not letting us look in the house, then you tell the mother you're not going to see your kids [until] you let us look at this house, that that is taking away custody. Custody is the right to physical possession, and the ability to direct the children's every day activities while you have that physical possession. They were aware that custody was to return a day or two later, and instead these individuals went and said you're not going to give her back the kid and do not do so until I tell you to, I think that under the law's definition, falls with taking custody of the child. Are you now telling that child where, telling the child and the parents where that kid can stay and what interactions it is to have with the outside world.

Tr. at 34:15-35:14 (Garcia). C. Payne reiterated that she did not have custody of her kids in the time subsequent to seeing Wilder and that, accordingly, he substantively took away her parental rights. See Tr. at 35:23-36:19 (Garcia). As to what C. Payne termed the merits prong of substantive due-process analysis, "it is crystal clear in our criminal law precedence, which the officer should be aware of[,] that an anonymous tip does not constitute reasonable suspicion," which she argued is a different issue from the Fourth Amendment reasonable suspicion for the traffic stop. Tr. at 38:7-39:4 (Garcia, Court). That is, C. Payne argued, she is not arguing at all that the traffic stop lacked reasonable suspicion at the outset, but primarily that, for substantive due process, the anonymous tip was not sufficient to support an interference with her parental rights. See Tr. at 39:8-25 (Garcia, Court). As to the anonymous tip's content, C. Payne argued that the tipster's subjective belief that C. Payne was doing drugs cannot provide reasonable suspicion of child abuse and that to the extent the tipster identifies her as being "skinny," she is skinny. Tr. at 40:3-15 (Garcia). C. Payne also explained that, regarding her alleged "scabs" -- an indicator of methamphetamine use -- the Traffic Stop Video belies any possibility of her having scabs:

On that video you can clearly see her legs her face and her arms and you know my client would probably shoot me for saying this if she was here, but she's so white she glows in the dark. And there is no discoloration that could be

misinterpreted through the video to be these scab[s] that [] they're referring to. Her legs are [pale], [pale], [pale] white, and clear, her arms are clear with the exception of the freckles that you get from the sun with having light skin and her face, I don't see any indication of a scab on the face.

Tr. at 41:11-21 (Garcia).  As to C. Payne's supposed "shaking," C. Payne explained that,

in the video, they're standing there face-to-face, probably a foot or two between them in a parking lot right off the roadway.  It's in a business district.  It's all paved.  About ready to do this field sobriety thing.  This mother who has had her children taken away from her is still asking, I don't understand why I have to keep doing these things[.  Y]ou guys do not have any reason to be taking my children from me.  And Wilder is explaining that he got the report and that he needs to do a[ll] these things, well, he needs to do the inspection of the house in order to give her her kids back, and they get into an argument over, you know, the merits of that, and Wilder responds with, you know, something of and by the way look at you you're shak[ing] right now.  And she said of course I'm shaking I've just had my children taken away.  I feel you're harassing me in always trying to get in touch with me and leaving me messages and stuff, and here, we are already again at a traffic stop.  I'm scared.  She tells him I'm scared and I don't, you know, a single mother who is thrown into this situation[.] I cannot blame her one bit.

Tr. at 42:11-43:8 (Garcia).  C. Payne was not clear whether the traffic stop was the first encounter between C. Payne and Wilder, and also was not clear whether and when C. Payne had lost full custody of her children, or when R. Payne and Wilder had conversed about the anonymous tip with relation to the traffic stop.  See Tr. at 44:18-45:24 (Garcia).  In reply, the Court inquired of Wilder: "[Y]our theory has been that . . . there was no removal of the children, and what [C. Payne] is saying is that yes . . . there was a removal because the police told Mr. Payne not to give the children back to Ms. Payne.  So there was a removal."  Tr. at 48:15-21 (Court).  The Court also inquired:

I [am] still focusing on whether there is a violation.  Do you have any cases that says there is a violation when all you have is a police officer, CYFD, somebody using words rather than . . . an actual taking of the child.  Now, [C. Payne is] . . . saying no I don't have something that's not words.  But that's not this case, this case involves the removal of the children, because of Wilder putting pressure on Mr. Payne not to send the children back to Ms. Payne.

Tr. at 49:6-15 (Court).  Wilder disagreed that inquiry was relevant, instead asserting that,

even if the[re] were a case out there, that would show that a party has a constitutional right preventing an officer, a state official from saying you can't have your kids, it's still, for it to be clearly established is the key to put beyond debate that what Wilder did was wrong and plaintiff has pointed to absolutely no case, the Supreme Court as recently as I believe it was January of this year . . . has said that we need specific facts and case law to demonstrate a violation of a clearly established law and we simply don't have that.

Tr. at 49:16-50:2 (Martinez). Wilder then reiterated the standard requiring the Court to balance the state's interests in protecting children against C. Payne's familial rights, and explained that Wilder received an anonymous tip referral from CYFD and then went and spoke with R. Payne about C. Payne's living arrangements and, during the conversation, R. Payne corroborated the allegations of methamphetamine usage in that anonymous tip. See Tr. at 51:3-23 (Martinez). Wilder conceded that R. Payne did not personally observe C. Payne use or sell methamphetamine, and that he was only suspicious. See Tr. at 52:7-9 (Martinez).

Wilder then turned to his MSJ's arguments regarding C. Payne's procedural due process claims, explaining:

Again, we know that Mr. Wilder or Deputy Wilder informed Ms. Payne that if she did not comply with this investigation she would not see her children. Again, we did not remove these children, and what happened at that point was a failure. That's in the facts and the attached deposition transcript, a complete and absolute failure on the part of Ms. Payne to contact any authorities regarding the so-called removal of the children by Deputy Wilder. We did not remove the children. We assisted in an investigation. We are not the entity that would give Ms. Payne any procedural due process. That is the essence of our argument is it relates to that aspect of the claim.

Tr. at 53:2-16 (Martinez). Wilder crystallized that he was not the entity which could give procedural due process. See Tr. at 53:19 (Martinez). C. Payne then argued and explained:

[T]o make it clear, our procedural due process claims is that if the deputy and social worker Bucag did not under the law's eyes take custody of these children by preventing mom to have physical possession of the kids and preventing mom to have decision making authority both at the time when the Court told her she is to have those rights, that the deputy and CYFD, ad hoc on the side of the highway adjudicated those rights for Ms. Payne and modified the child custody agreement

to Mr. Payne will keep the kids until this investigation is over, and in order to do that, it takes at the very minimum notice and opportunity to be heard and those are nowhere presented throughout the record. And without that that is the procedural side of the Fourteenth Amendment violation.

Tr. at 54:4-19 (Garcia). In reply, Wilder maintained that, at this stage, in regard to qualified immunity, C. Payne again has failed to "point to some case law that would show that the actions of Deputy Wilder would somehow violate procedural due process of Ms. Payne." Tr. at 61:18-21 (Martinez).

Wilder then addressed C. Payne's allegations surrounding the Fourth Amendment and the field sobriety test, and explained that he moved for summary judgment on this count, because,

based on background investigation that Ms. Payne's license was suspended, she was pulled over. We would concede that generally you [can] not extend traffic stops beyond the reason that you pull somebody over unless you have articulable facts, and the facts show that deputy Wilder did indeed have these articulable facts. Whether he was mistaken that Ms. Payne was scared, or afraid, because he pulled her [over and] she was jittery, she had sor[]es on her body.

Tr. at 62:13-22 (Martinez). The Court pressed Wilder about C. Payne's earlier argument that you could not see scabs on the Traffic Stop Video, to which Wilder responded the Traffic Stop Video is not high definition, and, regardless, C. Payne has done nothing to put evidence on the record that she did not have scabs. See Tr. at 62:23-63:5 (Court, Martinez). In addition to relying on the scabs, which Wilder conceded were not evidence of present drug use, Wilder explained that he formed reasonable suspicion to extend the stop by virtue of her thin appearance and shakiness, too, but also that he was operating under reasonable suspicion from the beginning of the traffic stop, anyway. See Tr. at 63:14-65:20 (Martinez). C. Payne responded by first conceding that the state and federal standards for probable cause and reasonable suspicion in this regard were indistinguishable. See Tr. at 66:14-24 (Court, Garcia). The Court, then, asked C. Payne "[w]hy is it, though, he's got some evidence that she's a meth user, and shaking, why isn't

that enough to have reasonable suspicion to conduct the field sobriety test?"  Tr. at 66:25-67:3

(Court).  C. Payne argued that Wilder would still "have to do one more step and say are these

likely to have come from using methamphetamine, and [is she] presently under the effects of that

drug so that [her] driving is impaired to the slightest degree."  Tr. at 67:15-19 (Garcia).  Wilder

next concluded his argument on the Fourth Amendment issue by stating:

> Whether or not, whether the shaking was enough to allow the field sobriety test[,
> u]nder qualified immunity[,] Deputy Wilder can be mistaken and still be entitled
> to qualified immunity.  So even if he's mistaken as to why she's shaking, when
> you combine it with the other information that he gleaned through his
> investigation, it would be reasonable for deputy Wilder to conduct that field
> sobriety test.

Tr. at 69:8-15 (Martinez).

Wilder next discussed "count 2, [where] plaintiff asserts that deputy Wilder violated her

state rights under article 2, section 18 to the custody and visitation of her children."  Tr. at 69:19-

22 (Martinez).  The Court then confirmed that Article II, Section 18 of the New Mexico

Constitution was the counterpart to the federal substantive familial integrity due process claim, at

which point C. Payne conceded that she was not arguing that the New Mexico protections were

stronger than the federal protections.  See Tr. at 70:3-5 (Court); id. at 70:15-16 (Garcia).  Wilder

then turned to C. Payne's allegations under "article 2, section 10 of the New Mexico Constitution

which is the analog to the Fourth Amendment."  Tr. at 70:22-71:5 (Martinez).  Similarly, C.

Payne conceded that she was not arguing that the New Mexico protections were stronger than the

federal protections.  See Tr. at 71:9 (Garcia).  Wilder explained that the case was originally filed

in state court, making only the state claims, but that C. Payne ultimately amended to add the

federal claims, prompting removal.  See Tr. at 71:18-23 (Martinez).

The Court then gave its inclination:

I'm probably going to analyze whether there was a constitutional violation of the

first two, the substantive due process and the procedural due process. So I probably won't skip to the clearly established. I'll first decide whether there is a violation. And I don't have a good sense as to which way I'm going to go on that. I need to make sure I understand fully these facts, but I am troubled by this link between Wilder and Mr. Payne whether that's enough to establish the children were taken away. I'm skeptical that simply making these statements is enough. But state authority ordered Mr. Payne to not let the children go back, that troubles me, and I realize [the] argument that I shouldn't attribute Mr. Payne's actions to Mr. Wilder. But I'm still troubled by a police officer stating that a citizen cannot do something then saying that's a third party so I'll have to give that some thought. I do think though that it's probably going to fail on the clearly established, I do think that on both these scores it's going to fail so I'm inclined to grant the summary judgment on the first two federal claims. On the Fourth Amendment, I think that the law is probably clearly established in these traffic stop incidents, and the fact patterns typically vary a little bit between traffic stop to traffic stop, but I do think that probably in this case Officer Wilder had reasonable suspicion to order the field sobriety test. I don't think he had to have probable cause. If that were the case he'd go ahead and arrest without going through a field sobriety. So I don't think he had probable cause but I do think he had reasonable [suspicion], and therefore was authorized to engage in the field sobriety test I'm inclined to think that the law is clearly established enough on these traffic violation[s], even though there may be some factual differences from case to case so I'm inclined to grant the motion there. As far as the state claims, it seems to me depending upon what I do with Mr. Bucag, I may end up without any federal claims and may be inclined to send it back to state court. On the other hand if I'm going to leave anything with Mr. Bucag it may be that I need to go ahead and dismiss the state claims so I'll have to give that some thought and see where it fits in at the time that we're deciding the motion, whether I'm going to leave any federal claims in the case or not.

Tr. at 72:7-74:5 (Court).

## **LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT**

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M.

2013)(Browning, J.)(quoting <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991)). <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, <u>or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."</u> <u>Celotex</u>, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." <u>Cardoso v. Calbone</u>, 490 F.3d 1194, 1197 (10th Cir. 2007).

<u>Plustwik v. Voss of Norway ASA</u>, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.) (emphasis added). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[13] Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 324; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 256.

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238,

---

[13]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States of America, dissented in <u>Celotex Corp. v. Catrett</u>, this sentence is widely understood to be an accurate statement of the law. <u>See</u> 10A Charles Allen Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (D. Kan. 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"

Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). See also Am. Mech. Sols., L.L.C. v. Northland Process Piping, Inc., 184 F. Supp. 3d 1030, 1061 (D.N.M. 2016)(Browning, J.)(considering the nuance of a motion for summary judgment, and the interplay between state and federal law, and providing -- in part -- that "New Mexico, along with other jurisdictions, has required expert testimony when the issue of causation is presented in a context which is not a matter of common knowledge").

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Anderson v. Liberty

Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of

events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The United States Court of Appeals for the Tenth Circuit applied this doctrine in

Thomson v. Salt Lake County and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads

v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished,[14]] explained that the

blatant contradictions of the record must be supported by more than other witnesses'

testimony[.]" Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning,

J.)(citation omitted), aff'd, 499 F. App'x 771 (10th Cir. 2012).

In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott

---

[14]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that Rhoads v. Miller has persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

v. Harris, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380. In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events. 550 U.S. at 379. Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . . Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted). See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92). In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court," before inquiring into whether there are genuine issues of material fact for resolution by the jury. 584 F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects,

or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability. See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights." (quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006))). The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983. See Ashcroft v. Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to Bivens[15] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997). "An entity cannot be held liable solely on the

---

[15]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment to the Constitution of the United States of America "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct." 403 U.S. at 389.

basis of the existence of an employer-employee relationship with an alleged tortfeasor." <u>Garcia</u>

<u>v. Casuas</u>, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8,

2011)(Browning, J.)(citing <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. at 689). Supervisors can be

held liable only for their own unconstitutional or illegal policies, and not for the employees'

tortious acts. <u>See</u> <u>Barney v. Pulsipher</u>, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

      **1.**      <u>**Color of State Law**</u>**.**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'"

<u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d 1442, 1447 (10th Cir. 1995). The under-

color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . .

furthers the fundamental goals of preserving an area of individual freedom by limiting the reach

of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for

conduct for which they cannot fairly be blamed." <u>Jojola v. Chavez</u>, 55 F.3d 488, 492 (10th Cir.

1995). "The traditional definition of acting under color of state law requires that the defendant in

a § 1983 action have exercised power 'possessed by virtue of state law and made possible only

because the wrongdoer is clothed with the authority of state law.'" <u>West v. Atkins</u>, 487 U.S. at

49 (quoting <u>United States v. Classic</u>, 313 U.S. 299, 326 (1941)). "The authority with which the

defendant is allegedly 'clothed' may be either actual or apparent." <u>Jojola v. Chavez</u>, 55 F.3d at

493. Accordingly, at a base level, to conclude that an action was taken under color of state law,

the court must determine that "'the conduct allegedly causing the deprivation of a federal right'

must be 'fairly attributable to the State.'" <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at

1447 (quoting <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 937 (1982)).

The Tenth Circuit has directed that, while "'state employment is generally sufficient to

render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise

private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'" Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmondson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)). Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." Jojola v. Chavez, 55 F.3d at 493. What constitutes the required real nexus, however, is not completely clear. As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty. Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(citations omitted) (quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

## 2. **Individual Liability.**

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations. Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006). The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part

by Monell v. Dep't of Soc. Servs., 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009) (Browning, J.).[16]

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."  Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."  72 F.3d at 400.  In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.  See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989).

---

[16]The Court clarified in Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1188 (D.N.M. Aug. 29, 2014)(Browning, J.), that common-law causation standards do not necessarily hold in the municipal-liability context, and, in fact, "the causation standard for municipal liability cases is unclear in the Tenth Circuit."  41 F. Supp. 3d at 1273.  The Court applied a traditional proximate cause analysis, and left open the possibility that there might be some greater, undefined causation requirement.  See Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d at 1281.

Trask v. Franco, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."  Martinez v. Carson, 697 F.3d at 1255.   The Tenth Circuit gave an example of a superseding-intervening cause, quoting the Honorable Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the Third Circuit:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.  Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest.  The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him.  Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful?  The obvious answer is "no."   The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability.  See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400).  Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the defendant's responsibility."  Trask v. Franco, 446 F.3d at 1047 (quoting William Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed.1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt.b (1965)).

### 3.    Supervisory Liability.

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, . . . exercise of control or direction, or . . . failure to supervise.'" Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(alterations omitted). Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice." Barney v. Pulsipher, 143 F.3d at 1307-08 (citations and internal quotation marks omitted). Cf. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.")(emphasis in original).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations. See Garcia v. Casuas, 2011 WL 7444745, at *25-26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)). The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676. The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be

- 48 -

subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

Dodds v. Richardson, 614 F.3d at 1199.  The Tenth Circuit noted that Ashcroft v. Iqbal "does not purport to overrule existing Supreme Court precedent," but stated that "*Iqbal* may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  Dodds v. Richardson, 614 F.3d at 1200.  The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after Ashcroft v. Iqbal:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Relying on the Supreme Court's opinion in Board of County Commissioners v. Brown, the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.  Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right.  In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation.  Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.  Similarly, the conclusion that the action taken or directed by the

municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).  The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

4.      **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

**LAW REGARDING SUBSTANTIVE DUE-PROCESS CLAIMS**

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due-process rights and not for third parties' acts. See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197). "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. at 195. The Due Process Clause is not a guarantee of a minimal level of safety and security. See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. at 195.

**1.      Exceptions to the General Rule.**

There are, however, two exceptions to this general rule. The first exception -- the special-relationship doctrine -- arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual. See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-95 (10th Cir. 1994). The second exception -- the danger-creation theory -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'" Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)). "If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'" Glover v. Gartman, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning,

J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits.")).

### 2.    Special-Relationship Exception.

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the due-process clause is the special-relationship doctrine. A plaintiff must show that they were involuntarily committed to state custody to establish a duty to protect under the special-relationship doctrine. See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996). "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)." Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995).

### 3.    Danger-Creation Exception.

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct." Uhlrig v. Harder, 64 F.3d at 573. The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm."). Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573. A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'" Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)). To

state a prima-facie case, the plaintiff must show that his or her danger-creation claim for due-process violations meets a six-part test: (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; and (v) the defendant must have acted recklessly in conscious disregard of that risk. See Pena v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm. See Christiansen v. City of Tulsa, 332 F.3d at 1281. The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk." Medina v. City & Cnty. of Denver, 960 F.2d at 1496. The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences." Medina v. City & Cnty. of Denver, 960 F.2d at 1496 (citations omitted).

4.    **What Shocks the Conscience.**

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience. See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."). "[A] plaintiff must do more than show that the government actor

- 53 -

intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)(internal quotation marks omitted)). "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995))(internal quotation marks omitted).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three

inmates.  See 265 F.3d at 1132.  The district court found that the plaintiff failed to state a § 1983

claim for violation of the Due Process Clause under a danger-creation theory, because the

defendants' actions were "not of such a magnitude that the Court is able to conclude they shock

the conscience."   265 F.3d at 1134.   The Tenth Circuit agreed with the district court's

conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known

dangers or risks is not enough to satisfy the danger-creation theory's conscience shocking

standard."  265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M.

2010)(Browning, J.), the plaintiffs alleged that the defendants -- the school district,

superintendent, principal, and vice principal of a middle school -- violated the plaintiffs'

substantive due-process rights when they did not take sufficient action to prevent a student at the

school from "racking"[17] the plaintiffs' son.  716 F. Supp. 2d at 1072-73.  The Court concluded

that the defendants' conduct did not shock the conscience.  See 716 F. Supp. 2d at 1074-75.  The

Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the
> Defendants were aware of three instances of an unknown eighth-grade student
> racking various sixth-grade students within the span of a month, and failed to
> implement policies to improve hallway monitoring and stop this conduct from
> occurring in time to prevent [the plaintiffs' son] from falling victim to the same
> fate.  Further, the Defendants indicated to the sixth graders that it had policies in
> place to punish individuals that assaulted other students but did not, in fact, have
> such policies.
>
> While such behavior may be worthy of remedy under tort law, and
> perhaps worthy of punishment in the form of punitive damages, the Court's
> conscience is not shocked . . . .

---

[17]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as
being "kicked and/or punched in the testicles."   716 F. Supp. 2d at 1059 n.2 (citations
omitted)(internal quotation marks omitted).

Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy.  Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## LAW REGARDING PROCEDURAL DUE PROCESS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.   The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.  See Reid v. Paulter, No. CIV 13-0337 JB/KBM, 2013 WL 3845042, at *50 (D.N.M. July 31, 2014)(Browning, J.)(citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property."  Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-0633, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).  The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due-process rights are violated: (i) "Did the individual possess a protected property interest to which due process protection was applicable?"; and (ii) "Was the individual afforded an appropriate level of process?"  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)(internal quotation marks omitted)).

 "The Constitution does not create or define the contours of 'liberty' or 'property,' the 'broad and majestic terms' enshrined in the Fourteenth Amendment."  Farthing v. City of

Shawnee, Kan., 39 F.3d 1131, 1135 (10th Cir. 1994)(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 571 (1972)). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007). See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law."). "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. See Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 ("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542

(citation omitted). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334 (1976). The Supreme Court has explained that

> the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote, citations, and internal quotation marks omitted).

> The United States Court of Appeals for the Second Circuit has stated:
>
> The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." Hamdi v. Rumsfeld, 542 U.S. 507, [529] (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335). A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" Id. (quoting Mathews v. Eldridge, 424 U.S. at 335).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004). The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose. See Mathews v. Eldridge, 424 U.S. at 335. For example, "[w]here . . . the state must act

quickly, a meaningful postdeprivation hearing is adequate." Clark v. City of Draper, 168 F.3d at

1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(holding that removal

of a child from parents' custody requires predeprivation hearing "except for extraordinary

situations where some valid governmental interest is at stake that justifies postponing the hearing

until after the event").

## LAW REGARDING FOURTH AMENDMENT SEIZURES

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided

interactions between police and citizens into three categories: (i) consensual encounters;

(ii) investigative stops; and (iii) arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th

Cir. 2000).  A consensual encounter occurs when a police officer approaches a person to ask

questions under circumstances where a reasonable person would feel free to refuse to answer and

to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally

may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st

Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek

admission for the purpose of investigating a complaint or conducting other official business," 1

W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed.

1996).  Such encounters generally "are not seizures within the meaning of the Fourth

Amendment, and need not be supported by suspicion of criminal wrongdoing."  Oliver v. Woods,

209 F.3d at 1186.

1.      **Investigative Detentions and Reasonable Suspicion.**

An encounter that is not consensual may nevertheless be justified as an investigative

detention.  See Dorato v. Smith, 108 F. Supp. 3d. 1064, 1118 (D.N.M. 2015)(Browning, J.).  An

investigative detention occurs when an officer stops and briefly detains a person "in order to

determine his identity or to maintain the status quo momentarily while obtaining more information." Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).  Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment.  Dorato v. Smith, 108 F. Supp. 3d. at 1118.  First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. 1, 20 (1968), because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001)(en banc), overruled on other grounds as recognized in United States v. Stewart, 473 F.3d 1265 (10th Cir. 2007).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).  Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion.  United States v. Winder, 557 F.3d at 1134.  See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").  A police-citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest, which probable cause or consent must support to be valid.  See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An

encounter between police and an individual which goes beyond the limits of a <u>Terry</u> stop, however, may be constitutionally justified only by probable cause or consent.").

An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." <u>Terry v. Ohio</u>, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." <u>Terry v. Ohio</u>, 392 U.S. at 27. A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." <u>Terry v. Ohio</u>, 392 U.S. at 29. In evaluating the validity of the stop-and-frisk, the totality of the circumstances must be considered. <u>See</u> <u>Florida v. Bostick</u>, 501 U.S. 429, 436 (1991).

The Tenth Circuit has recognized the doctrine in <u>Terry v. Ohio</u> of an investigative detention -- a "stop" -- and of a protective search -- a "frisk."

> <u>Terry</u> has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

<u>United States v. King</u>, 990 F.2d 1552, 1557 (10th Cir. 1997)(citations omitted)). The legal standard is whether a "stop and frisk" is reasonable under the Fourth Amendment. <u>United States v. King</u>, 990 F.2d at 1557.

In <u>United States v. Johnson</u>, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit held that an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded to a call from a citizen who gave his telephone number, and gave a

detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; and (iii) the suspect displayed nervous behavior. See 364 F.3d at 1194. The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal activity was afoot. See 364 F.3d at 1194 ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable details."). While many of the factors that the Tenth Circuit considered would not, without more, have given rise to reasonable suspicion, the combination of circumstances was sufficient. See 364 F.3d at 1193 (noting that the district court had erred, because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

In United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished), the police officer observed a young girl walking down the street at night. See 355 F. App'x at 227-28. A truck pulled up alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead, and the girl continued on her walk. See 355 F. App'x at 228. Rather than leave, however, the truck drove ahead and parked with its lights off at a dark spot on the road by which the girl would have to walk. See 355 F. App'x at 228. The officer spoke to the girl, who seemed unconcerned and told him that the man in the truck had asked only if she needed a ride; she had refused. See 355 F. App'x at 228. Not investigating any particular crime or suspected crime, and admittedly acting on a "hunch," the officer turned on his emergency lights and pulled up behind the truck. 355 F. App'x at 228, 229. Upon talking to the truck's driver, Ceballos, the officer discovered that Ceballos' breath smelled of alcohol, he did not have a driver's license, and he had a gun and other items in his vehicle. See 355 F. App'x at 227-29. The Tenth Circuit found

that the facts available to the officer would have led a reasonable officer to conclude that reasonable suspicion existed and that the officer's "subjective characterization of his actions is irrelevant." 355 F. App'x at 229. The Tenth Circuit explained, in an opinion that the Honorable Michael R. Murphy, United States Circuit Judge for the Tenth Circuit, wrote and Judges Briscoe and McWilliams joined:

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian. Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night. He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street. Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride. She refused, telling him she lived up the street. Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking. He parked in a dark location and turned off his lights.

> . . . .

> We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos. Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home. The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

355 F. App'x at 229. The Tenth Circuit did not require the officer to identify the particular crime of which the officer had reasonable suspicion or even to acknowledge having reasonable suspicion. See 355 F. App'x at 229. The Tenth Circuit was content to find that a reasonable officer would have reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian." 355 F. App'x at 229. The Tenth Circuit demanded only that an officer have facts from which a reasonable officer could form a reasonable suspicion that criminal conduct was occurring or was about to occur. See 355 F. App'x at 229.

In United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012)(unpublished), the Tenth

Circuit found reasonable suspicion based upon an officer's knowledge of the defendant's

> (1) gang tattoo; (2) presence in a high crime area; (3) abrupt move away from the
> officer as soon as [the defendant] saw [the officer]; (4) glancing about in a manner
> consistent with an attempt to find a route to flee; and, (5) approach to [a private]
> home's back door without conversing with the residents visible inside.

483 F. App'x at 417. At the district court level, in ruling on the motion to suppress, the

Honorable Martha A. Vazquez, United States District Court Judge for the District of New

Mexico, had concluded that, because the defendant's conduct in standing outside a private

residence and looking in "was consistent with the most benign of conduct, including a visit to a

friend's house or calling upon a neighbor for assistance," the officer did not have reasonable

suspicion at the time of the stop and should have waited longer to rule out innocent conduct. 483

F. App'x at 418 (quoting District Court Opinion at 19). The Tenth Circuit disagreed, however,

stating: "The problem is that conduct giving rise to reasonable suspicion sufficient to support an

investigative detention can be -- and often is -- consistent with innocent behavior." 483 F. App'x

at 418. The Tenth Circuit noted that, moreover, the defendant's conduct was not necessarily

innocent, because an Albuquerque public ordinance prohibits "[e]ntering upon any private

property and looking into any occupied dwelling without the consent of the occupant or owner of

the dwelling." 483 F. App'x at 417 (quoting Albuquerque Ord. § 12-2-21(B)). The Tenth

Circuit, thus, reversed Judge Vazquez' decision, disagreeing with her conclusion that the officer

lacked reasonable suspicion of unlawful activity, and concluded that "a reasonable officer could

have suspected that [the defendant] wasn't a welcome guest and did not have consent to look into

the home." 483 F. App'x at 417.

2. **Arrests.**

A seizure that exceeds the investigative detention's limited scope or duration may nevertheless be justified as an arrest. An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention." Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)). The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest. United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994). See Florida v. Royer, 460 U.S. 491, 499 (1983). The use of handcuffs, however, does not always elevate a detention into an arrest. See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a Terry stop."); United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs . . . does not always elevate a detention into an arrest."); Pierre-Louis v. Schake, No. CIV 12-0527 JB/RHS, 2014 WL 1954783, at *44-49 (D.N.M. Apr. 30, 2014) (Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a person on the side of the road by threatening him with a gun). "Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause." United States v. Rodriguez, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.). See Wilson v. Jara, 866 F. Supp. 2d 1270, 1292 (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy search or detention.'" )(quoting Oliver v. Woods, 209 F.3d at 1185), aff'd, 512 F. App'x 841 (10th Cir. 2013).

"Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in

themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001))(citing Draper v. United States, 358 U.S. 307, 313 (1959)). Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require more than mere suspicion." United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(internal quotation marks omitted). The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard. See Beck v. Ohio, 379 U.S. 89, 96 (1964). "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive." United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. 491, 507 (1983); United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002)). Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations and internal quotation marks omitted).

### 3.    When a Detention Becomes an Arrest.

The Tenth Circuit has held that a police-citizen encounter which goes beyond an investigative stop's limits is an arrest that probable cause or consent must support to be valid.

See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").  "Terry stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances."  United States v. Perdue, 8 F.3d at 1462.  "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'"  United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)).

This Court has also engaged in the balancing act of deciding when a detention becomes an arrest.  In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub nom, United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the Court had to determine whether the police involved transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car.  See United States v. Perea, 374 F. Supp. 2d at 976.  In that case, the Court determined that such measures were appropriate and did not elevate the investigative detention to the level of an arrest.  See 374 F. Supp. 2d at 976.  The Court recognized that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause."  374 F. Supp. 2d at 974.  See United States v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's determination in United States v. Perea that the officers had reasonable suspicion to believe that the suspect might be armed and dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a formal arrest requiring probable cause); United States v.

Gama-Bastidas, 142 F.3d 1233, 1240 (10th Cir. 1998)("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'").

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest. 'The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'" United States v. Perea, 374 F. Supp. 2d at 974. See United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding reasonableness of stop when officers detained the defendant at gunpoint and placed him in handcuffs where suspect had threatened to kill someone and was pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's "drawing his gun but keeping it pointed to the street" was not "unreasonably intrusive"); United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers did not convert the stop into an arrest by "unholstering their guns and frisking" the defendant when they suspected that the defendant had "just completed a narcotics purchase," there were a number of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially hazardous and supports the need for added safeguards").  Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs.  See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action designed to provide for the safety of the agents.").  United States v. Perea was one of those unique cases, because the police

had reasonable cause to believe that the person whom they were detaining was the suspect whom they sought to arrest -- a man wanted for murder whom, it was believed, might be armed and dangerous.  See 374 F. Supp. 2d at 976.  The Tenth Circuit affirmed the Court's determination that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the perceived threat.  The measures taken during a <u>Terry</u> stop must be reasonably related in scope to the circumstances which justified the interference in the first place and may not go beyond what is necessary for officer safety.  The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous.  The officers displayed their weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat.  The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else was in the car.

<u>United States v. Burciaga-Burciaga</u>, 147 F. App'x at 730 (citations and internal quotation marks omitted).

### 4.      Officers Have a Duty to Investigate Easily Accessible Evidence Before Making an Arrest.

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention."  <u>Romero v. Fay</u>, 45 F.3d 1472, 1476-77 (10th Cir. 1995).  Police officers "may not ignore easily accessible evidence and thereby delegate their duty to investigate [to others]."  <u>Baptiste v. J.C. Penney Co.</u>, 147 F.3d 1252, 1259 (10th Cir. 1998).  However, "[o]nce probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect."  <u>Garcia v. Casuas</u>, 2011 WL 7444745, at *49 (citing <u>Cortez v. McCauley</u>, 478 F.3d 1108, 1121 n.18 (10th Cir. 2007)(en banc)).

The Tenth Circuit confronted the issue when an officer must conduct further investigation before arresting an individual in <u>Romero v. Fay</u>.  In that case, law enforcement officers

interviewed two individuals -- Stella Gutierrez and Manuel Duran -- who implicated the plaintiff in a murder.  See 45 F.3d at 1474.  Approximately four hours later, without conducting additional investigation or obtaining a warrant, an officer arrested the plaintiff for murder.  See 45 F.3d at 1474.  After he was taken into custody, the plaintiff told the officer that he was innocent and that he had an alibi.  See 45 F.3d at 1474.  The plaintiff stated that three individuals would establish that he was asleep at home when the murder occurred.  See 45 F.3d at 1474.  The officer refused the plaintiff's offer of names of alibi witnesses and said that the witnesses "were of little significance because they would lie to protect" the plaintiff.  45 F.3d at 1474.  The officer never interviewed the alibi witnesses.  See 45 F.3d at 1474.  The plaintiff was incarcerated for three months before the government dismissed the case and he was released.  See 45 F.3d at 1474.

The plaintiff brought a § 1983 action for, among other things, violations of his Fourth Amendment rights.  See Romero v. Fay, 45 F.3d at 1474.  The plaintiff argued that, regardless whether the officers' interviews of Gutierrez and Duran established probable cause, under clearly established law, a reasonable officer would have investigated his alibi witnesses before arresting him.  See 45 F.3d at 1476.  The Tenth Circuit disagreed, in an opinion that the Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, authored, and Judges Tacha and McKay joined.  See 45 F.3d at 1476.  The Tenth Circuit stated that the Fourth Amendment requires officers to only "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless detention."  45 F.3d at 1476-77.  The Tenth Circuit determined that,

> [o]nce [the defendant] concluded based on the facts and information known to
> him that probable cause existed to arrest Plaintiff for the murder of David

Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause. Thus, [the defendant's] failure to investigate Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

In Baptiste v. J.C. Penney Co., officers arrested the plaintiff for shoplifting after: (i) receiving reports from store security guards that they witnessed her shoplifting on store surveillance; and (ii) watching a video of the surveillance footage on which the security officers relied in reaching their conclusion -- which supported the plaintiff's story that she had not stolen anything. See 147 F.3d at 1254-55. The Tenth Circuit, in an opinion that the Honorable Michael R. Murphy, United States Circuit Judge for the Tenth Circuit, authored, and Judges Anderson and Logan joined, concluded that qualified immunity did not apply. See 147 F.3d at 1257-59. The Tenth Circuit asserted that the security guards' allegations were based solely on the plaintiff's conduct, "which was memorialized in its entirety on the videotape." 147 F.3d at 1257. The Tenth Circuit stated that the police officers "viewed the very same conduct on the videotape, which this court has concluded failed to establish probable cause." 147 F.3d at 1257. The Tenth Circuit held that, consequently, "it was . . . not reasonable for the officers to rely on the security guards' allegations." 147 F.3d at 1257. The Tenth Circuit added that

police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation. . . . Here, [the defendants] did conduct some investigation by viewing the videotape and questioning [the plaintiff]. They argue, however, that they should be allowed to rely on the statement of the guards for probable cause to arrest. Because the officers knew that the allegations of the guards were based on observations of conduct captured and preserved on an available videotape, to credit this argument would allow a wholesale delegation of police officers' duty to investigate and make an independent probable cause determination.

Baptiste v. J.C. Penney Co., 147 F.3d at 1259.

In Cortez v. McCauley, officers responded to a call from a nurse stating that a woman had brought her two-year-old daughter to the hospital asserting that the child had complained that her babysitter's boyfriend had molested her. See 478 F.3d at 1113 (internal quotation marks omitted). Without (i) interviewing the girl, her mother, the nurse, or the attending physician; (ii) inspecting the girl's clothing for signs of sexual assault; or (iii) waiting for the results of the child's medical examination, the officers arrested the boyfriend. See 478 F.3d at 1113. The Tenth Circuit, in an en banc opinion that Judge Kelly authored, explained that,

> whether we view it as a need for more pre-arrest investigation because of insufficient information, . . . or inadequate corroboration, what the officers had fell short of reasonably trustworthy information indicating that a crime had been committed by [the defendant]. See BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986)("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place."). Based on the facts above, [the defendant] was arrested without probable cause.

478 F.3d at 1116 (footnotes and citations omitted). The Tenth Circuit further held that

> it was established law that "the probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." Romero, 45 F.3d at 1476-77 (footnote omitted); see also Baptiste v. J.C. Penney, Co., 147 F.3d . . . 1259 . . . ("[P]olice officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation."). In the present case, witnesses were readily available for interviews, physical evidence was available, and a medical diagnosis was forthcoming. Defendants, however, . . . conducted no investigation. Instead, the Defendants relied on the flimsiest of information conveyed by a telephone call.

Cortez v. McCauley, 478 F.3d at 1117-18 (footnotes and citations omitted). The Tenth Circuit concluded, therefore, that qualified immunity did not apply. See 478 F.3d at 1118-22.

In Garcia v. Casuas, a detective with the City of Rio Rancho, New Mexico -- Monica Casuas -- arrested the plaintiff, Mitchell Garcia, for sexual penetration of a minor. See 2011 WL

7444745, at *8.  The plaintiff was ultimately exonerated, and subsequently filed a § 1983 claim against the arresting officer and the City of Rio Rancho for, among other things, unlawfully arresting him in violation of his Fourth Amendment rights.  See 2011 WL 7444745, at *12.  The Court found that the officer had probable cause to arrest the plaintiff based on information gleaned from other officers' interviews of the plaintiff, the victim -- K.J., the victim's mother -- Audrey Odom, and a witness at the scene on the night of the incident -- Jennifer Katz.  See 2011 WL 7444745, at *43-46.  Garcia argued that, by failing to re-interview Odom and Katz, and instead choosing to rely on the other officers' interviews of them, Casuas "fail[ed] to interview readily accessible witnesses."  2011 WL 7444745, at *15.  Garcia contended that, moreover, Casuas should have known that failing to personally interview him, Odom, Katz, K.J., and Katz' neighbors before arresting him violated his constitutional rights.  See 2011 WL 7444745, at *15.  Garcia argued that, had Casuas interviewed him before arresting him, she would have discovered Katz' and Odom's motivations to lie.  See 2011 WL 7444745, at *15.

Finding that the defendant's failure to conduct further investigation before arresting the plaintiff did not constitute a Fourth Amendment violation, the Court explained:

> Although Garcia cites Romero v. Fay and cases from several other circuits for the general proposition that officers must interview witnesses at the scene, Garcia points to no case law which would establish that, after the officers at the scene have interviewed witnesses, the Constitution requires the investigating detective to interview those witnesses again. . . .  Here, the responding police officers . . . interviewed every adult alleged to be involved in the incident and briefly spoke with K.J. . . .

> Garcia also states that, if Casuas had investigated further, she would have known that there was no semen on the bedding, and she would have discovered Katz' and Odom's motivation if she spoke to him. . . .  The Tenth Circuit's discussion of probable cause in Romero v. Fay also undercuts Garcia's assertion that Casuas was required to do more after [K.J.'s interview] solidified the existence of probable cause.  In Romero v. Fay, the Tenth Circuit held:

Plaintiff contends that regardless of whether the statements by Duran and Guiterrez supplied probable cause for Defendant Fay to arrest Plaintiff, under clearly established law a reasonable police officer would have investigated his alibi witnesses before arresting him, and the exculpatory information possessed by them would have negated the probable cause to arrest. We disagree.

45 F.3d at 1466. In Baptiste v. J.C. Penney Co., the Tenth Circuit also recognized that "officers are not required to conduct full investigations before making an arrest." 147 F.3d at 1257 n.8.

. . . .

These cases establish that Casuas was not required to speak to [Katz' neighbors], because they did not appear to be material witnesses. Garcia has made no allegations and presented no facts suggesting that the neighbors were ever around K.J. Garcia has also not presented any facts demonstrating that [the neighbors] have shed light on the motivations of Katz or Odom. Garcia only speculates that Casuas *might* have found something. An officer is not required to exhaust every possible lead to satisfy the Fourth Amendment. In Romero v. Fay, the Tenth Circuit held:

Once Defendant Fay concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause. Thus, Defendant Fay's failure to investigation Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

. . . .

Furthermore, Garcia's other statements belie the fact that, if Casuas had interviewed him before his arrest, he would have explained that Katz and Odom were biased or trying to frame him. When [another officer] interviewed Garcia on the night of the incident, he asked Garcia whether Katz and Odom had a reason to beat him up, and informed him that he was being accused of choking K.J. . . . Garcia responded that Katz and Odom had no reason to beat him up, and denied hurting K.J., never mentioning that Katz and Odom might have beat him up or encouraged K.J. to accuse him because they were romantically interested in him. . . . . During his interrogation after his arrest, Garcia never mentioned that Katz and Odom might have improper motives. The cases that Garcia cites establish only that the police may not ignore available material witnesses. Here, Thacker spoke with Garcia; Garcia denied doing wrong and never related that he may have been framed. Garcia presents no cases, and the Court could find none,

suggesting that Casuas was required to repeat the steps other officers had already taken and re-interview all witnesses. . . . Finally, waiting for the laboratory results would not have substantially altered the probable-cause determination, because, while the New Mexico Department of Public Safety Forensic Laboratory found no semen, it does not have the capabilities to detect the presence of urine in or on a substance . . . .

Once probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect. See Cortez v. McCauley, 478 F.3d at 1121 n.18 (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)). The Court has already determined that Casuas had probable cause to arrest Garcia and that there was a substantial basis for the issuance of the arrest warrant after the safe-house interview. Casuas was not required to investigate further after that determination.

Garcia v. Casuas, 2011 WL 7444745, at *47-49.

**5.    Traffic Stops.**

"'A traffic stop is a 'seizure' within the meaning of the Fourth Amendment . . . .'" United States v. Holt, 264 F.3d at 1220. "For the duration of a traffic stop, . . . a police officer effectively seizes everyone in the vehicle, the driver and all passengers." United States v. White, 584 F.3d 935, 945 (10th Cir. 2009)(quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009)). "This seizure implicates a passenger's Fourth Amendment interests to the same degree as the driver's." United States v. Wilson, 96 F. App'x 640, 643 (10th Cir. 2004)(unpublished)(citing United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)). "Therefore, both the driver and passenger have standing to challenge the constitutionality of the initial stop." United States v. White, 584 F.3d at 945. Passengers may challenge their detention during traffic stops. See United States v. Wilson, 96 F. App'x at 643 ("Wilson does not assert any such interest in the truck or its contents[;] [n]evertheless, Wilson may, as he does here, 'contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.'")(quoting United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000), and citing United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998); United States v.

Shareef, 100 F.3d at 1500).  The Tenth Circuit "reject[s] any notion that a vehicular stop detains

for Fourth Amendment purposes only the driver simply because the passenger may be free to

depart."  United States v. Erwin, 875 F.2d at 270.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'"

Kentucky v. King, 131 S. Ct. 1849, 1856 (2011)(quoting Brigham City v. Stuart, 547 U.S. 398,

403 (2006)), courts

> assess the reasonableness of a routine traffic stop under the principles laid out for
> investigative detentions in Terry v. Ohio, 392 U.S. 1 (1968), considering "whether the
> officer's action was justified at its inception, and whether it was reasonably related in
> scope to the circumstances which justified the interference in the first place."

United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Holt, 264 F.3d at 1220

(quoting Terry v. Ohio, 392 U.S. at 20)).  "A traffic stop is justified at its inception if an officer

has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic . .

. regulations of the jurisdiction."  United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009).

"[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic

violation . . . ."  United States v. Williams, 403 F.3d 1203, 1206 (10th Cir. 2005)(citation and

internal quotation marks omitted).

The Terry v. Ohio framework applies whether the traffic stop is based on probable cause

or reasonable suspicion.[18]  See United States v. Holt, 264 F.3d at 1230.  A court must examine

---

[18]The Tenth Circuit in United States v. King, 990 F.2d 1552 (10th Cir. 1997), noted:
"Terry was the first case to recognize that 'the Fourth Amendment governs 'seizures' of the
person . . . [other than] arrests' and created a 'narrowly drawn' exception to the probable cause
requirement for lesser government intrusions into an individual's liberty."  990 F.2d at 1557
(internal citations omitted)(quoting Terry v. Ohio, 392 U.S. at 16, 27).  Thus, Terry v. Ohio

> has come to stand for two distinct propositions -- an investigative detention
> ("stop") in which a police officer, for the purpose of investigation, may briefly
> detain a person on less than probable cause, and a protective search ("frisk")
> which permits an officer, in the course of an investigative detention, to conduct a

"both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d at 1230, "keeping in mind that an officer may extend the duration and scope of the initial detention based on 'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring,'" United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001)). "When the stop is extended based on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary, lasting no longer than necessary to effectuate the purpose of the [further detention], and the scope of the [further] detention must be carefully tailored to its underlying justification.'" United States v. Wilson, 96 F. App'x at 644 (quoting United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997)).

"A traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic . . . regulations of the jurisdiction." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009). "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation . . . ." United States v. Williams, 403 F.3d 1203, 1206 (10th Cir. 2005)(citation and internal quotation marks omitted).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects

---

limited search for weapons for his or her own protection.

United States v. King, 990 F.2d at 1557 (internal citations omitted)(citing United States v. Sokolow, 490 U.S. at 7; Adams v. Williams, 407 U.S. 143, 147-48 (1972)).

federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982). That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)). "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001). When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

**1.      Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense. In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. The Supreme Court also noted that, while no longer mandatory, the protocol that Saucier v. Katz outlined -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial. See Pearson v. Callahan, 555 U.S. at 241. In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise." 555 U.S. at 237. The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on

questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted)(internal quotation marks omitted). See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily"). Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails. See Cannon v. City & Cty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address

the first prong before the second prong in cases involving a recurring fact pattern, where

guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely

only to face challenges in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-

707. See Kerns v. Bader, 663 F.3d at 1181.[19] "Courts should think carefully before expending

---

[19] In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5. On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:
>
> > Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . . The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to <u>the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,</u> shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added). The Supreme Court established the qualified immunity defense in <u>Pierson v. Ray</u>, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: <u>Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases</u>, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." <u>Wood v. Strickland</u>, 420 U.S. 308, 322 (1975). In <u>Harlow v. Fitzgerald</u>, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, <u>The Fourth Amendment at a Three-Way Stop</u>, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, <u>Why Liberals Should Chuck the Exclusionary Rule</u>, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving . . . . These theories also suggest that a

'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37). See Camreta v. Greene, 563 U.S. at 707 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").[20] The Tenth Circuit will remand a case to the district court for

---

judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.). See Richard E. Myers, Fourth Amendment Small Claims Court, 10 OHIO ST. J. CRIM. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

[20]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases. [563 U.S. at 707]. As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small." It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the

most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment. Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job. The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way. Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts. The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice. The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance. Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012). In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation. See 132 S. Ct. at 2092, 2097. In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 S. Ct. at 1660, 1668. In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error. See 132 S. Ct. at 1241, 1250. The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant. See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

## 2. <u>Clearly Established Rights in the Qualified Immunity Analysis.</u>

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the

---

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. at 741. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741). "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly

established where "a distinction might make a constitutional difference." 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183 (emphasis added). Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established. See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."). "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law." Casey v. City of Fed. Heights, 509 F.3d at 1284. Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

### LAW REGARDING SUPPLEMENTAL JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). Federal courts "possess only that power authorized by [the] Constitution and statute . . . ." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction. See 28 U.S.C. §§ 1331-32.

1.      **Supplemental Jurisdiction.**

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a

controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552. The Supreme Court has long subscribed to the concept of supplemental jurisdiction recognized in two common-law doctrines -- pendent and ancillary jurisdiction.[21] "Historically, courts tended to use the term 'pendent' to refer to non-federal, non-diversity claims asserted by the plaintiff in a federal question case. And they tended to use 'ancillary' to refer to non-federal, non-diversity claims asserted in a diversity of citizenship case by parties *other* than the plaintiff." 13 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, & Richard D. Freer, Federal Practice and Procedure § 3523, at 155-56 (3d ed. 2008)(emphasis in original)(footnote omitted). Federal courts may exercise pendent jurisdiction over state law claims when "state and federal claims . . . derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966). Ancillary jurisdiction gives federal courts the flexibility to "entertain[] a non-federal, non-diversity claim asserted by a party other than the plaintiff, usually in a diversity of citizenship case," although occasionally in admiralty cases as well. 13 Wright et. al., supra, § 3523, at 173 & n.45 (3d ed. 2008).

In 1988, Chief Justice William H. Rehnquist created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms. See James v. Chavez, No. CIV 09-0540 JB/CG, 2011 WL 6013547, at * 5 (D.N.M. 2011)(Browning, J.)(citing 16 Moore's

---

[21]The Tenth Circuit has noted that Congress' intent in passing 28 U.S.C. § 1367 was to supersede the common-law doctrine of pendent jurisdiction: "Effective December 1, 1990, Congress enacted legislation, codified at 28 U.S.C. § 1367 (1976 & Supp. 1992), which supersedes the common law pendent jurisdiction doctrine." Baker v. Bd. of Regents of State of Kan., 991 F.2d 628, 634 (10th Cir. 1993)(citing Whalen v. Carter, 954 F.2d 1087, 1097 (5th Cir. 1992), and Aschinger v. Columbus Showcase Co., 934 F.2d 1402 (6th Cir. 1991)).

Federal Practice § 106.04[5], at 106-22 (Matthew Bender 3d ed. 2013)).  In response to the Committee's findings regarding pendent and ancillary jurisdiction, Congress codified the application of the two doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence."  Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).  Congress codified both ancillary and pendent jurisdiction "under the generic rubric 'supplemental' jurisdiction" in 28 U.S.C. § 1367, although "courts and lawyers routinely continue to use 'ancillary' and 'pendent' as well as 'supplemental' interchangeably to refer to *any* situation in which a federal court entertains a claim or proceeding that by itself would not invoke an independent basis of federal subject matter jurisdiction."  13 Wright et. al., supra, § 3523, at 156 (emphasis in original).

## 2.  District Court Discretion.

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction not as a litigant's right, but as a matter of judicial discretion.  See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).  In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains

discretion to decline to exercise that jurisdiction. The traditional analysis, based on the Supreme

Court's opinion in <u>United Mine Workers v. Gibbs</u>, compelled courts to consider "judicial

economy, convenience and fairness to litigants" when deciding whether to exercise supplemental

jurisdiction. 383 U.S. at 726. Similarly, Congress' supplemental jurisdiction statute enumerates

four factors that the court should consider:

>(1)     the claim raises a novel or complex issue of State law,
>
>(2)     the claim substantially predominates over the claim or claims over which
>the district court has original jurisdiction,
>
>(3)     the district court has dismissed all claims over which it has original
>jurisdiction, or
>
>(4)     in exceptional circumstances, there are other compelling reasons for
>declining jurisdiction.

28 U.S.C. § 1367(c). In applying these factors, district courts should seek to exercise

supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness,

and comity . . . ." <u>Estate of Harshman v. Jackson Hole Mountain Resort Corp.</u>, 379 F.3d at 1164.

Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the

district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions

of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction. <u>See</u> <u>Itar-Tass Russian

News Agency v. Russian Kurier, Inc.</u>, 140 F.3d 442, 447 (2d Cir. 1998)("[S]ection 1367 has

indeed altered <u>Gibbs</u>' discretionary analysis."); <u>McLaurin v. Prater</u>, 30 F.3d 982, 985 (8th Cir.

1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims

only in the four instances described therein."); <u>Executive Software N. Am. v. U.S. Dist. Court</u>,

24 F. 3d 1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of <u>Gibbs</u> in

subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be

triggered by the court's identification of a factual predicate that corresponds to one of the section

1367(c) categories."), <u>overruled on other grounds by</u> <u>Cal. Dep't of Water Res. v. Powerex Corp.</u>, 533 F.3d 1087 (9th Cir. 2008); <u>Palmer v. Hosp. Auth.</u>, 22 F.3d 1559, 1569 (11th Cir. 1994)("[S]upplemental jurisdiction <u>must</u> be exercised in the absence of any of the four factors of section 1367(c) . . . .")(emphasis in original); <u>Bonadeo v. Lujan</u>, No. CIV 08-0812 JB/ACT, 2009 WL 1324119, at *8 (D.N.M. April 30, 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists."); <u>Gudenkauf v. Stauffer Commc'ns, Inc.</u>, 896 F. Supp. 1082, 1084 (D. Kan. 1995)(Crow, J.)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated.").

The Tenth Circuit has held that district courts should generally decline jurisdiction over state claims when federal claims no longer remain: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." <u>Koch v. City of Del City</u>, 660 F.3d 1228, 1248 (10th Cir. 2011)(Ebel, J.)(quoting <u>Smith v. City of Enid ex rel. Enid City Comm'n</u>, 149 F.3d 1151, 1156 (10th Cir. 1998)). The Supreme Court has also recognized:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

<u>United Mine Workers of Amer. v. Gibbs</u>, 383 U.S. at 726. The Court has previously stated that the Supreme Court and the Tenth Circuit have indicated that a district court should usually decline to exercise supplemental jurisdiction when 28 U.S.C. § 1367(c) applies. <u>See</u> <u>Armijo v. New Mexico</u>, No. CIV 08-0336, 2009 WL 3672828, at *4 (D.N.M. September 30,

2009)(Browning, J.)("The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it.").  The Tenth Circuit has recognized that a district court does not "abuse [its] discretion" when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims over which it has original jurisdiction[.]'"  <u>Muller v. Culbertson</u>, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished).

## ANALYSIS

C. Payne's Count I alleges that Wilder violated her substantive and procedural due process rights under the United States Constitution by depriving her of custody and visitation of her children.  <u>See</u> Complaint ¶¶ 22-28, at 4-6.  C. Payne also alleges that Wilder has violated her right to be free from search and seizure under the United States Constitution by subjecting her to the "prolonged . . . traffic stop and . . . field sobriety tests when he lacked reasonable suspicion . . . ."  Complaint ¶¶ 22-28, at 4-6.  C. Payne bases her allegations in Count II on that same conduct, but brings Count II under Article II, Sections 10 and 18 of the Constitution of the State of New Mexico, the state's analogs to the Fourth and Fourteenth Amendments.  <u>See</u> Complaint ¶¶ 26-32, at 6-7.  Wilder asserts qualified immunity, and moves for summary judgment in his favor on both Counts I and II.  <u>See</u> MSJ at 1.  The Court concludes that Wilder is entitled to qualified immunity from liability for his conduct that C. Payne alleges violated her federal constitutional rights to substantive due process, procedural due process, and to be free from unreasonable search and seizure, and will thus grant the MSJ as to Wilder and Count I.  The Court further concludes that Wilder is entitled to summary judgment as to C. Payne's claims sounding in New Mexico substantive due process and unreasonable search and seizure, because this record of undisputed material facts demonstrates that Wilder did not commit such state constitutional

violations in the course of his alleged conduct.  The Court concludes, however, that this record of undisputed material facts does not entitle Wilder to summary judgment as to C. Payne's claims sounding in New Mexico's protections of procedural due process, because C. Payne has asserted facts creating a genuine dispute whether Wilder's conduct resulted in a state-deprivation of her custody over her children without meaningful process before -- or after -- the deprivation. Accordingly, the Court grants in part and denies in part Wilder's MSJ as to Count II.

In essence, Wilder's MSJ as to Count I contends that C. Payne has not alleged that he violated any of her clearly established constitutional rights.   Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.  When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d at 1107. The Court will take each of C. Payne's allegations and consider whether the undisputed facts establish that Wilder is entitled to qualified immunity, because, either (i) Wilder did not commit a violation of C. Payne's rights; or (ii) the rights Wilder violated were not clearly established at the time of Wilder's conduct.  Taking the facts in the light most favorable to C. Payne, Wilder did not violate a clearly-established right.

# I.   WILDER DID NOT VIOLATE C. PAYNE'S CLEARLY ESTABLISHED RIGHTS TO SUBSTANTIVE DUE PROCESS.

C. Payne's relevant allegations against Wilder are that his conduct over the course of his child-abuse investigation -- particularly his conduct during his traffic stop of C. Payne, where he cited her for driving with a suspended license, and he and Bucag's instruction to R. Payne not to let C. Payne take the children from R. Payne's home -- violated her substantive due-process right to a familial relationship with her children.  See Response at 6-7.  Put differently, according to C. Payne, Wilder "virtually terminated" her access to her children, violating her substantive due-process rights.  Response at 7.  Wilder moves for summary judgment by arguing that his "actions are consistent with Plaintiff's Fourteenth Amendment Due Process rights under the Constitution because he did not interfere with Plaintiff's parental rights[; t]herefore, his conduct did not violate clearly established law and he is entitled to qualified immunity."  MSJ at 8.  Wilder asserts that "[n]either the United States Supreme Court nor the Tenth Circuit have articulated any specific prohibition against a public official's statement about a parent's custody rights during a child abuse or neglect investigation."  MSJ at 8.  In that regard, Wilder maintains that Wilder afforded C. Payne "all rights pursuant to her substantive due process right to have control and custody over her children," and that, consequently, she has not shown that his conduct violated a constitutional right.  MSJ at 8.

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  Children have a constitutionally protected liberty interest in a relationship with their parents, and vice versa.

> [C]hoices to enter into and maintain certain familial human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our

> constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty.

Roberts v. U.S. Jaycees, 468 U.S. 609, 617-18 (1984).  See Trujillo v. Bd. of County Comm'rs, 768 F.2d 1186, 1189 (10th Cir. 1985)(holding that a parental relationship is a constitutionally protected liberty interest).  "'Th[e] right to familial association is grounded in the Fourteenth Amendment's Due Process Clause.'"  Cordova v. City. of Albuquerque, 816 F.3d at 654 (quoting Lowery v. City of Riley, 522 F.3d 1086, 1092 (10th Cir. 2008)).

> To prevail on a familial-association claim, a plaintiff must make two showings: (1) that the defendants intended to deprive [him or her] of [his or her] protected relationship," and (2) that balancing the individual's interest in the protected familial relationship against the state's interests in its actions, defendants either "unduly burdened plaintiff['s] protected relationship, or effected an unwarranted intrusion into that relationship."

Cordova v. City. of Albuquerque, 816 F.3d at 654-55 (quoting Thomas v. Kaven, 765 F.3d 1183, 1196 (10th Cir. 2014))(alterations added).  The Tenth Circuit has held, however, that "not every statement or act that results in an interference with the right of familial association is actionable.  The conduct or statement must be directed at the familial relationship with knowledge that the statements or conduct will adversely affect that relationship."  Cordova v. City. of Albuquerque, 816 F.3d at 654-55 (internal quotation marks and citation omitted).  To satisfy the first prong of the familial-association substantive due-process test, then, a plaintiff must allege the defendant had the "intent to interfere" with a particular protected relationship.  Cordova v. City. of Albuquerque, 816 F.3d at 654-55 (internal quotation marks and citation omitted).  As to the balancing analysis that the second prong requires, "'the court will consider, among other things, the severity of the infringement on the protected relationship, the need for defendants' conduct, and possible alternative courses of action.'"  Cordova v. City. of Albuquerque, 816 F.3d at 654-55 (quoting Thomas v. Kaven, 765 F.3d at 1196).

To determine whether a person's familial association rights have been violated in this factual setting, we must weigh two factors: the state's interests in investigating reports of child abuse, . . . [and] [the plaintiff's] interests in . . . familial right of association. Initially, we examine these factors objectively, that is, outside of the facts or subjective positions of the parties. Nonetheless, we do not evaluate constitutional rights in a vacuum. Ultimately, we must examine the parties' interests in light of the facts of this particular case.

Griffin v. Strong, 983 F.2d 1544, 1547 (10th Cir. 1993).

As to whether there was a constitutional violation, Wilder maintains that he did not "act with knowledge or intent, even if his words interfered with plaintiff's parental rights," because: (i) he "acted pursuant to another entity's directive," -- which was a "referral from CYFD requiring that he follow up on an anonymous tip"; (ii) he did "not interfere with Plaintiff's access to her children" and only informed her that she would be prevented from seeing her children until the investigation was complete; (iii) any of his "interference was justified by facts amounting to reasonable suspicion that the children faced imminent threats to their safety"; and (iv) he "only intended to pursue the investigation." MSJ at 11. According to Wilder, these actions do not show the "requisite knowledge or intent amounting to a substantive due process violation." MSJ at 10-11 (citing J.B. v. Wash. Cnty., 127 F.3d at 922, 927-28)(considering a child abuse investigation where county officials removed a child for eighteen hours but eventually concluded that, through the course of their investigation, there was no evidence of child abuse, and holding that, although removal of the child for eighteen hours practically interfered with her parent's rights of familial association, the officials committed no substantive due-process violation). Wilder further avers that he did not, at any point, "exercise[] any authority to prevent Plaintiff from the control and custody over her children," and that he only investigated the report of child abuse as it was his duty. MSJ at 11-12. Wilder also contends that, should his words to C. Payne constitute interference, that interference is "minimal and

outweighed by the risks described in the anonymous tip." MSJ at 12. Wilder requests that the Court balance the interests at stake and conclude: "Plainly, Deputy Wilder did not violate Plaintiff's substantive due process rights and any intrusion was justified by the need to assure the children's safety and well-being," because his only intent was to "pursue the investigation and assure the children's safety, not to sever or obstruct Plaintiff's relationship with her children." MSJ at 12-13. C. Payne disagrees, arguing that Wilder "virtually terminated" her rights to her children by prohibiting her "from having physical custody of her children until she allowed a search of the home in which she was housesitting" and that Wilder based this prohibition upon an unreliable anonymous tip. Response at 6.

The undisputed facts first establish that, "[o]n July 8, 2015, Deputy Wilder received a referral from CYFD and Intake Report as part of an investigation into an anonymous tip alleging child abuse and neglect of Plaintiff Cara Payne's two children." MSJ ¶ 3, at 3. See Response ¶ 3, at 1. Next, Wilder began investigating the anonymous tip by running a background check on R. Payne, C. Payne, and C. Payne's partner, Herndon, at which point he discovered C. Payne's driver's license was suspended. See MSJ ¶ 4, at 3; Response ¶ 4, at 1. Wilder next visited R. Payne in an attempt to corroborate the anonymous tip's allegations against C. Payne, which R. Payne confirmed. See MSJ ¶ 6, at 3-4; Response ¶ 7, at 1. When Wilder attended C. Payne's residence that the anonymous tip described -- 10 Coyote Lane -- C. Payne was not there, but Wilder encountered her vehicle later that day, at which point he executed a traffic stop. See MSJ ¶¶ 8-9, at 4; Response ¶¶ 8-9, at 1-2. During the traffic stop, in relevant part, Wilder informed C. Payne that "she could not see her children if she did not cooperate with the CYFD investigation," and that, because of the open child abuse investigation, he needed to conduct an investigation of the home at 10 Coyote Run before he could allow the children there. MSJ ¶ 11, at 4; Response ¶

11, at 2; id. ¶ 2, at 3. Accordingly, "[f]rom July 8, 2015 until December 25, 2015, Plaintiff was only allowed to see her kids at her ex-husband's house on two occasions." Response ¶ 5, at 3. The Court also notes that, in its review of the record, Wilder testified that he and Bucag subsequently met with R. Payne, at which point Wilder "told him not to give her the children. And if she tries to contact him contact me and I will then contact Ms. Payne and advise her of what I had already told her at the traffic stop in reference to the cooperation of the child abuse investigation." Wilder Depo. at 24:8-12.

> At that point I just wanted to make sure that the kids were in a safe place. They were with him anyway, it was his week. I wanted to make sure that Ms. Payne didn't come and try and pick up the kids early or give him some type of a deal to pick up the kids early, 'cause I wanted him to know that this was an open investigation and we needed to insure that the environment at 10 Coyote Run was safe for kids to go back to. . . . When you say take the kids[,] I think there's a misconception here that we picked them up, took them and transported them somewhere. They were already with their father who is the legal guardian and custodian of them. We just said, hey listen we'd like for you to keep the kids here. He said there's no reason for him to turn them over. I said, yeah, but if she comes here saying that she wants to take the kids these are the allegations. We want to make sure that wherever she's staying is a safe environment for the kids. That was the extent of the conversation. . . . We obviously didn't deny the fact that she could come over to the house. I told him that's totally up to you. You have a custody agreement. If you want to allow her into the house to visit the kids that's totally on you. And in conversations with him I guess that has happened. . . . There was also a conversation with Mr. Payne that he understood that that's a civil order between them. And that what we're basically doing at that point is interrupting the civil order while we're conducting basically a criminal investigation.

Wilder Depo at 27:23-29:6. "When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff, who must" demonstrate that "(1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged unlawful activity." Lundstrom v. Romero, 616 F.3d 1108, 1118 (10th Cir. 2010). Here, C. Payne has not attempted to dispute Wilder's account of his interaction with R. Payne, but instead is arguing that Wilder's conduct in speaking to R. Payne "virtually terminated" her rights to

familial association. Response at 6. The Court, then, credits Wilder's account of the nature of his instruction to R. Payne as being undisputed evidence on this record. <u>See</u> Response <u>passim</u> (not disputing or proffering alternative evidence regarding Wilder's discussions with R. Payne, and, generally, only proffering as evidence in support of the Response by attaching the C. Payne Aff.).

Turning, then, to the two-pronged familial-association substantive due-process test, the Court concludes that the undisputed facts entitle Wilder to qualified immunity, because C. Payne has not established that Wilder's conduct in this case constituted an "undue burden" on C. Payne's associational interests. <u>Griffin v. Strong</u>, 983 F.2d at 1547. <u>See</u> <u>Cordova v. City. of Albuquerque</u>, 816 F.3d at 654-55. First, it is important to note at the outset that C. Payne argues that Wilder "virtually terminated" her rights to familial association by prohibiting her "from having physical custody of her children until she allowed a search of the home in which she was housesitting" and that Wilder based this prohibition upon an unreliable anonymous tip. Response at 6. C. Payne does not allege that Wilder's conduct resulted in her inability to visit with the children while the investigation was ongoing. <u>Cf.</u> Response at 6 (asserting she saw the children twice). In that regard, the undisputed facts establish that C. Payne was not separated completely from her children, and that the allegedly unconstitutional conduct concerns Wilder's statements to C. Payne during the traffic stop about how he needed to search 10 Coyote Lane before the children could go there and Wilder's statements to R. Payne requesting he not allow C. Payne take the children away from his home; there is no allegation of a direct, physical state intervention by removal of the children from C. Payne. <u>See</u> Complaint, <u>passim</u>; Response at 6. Nonetheless, in the context of R. Payne and C. Payne's custody agreement, Wilder's conduct ultimately resulted in C. Payne's inability to have physical custody of her children at her home.

<u>See</u> Response at 6. The Court also notes that, at the time when Wilder told R. Payne not to let C.

Payne take the children, Wilder's statement was an empty directive, because it was not C.

Payne's turn to have the children anyway; moreover, the undisputed record facts reflect that C.

Payne did not take physical custody of her children from "[f]rom July 8, 2015 until December

25, 2015 . . . ." Response ¶ 5, at 3. C. Payne accomplished visitation of her children during that

time period, and she has not alleged that Wilder interfered with her ability in that regard, but that

was not the strictures of her custody agreement. <u>See</u> Response ¶ 5, at 3. Nonetheless, in light of

these facts, the Court concludes that Wilder interfered with C. Payne and her children's normal,

everyday familial association, and that "it is evident that there was interference with plaintiff's

rights of familial association," leaving the Court to determine whether the interference is

actionable under the prongs of the familial-association substantive due-process test. <u>J.B. v.

Washington Cnty.</u>, 905 F. Supp. 979, 988 (D. Utah 1995)(Greene, J.). <u>See</u> <u>Cordova v. City of

Albuquerque</u>, 816 F.3d at 654 ("[N]ot every statement or act that results in an interference with

the right of familial association is actionable. The conduct or statement must be directed at the

familial relationship with knowledge that the statements or conduct will adversely affect that

relationship.")(internal quotation marks and citation omitted)).

Concerning the first prong, the Court concludes that Wilder had the requisite intent to

interfere with C. Payne's rights to familial association. Indeed, as to the alleged unconstitutional

conduct, the Court can discern no other intent on Wilder's behalf, because his conduct was

directed at ensuring that some modicum of C. Payne's rights to familial association were ceded

during his investigation of the child abuse allegations. <u>Cf.</u> <u>J.B. v. Washington Cnty.</u>, 905 F.

Supp. at 988 (concluding that an eighteen-hour removal of the child from parents' physical

custody, for an interrogation regarding allegations of sexual abuse, was interference with

plaintiffs' rights of familial association). Wilder maintains that his intent was only to investigate the child abuse allegations and not to interfere with C. Payne's associational rights, see MSJ at 11, but the Court is not persuaded that Wilder's statements did not accomplish both the furtherance of his investigation and an intentional attempt to interfere with C. Payne's associational rights. Wilder primarily relies on J.B. v. Washington Cnty., 127 F.3d at 927-28, where the Tenth Circuit provided:

> Plaintiffs recognize that the County officials had a duty to investigate the report of child sexual abuse. They do not allege that the officials were motivated by any other purpose apart from investigation. Rather, they claim that the officials failed to use the least disruptive procedure to interview the child.
>
> We agree with the district court that while the County's "objectives might have been accomplished within a shorter period, there is no evidence that [the County officials] intended or directed their conduct in this matter at the familial relationship of L.B. and J.B. with knowledge that such conduct would adversely affect the relationship as required by [this court]." [J.B. v. Washington Cnty.,] 905 F. Supp. at 988 (citing *Griffin [v. Strong]*, 983 F.2d at 1546, 1548). "Absent such evidence of wilfulness or intent," the district court appropriately determined that no genuine issue of material fact exists as to plaintiffs' substantive due process claims. *Id.* We similarly conclude that the County officials' conduct did not impermissibly interfere with plaintiffs' right of familial association.

J.B. v. Washington Cnty., 127 F.3d at 927-28 (quoting J.B. v. Washington Cnty., 905 F. Supp. at 988). The Court notes, however, that, in the preceding paragraphs, the Tenth Circuit also provided:

> In evaluating these competing interests, we have observed that "[n]ot every statement or act that results in an interference with the rights of intimate association is actionable." *Griffin*, 983 F.2d at 1548. The conduct or statement must be directed "at the intimate relationship with knowledge that the statements or conduct will adversely affect that relationship." *Id*.
>
> Here, plaintiffs have sounded a constitutional claim by alleging that the conduct of the County officials was directed at the family relationship with knowledge that it would adversely affect that relationship. "[I]t is evident that there was interference with plaintiffs' rights of familial association" because "L.B. was physically removed from her home and from her parents for a period of almost 18 hours," which "included an overnight stay in a pre-arranged shelter

> home." 905 F. Supp. at 988. Therefore, we proceed to "examine the evidence to determine the severity of the alleged infringement, the need for the defendant's conduct, and any possible alternatives." *Griffin*, 983 F.2d at 1548.

J.B. v. Washington Cnty., 127 F.3d at 927 (quoting Griffin v. Strong, 983 F.2d at 1548). In essence, then, the Court concludes that the Tenth Circuit, in J.B. v. Washington Cnty., primarily premised its holding in its analysis of the second prong of the familial-association substantive due-process test, which entails a balancing of all of the competing interests at stake in the case. The Court's review of Griffin v. Strong, a case upon which Wilder heavily relies for its statements of the law, bolsters this conclusion. In Griffin v. Strong, the Tenth Circuit considered allegations by a married couple against a detective who used allegedly coercive tactics to obtain a confession of sexual abuse from the father, resulting in his incarceration and separation from his wife and daughter. See Griffin v. Strong, 739 F. Supp. 1496, 1498 (D. Utah 1990)(Greene, J.). The Tenth Circuit overturned the verdict against the defendant for violating the plaintiff's substantive due-process rights, and held that "the infringement of familial rights of association in this case is slight," but, in the process also cited a case called Trujillo v. Bd. of Cty. Comm'rs of Santa Fe Cnty., 768 F.2d 1186, 1190 (10th Cir. 1985), for the proposition that, "to rise to the level of a constitutional claim, the defendant must direct his or her statements or conduct at the intimate relationship with knowledge that the statements or conduct will adversely affect that relationship." Griffin v. Strong, 983 F.2d at 1548. The context of that proposition is important in guiding the Court's analysis of this first prong, because, when the Tenth Circuit in Trujillo v. Bd. of Cty. Comm'rs of Santa Fe Cnty. held that "an allegation of intent to interfere with a particular relationship protected by the freedom of familial association is required to state a claim under section 1983," it was considering an inapposite scenario where the family of a deceased inmate at the Santa Fe County Jail brought their lawsuit for a deprivation "of their constitutional

right of familial association under the First and Fourteenth Amendments." <u>Trujillo v. Bd. of Cty.</u> <u>Comm'rs of Santa Fe Cnty.</u>, 768 F.2d at 1187. The first prong of the familial-association substantive due-process test is met in this case, because Wilder intended to interfere with C. Payne's right and did not merely interfere with that right as a byproduct of, for example, causing the negligent death of C. Payne's family member. <u>Cf.</u> <u>Trujillo v. Bd. of Cty. Comm'rs of Santa</u> <u>Fe Cnty.</u>, 768 F.2d at 1187. The Court, accordingly, must proceed to the second prong, and consider, "among other things, the severity of the infringement on the protected relationship, the need for defendants' conduct, and possible alternative courses of action,'" <u>Cordova v. City. of</u> <u>Albuquerque</u>, 816 F.3d at 654-55 (quoting <u>Thomas v. Kaven</u>, 765 F.3d at 1196), to "ascertain whether a defendant's conduct constitutes an undue burden on the plaintiff's associational rights," <u>PJ ex rel. Jensen v. Wagner</u>, 603 F.3d 1182, 1199 (10th Cir. 2010)(citing <u>Griffin v.</u> <u>Strong</u>, 983 F.2d at 1547).

The undisputed facts establish that Wilder was investigating an allegation of child abuse against C. Payne. In the course of his investigation, Wilder explained to C. Payne that he would need to search 10 Coyote Lane so that he could ascertain whether the allegations of an unsafe living environment were accurate. He alerted C. Payne that, should the allegations be untrue, the investigation would close and that he would no longer have an interest in keeping the children out of her home. At no point did Wilder tell C. Payne that she could not otherwise challenge the allegations with CYFD or discourage her from filing the lawsuits she ultimately filed. Indeed, at all times, it appears that Wilder's conduct in interfering with C. Payne's rights to familial association was narrowly focused on completing his investigation before C. Payne took physical custody of her children from R. Payne in accordance with their custody agreement. Further, unlike in <u>J.B. v. Washington Cnty.</u>, where the Tenth Circuit concluded that an eighteen-hour

removal of parents' child to interrogate that child about potential occasions of sexual abuse did not unduly burden the parents' substantive due-process rights, Wilder did not even physically remove C. Payne's children from her personal custody. See 127 F.3d at 927-28. The infringement's severity, then, is not as serious as the actual physical removal in J.B. v. Washington Cnty., because C. Payne had the opportunity to comply with Wilder's investigation, and, nonetheless, still had access to visit her children at R. Payne's home during the investigation.

Ultimately, Wilder's conduct appears to be the imposition of some restrictions in accordance with what he perceived was the proper path for investigating the allegations against C. Payne. In that regard, the Court is persuaded by its analysis of the "need for defendants' conduct, and possible alternative courses of action," Cordova v. City of Albuquerque, 816 F.3d at 654-55, that these factors weigh in favor of Wilder's conduct, particularly where C. Payne has not attempted to proffer any alternative courses of action. As to the necessity of Wilder's conduct, the Court notes that the state of New Mexico has a strong interest in investigating allegations of child abuse, and that the undisputed facts here do not otherwise indicate that Wilder had some motive besides investigating the present allegation of child abuse. See Griffin v. Strong, 983 F.2d at 1547 The Tenth Circuit, similarly, in PJ ex rel. Jensen v. Wagner addressed a parents' lawsuit against a doctor who diagnosed their child with cancer. See 603 F.3d at 1190. In short, a juvenile court ordered the child be taken into state custody for chemotherapy treatment, because the parents refused. See 603 F.3d at 1190-91. After a lengthy series of events, the state ultimately decided "that the state's interest in the case had shifted such that attempting to force chemotherapy treatment and placing the [parents] in jail would no longer be in P.J.'s best interest." 603 F.3d at 1192. The Tenth Circuit considered the parents' lawsuit

alleging a deprivation of their rights to familial association, and, in balancing the interests at stake, held:

> First, the [parents'] interest in associating with P.J. is unquestionably of paramount importance. . . . Second, as discussed above, the state's interest in protecting and safeguarding P.J.'s life is also significant. Finally, given these countervailing interests, the record demonstrates that the actual burden on the [parents]' right to associate with P.J. was minimal in this case. The [parents] correctly point out that the forced separation of parent from child, even for a short time, represents a serious impingement. . . . <u>In this case, however, P.J. was never physically removed from the[ir] custody and the state afforded the[m] numerous opportunities to obtain treatment for P.J. before it even sought to remove him from their custody. Under these circumstances, the [parents] fail to show that any defendant imposed an undue burden on their relationship with P.J. and therefore fail to show a violation of their associational rights.</u>

603 F.3d at 1199 (internal quotation marks and citations omitted)(emphasis added).[22] C. Payne similarly does not show that Wilder imposed an undue burden on her relationship with her children, because he never physically removed the children from her custody, and his minimal interference in her relationship with the children -- by suggesting to her and R. Payne that she could not take the children to 10 Coyote Lane until he had searched that residence and closed his investigation -- was not unaccompanied by opportunities to comply or challenge the investigation. The Court concludes that, on balance, the infringement of familial rights of association in this case is thus slight, resulting only in a minor disruption in C. Payne and her children's lives. Again, the right of intimate association is not absolute, and, viewed in the context of the minimal infringement indicated by this record, the Court concludes that Wilder's conduct did not unduly interfere with C. Payne's right of familial association with her children. Consequently, C. Payne has not demonstrated a constitutional violation of her substantive due-

---

[22]The Court notes that, in the absence of the Tenth Circuit caselaw which squarely controls the Court's analysis in this case, the Court is uncertain it would reach the same conclusion that it reaches today in determining that there was no substantive due-process violation on these facts.

process rights to familial association, and has thus not met her burden in responding to Wilder's MSJ -- wherein he asserts his qualified immunity to her claims -- because on these undisputed facts Wilder is entitled to qualified immunity as a matter of law.

The Court, accordingly, need not rely upon the clearly established prong of the qualified immunity analysis to grant Wilder's MSJ as to C. Payne's substantive due-process claims. The Court notes, however, that there is no clearly established law making Wilder's conduct unlawful. "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923. "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d at 1298. The issue then is whether Wilder was on fair notice that, in his investigation of the child abuse allegations against C. Payne, his "described conduct was unconstitutional." Pierce v. Gilchrist, 359 F.3d at 1298. In answering that question, it is important to note that the clearly established prong of the qualified immunity test is a very high burden for C. Payne: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. at 741. "In other words,

'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741). "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205. In this substantive due-process/familial association context, the "[c]ourts have recognized that the constitutional right to familial integrity is amorphous and always must be balanced against the governmental interest involved." Martinez v. Mafchir, 35 F.3d at 1490. Indeed, the substantive due-process right to familial association "has never been deemed absolute or unqualified." Starkey v. Boulder Cnty. Soc. Servs., 569 F.3d at 1253 (quoting Martinez v. Mafchir, 35 F.3d at 1490).

C. Payne has not alerted the Court -- or attempted to alert the Court -- in her Response, to a case or statute which qualifies in relevant fashion the amorphous right which she alleges Wilder has violated. See Response passim. Accordingly, although the Court has already concluded that Wilder did not commit a constitutional violation of C. Payne's constitutional rights, the right of which she complains was violated is nonetheless not clearly established; Wilder is entitled to qualified immunity regardless of which prong it analyzes. The Court grants the MSJ and concludes that Wilder is entitled to qualified immunity from C. Payne's claims

sounding in substantive due process.

## II. WILDER VIOLATED C. PAYNE'S RIGHTS TO PROCEDURAL DUE PROCESS, BUT THOSE RIGHTS WERE NOT CLEARLY ESTABLISHED IN THIS CONTEXT.

C. Payne also alleges that Wilder violated her procedural due-process rights by depriving her of custody of her children without notice or any opportunity to be heard. See Complaint ¶ 25, at 8. Wilder moves for summary judgment on this claim, because he "did not interfere with any right to challenge the terms of the CYFD investigation and he could not have violated Plaintiff's procedural due process rights." MSJ at 14. Wilder concedes that states may take children from parents only after fair process, but asserts that he "never interfered with that right, much less her procedural right to contest any related intrusion." MSJ at 15. Essentially, Wilder maintains that C. Payne could have, and should have, contacted CYFD about the anonymous tip and subsequent investigation, should she have wanted process. See MSJ at 15. Regardless, Wilder further argues that, even if he controlled the procedures of which C. Payne argues he deprived her, "he never removed or interfered with Plaintiff's control or custody over her children." MSJ at 15. Wilder also contends that, "[i]f he had removed the children with a prior hearing, he would have been justified by reasonable suspicion based upon 1) the information in the anonymous tip; 2) Mr. Payne's corroboration of those facts; and 3) Deputy Wilder's awareness of Ms. Payne's association with methamphetamine users." MSJ at 15. In sum, Wilder reiterates that no "reasonable officer would know that mere words violate a plaintiff's procedural due process rights . . . or could have known that sharing misinformation about a plaintiff's parental rights interferes with the right to contest the deprivation." MSJ at 16. In her Response, C. Payne confronts only Wilder's arguments regarding procedural due process by

stating she has pursued her case in state court and that she has thus not disavailed herself of "process" to regain custody. Response at 6-7.

The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due-process rights are violated: (i) "Did the individual possess a protected property interest to which due process protection was applicable?"; and (ii) "Was the individual afforded an appropriate level of process?" Camuglia v. City of Albuquerque, 448 F.3d at 1219 (quoting Clark v. City of Draper, 168 F.3d at 1189 (internal quotation marks omitted)). Child custody, care, and control is an established, protected interest under the first step of the inquiry, see Spielman v. Hildebrand, 873 F.2d at 1385, and the state may thereby take children from parents only after fair process, which in context requires "prior notice and a hearing, except in extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event," Gomes v. Woods, 451 F.3d at 1128. "These extraordinary situations include emergency circumstances which pose an immediate threat to the safety of a child." 451 F.3d at 1128 (internal quotation marks and alterations omitted). Regarding application of this principle, the Tenth Circuit has held:

> In our view, the reasonable suspicion standard appropriately balances the interests of the parents, the child, and the state. The failure to act when a child is in danger may have "unthinkable consequence[s]." *Jordan v. Jackson*, 15 F.3d 333, 350 (4th Cir. 1994). As a result, social workers should be afforded some discretion when they seek to protect a child whose safety may be at risk. . . . Following the majority approach, we conclude that state officials may remove a child from the home without prior notice and a hearing when they have a reasonable suspicion of an immediate threat to the safety of the child if he or she is allowed to remain there. We emphasize again that even in these instances in which emergency removal is justified, the state must afford the parents a prompt post-removal hearing.

Gomes v. Woods, 451 F.3d at 1130. Reasonable suspicion, the Court notes, does not include the mere possibility of danger. See Roska v. Peterson, 328 F.3d at 1245. Under that standard, state

officials must have "'evidence giving rise to a reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse.'" <u>Gomes v. Woods</u>, 451 F.3d at 1129 (quoting <u>Hatch v. Dep't for Children, Youth & Their Families</u>, 274 F.3d 12, 20 (1st Cir. 2001)). Further, when an agency removes a child before a hearing, the state remains obligated to provide a hearing post-removal. <u>See</u> <u>Gomes v. Woods</u>, 451 F.3d at 1128.

Accordingly, the Court must determine whether Wilder's statements to C. Payne at the traffic stop and his subsequent statements to R. Payne, about C. Payne's inability to have the children in her home while the investigation was pending constitute a clearly established violation of her procedural due process rights. At the outset, the Court notes that C. Payne does not argue that the children were formally removed from her custody and control without process; she instead argues that her children were "virtually removed" from her custody and control without process, because Wilder's statements effectively barred her from custody, because R. Payne did not let her have them subsequent to Wilder's conduct. Response at 6. The Court is not persuaded that the deprivation C. Payne endured is the same as a full-fledged state removal of her children without process; indeed, even looking at the applicable law's language, the present scenario is not comparable to that in <u>Gomes v. Wood</u>, where the Tenth Circuit held that "state officials may remove a child from the home without prior notice and a hearing when they have a reasonable suspicion of an immediate threat to the safety of the child if he or she is allowed to remain there," because the children were not at 10 Coyote Lane when Wilder made his statements. Of course, the statements appear to have had an enduring effect, as C. Payne -- before CYFD closed their investigation -- relied upon Wilder's authority and only visited the children at R. Payne's home twice in the relevant time frame, and did not apparently attempt to take them with her to 10 Coyote Lane in contravention of what Wilder had directed. <u>See</u>

Response ¶ 5, at 3.  See also Jojola v. Chavez, 55 F.3d at 493 ("The authority with which the defendant is allegedly 'clothed' may be either actual or apparent.").  The Court does not have information about R. Payne and C. Payne's custody agreement, and only knows that it is undisputed that it exists.  See MSJ ¶ 15, at 5.  C. Payne does not tender to the Court the times when she was entitled to the children's physical custody.  See Response, passim.  There was no actual, formal state deprivation of C. Payne's parental custody, distinguishing this case from the typical procedural due-process analyses where a state has physically removed children from an allegedly abusive living situation.  See Gomes v. Woods, 451 F.3d at 1129 (quoting Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d at 20).

What C. Payne essentially requests is process at some point during the pendency of the investigation regarding Wilder's informal interference with her physical custody over her children, unless and until she complied with the investigation and a search of her residence.  The Court must, therefore, first consider whether these statements constituted a deprivation subject to due-process procedural protections.  There do not appear to be, in the Court's review, any Tenth Circuit cases addressing circumstances such as those present here, where the State has not physically taken the child away from a parent, but otherwise gained the child's custody by, say, "refusing to release him or her after the parent has voluntarily granted temporary custody to the government or a third party.  Such situations unquestionably also implicate the parent and child's procedural due process rights."  Kia P. v. McIntyre, 235 F.3d 749, 760 (2d Cir. 2000)(citing Cecere v. City of N.Y., 967 F.2d 826, 830 (2d Cir. 1992)(holding that, when a parent voluntarily leaves a child with a third party, and the third party later refuses to return the child to the parent on basis of State authority, the parent is deprived of constitutionally protected liberty interest in the custody of her child at the moment of refusal to return that child); Duchesne v. Sugarman,

566 F.2d 817, 822-23, 828 (2d Cir. 1977)(holding that, even though a mother voluntarily left her children with a neighbor, when State officials assumed custody of the children from the neighbor and refused to return the children to the mother, the officials were required to initiate post-deprivation proceeding).  Cf. Joyner by Lowry v. Dumpson, 712 F.2d 770, 782-83 (holding that parents who voluntarily relinquished their children to the State nonetheless possessed substantive due process rights with respect to the State's later refusal to return the children and the State's practice of "strictly controlling visitation, thereby isolating the child and straining familial bonds")).  The Second Circuit, in that regard, has developed a small body of caselaw providing guidance which the Court finds persuasive, and which that circuit readily follows.  For example, in Sundbye v. Ogunleye, 3 F. Supp. 2d 254 (E.D.N.Y. 1998)(Gleeson, J.), the district judge concluded that even where there was not an actual deprivation of the parent's liberty interest in the custody and care of their child through a legal change in custody -- the parent believed that a written agreement she had signed allowing her daughter to live with family members was legally binding in the same way a voluntary placement instrument would have been -- the parent's mere reasonable belief of deprivation was sufficient to implicate her liberty interests.  See 3 F. Supp. 2d 254.  The district judge also concluded that the investigating agency's delay in filing a petition in Family Court did not meet due-process requirements, citing the Second Circuit decision in Gottlieb v. County of Orange, 84 F.3d 511, 520 (2d Cir. 1996).  Accordingly, the Court concludes that C. Payne suffered a deprivation of her custody rights, because she was effectively deprived of those rights when Wilder -- an authority figure acting on behalf of the state -- made it apparent to C. Payne and R. Payne that the children could not return to 10 Coyote Lane until C. Payne submitted to a search of the home and ended the pending investigation.  C. Payne and R. Payne reasonably believed there would be legal repercussions should she take the

children. As to Wilder's argument that C. Payne could have taken the kids, the Court notes that Wilder testified that he told both C. Payne and R. Payne that C. Payne could not have the children until Wilder had searched 10 Coyote Lane, and that Wilder also testified that he had knowledge of the custody agreement, which signals to the Court that C. Payne was not somehow on notice that Wilder did not have the authority to cancel her civil custody agreement. The Court concludes that, as did the district judge in Sundbye v. Oqunleye, C. Payne effectively suffered a deprivation, albeit not a formal custody removal, at Wilder's hands.

Wilder nonetheless advances that the undisputed facts of this case indicate that he was operating upon what he perceived to be reasonable grounds that, until he cleared 10 Coyote Lane by a safety search, the evidence he had gathered suggested that C. Payne's children were at an imminent risk of abuse should they continue to live at 10 Coyote Lane. The Court disagrees with Wilder that the undisputed facts upon which Wilder acted objectively establish reasonable articulable suspicion that the children would be subject to abusive neglect and inadequate living conditions -- living conditions that, should they be true, had inspired Wilder's assignment of this investigation -- while the children were in C. Payne's custody at 10 Coyote Lane. The Court first recognizes that, in New Mexico, a police officer like Wilder may hold or take a child into custody if they have

> evidence giving rise to reasonable grounds to believe that the child is abused or neglected and that there is an immediate threat to the child's safety; provided that the law enforcement officer contacts the department to enable the department to conduct an on-site safety assessment to determine whether it is appropriate to take the child into immediate custody, except that a child may be taken into custody by a law enforcement officer without a protective services assessment being conducted if:
>
>> (a) the child's parent, guardian or custodian has attempted, conspired to cause or caused great bodily harm to the child or great bodily harm or death to the child's sibling;

> (b) the child's parent, guardian or custodian has attempted, conspired to cause or caused great bodily harm or death to another parent, guardian or custodian of the child;
>
> (c) the child has been abandoned;
>
> (d) the child is in need of emergency medical care;
>
> (e) the department is not available to conduct a safety assessment in a timely manner; or
>
> (f) the child is in imminent risk of abuse . . . .

N.M. Stat. Ann. § 32A-4-6(A)(1). In New Mexico, "[e]vidence that demonstrates that a child has been knowingly and intentionally exposed to the use of methamphetamine shall be deemed prima facie evidence of abuse of the child." N.M. Stat. Ann. § 30-6-1(J). Thus, at the times when Wilder made his statements, he contends that there was no violation of C. Payne's procedural due-process rights in light of the undisputed facts in this case, because C. Payne was not entitled to any additional predeprivation process from Wilder given that he was acting upon "'evidence giving rise to a reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse,'" Gomes v. Woods, 451 F.3d at 1129 (quoting Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d at 20), with that evidence being, in New Mexico pursuant to N.M. Stat. Ann. § 30-6-1(J), "prima facie evidence of abuse." The evidence upon which Wilder acted was: (i) the information in the anonymous tip alleging C. Payne's drug use and cohabitation with a wanted felon at 10 Coyote Lane, see MSJ ¶ 6, at 3-4; (ii) R. Payne's corroboration of the allegations in the anonymous tip; and (iii) Wilder's impressions of C. Payne's association with methamphetamine use during and after his traffic stop, see MSJ at 15. By these items of evidence, the Court concludes that there was insufficient evidence to establish "'a reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse.'" Gomes v. Woods, 451 F.3d at 1129 (quoting Hatch v. Dep't for Children, Youth &

Their Families, 274 F.3d at 20). The Court first recognizes that, generally, Tenth Circuit cases involving reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse tend to be cases where, for example, children presented in hospitals with visible, physical injuries. See Gomes v. Woods, 451 F.3d at 1137. The Court does not read the Gomes v. Woods standard to be that exclusive, however:

> Accordingly, we conclude that in determining whether state officials have a reasonable suspicion of an immediate threat to the safety of the child, we must consider all relevant circumstances, including the state's reasonableness in responding to a perceived danger, as well as the objective nature, likelihood, and immediacy of danger to the child. Ordinarily, the question of whether state officials had time to seek and obtain judicial authorization for the removal without jeopardizing the safety of the child will be an important consideration, and the failure to establish that judicial authorization was impracticable will undermine the contention that emergency circumstances existed. However, neither this factor, nor any other single factor, is necessarily dispositive.

Gomes v. Wood, 451 F.3d at 1131 (internal quotation marks and citation omitted). There is, then, a colorable argument that "[e]vidence that demonstrates that a child has been knowingly and intentionally exposed to the use of methamphetamine shall be deemed prima facie evidence of abuse of the child," N.M. Stat. Ann. § 30-6-1(J), could satisfy the Gomes v. Woods standard for imminent peril of abuse. The problem here, though, is that Wilder merely had evidence which suggested that C. Payne used methamphetamine, with no spatial or temporal qualifications. See MSJ ¶ 6, at 3-4; id. at 15. The Court cannot conclude that such evidence of alleged drug use -- particularly where the Court can contemplate times where C. Payne might use methamphetamine when she did not have the children's custody, but might not comport herself in that fashion whilst having custody -- satisfies the Gomes v. Wood standard. To conclude otherwise would give the state carte blanche authority to effect deprivations of child custody, without any predeprivation process, upon mere allegations of drug use while also being a parent. Accordingly, the Court concludes that C. Payne was owed predprivation process under these

circumstances before Wilder took steps to effectuate deprivation of her children's custody, and that, in its consideration of Wilder's entitlement to qualified immunity, there was a constitutional violation of C. Payne's procedural due process. The Court next turns to analysis of the clearly established prong.

The Supreme Court has resolved that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. at 741. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741). To determine whether C. Payne's right in this context was clearly established, the Court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right. See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007). The Tenth Circuit has held that the law is not clearly established where "a distinction *might* make a constitutional difference." Kerns v. Bader, 663 F.3d at 1186-87 (emphasis in original).

Wilder contends that he operated under reasonable suspicion that, on the basis of the anonymous tip and his interaction with C. Payne, the children were under imminent threat of child abuse, because C. Payne was allegedly using methamphetamine at 10 Coyote Lane. The Court has already concluded that this evidence does not suffice the Gomes v. Wood standard for negating predeprivation process in these circumstances, but the Court cannot further conclude that the Supreme Court or the Tenth Circuit has clearly established C. Payne's rights in these

unique circumstances.  Indeed, C. Payne has not cited any cases in her favor which suggest that it is clearly established that Wilder's conduct in this case of effectuating the deprivation of C. Payne's custody over her children was procedurally unconstitutional.  <u>See</u> Response at 6 (making no argument regarding the clearly established prong and her claims alleging violations of her procedural due process rights).  Indeed, it appears that Wilder considered himself to have the authority to handle this issue in the manner in which he did, and CYFD and Bucag's presence at the meeting with R. Payne, where he made the most significant deprivation of C. Payne's procedural due-process rights, bolsters this conclusion.  To borrow <u>Kerns v. Bader</u>'s language, the Court must consider "whether it was beyond debate" that Wilder's conduct in the course of his investigation "lacked legal justification."  663 F.3d at 1183.  Qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  <u>Saucier v. Katz</u>, 533 U.S. at 205.  The Court concludes that Wilder made a "reasonable, but mistaken belief[]" in the course of his child abuse investigation which resulted in a violation of C. Payne's procedural due process rights.  Accordingly, because the law on these precise facts -- involving the proper strictures of Wilder's child abuse investigation and the means available to him to conduct his investigation -- was not clearly established at the time of Wilder's violation, the Court will afford Wilder qualified immunity to C. Payne's claims alleging a procedural due-process violation.

The Court also notes, for clarity, that the undisputed facts indicate that Wilder did not continue to instruct R. Payne to withhold custody from C. Payne, and that, on balance, the undisputed facts suggest that Wilder's role in the investigation was diminished as CYFD became more heavily involved.  <u>See</u> Response ¶¶ 3-4, at 3.   Instead, the undisputed facts indicate that, upon evidence giving Wilder what he considered "'a reasonable and articulable suspicion that

the child has been abused or is in imminent peril of abuse,'" Wilder made statements to C. Payne and to R. Payne, the effect of which appears to have persisted beyond that period of time which R. Payne was, in accordance with his and C. Payne's custody agreement, entitled to custody over the children. Response ¶ 5, at 3 (stating that "[f]rom July 8, 2015 until December 25, 2015," C. Payne only visited with her children). The Court also notes that Wilder was clear with C. Payne that his investigation was going to require him to search 10 Coyote Lane to ensure the allegations in the anonymous tip were not true and that C. Payne did not comply with Wilder's wish to investigate the anonymous tip. See Response ¶ 5, at 3 (stating that "[f]rom July 8, 2015 until December 25, 2015," C. Payne only visited with her children). Wilder also appears to have followed up with C. Payne on a couple occasions, to no avail, in an attempt to complete what he considered to be a lawful safety search of 10 Coyote Lane. In that regard, it appears that Wilder's role in this investigation and C. Payne's continued deprivation of her children ended after he made his statements to her and R. Payne, because the investigation ceased and on December 25, 2015, CYFD apparently ended the investigation. Cf. Response ¶ 5, at 3 (stating that "[f]rom July 8, 2015 until December 25, 2015," C. Payne only visited with her children). Wilder's de minimis role, in comparison to CYFD, is a further factor in assessing the reasonableness of Wilder's mistake, in light of the unestablished law on this matter, and the Court accordingly takes note of those facts.

### III.   WILDER DID NOT VIOLATE C. PAYNE'S CLEARLY ESTABLISHED RIGHTS UNDER THE FOURTH AMENDMENT.

C. Payne also challenges Wilder's traffic stop, generally, under the Fourth Amendment. C. Payne, specifically, contends that Wilder "lacked any reasonable information to support reasonable suspicion" that she was impaired before he required her to perform field sobriety tests. Response at 5-6. The Court concludes that the undisputed facts in this case entitle Wilder

to qualified immunity, because Wilder did not commit a Fourth Amendment violation when he stopped C. Payne and extended his traffic stop to include a field sobriety test. The undisputed facts support his contention that he had reasonable suspicion that C. Payne was operating her vehicle with a suspended driver's license and that she was operating the vehicle while under the influence. Generally, an encounter that is not consensual may nevertheless be justified as an investigative detention. See Dorato v. Smith, 108 F. Supp. 3d. at 1118. An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. at 146). Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment. Dorato v. Smith, 108 F. Supp. 3d. at 1118. First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. at 417-18). Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d at 1229, overruled on other grounds as recognized in United States v. Stewart, 473 F.3d at 1265.

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d at 1134 (quoting United States v. Vercher, 358 F.3d at 1261). Information "falling 'considerably short' of a preponderance standard" will

meet the standard for reasonable suspicion.  United States v. Winder, 557 F.3d at 1134.  See

Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less

demanding standard than probable cause and requires a showing considerably less than

preponderance of the evidence").  A police-citizen encounter that goes beyond the limits of a stop

under Terry v. Ohio is an arrest, which probable cause or consent must support, to be valid.  See

United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and

an individual which goes beyond the limits of a Terry stop, however, may be constitutionally

justified only by probable cause or consent.").

A court must examine "both the length of the detention and the manner in which it is

carried out," United States v. Holt, 264 F.3d at 1230, "keeping in mind that an officer may

extend the duration and scope of the initial detention based on 'an objectively reasonable and

articulable suspicion that illegal activity has occurred or is occurring,'" United States v. Wilson,

96 F. App'x at 643 (quoting United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001)).

"When the stop is extended based on reasonable suspicion, the further detention must, like the

original traffic stop, 'be temporary, lasting no longer than necessary to effectuate the purpose of

the [further detention], and the scope of the [further] detention must be carefully tailored to its

underlying justification.'"  United States v. Wilson, 96 F. App'x at 644 (quoting United States v.

Wood, 106 F.3d 942, 945 (10th Cir. 1997)).

"'A traffic stop is a 'seizure' within the meaning of the Fourth Amendment . . . .'"

United States v. Holt, 264 F.3d at 1220.  "For the duration of a traffic stop, . . . a police officer

effectively seizes everyone in the vehicle, the driver and all passengers."  United States v. White,

584 F.3d at 945 (quoting Arizona v. Johnson, 555 U.S. at 327).  "[B]ecause 'the ultimate

touchstone of the Fourth Amendment is reasonableness,'" Kentucky v. King, 131 S. Ct. at 1856

(quoting <u>Brigham City v. Stuart</u>, 547 U.S. at 403), courts

> assess the reasonableness of a routine traffic stop under the principles laid out for investigative detentions in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), considering "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

<u>United States v. Wilson</u>, 96 F. App'x at 643 (quoting <u>United States v. Holt</u>, 264 F.3d at 1220 (quoting <u>Terry v. Ohio</u>, 392 U.S. at 20)).  "A traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic . . . regulations of the jurisdiction."  <u>United States v. Winder</u>, 557 F.3d at 1134.  "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation . . . ." <u>United States v. Williams</u>, 403 F.3d 1203, 1206 (10th Cir. 2005)(citation and internal quotation marks omitted).

Wilder had reasonable suspicion to stop C. Payne's vehicle; the undisputed facts indicate that Wilder had performed a background investigation on C. Payne and had discovered that her driver's license was suspended.  <u>See</u> MSJ ¶ 9, at 4; Response ¶ 9, at 2.  "A traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic . . . regulations of the jurisdiction."  <u>United States v. Winder</u>, 557 F.3d at 1134.  There is also a question, however, whether Wilder had reasonable suspicion that C. Payne was operating her vehicle while under the influence of methamphetamine.  <u>See</u> <u>United States v. Wilson</u>, 96 F. App'x at 643-44.  <u>See also</u> <u>United States v. Winder</u>, 557 F.3d at 1134. Wilder was operating against the backdrop of an anonymous tip and R. Payne's corroborative suspicions that C. Payne uses methamphetamine.  This evidence, combined with the undisputed fact that C. Payne "appeared covered in scabs, shaking, and extremely thin consistent with methamphetamine usage," suggests to the Court that Wilder had reasonable suspicion that C. Payne was committing a second traffic violation by operating her vehicle under the influence of

methamphetamine.  MSJ ¶ 10, at 4.  When Wilder executed the traffic stop, he thus came to have reasonable suspicion that, given C. Payne's behavior during the stop, she might have been operating the vehicle under the influence of methamphetamine and with a suspended license. See United States v. Wilson, 96 F. App'x at 643-44.  Without the contemporaneous shaking, the Court would not make such a conclusion, but with the shaking, and the other facts, there is sufficient evidence to cross the line for reasonable suspicion.[23]   In the course of Wilder's administration of the field sobriety test, he determined that she was not operating her vehicle under the influence and then issued her the citation only for driving with a suspended license. See United States v. Wilson, 96 F. App'x at 643-44.  The Court concludes that Wilder did not unreasonably extend the stop and that Wilder did not commit a constitutional violation of C. Payne's Fourth Amendment rights in the course of the traffic stop.  See United States v. Wilson, 96 F. App'x at 643-44.

The  Court  also  notes  that,  regarding  the  law  which  it  applies  to  determine  that  no constitutional violation occurred on these undisputed facts, that law is not clearly established in this context of methamphetamine usage and reasonable suspicion.  Cf. Barrow v. Okla. Ex rel. Dept. of Public Safety, 2017 WL 303312 (10th Cir. 2017)(holding that reasonable suspicion of intoxication existed where suspect smelled of alcohol, was overly talkative, and was slurring speech); United States v. Luginbyhl, 321 F. App'x 780, 784 (10th Cir. 2009)(finding reasonable suspicion to support an investigatory stop upon reports a defendant was "acting crazy" and may have been stumbling around before the officer arrived).  Here, the Court identifies C. Payne's shaking at the time of the traffic stop as being the factor which convinces the Court that Wilder

---

[23]According to the Center for Substance Abuse Research at the University of Maryland, a common short-term effect of methamphetamine ingestion is the user's experience of tremors. See Methamphetamine, University of Maryland Center for Substance Abuse Research, http://www.cesar.umd.edu/cesar/drugs/meth.asp (last accessed August 14, 2017).

satisfactorily gained reasonable suspicion of C. Payne's contemporaneous methamphetamine usage and operation of her vehicle. The Tenth Circuit has held that the law is not clearly established where "a distinction *might* make a constitutional difference," and the Court, therefore, also concludes that the law is not clearly established in this regard. Kerns v. Bader, 663 F.3d at 1186-87 (emphasis in original). Neither the Tenth Circuit nor the Supreme Court has expressly established the law of reasonable suspicion for these circumstances, where the officer is charged with not having reasonable suspicion of methamphetamine usage. In sum, the Court concludes that Wilder did not violate C. Payne's Fourth Amendment rights on these undisputed facts, and that, further, it was not clearly established that, on these undisputed facts -- where C. Payne presented shaking and covered in scabs -- Wilder could not have reasonable suspicion of contemporaneous methamphetamine usage or intoxication.

IV. **WILDER DID NOT VIOLATE C. PAYNE'S SUBSTANTIVE DUE-PROCESS RIGHTS, OR HER RIGHT TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES UNDER THE NEW MEXICO CONSTITUTION, BUT, TAKING THE FACTS IN THE MOST FAVORABLE LIGHT TO C. PAYNE, THE COURT CONCLUDES THAT WILDER IS NOT ENTITLED TO SUMMARY JUDGMENT ON C. PAYNE'S ALLEGATIONS SOUNDING IN PROCEDURAL DUE PROCESS UNDER THE NEW MEXICO CONSTITUTION.**

C. Payne, by Count II, also makes claims against Wilder pursuant to the New Mexico Constitution. Specifically, C. Payne alleges:

> At all times material hereto, the New Mexico Constitution guaranteed Plaintiff the right to the custody and visitation of her children as well as to be free from unreasonable seizures. . . . Defendant Wilder violated Plaintiff's rights when he deprived her of the custody and visitation of her children and when he forced Plaintiff to perform field sobriety tests without reasonable suspicion.

Complaint ¶¶ 30-31, at 6. Because Count II realleges that "Wilder and Bucag's decision to take away Plaintiff's custody and visitation of her children was made without notice to Plaintiff, without any opportunity to be heard by Plaintiff, and in violation of Plaintiff rights to procedural

and substantive due process," the Court reads Count II as making allegations that Wilder violated her procedural and substantive due process rights -- as Article II, Section 18 of the New Mexico Constitution affords -- in addition to allegations that the traffic stop violated her right to be free from unreasonable searches and seizures under Article II, Section 10 of the New Mexico Constitution. Accordingly, Wilder moves for summary judgment on C. Payne's state constitutional claims, arguing, first, that he "did not violate Plaintiff's Search and Seizure rights pursuant to Article II, Section 10 of the New Mexico Constitution," and, second, that he "did not violate Plaintiff's Procedural Due Process rights pursuant to Article II, Section 18 of the New Mexico Constitution," thereby entitling him to summary judgment. MSJ at 19-23. In his MSJ's argument, Wilder also addresses the state substantive due-process claim, despite the imprecise language of his introduction to the argument which leads the reader to believe he is only addressing procedural due process. C. Payne, in the Response, makes no mention of her state constitutional claims under Article II, Section 18, seemingly relying only upon her arguments regarding the federal Fourteenth Amendment claims which share similar principles of law. See Response, passim. The Court also notes that C. Payne conceded at the hearing that, on these undisputed facts, she is not purporting to argue that the New Mexico Constitution provides greater protections than its relevant federal analogs in the Fourth and Fourteenth Amendments. See Tr. at 70:3-5 (Court); id. at 70:15-16 (Garcia); id. at 71:9 (Garcia). In that regard, the Court's inquiry into Count II as it pertains to C. Payne's allegations sounding in substantive due process and unreasonable search and seizure end here, because under New Mexico's interstitial approach those allegations lack further force after it concluded, supra, that Wilder committed no federal constitutional violation of C. Payne's substantive due process rights or her Fourth Amendment rights. See State v. Gomez, 1997-NMSC-006, ¶¶ 21, 932 P.2d 1, 7-8. Cf. Kerns v.

Bd. Of Comm'rs. of Bernalillo Cnty., 2015 WL 7873783, at *15 (D.N.M. 2015)(Browning, J.)("In conclusion, probable-cause standards are the same under federal and state law, and the Tenth Circuit has already concluded that the Defendants had probable cause under federal law."); E. Spire Communications, Inc. v. Baca, 269 F. Supp. 2d 1310, 1324 (D.N.M. 2003)(Smith, M.J.)(concluding that a plaintiff failed to present any authority that the standard for substantive due process under the New Mexico Constitution differs from the standard for substantive due process under the United States Constitution). To that extent, the Court -- uncovering no contrary authority on its own suggesting that, in this context, the New Mexico Constitution provides broader protections than its federal counterparts -- will similarly grant the MSJ as to Count II, because the undisputed facts demonstrate that Wilder has not committed the requisite constitutional violations.

The Court's task is somewhat different when considering C. Payne's allegations under Article II, Section 18, with respect to her rights to procedural due process, particularly because the Court has already concluded that C. Payne has, on this record, alleged a violation of her federal due-process rights but is nonetheless entitled to qualified immunity. See State v. Gomez, 1997-NMSC-006, ¶¶ 21, 932 P.2d 1, 7-8. The first issue that the Court must address, however, is C. Payne's apparent failure to have specifically supported her New Mexico procedural due-process allegations in her Response. See Reply at 10-11. The Court is at a crossroads, because C. Payne ostensibly addresses the principles which underlie Article II, Section 18, in her arguments regarding the Fourteenth Amendment. See Response passim. Accordingly, the Court will credit her arguments as to principles of federal procedural due process, and consider the undisputed facts against that backdrop of law in its analysis of her New Mexico procedural due-

process claim.[24]

At the outset, because C. Payne does not argue that "federal [due process] law is flawed," and concedes that she does not seek broader protections under the New Mexico Constitution, the Court will reiterate its conclusion supra that Wilder's conduct in his investigation violated C. Payne's federal procedural due-process rights. Montoya ex rel. S.M. v. Espanola Pub. Sch. Dist. Bd. of Educ., 968 F. Supp. 2d 1117, 1120 (D.N.M. 2013)(Johnson, J)("The Court concludes that Plaintiffs have not shown that Article II, § 18 provides greater protection than its federal constitutional counterpart. Thus, Plaintiffs' claims . . . asserted as violations of the New Mexico state constitution in Article II, § 18 will be analyzed under its federal counterpart."). For clarity, in New Mexico, "[n]o person shall be deprived of life, liberty or property without due process of law; nor shall any person be denied equal protection of the laws. Equality of rights under law shall not be denied on account of the sex of any person." N.M. Const. art. II, § 18. In this context, the Court of Appeals of New Mexico has stated:

> As observed by our Supreme Court in *Oldfield v. Benavidez*, 116 N.M. 785, 791, 867 P.2d 1167, 1173 (1994), "[t]he government has a compelling interest in the welfare of children, and the relationship between parents and their children may be investigated and terminated by the state, provided constitutionally adequate procedures are followed. *Santosky v. Kramer*, 455 U.S. 745, 766 [102 S. Ct.

---

[24]The Court notes that, although C. Payne's New Mexico constitutional claims against Wilder are encompassed by the New Mexico Tort Claims Act's waiver of state sovereign immunity, see N.M. Stat. Ann. § 41-4-12 ("The immunity granted . . . does not apply to liability for personal injury . . . resulting from . . . violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties."), C. Payne did not sufficiently plead her state constitutional claims pursuant to federal pleading standards, which require that, under rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009)(quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The allegations must be "enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008). Regardless, Wilder did not make such a motion to dismiss.

1388, 71 L. Ed. 2d 599] (1982)."  Similarly, in *Ronald A.*, 110 N.M. at 455, 797
P.2d at 244, the Court noted: "A parent's right in custody is constitutionally
protected, and actions to terminate that right must be conducted with scrupulous
fairness [.]"  (Citation omitted.)  The Court in *Ronald A.*, 110 N.M. at 455, 797
P.2d at 244, quoted with approval this Court's decision in *In re Laurie R.*, 107
N.M. 529, 534, 760 P.2d 1295, 1300 (Ct. App. 1988), which held that
"[p]rocedural due process requires notice to each of the parties of the issues to be
determined and opportunity to prepare and present a case on the material issues."
Similarly, in *Joe R.*, 1997-NMSC-038, ¶ 29, 123 N.M. 711, 945 P.2d 76, our
Supreme Court held that a "[f]ather's rights and obligations as a parent are
protected by his constitutional right to due process."

In *In re Kenny F.*, 109 N.M. 472, 786 P.2d 699 (Ct. App. 1990), *overruled on
other grounds by In re Adoption of J.J.B.*, 117 N.M. 31, 39, 868 P.2d 1256, 1264
(Ct. App. 1993), *aff'd*, 119 N.M. 638, 894 P.2d 994 (1995), this Court considered
the question of whether a parent's rights to due process were violated in the
termination of parental rights proceeding. We stated that "[t]he essence of
procedural due process in this context is a fair opportunity to be heard and present
a defense." *Id.* at 475, 786 P.2d at 702.  In *In re Kenny F.* the State offered to
transport Mother to the hearing and tried to contact her on numerous occasions to
make certain she was going to be at the hearing but she did not respond to the
state's offer. *See id.* Although ultimately this Court denied the mother's due
process claim, our conclusion was premised upon the mother's failure to protect
her own interests, despite the opportunity given to her by the state.

State ex rel. Children, Youth, and Families Dept. v. Ruth Anne E., 1999-NMCA-035, ¶¶ 19-20,

974 P.2d 164, 170 (alterations in original).  Indeed, the Court of Appeals of New Mexico further

relied on federal precedent in exploring the measure of process owed in the context of custody

deprivation.  See 1999-NMCA-035, ¶¶ 21-23.  The Court of Appeals of New Mexico announced:

> When a person has a right to be heard, procedural due process includes notice to
> the person whose right is affected by a proceeding, that is, timely notice
> reasonably calculated to inform the person concerning the subject and issues
> involved in the proceeding; a reasonable opportunity to refute or defend against a
> charge or accusation; a reasonable opportunity to confront and cross-examine
> adverse witnesses and present evidence on the charge or accusation;
> representation by counsel, when such representation is required by constitution or
> statute; and a hearing before an impartial decisionmaker.

1999-NMCA-035, ¶ 26 (adopting these principles).  Here, as the Court has explained, C. Payne

was owed predeprivation process under these circumstances before Wilder took steps to

effectuate deprivation of her custody of her children, and that, where Wilder used his authority as a law enforcement officer to direct R. Payne not to allow C. Payne to take the children, Wilder sidestepped C. Payne's rights to procedural due process.[25]  The Court's conclusion at federal law appears to be consistent with the Court's consideration of New Mexico's procedural due-process law, and the Court cannot thereby conclude that the undisputed facts -- taken in the light most favorable to C. Payne -- entitle Wilder to judgment as a matter of law.  The Court, accordingly, will deny the MSJ as to its requests relating to C. Payne's procedural due-process claim in Count II.

Before ending its analysis of the MSJ, the Court also notes that, although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552. "Historically, courts tended to use the term 'pendent' to refer to non-federal, non-diversity claims asserted by the plaintiff in a federal question case.  And they tended to use 'ancillary' to refer to non-federal, non-diversity claims asserted in a diversity of citizenship case by parties *other* than the plaintiff."  13 Wright et. al., supra, § 3523, at 155-56 (3d ed. 2008)(emphasis in original)(footnote omitted).  Federal courts may exercise pendent jurisdiction over state law claims when "state and federal claims . . . derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. at 725.  Ancillary jurisdiction gives federal courts the

---

[25]Alternatively, and at the least, C. Payne was owed some measure of formal postdeprivation process beyond the non-negotiable option of opening up the home for a search. See Duchesne v. Sugarman, 566 F.2d 817, 822-23, 828 (2d Cir. 1977)(holding that, even though a mother voluntarily left her children with a neighbor, when State officials assumed custody of the children from the neighbor and refused to return the children to the mother, the officials were required to initiate post-deprivation proceeding).

flexibility to "entertain[] a non-federal, non-diversity claim asserted by a party other than the plaintiff, usually in a diversity of citizenship case," although occasionally in admiralty cases as well. 13 Wright et. al., supra, § 3523, at 173 & n.45 (3d ed. 2008).

To account for these theories of jurisdiction, Congress codified the application of the two doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence." Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. at 787. Congress codified both ancillary and pendent jurisdiction "under the generic rubric 'supplemental' jurisdiction" in 28 U.S.C. § 1367, although "courts and lawyers routinely continue to use 'ancillary' and 'pendent' as well as 'supplemental' interchangeably to refer to *any* situation in which a federal court entertains a claim or proceeding that by itself would not invoke an independent basis of federal subject matter jurisdiction." 13 Wright et. al., supra, § 3523, at 156 (emphasis in original).

Here, the Court still has pending federal claims against Wilder's codefendant Bucag. Unless and until the Court resolves all of the federal claims before it pertaining to Bucag, the Court considers it necessary to continue to exercise its supplemental jurisdiction under 28 U.S.C. § 1367(a) and retain C. Payne's remaining state claim against Wilder. The Court will not

remand at this time.

**IT IS ORDERED** that the requests in Defendant's Motion for Summary Judgment on the Basis of Qualified Immunity, filed February 23, 2017 (Doc. 38), are denied in part and granted in part. The Court: (i) grants Defendant Lee Wilder summary judgment in his favor on Plaintiff Cara Payne's claims in Count I brought pursuant to the Fourth and Fourteenth Amendments to the Constitution of the United States of America; (ii) grants summary judgment as to Payne's claims in Count II brought pursuant to the New Mexico Constitution's protections for substantive due process, and against unreasonable searches and seizures, <u>see</u> Article II, Section 10; Article II, Section 18; and (iii) denies summary judgment on Payne's claim in Count II brought pursuant to the New Mexico Constitution's protections for procedural due process, <u>see</u> Article II, Section 18.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Miguel Garcia
John R. Hakanson, P.C.
Alamogordo, New Mexico

    *Attorneys for the Plaintiff*

Damian L. Martinez
Holt Mynatt Martinez, P.C.
Las Cruces, New Mexico

    *Attorneys for Defendant Lee Wilder*

Lee M. Rogers
Carla Neush Williams
Atwood, Malone, Turner, & Sabin, P.A.
Roswell, New Mexico

    *Attorneys for Defendants David Ceballes and Mayfritz Bucag*