# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

CARA PAYNE,

      Plaintiff,

vs.                                                                            No. CIV 16-0312 JB/GJF

LEE WILDER; MAYFRITZ BUCAG and
DAVID CEBALLES,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant Mayfritz Bucag's Motion for Summary Judgment on the Basis of Qualified Immunity, filed March 14, 2017 (Doc. 43)("MSJ"). The Court held a hearing on June 5, 2017. The primary issue is whether the undisputed material facts entitle Defendant Mayfritz Bucag to qualified immunity, because Plaintiff Cara Payne ("C. Payne") has not demonstrated that Bucag violated her clearly established constitutional rights when he agreed with Otero County Sherriff's Office Deputy Lee Wilder's statement that C. Payne could not have custody of her children unless she cooperated with a child abuse investigation. Because the Court concludes that, on this record of undisputed facts, Bucag is entitled to qualified immunity on C. Payne's claims sounding in federal due process, the Court will grant summary judgment as to those federal claims that C. Payne brings against Bucag. Accordingly, the Court grants Bucag's MSJ. Upon granting Bucag's MSJ, the Court notes that there are no longer any pending federal claims, and will thus decline to exercise supplemental jurisdiction and will remand to state court C. Payne's remaining New Mexico state procedural due-process claim brought against Wilder.

## FACTUAL BACKGROUND

Before the Court addresses the MSJ's proffer of undisputed facts, the Court provides a brief synopsis of the background facts giving rise to C. Payne's case. The Court provides this background only for ease of readership and context. The Court draws its recitation of the relevant background facts from the Plaintiff's Amended Complaint for Damages and Petition for Declaratory and Injunctive Relief, filed April 19, 2016 (Doc. 1-2)("Complaint").

### 1.    Background Facts Giving Rise to the Complaint.

The Complaint alleges that, on July 8, 2015, Wilder, a law enforcement officer in Otero County, New Mexico, stopped and seized C. Payne in Alamogordo, New Mexico, for driving with a suspended license. See Complaint ¶ 7, at 1. Wilder represented that he was conducting a child abuse investigation, forced C. Payne to do a field sobriety test, and attempted to force C. Payne to allow him to search a home where C. Payne was staying as a house sitter for the owner of the home. See Complaint ¶¶ 7-11, at 2-3. Wilder -- C. Payne alleges -- did not have reasonable suspicion to support the notion that Payne was intoxicated. See Complaint ¶¶ 8-9, at 2. Regarding the home search, C. Payne refused to allow the search, and told Wilder that she had previously been under investigation by the State of New Mexico Children, Youth, and Families Department ("CYFD"), but that the investigation did not support allegations of abuse. See Complaint ¶¶ 10-11, at 2-3. Upon her refusal, Wilder contacted Defendant Mayfritz Bucag, a CYFD investigator, whom C. Payne alleges then contacted C. Payne's ex-husband and ordered him to not allow C. Payne custody of their children. See Complaint ¶¶ 12-14, at 3. C. Payne did not have custody or visitation rights after this traffic stop, as a consequence of Wilder and Bucag's directive, despite having the legal right to custody and visitation. See Complaint ¶¶ 15-16, at 3.

Wilder and Bucag then petitioned the district attorney's office in Otero County to file criminal charges against C. Payne for refusing to allow the search of a house where she was staying as a house sitter for the home's owner. See Complaint ¶ 18, at 4. In particular, the criminal charges would flow pursuant to N.M. Stat. Ann. § 30-6-4, which relates to obstruction of reporting or investigating child abuse or neglect. See Complaint ¶ 19, at 4. Wilder expects that charges will be filed against C. Payne. See Complaint ¶ 20, at 4. Defendant David Ceballes was the District Attorney for Otero County when C. Payne filed her Complaint. See Complaint ¶ 6, at 2.

2.    **The Undisputed Facts That Bucag's MSJ and the Record Establish.**[1]

----

[1]Bucag first asserts:

1.    NMRA (2005[)] § 32A-4-3(B) requires that CYFD transmit the facts of any report of abuse or neglect to a local law enforcement agency.

2.    NMRA (2005) § 32A-4-3(B)(C) requires that the recipient [local law enforcement agency] of a child abuse and/or neglect report "[s]hall take immediate steps to ensure prompt investigation of the report. The investigation shall ensure that immediate steps are taken to protect the health or welfare of the alleged abused or neglected child . . . ."

3.    NMRA (2005) 32A-4-4(A) states that, reports alleging neglect or abuse shall be referred to the department [CYFD], which shall conduct and investigation to determine the best interest of the child with regard to any action being taken." (emphasis added).

MSJ ¶¶ 1-3, at 2 (asserting these facts). In response, C. Payne does not dispute that these are accurate statements of the law, but instead identifies that the assertions are legal conclusions to which no response is required. See Plaintiff's Response to Defendant Bucag's Motion for Summary Judgment ¶ 1, at 2, filed April 11, 2017 (Doc. 48)("Response"). Regarding the litigants' tasks when litigating a motion for summary judgment, the D.N.M. LR-Civ require:

**Statement of Material Facts.** The moving party must file with the motion a written memorandum containing a short, concise statement of the reasons in support of the motion with a list of authorities relied upon (the "Memorandum"). A party opposing the motion must file a written memorandum containing a short, concise statement of the reasons in opposition to the motion with authorities (the

"Deputy Lee Wilder was a Deputy Sheriff with the Otero County Sheriff's Office ('OCSO') at the time of the July 8, 2015 incident." MSJ ¶ 4, at 2 (asserting this fact). See

———————————————

"Response"). The moving party may file a written reply memorandum with authorities (the "Reply").

- The Memorandum must set out a concise statement of all of the material facts as to which the movant contends no genuine issue exists. The facts must be numbered and must refer with particularity to those portions of the record upon which the movant relies.

- The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted. The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.

- The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection. Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact. All material facts set forth in the Response will be deemed undisputed unless specifically controverted.

D.N.M. LR-Civ. 56.1(b). At the outset, in this case, neither of the responsive pleadings "letter[]" their paragraphs as required, nor satisfactorily number the asserted facts with consistency; the Court, however, is -- without much extra effort -- nonetheless capable of attributing each assertion to its response and vice versa. Bucag, then, in reply, does not take issue with C. Payne's argument that the proffered statements of law be omitted from the statement of facts which the Court must use for its analysis of the MSJ's merits. See Defendant Mayfritz Bucag's Reply in Support of his Motion for Summary Judgment on the Basis of Qualified Immunity, passim, filed April 28, 2017 (Doc. 54)("Reply"). Accordingly, to the extent that the statements of law are disputed, the Court will address that issue in its analysis section and will not include the statements in its replication of the parties' proffers of undisputed facts.

Plaintiff's Response to Defendant Bucag's Motion for Summary Judgment ¶ 2, at 2, filed April 11, 2017 (Doc. 48)("Response")(not disputing this fact).[2] "Defendant Bucag, at all material times, was a social worker employed by New Mexico Children, Youth, and Families Department ('CYFD')." MSJ ¶ 5, at 2 (asserting this fact). See Response ¶ 3, at 2 (not disputing this fact). "On July 8, 2015, Deputy Wilder received a referral from CYFD and Intake Report as part of an investigation into an anonymous tip alleging child abuse and neglect of Plaintiff Cara Payne's two children." MSJ ¶ 6, at 2 (asserting this fact). See Response ¶ 4, at 2 (not disputing this fact). "Upon receipt of the CYFD referral and Intake Report, Deputy Wilder ran a background check on Plaintiff, Plaintiff's ex-husband Robert Payne, and Richard Herndon, to include a check on the status of their driver's licenses and determined that Plaintiff's driver's license was suspended." MSJ ¶ 7, at 3 (asserting this fact). See Response ¶ 5, at 2 (not disputing this fact).

> The anonymous tip included that the reporting party believed that Plaintiff's children may be subject to abuse, neglect, and potential physical harm, because Plaintiff resided with a felon wanted by other felons and law enforcement; Plaintiff was likely using Methamphetamine based upon her appearance; and that

---

[2]The Court notes that C. Payne purports to make a blanket objection to all assertions of fact in the MSJ, because, at the time that Bucag filed the MSJ, Bucag was in "default." Response at 1 (citing Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc., 561 F.3d 1298, 1307 (11th Cir. 2009)(discussing a defendant who engaged in misconduct and suffered, as a sanction, an entry of a default judgment, and providing that a defendant suffering a default judgment "admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established"); Nishimatsu Const. Co., Ltd. v. Houston Nat. Bank, 515 F.2d 1200, 1206 (5th Cir. 1975)(considering a defendant who suffered entry of a default judgment and holding the "defendant, by his default, admits the plaintiff's well-pleaded allegations of fact"); Capitol Records v. Carmichael, 508 F. Supp. 2d 1079, 1084 n.3 (S.D. Ala. 2007)(considering default judgment and explaining that in that context the "effect of a default is to render all well-pleaded factual allegations of the complaint (except those relating to damages) admitted")). The Court here, however, did not enter default judgment against Bucag, mooting C. Payne's argument. See Memorandum Opinion and Order at 1, filed July 7, 2017 (Doc. 60)("Default MOO")(setting aside the Clerk's Entry of Default, filed November 16, 2016 (Doc. 22), which was entered against Bucag). To the extent C. Payne relies upon an objection premised on Bucag's initial default over the course of her Response, the Court will not credit such objections in its analysis of Bucag's MSJ, because Bucag's MSJ is properly before the Court following the Default MOO.

Plaintiff might be found at 10 Coyote Run in La Luz, New Mexico.

MSJ ¶ 8, at 3 (asserting this fact). <u>See</u> Response ¶ 6, at 2 (not disputing this fact). "On July 8, 2015, Defendant Wilder went to the address at 10 Coyote Run and tried to make contact with Plaintiff, however he got no answer at the door." MSJ ¶ 9, at 3 (asserting this fact). <u>See</u> Response ¶ 7, at 2 (not disputing this fact). "As part of the joint CYFD and OCSO investigation, Deputy Wilder visited with Robert Payne, the children's father, to assess the validity of the facts in the anonymous tip." MSJ ¶ 10, at 3 (asserting this fact). <u>See</u> Response ¶ 8, at 2 (not disputing this fact). "Robert Payne corroborated most of the information in the tip and told Defendant Wilder that he suspected Plaintiff was on Methamphetamine, was covered in scabs, suffered severe mood swings, and that Plaintiff's companion, Richard Herndon, was a felon living with Plaintiff." MSJ ¶ 11, at 3 (asserting this fact)(citing Deposition of Lee Wilder at 12:14-25 (taken November 16, 2015), filed March 14, 2017 (Doc. 43-1)("Wilder Depo.")).[3]

---

[3]C. Payne purports to dispute this assertion of fact, stating: "Plaintiff denies the allegations in Paragraph Eleven as it conflicts with the well-pleaded facts alleged in the Complaint. Further, confirming that someone shares the same suspicions as you does not 'corroborate' anything. At this point there were no facts to support the suspicions." Response ¶ 9, at 2. Bucag, in Defendant Mayfritz Bucag's Reply in Support of his Motion for Summary Judgment on the Basis of Qualified Immunity ¶ UMF No. 11, at 2, filed April 28, 2017 (Doc. 54)("Reply"), provides: "a Plaintiff cannot rest on the allegations in her complaint to oppose summary judgment." Reply ¶ UMF No. 11, at 2. The Court has already concluded that Bucag, when he filed the MSJ, was not under the burden of a default judgment and that C. Payne's blanket assertion that the facts of the Complaint govern the case fails. <u>See</u> <u>supra</u> note 1. Further, the cited portions of the Wilder Depo. indicate that, based on Wilder's impression of his conversation with R. Payne, "he basically confirmed his suspicions of most of the things" that C. Payne was doing. Wilder Depo. at 12:1-12. According to Wilder, R. Payne "told me that he suspected that she was on drugs. And he told me that he knew that Richard . . . is the person that's wanted on the felony charges, [and] was staying with her." Wilder Depo. at 12:16-19. Wilder also indicated that R. Payne "confirmed that she -- the scabs and the severe mood swings, and that she was extremely thin." Wilder Depo. at 12:22-24. Black's Law Dictionary defines "corroborate" to mean "[t]o strengthen or confirm; to make more certain." Corroborate, Black's Law Dictionary at 397 (9th ed. 2009). Bucag is asserting only that "Robert Payne corroborated most of the information in the tip and told Defendant Wilder that he suspected Plaintiff was on Methamphetamine, was covered in scabs, suffered severe mood swings, and that Plaintiff's

"Later, on July 8, 2015, Deputy Wilder stopped Plaintiff's vehicle knowing Plaintiff was driving with a suspended driver's license, to follow up with the investigation, and because he suspected Mr. Herndon may be hiding in the car behind the tinted windows."  MSJ ¶ 12, at 3 (asserting this fact).  See Response ¶ 10, at 2 (not disputing this fact).  "Upon pulling Plaintiff over, Plaintiff handed Deputy Wilder her driver's license and her attorney's business card and stated that she wanted her lawyer."  MSJ ¶ 13, at 3-4 (asserting this fact).  See Response ¶ 11, at 2 (not disputing this fact).  "Since at least July 8, 2015 Plaintiff has been represented by an attorney."  MSJ ¶ 14, at 4 (asserting this fact).  See Response ¶ 12, at 2 (not disputing this fact).

> During the traffic stop, Deputy Wilder came to believe that Plaintiff was under the influence of Methamphetamines relying on the information in the anonymous tip, his knowledge that she had been associated with Methamphetamine users in the past, and because she appeared to be covered in scabs, shaking, and extremely thin, consistent with Methamphetamine abuse.

MSJ ¶ 15, at 4 (asserting this fact)(citing Wilder Depo. at 36:16-24; id. at 39:3-8; July 8, 2015, Traffic Stop Video, filed in Clerk's Office on May 25, 2017 ("Traffic Stop Video"), see Notice of Filing Audio/Visual Material as Exhibit C to Defendant Lee Wilder's Motion for Summary Judgment on the Basis of Qualified Immunity and Memorandum in Support Thereof [Doc. 38],

---

companion, Richard Herndon, was a felon living with Plaintiff."  MSJ ¶ 11, at 3.  C. Payne does not create a genuine dispute by arguing -- without providing alternative evidence -- that "confirming that someone shares the same suspicions as you does not 'corroborate' anything." Response ¶ 9, at 2.  Instead, it appears that C. Payne is asking the Court to weigh the evidence and conclude that there is a genuine dispute of fact on this issue, because the alignment of R. Payne's suspicions regarding C. Payne's conduct with the allegations made by the anonymous tip is not sufficient corroboration.  In that regard, C. Payne has not specifically controverted Bucag's assertion that "Robert Payne corroborated most of the information in the tip and told Defendant Wilder that he suspected Plaintiff was on Methamphetamine, was covered in scabs, suffered severe mood swings, and that Plaintiff's companion, Richard Herndon, was a felon living with Plaintiff," MSJ ¶ 11, at 3, so the Court deems the assertion undisputed.

filed May 25, 2017 (Doc. 57)).[4]  "Plaintiff 'never doubted' that a child abuse complaint had been

 

[4]C. Payne purports to dispute this assertion of fact, stating:

> Defendant stated that Plaintiff was shaky, had scabs all over her body, and [was] extremely thin.  First, Defendant must show that he **reasonably** believed that Plaintiff was under the influence of methamphetamines.  Second, Defendant stated that Plaintiff had scabs all over body when she was obviously clothed and he could not see her entire body.  Third, Defendant had not known Plaintiff before the encounter and could not gauge her thinness.  Finally, in order for Defendant's belief to be "reasonable" it would have to be based on some type of training or experience but was not.

Response ¶ 13, at 2-3 (emphasis in original).  Wilder testified: "And my contact with her her[] w[as] very concerning in reference to possible meth use," and that he believed "there was evidence" of meth use "in her behavior and in her appearance."  Wilder Depo. at 36:16-24.  Wilder also testified:

> I was still very suspicious.  She was shaking, extremely thin.  She did have scabs all over her body, that is obviously indication[] of methamphetamine usage.  The fact she had been around methamphetamine in the past in reference to these search warrants.  Obviously I did not believe it was enough to arrest her otherwise I would have.

Wilder Depo. at 39:3-9.  In the video of the traffic stop, C. Payne is wearing a shirt and shorts, leaving much of her body exposed.  See Traffic Stop Video at 7:57-:58.  Accordingly, Bucag argues in Defendant Mayfritz Bucag's Reply in Support of his Motion for Summary Judgment on the Basis of Qualified Immunity ¶ UMF No. 15, at 2-3, filed April 28, 2017 (Doc. 54)("Reply"), that "Wilder's actions were objectively reasonable," and that, although "Plaintiff provides additional 'arguments' that Plaintiff did not have the appearance of being covered in scabs or thin, but again offers no citation to the record disputing these facts."  Reply ¶ UMF No. 15, at 2-3.  It is the Court's impression that Bucag has asserted, as undisputed fact, what appears to be Wilder's subjective impressions of C. Payne during the traffic stop, and a few of his consequent observations.  See MSJ ¶ 15, at 4.  To the extent that C. Payne disputes whether Wilder's inferences were "reasonabl[e]" in the Response, or supported by training and experience, the Court concludes that such a dispute does not specifically controvert Bucag's instant assertion of fact.  Response ¶ 13, at 3.

    Turning, then, to C. Payne's attempt to identify a genuine issue of fact in response to MSJ ¶ 15, at 4, regarding her appearance with "scabs," when she was "obviously clothed and he could not see her entire body," Response ¶ 13, at 3, the Court notes that, in the Traffic Stop Video, C. Payne is wearing shorts and a t-shirt leaving enough of her person exposed to allow Wilder to determine she had scabs covering a significant portion of her body, see Traffic Stop Video at 7:57-:58.  The record evidence supports Bucag's assertion, because C. Payne was wearing clothing which exposed enough of her body to allow Wilder to determine she had scabs covering the exposed parts of her body.  See Traffic Stop Video at 7:57-:58.  Digging deeper, the

made against her."  MSJ ¶ 16, at 4 (asserting this fact)(citing Deposition of Cara Payne at 24:24; 25:6-9 (taken November 16, 2015), filed March 14, 2017 (Doc. 43-2)("C. Payne Depo.")).[5]

"Plaintiff knew since at least July 8, 2015, that Deputy Wilder had a duty to investigate the

---

Court notes that Bucag is asserting only that the observable, exposed, portions of C. Payne's body were "covered in scabs"; Bucag asserts that she "appeared covered in scabs."  MSJ ¶ 15, at 4 (emphasis added).   Bucag is making an assertion regarding only Wilder's subjective observations of fact, and, in this regard C. Payne has not specifically controverted his assertion with evidence in the record.  Having failed to identify a genuine issue of fact regarding Wilder's assertion -- by, for example, identifying evidence in the record suggesting C. Payne had no visible scabs -- the Court deems undisputed Wilder's assertion that C. Payne "appeared covered in scabs."  MSJ ¶ 15, at 4.  The Court recognizes, too, however, that it remains disputed whether C. Payne's entire body was covered in scabs.  Next, regarding C. Payne's dispute that Wilder "had not known Plaintiff before the encounter and could not gauge her thinness," Response ¶ 13, at 3, the Court concludes that C. Payne has not identified record evidence which specifically controverts Bucag's assertion that "she appeared . . . extremely thin consistent with methamphetamine abuse," MSJ ¶ 15, at 4.  Instead, the Court considers C. Payne to be arguing that the assertion -- which is, essentially, Wilder asserting his observations at the time of the traffic stop -- was not the basis of a reasonable inference and is therefore genuinely disputed.  The Court disagrees, and concludes that C. Payne has not genuinely, and with evidence in the record, disputed the assertion of fact that -- to Wilder -- C. Payne "appeared covered in scabs, shaking, and extremely thin, consistent with methamphetamine abuse."   Whether Wilder's inferences were reasonable is a matter of law that the Court will measure, against the undisputed facts -- which includes Wilder's assertions regarding his observations and inferences about C. Payne at the time of the stop -- in the Court's Analysis section.  See O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1058 n.1 (D.N.M. 2012)(Browning, J.)(stating that the proper course is to determine relevance in the analysis section rather than in the factual background section).

[5]C. Payne purports to dispute this assertion by stating: "The material cited to support the allegation shows that Plaintiff was speaking in the present tense based upon a report being in front of her at her deposition."  Response ¶ 14, at 3.  C. Payne testified: "I believe there was a complaint made" and that complaint is why Wilder began his investigation.  C. Payne Depo. at 24:20-24.  C. Payne also testified that, in response to a question whether she understood how the process of a CYFD investigation begins, "I guess I don't know the -- what the formalities are or how it came about.  But I never doubted there was a report made, I guess.  There's a report here so obviously there was a report."  C. Payne Depo. at 25:6-9.  In his reply, Bucag argues that "the deposition citation shows[] Plaintiff believes that a complaint was made against her and never doubted the same."  Defendant Mayfritz Bucag's Reply in Support of his Motion for Summary Judgment on the Basis of Qualified Immunity ¶ UMF No. 16, at 3, filed April 28, 2017 (Doc. 54)("Reply").  In the Court's estimation, the statement "I never doubted that there was a report made" is a present tense statement which describes an unchanged past and present state of mind.  Accordingly, the Court concludes that C. Payne has not genuinely, and with evidence on the record, disputed Bucag's assertion of fact and will thus deem it undisputed.

allegations of child abuse made against her." MSJ ¶ 17, at 4 (asserting this fact)(citing C. Payne Depo. at 25:16-21).[6] "Plaintiff . . . in July 2015 . . . used Methamphetamine 'almost daily, maybe.'" MSJ ¶ 18, at 4 (asserting this fact)(citing C. Payne Depo. at 9:3-20; 28:23-25; 29:14). See Response ¶ 16, at 3 (not disputing this fact, but not admitting there was evidence to establish as much in the course of the investigations).[7] "On July 8, 2015, (during a traffic stop) Defendant Wilder informed Plaintiff that her live-in boyfriend, Mr. Herndon, had a warrant out for his arrest on July 8, 2015." MSJ ¶ 19, at 4 (asserting this fact). See Response ¶ 17, at 4 (not disputing this fact). "When Defendant Wilder made contact with Plaintiff during the traffic stop, Defendant Wilder told Plaintiff that if she did not comply with the child abuse investigation, that she could not see her children." MSJ ¶ 20, at 4 (asserting this fact). See Response ¶ 18, at 4 (not disputing this fact).[8]

---

[6]C. Payne purports to dispute this assertion by stating: "The cited material shows that Plaintiff understood that Defendant Wilder had a duty to investigate child abuse and that he informed her that he was investigating child abuse when he stopped her." Response ¶ 15, at 3. C. Payne testified that "[a]bsolutely, yes," Wilder had a duty to investigate allegations of child neglect and that, "[y]es," Wilder told her that was what he was doing when he interacted with her. C. Payne Depo. at 25:16-21. In Defendant Mayfritz Bucag's Reply in Support of his Motion for Summary Judgment on the Basis of Qualified Immunity ¶ UMF No. 17, at 3, filed April 28, 2017 (Doc. 54)("Reply"), Bucag explains that the "Plaintiff provides no explanation suggesting that there is a material difference between 'knew' and 'understood.'" Reply ¶ UMF No. 17, at 3. In the Court's estimation, the record evidence reflects C. Payne's knowledge of "Wilder['s] duty to investigate child abuse," a duty of which he "informed her . . . when he stopped her." Response ¶ 15, at 3. Accordingly, the Court concludes that C. Payne has not genuinely and with evidence in the record, disputed Bucag's assertion of fact that C. Payne had knowledge of Wilder's duties and that he was pursuing those duties, on the occasions when he interacted with her, and will thus deem Bucag's assertion undisputed.

[7]C. Payne does not dispute this fact, but objects to its materiality. The Court will leave its consideration of materiality for its Analysis section. See O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1058 n.1 (D.N.M. 2012)(Browning, J.)(stating that the proper course is to determine relevance in the analysis section rather than in the factual background section).

[8]Bucag next asserts: "Despite this conversation with Plaintiff, Deputy Wilder never removed the children from Plaintiff's custody and control." MSJ ¶ 21, at 4 (citing Wilder Depo.

"After Defendant Wilder spoke with Robert Payne, and he learned that the children were safely with him, he contacted Defendant Bucag to notify him of his findings." MSJ ¶ 22, at 5 (asserting this fact). <u>See</u> Response ¶ 20, at 4 (not disputing this fact). "Later that day, on July 8, 2015, both Defendant Wilder and Defendant Bucag went to Robert Payne's home." MSJ ¶ 23, at 5 (asserting this fact). <u>See</u> Response ¶ 21, at 4 (not disputing this fact). "During this visit,

_____

at 27:23-29:6). Wilder testified:

> When you say take the kids[,] I think there's a misconception here that we picked them up, took them and transported them somewhere. They were already with their father who is the legal guardian and custodian of them. We just said, hey listen we'd like for you to keep the kids here. He said there's no reason for him to turn them over. I said, yeah, but if she comes here saying that she wants to take the kids these are the allegations. We want to make sure that wherever she's staying is a safe environment for the kids. That was the extent of the conversation. . . . We obviously didn't deny the fact that she could come over to the house. I told him that's totally up to you. You have a custody agreement. If you want to allow her into the house to visit the kids that's totally on you. And in conversations with him I guess that has happened. . . . There was also a conversation with Mr. Payne that he understood that that's a civil order between them. And that what we're basically doing at that point is interrupting the civil order while we're conducting basically a criminal investigation.

Wilder Depo at 27:23-29:6. In response, C. Payne argues: "It is clear from Defendant Bucag's admission in his statement of material facts that Plaintiff was not allowed to see or have custody of her children unless she cooperated with the investigation." Response ¶ 19, at 3-4 (citing Bucag's MSJ ¶ 20, at 4 ("When Defendant Wilder made contact with Plaintiff during the traffic stop, Defendant Wilder told Plaintiff that if she did not comply with the child abuse investigation, that she could not see her children.")). In Defendant Mayfritz Bucag's Reply in Support of his Motion for Summary Judgment on the Basis of Qualified Immunity ¶ UMF No. 21, at 4, filed April 28, 2017 (Doc. 54)("Reply"), Bucag then argues that "Plaintiff disputes this fact, but provides no citation to the record that Deputy Wild[er] ever removed the children from Plaintiff's custody and control." Reply ¶ UMF No. 21, at 4. Defendant Mayfritz Bucag's Reply in Support of his Motion for Summary Judgment on the Basis of Qualified Immunity ¶ UMF No. 21, at 4, filed April 28, 2017 (Doc. 54)("Reply"). The Court recognizes that, here, there is an apparent dispute about the operative effect of Wilder's statements to C. Payne regarding the legal repercussions of not cooperating with his investigation. Accordingly, the Court deems it disputed whether Wilder ever "removed the children from Plaintiff's custody," in the legal sense of the word "remove," and will address the legal effect of Wilder's conduct in its Analysis section.

Defendant Bucag inspected Robert Payne's home, interviewed both children, and spoke with Robert Payne." MSJ ¶ 24, at 5 (asserting this fact). See Response ¶ 22, at 4 (not disputing this fact). "Defendant Wilder and Defendant Bucag were aware that there was a joint custody agreement between Mr. Payne and Plaintiff per a court custody order." MSJ ¶ 25, at 5 (asserting this fact). See Response ¶ 23, at 4 (not disputing this fact).

> After determining that the children were safe in the care of Mr. Payne, Defendant Wilder informed him to "hold onto the kids and we'll figure things out. At this point [the Plaintiff] is not cooperating with the investigation so we have to make sure there is a safe place for the kids to go."

MSJ ¶ 26, at 5 (asserting this fact). See Response ¶ 24, at 4 (not disputing this fact). "On July 8, 2015, Deputy Wilder told Mr. Payne not to allow Plaintiff to have the children, and if Plaintiff tried to contact Mr. Payne, he was to contact Deputy Wilder who would then advise Plaintiff to cooperate with the child abuse investigation." MSJ ¶ 27, at 5 (asserting this fact). See Response ¶ 25, at 4 (not disputing this fact). "Defendant Bucag agreed with Deputy Wilder's decision to leave the children in the care of joint custodial parent Robert Payne, for the immediate safety of the children." MSJ ¶ 28, at 5 (asserting this fact). See Response ¶ 26, at 4 (not disputing this fact). Regarding whether Wilder and Bucag told R. Payne about C. Payne's ability to visit the children, "he was told 'that's totally up to you. You have a custody agreement. If you want to allow her into the house to visit the kids that's totally up to you.'" MSJ ¶ 29, at 5 (asserting this fact)(citing Wilder Depo. at 28:13-17).[9]

---

[9]Bucag asserts:

> Mr. Payne was not told that there was a specific time that he should withhold the children from Plaintiff, and he was told "that's totally up to you. You have a custody agreement. If you want to allow her into the house to visit the kids that's totally up to you."

MSJ ¶ 29, at 5. C. Payne disputes this assertion of fact, because the "material cited shows that

"Plaintiff refused to cooperate with the two pending investigations: the CYFD investigation and the criminal investigation of Plaintiff under NMRA § 30-6-4 conducted by OCSO." MSJ ¶ 30, at 6 (asserting this fact). <u>See</u> Response ¶ 28, at 4 (not disputing this fact). "The two-pronged investigation of Plaintiff was to make sure the children were safe, and to allow law enforcement looks from a 'criminal perspective' to see if there were any charges that should be filed related to child abuse." MSJ ¶ 31, at 6 (asserting this fact). <u>See</u> Response ¶ 29, at 4 (not disputing this fact). "CYFD's main concern is the safety of the children, but CYFD's goal is different from that of law enforcement." MSJ ¶ 32, at 6 (asserting this fact). <u>See</u> Response ¶ 30, at 4 (not disputing this fact). "Defendant Wilder took immediate steps to make sure that Plaintiff's children were safe." MSJ ¶ 33, at 6 (asserting this fact). <u>See</u> Response ¶ 31, at 4 (not disputing this fact). "A few days after July 8, 2015, two CYFD workers, including Defendant Bucag, went to the 10 Coyote Run residence. At that time, Plaintiff, met them at the

_____

the statement was made with regard to Plaintiff visiting the children at their father's house and not in regard to custody." Response ¶ 27, at 4. Wilder testified, in response to the question whether he told "Mr. Payne that there was a specific time when he would be allowed to allow Ms. Payne to have the kids back":

> No. We obviously didn't deny the fact that she could come over to the house. I told him that's totally up to you. You have a custody agreement. If you want to allow her into the house to visit the kids that's totally on you. And in conversations with him I guess that has happened.

Wilder Depo. at 28:9-17. In Defendant Mayfritz Bucag's Reply in Support of his Motion for Summary Judgment on the Basis of Qualified Immunity ¶ UMF No. 29, at 4, filed April 28, 2017 (Doc. 54)("Reply"), Bucag provides: "Plaintiff disputes this fact, arguing the material cited shows that the statement was made with regard to Plaintiff visiting the children at their father's house and not in regard to custody. This is exactly what the facts purport to say." Reply ¶ UMF No. 29, at 4. The Court will credit Bucag's concession that the fact he seeks to assert regards visitation and not custody in the broader sense. Accordingly, the Court will deem undisputed: Regarding whether Wilder and Bucag told R. Payne about C. Payne's ability to visit the children, "he was told 'that's totally up to you. You have a custody agreement. If you want to allow her into the house to visit the kids that's totally up to you,'" MSJ ¶ 29, at 5.

outside gate and, again, refused to cooperate with the CYFD investigation."  MSJ ¶ 34, at 6

(asserting this fact).  See Response ¶ 32, at 4 (not disputing this fact).  "On July 23, 2015,

Plaintiff and her attorney filed a Petition for a Writ of Habeas Corpus and Complaint for

Damages under the New Mexico Tort Claims Act asking that the court release her children from

'unlawful detention' and for damages against Deputy Wilder, Sheriff Benny House, and Robert

Payne."  MSJ ¶ 35, at 6 (asserting this fact).  See Response ¶ 33, at 4 (not disputing this fact).

> On July 30, 2015, New Mexico State District Court Judge Jerry H. Ritter denied
> Plaintiff's Ex Parte Writ of Habeas Corpus noting, "the matter of child custody
> has been litigated and ruled upon by the District Court in Cara Payne v. Robert
> Payne, D-1215-DM-201100176, where a parenting plan . . . was adopted. . . .  The
> issue of child custody raised by the instant petition would typically be raised by
> an appropriate pleading asking enforcement or amendment of the current custody
> order, not by a collateral proceeding for 'imprisonment and detention' of the
> children."

MSJ ¶ 36, at 6 (asserting this fact).  See Response ¶ 34, at 4 (not disputing this fact).[10]

> On August 6, 2015, Defendant Bucag completed the CYFD portion of
> Plaintiff's investigation.  His Investigation Summary notes, "Ms. Payne did not
> cooperate with the investigation. Ms. Payne was advised by her attorney, Mr.
> Miguel Garcia, not to speak with CYFD.  Mr. Garcia told Ms. Peterson, CYFD
> attorney, that he will sue law enforcement and CYFD. Officer Wilder indicated
> that children would not return to mom until she cooperates with the investigation.
> Children are residing with their dad."

MSJ ¶ 38, at 6 (asserting this fact).  See Response ¶ 36, at 4 (not disputing this fact).  "At the

---

[10]Bucag next asserts: "Judge Ritter's Order put Plaintiff on notice that the proper
mechanism for enforcing Plaintiff's custody order was by seeking enforcement or modification
of the current custody order, however at no time did Plaintiff file a petition in District Court to
modify or enforce the existing custody order."  MSJ ¶ 37, at 7.  C. Payne argues that "[t]he
allegations . . . are legal conclusions which do not require a response."  Response ¶ 35, at 4.  In
Defendant Mayfritz Bucag's Reply in Support of his Motion for Summary Judgment on the
Basis of Qualified Immunity passim, filed April 28, 2017 (Doc. 54)("Reply"), Bucag does not
address C. Payne's argument.  See Reply, passim.  The Court agrees with C. Payne, because the
Court has already adopted the content of "Judge Ritter's Order" as an undisputed fact.  MSJ ¶ 37,
at 7.  To the extent that Bucag is attempting to make an assertion regarding the operative legal
effect of the contents of that order, the Court will, if necessary, address that issue in its Analysis
section, and deem Bucag's assertion duplicative of the assertions already adopted by the Court.

time Defendant Bucag completed his investigation on August 6, 2015, he believed that the children were safely residing with their father." MSJ ¶ 39, at 6 (asserting this fact). <u>See</u> Response ¶ 36, at 4 (not disputing this fact). "Defendant Wilder left 'several messages' for Plaintiff between the time of July 8, 2015 and end of August or beginning of September 2015 wherein Defendant Wilder asked Plaintiff to call him to 'close this thing out.'" MSJ ¶ 40, at 6 (asserting this fact). <u>See</u> Response ¶ 36, at 4 (not disputing this fact). "At no time from the time she spoke with Defendant Bucag in July 2015 until her deposition on November 16, 2015, did Plaintiff call or contact CYFD to determine if there was an active case." MSJ ¶ 41, at 6 (asserting this fact). <u>See</u> Response ¶ 36, at 4 (not disputing this fact). "On September 3, 2015 a letter entitled 'Notice of Results of Investigation' was sent to both Plaintiff and Mr. Payne to include noting that the physical abuse and neglect allegations were unsubstantiated." MSJ ¶ 42, at 6 (asserting this fact). <u>See</u> Response ¶ 36, at 4 (not disputing this fact). "Both Robert Payne and Plaintiff were given notice upon receipt of the September 3, 2015, letters from CYFD, that the investigation was closed." MSJ ¶ 43, at 6 (asserting this fact). <u>See</u> Response ¶ 36, at 4 (not disputing this fact). "CYFD did not recommend the filing of a petition against Plaintiff based upon this investigation." MSJ ¶ 44, at 6 (asserting this fact). <u>See</u> Response ¶ 36, at 4 (not disputing this fact). "At all material times Plaintiff was aware that the state district court still had jurisdiction over the custody of her children, however, at no time did she file a motion to enforce the custody provisions." MSJ ¶ 45, at 6 (asserting this fact). <u>See</u> Response ¶ 36, at 4 (not disputing this fact).

"Defendant Bucag, based on the information obtained from Deputy Wilder, Robert Payne, and his observation of Plaintiff outside of 10 Coyote Ct. a few days after July 8, 2015, believed that Plaintiff [may be] abusing Methamphetamine." MSJ ¶ 46, at 8 (asserting this

fact)(alteration added in accordance with Defendant Mayfritz Bucag's Reply in Support of his

Motion for Summary Judgment on the Basis of Qualified Immunity ¶ UMF 46, at 4, filed April

28, 2017 (Doc. 54)("Reply")).  See Response ¶ 37, at 4-5 (suggesting the alteration as

incorporated by Bucag's concession in the Reply).

> Throughout the course of the investigation, Defendant Bucag believed he was acting in accordance with NMRA (2005) § 32A-4-3(B)-(C), which requires that CYFD transmit information of an alleged abuse or neglect report to the OCSO, and that Deputy Wilder of the OCSO was statutorily required to take immediate steps to ensure that the health and welfare of Plaintiff's children was protected.

MSJ ¶ 47, at 8 (asserting this fact).[11]

> Throughout the course of the CYFD investigation, Defendant Bucag believed he acted pursuant to NMSA § 32A-4-4(B) which states, in part: "During the investigation of a report alleging neglect or abuse, the matter may be referred to another appropriate agency and conferences may be conducted for the purpose of effecting adjustments or agreements that will obviate the necessity for filing a petition."

MSJ ¶ 48, at 8 (asserting this fact).[12]  "Throughout the investigation, Defendant Bucag knew that

under § 30-6-1(J), child abuse is defined, in part, as knowingly and intentionally exposing a child

to Methamphetamine, and based upon the circumstances, he believed all actions he took were

---

[11]C. Payne purports to dispute this fact, because "they are contrary to the facts admitted by Bucag in Plaintiff's complaint."  Response ¶ 38, at 5.  The Court deems Bucag's asserted fact undisputed, because Bucag has not suffered a default judgment, and because, in accordance with the local rules, C. Payne must specifically controvert Bucag's assertions of fact.  D.N.M. LR-Civ. 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  The Court further notes that, in its review of the Complaint, this assertion is not inconsistent with C. Payne's allegations.

[12]C. Payne purports to dispute this fact, because "they are contrary to the facts admitted by Bucag in Plaintiff's complaint."  Response ¶ 38, at 5.  The Court deems Bucag's asserted fact undisputed, because Bucag has not suffered a default judgment, and because, in accordance with the local rules, C. Payne must specifically controvert Bucag's assertions of fact.  D.N.M. LR-Civ. 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  The Court further notes that, in its review of the Complaint, this assertion is not inconsistent with C. Payne's allegations.

taken to protect the health and welfare of Plaintiff's children." MSJ ¶ 49, at 9[13] (asserting this fact).[14]

## PROCEDURAL BACKGROUND

C. Payne originally filed her Complaint in the Twelfth Judicial District Court, County of Otero, State of New Mexico. See Complaint at 1. Wilder removed the case to federal court on April 19, 2016. See Notice of Removal, filed April 19, 2016 (Doc. 1). C. Payne alleges in Count I that Wilder and Bucag violated her substantive and procedural due-process rights, and her right to be free from unreasonable search and seizure, pursuant to the Constitution of the United States of America and "New Mexico Statutory law," by depriving her of custody and visitation of her children, and by Wilder's "prolonged . . . traffic stop and . . . field sobriety tests when he lacked reasonable suspicion . . . ." Complaint ¶¶ 22-28, at 4-6. C. Payne also alleges in

---

[13]C. Payne purports to dispute this fact, because "they are contrary to the facts admitted by Bucag in Plaintiff's complaint." Response ¶ 38, at 5. The Court deems Bucag's asserted fact undisputed, because Bucag has not suffered a default judgment, and because in accordance with the local rules, C. Payne must specifically controvert Bucag's assertions of fact. D.N.M. LR-Civ. 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."). The Court further notes that, in its review of the Complaint, this assertion is not inconsistent with C. Payne's allegations.

[14]In her Response, as the Court addressed supra, C. Payne approached Bucag's MSJ under the looming potential of a default judgment against Bucag in her favor. See Response at 1. In that respect, C. Payne restates various allegations from her Complaint as assertions of fact for the purposes of the MSJ litigation. See Response ¶¶ 1-10, at 5-6. C. Payne does not cite, however, to information in the record that supports her assertions, and states only that, "by failing to plead or answer in time, the Court has entered default judgment against Bucag. Consequently, he has admitted the following facts contained in the Complaint . . . ." Response at 5. Again, the Court has not entered a default judgment in this case and has instead entered the Default MOO which sets aside what was only a Clerk's Entry of Default. See Default MOO at 1. The Court deems C. Payne's assertions made under this assumption of default judgment, and lacking any citation to evidentiary support in the record, unsupported and will thus not adopt these assertions as undisputed facts. See D.N.M. LR-Civ. 56.1(b)("The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.").

Count II that Wilder violated her due-process rights, and her right to be free from unreasonable search and seizure, under Article II, Sections 10 and 18 of the Constitution of the State of New Mexico. See Complaint ¶¶ 26-32, at 6-7. Payne last alleges, in Count III, that N.M. Stat. Ann. § 30-6-4 is unconstitutional, because it violates the Fourth Amendment to the Constitution of the United States of America and Article II, § 10, of the New Mexico Constitution, supporting her request for injunctive and declaratory relief regarding Ceballes' potential prosecution of her. See Complaint ¶ 21, at 4. On January 3, 2017, the Court concluded that the allegations in the Complaint implicating Ceballes were not ripe for review, and thus granted the requests in Defendant David Ceballes [sic] Motion and Memorandum to Dismiss Plaintiff's Declaratory and Injunctive Relief Claims, filed September 27, 2016 (Doc. 10)("Motion to Dismiss"), which asked that the Court dismiss C. Payne's allegations against Ceballes, see Memorandum Opinion and Order at 1, filed January 3, 2017 (Doc. 36)("Ripeness MOO"). The Court has also issued a Memorandum Opinion and Order at 1, filed July 7, 2017 (Doc. 60)("Default MOO"), setting aside the Clerk's Entry of Default, filed November 16, 2016 (Doc. 22), which the Clerk of Court entered against Bucag.

1.    **The MSJ.**

After providing his proffer of undisputed fact, Bucag first argues that he is entitled to qualified immunity, because he "did not violate Plaintiff's right to substantive due process under the Fourteenth Amendment when he participated in the CYFD investigation." MSJ at 11. Bucag explains that he "was in the initial stages of the statutorily required investigation of the anonymous tip regarding Plaintiff's drug use and possible abuse/neglect of her children," and that, in addition, a "statutorily required report of abuse was sent to the OCSO, and Deputy Wilder was [thus] also jointly investigating the allegations of abuse." MSJ at 11. According to

Bucag, the extent of his involvement in C. Payne's allegations was that he "agreed with Defendant Wilder's statement to Plaintiff's ex-husband that he should continue to keep the children for their own safety pending the investigation." MSJ at 11. Bucag further asserts that he "did not interfere with Plaintiff's right to challenge any obstruction of those rights," and that "the facts thus indisputably establish that Defendant Bucag was acting in the best interest of Plaintiff's children, and not acting with the intent to interfere with Plaintiff's right to familial association." MSJ at 11. Bucag essentially contends:

> Neither the United States Supreme Court nor the Tenth Circuit have articulated any specific prohibition against a public official's statement about a parent's custody rights during a child abuse or neglect investigation. Additionally, if there was any interference with Plaintiff's parental rights, the interference was minimal and Plaintiff's rights were outweighed by the risk that Plaintiff's children might be exposed to Plaintiff's methamphetamine use and the dangers associated with living with a wanted felon. . . . Plaintiff's right to familial relationship were substantially outweighed by the concern for the safety and well-being of Plaintiff's children and the State of New Mexico may temporarily interfere with Plaintiff's rights to ensure the health and safety of her children.

MSJ at 12. In conclusion, regarding substantive due process, Bucag explains that C. Payne has "failed to allege that Defendant Bucag intended to deprive Plaintiff of her protected relationship with her children" and that he is thus "entitled to summary judgment on the basis of qualified immunity." MSJ at 12.

Bucag then addresses C. Payne's allegations regarding procedural due process and again asserts he "is entitled to qualified immunity . . . because [he] did not violate Plaintiff's right to procedural due process under the Fourteenth Amendment when he participated in the CYFD investigation." MSJ at 12. Bucag supports his argument by citation to Hollingsworth v. Hill, 110 F.3d 733, 739 (10th Cir. 1997), which provides that state officials "faced with 'emergency circumstances which pose an immediate threat to the safety of a child' . . . may 'temporarily deprive a parent of custody without parental consent or a court order.'" MSJ at 12 (quoting

<u>Hollingsworth v. Hill</u>, 110 F.3d at 739).  Bucag argues that such circumstances are present in this case.  <u>See</u> MSJ at 13.  Bucag then cites to <u>J.B. v. Washington County</u>, 127 F.3d 919, 922 (10th Cir. 1997), because, in that case, the United States Court of Appeals for the Tenth Circuit held that state officials who "received an *ex parte* removal order" and then "practically interfered with" the parents' rights to a relationship with their child for eighteen hours for the purposes of interrogating the child, had not committed "a substantive due process violation."  MSJ at 13. Accordingly, Bucag argues:

> Plaintiff cannot show that Defendant Bucag intentionally or knowingly acted against her parental rights.  Plaintiff at all material times, knew that law enforcement had a duty to investigate allegations of child abuse, and Defendant Bucag and Defendant Wilder were jointly investigating an anonymous tip regarding Plaintiff's drug use and possible abuse/neglect of her children. . . .  The information provided in the tip was corroborated by Plaintiff's ex-husband who provided information to both Defendant Wilder and Defendant Bucag about Plaintiff's appearance and probable drug use. . . .  Deputy Wilder also believed, based upon Plaintiff's appearance and demeanor, that she was using Methamphetamine. . . .  Plaintiff confirmed in her deposition that she was, in fact[, u]sing drugs regularly throughout the relevant time period.

MSJ at 14.

Bucag then argues that his "agreement with Deputy Wilder's statement did not violate Plaintiff's right to have custody and control of her children, and he violated no clearly established law waiving his qualified immunity."  MSJ at 14.  According to Bucag, his agreement with Wilder's alleged interference does not constitute interference on Bucag's behalf and, further, "any interference was justified by facts amounting to reasonable suspicion that the children faced immediate threats to their safety."  MSJ at 14.  Bucag then reiterates that C. Payne should have done more on her behalf to enforce her civil custody order, and that R. Payne was to blame for much of the alleged deprivation, because CYFD closed the investigation into the anonymous tip before R. Payne allowed the children to be in C. Payne's custody.  <u>See</u> MSJ at

14-15.  In conclusion to Bucag's argument regarding procedural due process, Bucag asserts that he "acted reasonably during the CYFD portion of the investigation, and he is entitled to qualified immunity and summary judgment on Plaintiffs' substantive due process claim."  MSJ at 15.

       **2.**       <u>**The Response.**</u>

C. Payne first argues that, because Bucag "is in Default," he has conceded the "well-pleaded facts contained in Plaintiff's Complaint," defeating the MSJ.  Response at 7-8.  C. Payne next argues that "Bucag violated her substantive and procedural due process rights to her children," and cites to <u>Roska v. Peterson</u>, 328 F.3d 1230 (10th Cir. 2003), which announces "the 'mere possibility' of danger is not enough to justify a removal without appropriate process," Response at 8 (quoting <u>Roska v. Peterson</u>, 328 F.3d at 1245).  C. Payne states:

> New Mexico has codified the precedents and has set out a simple statutory scheme for dealing with depriving parents of the custody or control of their children.  Section 32A-4-6 N.M. Stat. Annot. allows an officer to take a child into custody "when the officer has evidence giving rise to reasonable grounds to believe that the child is abused or neglected and that there is an immediate threat to the child's safety . . . ."

Response at 8.  C. Payne then turns to Bucag's contention that he played only a de minimis role in comparison to Wilder, and asserts: "Clearly, Bucag was complicit with Wilder and aided and abetted Wilder's decisions to withhold custody from Plaintiff. Further, it is undeniable that Bucag, as a social worker, would know that withholding custody from parent would adversely affect the parent-child relationship."  Response at 9.

C. Payne then concedes: "It is clear that the right to familial association and harmony are recognized at the Supreme Court level and the Tenth Circuit.  Those rights yield, however, when a child is in imminent or immediate danger of neglect or abuse."  Response at 10.  C. Payne maintains, however, that the anonymous tip, and the other evidence upon which Wilder and Bucag rely to argue that there was imminent and immediate danger to C. Payne's children --

"concluding that Plaintiff was living with a wanted individual and a conclusion that Plaintiff was using drugs" -- was insufficient to meet that standard, and that, "[f]urther, there is no statutory provision in New Mexico that requires a subject of a child abuse investigation to allow searches of other people's property or that they speak with law enforcement or CYFD." Response at 10. Turning, last, to Bucag's assertions regarding C. Payne's apparent failure to "make any process available to herself," C. Payne maintains that she filed her "habeas corpus petition attempting to recover the children" and that, ultimately,

> Section 32A-4-18(A) N.M. Stat. Annot. requires that "When a child alleged to be neglected or abused has been placed in the legal custody of the department or the department has petitioned the court for temporary custody, a custody hearing shall be held within ten days from the date the petition is filed to determine if the child should remain in or be placed in the department's custody pending adjudication."

Response at 11. C. Payne, in conclusion, requests that the Court deny the MSJ.

### 3. **The Reply**.

Bucag, in the Reply, first addresses the substantive due-process allegations and asserts:

> In this case, Plaintiff's children were already in the physical custody of their father, Robert Payne, when the investigation began and that CYFD never took custody of the children. . . . Further, the undisputed facts establish that Defendant Bucag's intent was not to interfere with Plaintiff's rights to familial association, but was instead acting in the best interest of Plaintiff's children. . . . No action or inaction on the part of Defendant Bucag rose to the level of a constitutional deprivation and Defendant Bucag is entitled to summary judgment on the basis of qualified immunity.

Reply at 6. Next, turning to procedural due process, Bucag maintains that there were emergency circumstances posing an immediate threat to C. Payne's children's safety should they be allowed into her custody, because Bucag and Wilder's joint investigation into possible abuse and neglect by C. Payne's drug use had ostensibly corroborated an anonymous tip to that effect. See Reply at 7 (citing Hollingsworth v. Hill, 110 F.3d at 739). Further, Bucag maintains that "Bucag's agreement with Deputy Wilder's statement did not violate Plaintiff's right to have control and

custody of her children, and Defendant Bucag violated no clearly established law waiving his qualified immunity." Reply at 8. In conclusion, Bucag reiterates:

> Defendant Bucag had an interest in assuring the preservation and health of Plaintiff's children. Only after these initial steps were taken, and only after Plaintiff's refused to cooperate with the investigation, did Defendant Bucag agree with Defendant Wilder's statement to Mr. Payne that he should "hold on to the kids" for the immediate safety of the children.

Reply at 9.

### 4. **The June 5, 2017, Hearing.**

The Court held a hearing on June 5, 2017. See Transcript of Hearing, taken June 5, 2017 ("Tr.").[15] At the hearing, the Court heard argument on a variety of issues and, regarding the MSJ, heard argument second from Bucag. See Tr. at 18:1-4 (Court). The Court also heard argument from Wilder, in tandem, which addressed in its resolution of Wilder's Defendant's Motion for Summary Judgment on the Basis of Qualified Immunity, filed February 23, 2017 (Doc. 38)("Wilder's MSJ"). Memorandum Opinion and Order, filed August 18, 2017 (Doc. 63)("Wilder MOO")(granting in part and denying in part Wilder's MSJ). Regarding substantive due process, Bucag began by arguing that he appropriately investigated the anonymous tip alleging C. Payne's child abuse:

> He deemed that the house where the children were staying, that is correct at the time Mr. Bucag and Mr. Wilder went to see the children, they were at the house of their father, who readily agreed to the search the home, and they determined, or Mr. Bucag determined the [house] was safe, so he felt comfortable that the children were safe and were comfortable with them being with the father. It [is] important Mr. Bucag did not remove the children, he did not file a petition that the children should be removed. He did not file any type of petition to modify the custody agreement. He never removed the children. The children were never removed from Ms. Payne.

---

[15]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

Tr. at 29:4-17 (Williams).  According to Bucag, the extent of his involvement was that he "agree[d] with Deputy Wilder's statement to the father that he thought it was in the children's best interests to stay with Mr. Payne where it was absolutely determined that because Mr. Payne allowed investigation that that was a safe place for the children to be."  Tr. at 29:18-23 (Williams).  Bucag then explained to the Court that, in the context of familial association, the operative inquiry entails consideration of "what circumstances you can take away the children from emergency," and "the issue is an intent to interfere and that is where most of the cases get dismissed where there is no, that the standard is that a defendant has to have a reasonable belief that he's acting in the best interests of the children."  Tr. at 30:10-11; 18-23 (Williams).

The Court then addressed C. Payne and began by inquiring: "I'm just trying to get a handle on what the law is here.  What do you understand the standard to be, is it still this shock the conscience or do you think there is a different standard for this particular right?"  Tr. at 31:13-15 (Court).  C. Payne stated that

> the general description of the right with regard to Deputy Wilder is that parental rights are rights that may not be interfered with without due process of law.  The specifics are set out in the cases that I have cited [and w]hen you go through those cases, those cases set out the standard that Your Honor seeks.  And that is for a law enforcement officer to interfere with those parent rights you'll see different terms used, reasonable belief, reasonable cause, reasonable grounds, reasonable facts et cetera, et cetera, but I think what they're all pointing towards is just reasonable suspicion, what we term as reasonable suspicion.  That's what's required for the state to interfere with that relationship.  There [are] some factual issues that have been inaccurately described to Your Honor and I want to clear those up before we get too lost down the way.  When these complaints come in they go to both CYFD and then CYFD sends them to the law enforcement agency as New Mexico statute requires them.  I don't believe that Bucag called and said, hey, Wilder come help me on this.  I think it just went to the sheriff's department; Wilder was assigned that case, and he started his investigation.

Tr. at 31:25-33:1 (Garcia).  C. Payne also stated that, regarding Wilder's traffic stop of C. Payne:

> [T]he words he used was [sic] either you're going to allow me to inspect that house or you're not going to see your kids again until we get this inspection done

-- I need to make sure that the house is okay.  In our factual presentation set out to the Court, the allegations that we made . . . was that not only did he make that statement there, but continued to call my client and leave messages on her cellphone saying he wanted to get that inspection done, and she's not going to see her kids until he allows her to do that.  It wasn't just one instance.  He continued this on until eventually he stopped.  I don't know what made these two individuals stop, we just know through the record eventually CYFD closed the file with a no substantial findings notation on the file.

Tr. at 33:7-23 (Garcia).  The Court pushed C. Payne, however, whether she was arguing to expand the familial substantive due-process right -- an important inquiry in the clearly established prong of qualified immunity analysis -- because all Wilder did here was make statements, and all Bucag did was assent, never having actually removed C. Payne's kids from her person.  See Tr. at 34:11-14 (Court).  C. Payne resisted the Court's characterization, arguing instead that the

argument that I am making or attempting to make is that the law is clear that custody, a parent and then he can even s[ay] it backwards, a child, both the parent and child.  But especially the parent is entitled to the custody of their [sic] children.  When you issue an order both to the mother and in a meeting with the father, where you tell the father do not let her have the kids, but you can let her see the kids, do not let her have these kids until I call you and tell you [that] you can do so because she's not letting us look in the house, then you tell the mother you're not going to see your kids [until] you let us look at this house, that that is taking away custody.  Custody is the right to physical possession, and the ability to direct the children's every day activities while you have that physical possession.  They were aware that custody was to return a day or two later, and instead these individuals went and said you're not going to give her back the kid and do not do so until I tell you to, I think that under the law's definition, falls with taking custody of the child.  Are you now telling that child where, telling the child and the parents where that kid can stay and what interactions it is to have with the outside world.

Tr. at 34:15-35:14 (Garcia).  C. Payne reiterated that she did not have custody of her kids in the time subsequent to seeing Wilder and that, accordingly, he substantively took away her parental rights.  See Tr. at 35:23-36:19 (Garcia).  As to what C. Payne termed the merits prong of substantive due-process analysis, "it is crystal clear in our criminal law precedence, which the

officer should be aware of[,] that an anonymous tip does not constitute reasonable suspicion," which she argued is a different issue from the Fourth Amendment reasonable suspicion for the traffic stop. Tr. at 38:7-39:4 (Garcia, Court). C. Payne stated that she is not arguing at all that the traffic stop lacked reasonable suspicion at the outset, but primarily that, for substantive due process, the anonymous tip was not sufficient to support an interference with her parental rights. See Tr. at 39:8-25 (Garcia, Court). As to the anonymous tip's content, C. Payne argued that the tipster's subjective belief that C. Payne was doing drugs cannot provide reasonable suspicion of child abuse and that, to the extent the tipster identifies her as being "skinny," she is skinny. Tr. at 40:3-15 (Garcia). C. Payne also explained that, regarding her alleged "scabs" -- an indicator of methamphetamine use -- the Traffic Stop Video belies any possibility of her having scabs:

> On that video you can clearly see her legs[,] her face and her arms and you know my client would probably shoot me for saying this if she was here, but she's so white she glows in the dark. And there is no discoloration that could be misinterpreted through the video to be these scab[s] that [] they're referring to. Her legs are [pale], [pale], [pale] white, and clear, her arms are clear with the exception of the freckles that you get from the sun with having light skin and her face, I don't see any indication of a scab on the face.

Tr. at 41:11-21 (Garcia). As to C. Payne's supposed "shaking," C. Payne explained that,

> in the video, they're standing there face-to-face, probably a foot or two between them in a parking lot right off the roadway. It's in a business district. It's all paved. About ready to do this field sobriety thing. This mother who has had her children taken away from her is still asking, I don't understand why I have to keep doing these things[. Y]ou guys do not have any reason to be taking my children from me. And Wilder is explaining that he got the report and that he needs to do a[ll] these things, well, he needs to do the inspection of the house in order to give her her kids back, and they get into an argument over, you know, the merits of that, and Wilder responds with, you know, something of and by the way look at you you're shak[ing] right now. And she said of course I'm shaking[;] I've just had my children taken away. I feel you're harassing me in always trying to get in touch with me and leaving me messages and stuff, and here, we are already again at a traffic stop. I'm scared. She tells him I'm scared and I don't, you know, a single mother who is thrown into this situation[.] I cannot blame her one bit.

Tr. at 42:11-43:8 (Garcia). C. Payne was not clear whether the traffic stop was the first

encounter between C. Payne and Wilder, and also was not clear whether and when C. Payne had lost full custody of her children, or when R. Payne and Wilder had conversed about the anonymous tip with relation to the traffic stop. See Tr. at 44:18-45:24 (Garcia).

Bucag then took up argument, in reply, and maintained that

> there is no evidence that Mr. Bucag told Ms. Payne that she could not have custody of her children. Again, the only act at [issue] is Mr. Bucag agreeing that the children remain in the custody of . . . a parent whose house he investigated whose father he interviewed, and determined . . . to be safe.

Tr. at 47:14-20 (Williams). Further, according to Bucag, "there is no case law identified that Mr. Bucag's actions are unconstitutional or that he should be responsible for Mr. Payne's alleged violation of a custody agreement." Tr. at 48:8-11 (Williams). Bucag, at this point, chose to forego her opening argument regarding procedural due process, see Tr. at 53:22-23 (Williams), at which point C. Payne argued and explained:

> [T]o make it clear, our procedural due process claims is that if the deputy and social worker Bucag did not under the law's eyes take custody of these children by preventing mom to have physical possession of the kids and preventing mom to have decision making authority both at the time when the Court told her she is to have those rights, that the deputy and CYFD, ad hoc on the side of the highway adjudicated those rights for Ms. Payne and modified the child custody agreement to Mr. Payne will keep the kids until this investigation is over, and in order to do that, it takes at the very minimum notice and opportunity to be heard and those are nowhere presented throughout the record. And without that that is the procedural side of the Fourteenth Amendment violation.

Tr. at 54:4-19 (Garcia). The Court then inquired of C. Payne "what about [Bucag's] point [that] it's not Wilder that deprived Ms. Payne, her children, it was Mr. Payne, and [] you can't link those two up?" Tr. at 55:11-14 (Court). C. Payne responded: "[W]e all know that a police officer cannot direct a private citizen to do something, be successful in that, and then claim that was private action, that wasn't official police conduct that did that." Tr. at 56:3-7 (Garcia).

Bucag argued, in reply, that "the question still is notice of what . . . . There was no

petition filed under the statute . . . to remove custody of the children." Tr. at 56:13-16

(Williams). Indeed, Bucag argued:

> [I]t's undisputed, Mr. Bucag did not tell Mrs. Payne she could not have her children. She claims defendant Wilder told her that. So again, it's still obviously procedural process deals with the procedure. There has not been an identified procedure identified. They say fail to give opportunity to be heard. Again, that, I mean, they were told how to do that by Judge Ritter from the outset. If you have an issue with the custody agreement, file a motion in this court regarding the same. And that was never done. The custody, that state court case controlled the custody, again, this habeas petition was filed. It was dismissed, and Judge Ritter said we have a custody arrangement. If you have an issue with that, that's where you file it, and that was never done. Again there has not been identified what notice did Mr. Bucag fail to give. I don't believe there has been any procedural due process filed.

Tr. at 56:16-57:9 (Williams). The Court was not convinced, positing:

> [I]f in fact I have to take on these facts the facts most favorable to the plaintiff, do I have to take the fact that the children that the state deprived Ms. Payne of her children without a hearing? In other words the police officer just made a determination that she was an unfit mot[her] and then ordered Mr. Wilder not to have her see the children again. In some ways she got notice, she got notice, if you either cooperate with CYFD or we're going to take your kids away so nothing has happened yet although I'm still confused by the facts here what the chronology is. But so in some ways she may have had a little notice but she didn't really get an opportunity to contest it. A decision was made right there when the notice or order was given.

Tr. at 57:11-58:1 (Court). Bucag responded:

> I think that's part of the[,] in terms of the time, these facts are undisputed. But to keep in mind that the anonymous tip comes in, it's referred to law enforcement and CYFD is doing a dual investigation. The first step, the first place they go to, Mr. Bucag[,] [is] Mr. Payne first and [he] does the investigation, receives additional information of concerns,

Tr. at 58:2-9 (Williams), and then Wilder tells R. Payne "don't let her have the kids until something," Tr. at 58:10-12 (Court). Bucag then reiterated that all he did was "remain[] silent" upon Wilder's directive "after an investigation agreeing the children were safe in that environment at Mr. Payne's house." Tr. at 61:8-12 (Court, Williams). According to Bucag, C.

Payne's allegations against him entailed:

> [A] failure to act, failure to tell Mr. Wilder, no, you're wrong. Mr. Payne, follow your custody agreement. Don't worry about the results of this investigation, but again that's why timing is so important. Mr. Bucag's first step in this[,] he comes to Mr. Payne's home and corroborates a lot of information given from that tip. So if you look at his declaration, again, all he's agreeing is let me pull that up -- that during the visit was aware that Ms. Payne and Robert Payne had a joint custody agreement and that he had custody of the children at the time of my visit. I agreed with Deputy Wilder that it was in the children's best interests that they remain with the father during the pendency.

Tr. at 75:11-25 (Williams). Bucag also resisted the notion that his conduct resulted in a misinterpretation of Wilder's statement on R. Payne's behalf, and argued that, regardless what Wilder said about not letting C. Payne have the children, Wilder also said "you have a custody agreement." Tr. at 76:12-77:15 (Court, Williams). Bucag further explained that it may be important for the Court to know that Wilder's directive came early in the investigation, at a time when there was a lot of uncertainty regarding C. Payne's fitness as a mother. See Tr. at 78:14-79:23 (Williams). C. Payne then responded, arguing that "I believe there is evidence in the record to suggest, as we are, that these actions were taken as a result of some type of meeting and collusion, or plan between CYFD and Wilder," and not simply quiet assent on Bucag's part. Tr. at 81:1-5 (Garcia). The Court then gave its inclination:

> I'm inclined to grant both the motions for summary judgment, both of them, on clearly established [grounds]. I do want to go ahead and analyze whether there was a constitutional violation. So I probably will give you a pretty comprehensive opinion on that. Sometimes, when I sort out whether there is a constitutional violation, it helps me analyze the clearly established a little bit better. But I don't want to just skip to the clearly established. I want to do both prongs, make sure I have a comprehensive opinion so that I understand the rights here as well as possible.

Tr. at 83:3-15 (Court).

# LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Norway ASA, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.) (emphasis added). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[16]  Once the movant

---

[16]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States of America, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (D. Kan. 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). See also Am. Mech. Sols., L.L.C. v. Northland Process Piping, Inc., 184 F. Supp. 3d 1030, 1061 (D.N.M. 2016)(Browning, J.)(considering the nuance of a motion for

summary judgment, and the interplay between state and federal law, and providing -- in part -- that "New Mexico, along with other jurisdictions, has required expert testimony when the issue of causation is presented in a context which is not a matter of common knowledge").

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Fourth, the court cannot decide any issues of credibility. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec.
Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote
omitted).  "[T]he mere existence of *some* alleged factual dispute between the
parties will not defeat an otherwise properly supported motion for summary
judgment; the requirement is that there be no *genuine* issue of *material* fact."
Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .  When opposing
parties tell two different stories, one of which is blatantly contradicted by the
record, so that no reasonable jury could believe it, a court should not adopt that
version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent
was driving in such fashion as to endanger human life.  Respondent's version of
events is so utterly discredited by the record that no reasonable jury could have
believed him.  The Court of Appeals should not have relied on such visible
fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the
litigation, a plaintiff's version of the facts must find support in the record: more
specifically, "[a]s with any motion for summary judgment, when opposing parties
tell two different stories, one of which is blatantly contradicted by the record, so
that no reasonable jury could believe it, a court should not adopt that version of
the facts."  York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)
(quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v.
Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets omitted).  "The Tenth Circuit, in Rhoads

v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[17]] explained that the

---

[17]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished
opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R.
32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive
value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have
generally determined that citation to unpublished opinions is not favored.
However, if an unpublished opinion or order and judgment has persuasive value
with respect to a material issue in a case and would assist the court in its
disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court

blatant contradictions of the record must be supported by more than other witnesses' testimony[.]"  Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted), aff'd, 499 F. App'x 771 (10th Cir. 2012).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380.  In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events.  550 U.S. at 379.  Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . . Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).  In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court," before inquiring into whether there are genuine issues of material fact for resolution by the jury.  584 F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are

---

finds that Rhoads v. Miller has persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

irrelevant to the qualified immunity analysis because that analysis assumes the validity of the

plaintiffs' facts").

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right

secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law." West v. Atkins, 487

U.S. 42, 48 (1988). Individual, non-supervisory defendants may be liable if they knew or

reasonably should have known that their conduct would lead to the deprivation of a plaintiff's

constitutional rights by others, and an unforeseeable intervening act has not terminated their

liability. See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal

connection is satisfied if [the defendants] set in motion a series of events that [the defendants]

knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their]

constitutional rights." (quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006))). The

Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. §

1983. See Ashcroft v. Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to

Bivens[18] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997). "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor." Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. at 689). Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts. See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

1.     **Color of State Law.**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995). The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)). "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent." Jojola v. Chavez, 55 F.3d at 493. Accordingly, at a base level, to conclude that an action was taken under color of state law,

---

[18]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment to the Constitution of the United States of America "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct." 403 U.S. at 389.

the court must determine that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'"  Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).

The Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'"  Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmondson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant."  Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty.  Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(citations omitted) (quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

### 2. **Individual Liability.**

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing

the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009) (Browning, J.).[19]

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

---

[19]The Court clarified in Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1188 (D.N.M. Aug. 29, 2014)(Browning, J.), that common-law causation standards do not necessarily hold in the municipal-liability context, and, in fact, "the causation standard for municipal liability cases is unclear in the Tenth Circuit."  41 F. Supp. 3d at 1273.  The Court applied a traditional proximate cause analysis, and left open the possibility that there might be some greater, undefined causation requirement.  See Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d at 1281.

Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct." Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry." 72 F.3d at 400. In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability. See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989).

Trask v. Franco, 446 F.3d at 1046. Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability." Martinez v. Carson, 697 F.3d at 1255. The Tenth Circuit gave an example of a superseding-intervening cause, quoting the Honorable Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the Third Circuit:

Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence. Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful? The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400). Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the defendant's responsibility." Trask v. Franco, 446 F.3d at 1047 (quoting William Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed. 1984)). If

the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt.b (1965)).

### 3. **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, . . . exercise of control or direction, or . . . failure to supervise.'" Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(alterations omitted). Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice." Barney v. Pulsipher, 143 F.3d at 1307-08 (citations and internal quotation marks omitted). Cf. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.")(emphasis in original).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations. See Garcia v. Casuas, 2011 WL 7444745, at *25-26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)). The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution." Ashcroft

v. Iqbal, 556 U.S. at 676. The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

Dodds v. Richardson, 614 F.3d at 1199. The Tenth Circuit noted that Ashcroft v. Iqbal "does not

purport to overrule existing Supreme Court precedent," but stated that "*Iqbal* may very well have

abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we

do not need to address to resolve this case." Dodds v. Richardson, 614 F.3d at 1200. It

concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983

causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d at 1200. The

Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983

after Ashcroft v. Iqbal:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995,

1000 (10th Cir. 2002)). The Tenth Circuit noted, however: "We do not mean to imply that these

are distinct analytical prongs, never to be intertwined." Dodds v. Richardson, 614 F.3d at 1200

n.8. Relying on the Supreme Court's opinion in Board of County Commissioners v. Brown, the

Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the

third prong has been met also:

Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted). The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law." Dodds v. Richardson, 614 F.3d at 1200 n.8. Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'" Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

### 4. Municipal Liability.

A municipality will not be held liable under § 1983 solely because its officers inflicted injury. See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006). Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged. See Graves v. Thomas, 450 F.3d at 1218. When a claim is brought against a municipality for failing to train its

officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

<h2 style="text-align:center"><u>LAW REGARDING SUBSTANTIVE DUE-PROCESS CLAIMS</u></h2>

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due-process rights and not for third parties' acts.  See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)).  "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. at 195.  The Due Process Clause is not a guarantee of a minimal level of safety and security.  See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. at 195.

**1.      <u>Exceptions to the General Rule</u>.**

There are, however, two exceptions to this general rule.  The first exception -- the special-relationship doctrine -- arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual.  See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-95 (10th Cir. 1994).  The second exception -- the danger-creation theory -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'"  Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).  "If either the special-relationship or danger-creation exception applies,

the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'" Glover v. Gartman, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning, J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits.")).

### 2. **Special-Relationship Exception.**

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the due-process clause is the special-relationship doctrine. A plaintiff must show that they were involuntarily committed to state custody to establish a duty to protect under the special-relationship doctrine. See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996). "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)." Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995).

### 3. **Danger-Creation Exception.**

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct." Uhlrig v. Harder, 64 F.3d at 573. The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm."). Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573. A plaintiff must show "sufficient[] 'affirmative

conduct on the part of the state in placing the plaintiff in danger.'" Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)). To state a prima-facie case, the plaintiff must show that his or her danger-creation claim for due-process violations meets a six-part test: (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; and (v) the defendant must have acted recklessly in conscious disregard of that risk. See Pena v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm. See Christiansen v. City of Tulsa, 332 F.3d at 1281. The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk." Medina v. City & Cnty. of Denver, 960 F.2d at 1496. The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences." Medina v. City & Cnty. of Denver, 960 F.2d at 1496 (citations omitted).

### 4. **What Shocks the Conscience.**

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience. See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)("[C]onduct intended to injure in some way

unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."). "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)(internal quotation marks omitted)). "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995))(internal quotation marks omitted).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of

penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective

action to protect her husband, all of which resulted in him being killed during the escape of three

inmates.  See 265 F.3d at 1132.  The district court found that the plaintiff failed to state a § 1983

claim for violation of the Due Process Clause under a danger-creation theory, because the

defendants' actions were "not of such a magnitude that the Court is able to conclude they shock

the conscience."   265 F.3d at 1134.   The Tenth Circuit agreed with the district court's

conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known

dangers or risks is not enough to satisfy the danger-creation theory's conscience shocking

standard." 265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M.

2010)(Browning, J.), the plaintiffs alleged that the defendants -- the school district,

superintendent, principal, and vice principal of a middle school -- violated the plaintiffs'

substantive due-process rights when they did not take sufficient action to prevent a student at the

school from "racking"[20] the plaintiffs' son.  716 F. Supp. 2d at 1072-73.  The Court concluded

that the defendants' conduct did not shock the conscience.  See 716 F. Supp. 2d at 1074-75.  The

Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the
> Defendants were aware of three instances of an unknown eighth-grade student
> racking various sixth-grade students within the span of a month, and failed to
> implement policies to improve hallway monitoring and stop this conduct from
> occurring in time to prevent [the plaintiffs' son] from falling victim to the same
> fate.  Further, the Defendants indicated to the sixth graders that it had policies in
> place to punish individuals that assaulted other students but did not, in fact, have
> such policies.

---

[20]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as
being "kicked and/or punched in the testicles."   716 F. Supp. 2d at 1059 n.2 (citations
omitted)(internal quotation marks omitted).

While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked . . . .

Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy. Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## LAW REGARDING PROCEDURAL DUE PROCESS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons. See Reid v. Paulter, 2013 WL 3845042, at *50 (D.N.M. 2014)(Browning, J.)(citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)). "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-0633, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.). The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due-process rights are violated: (i) "Did the individual possess a protected property interest to which due process protection was applicable?"; and (ii) "Was the individual afforded an appropriate level of process?" Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)(internal quotation marks omitted)).

"The Constitution does not create or define the contours of 'liberty' or 'property,' the 'broad and majestic terms' enshrined in the Fourteenth Amendment." Farthing v. City of Shawnee, Kan., 39 F.3d 1131, 1135 (10th Cir. 1994)(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 571 (1972)). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007). See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law."). "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. See Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 ("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a

deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542 (citation omitted). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334 (1976). The Supreme Court has explained that

> the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote, citations, and internal quotation marks omitted).

> The United States Court of Appeals for the Second Circuit has stated:
>
> The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." Hamdi v. Rumsfeld, 542 U.S. 507, [529] (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335). A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" Id. (quoting Mathews v. Eldridge, 424 U.S. at 335).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004). The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove

valuable; and (iii) the government's interest and the burdens that additional procedures might impose.  See Mathews v. Eldridge, 424 U.S. at 335.  For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate."  Clark v. City of Draper, 168 F.3d at 1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(holding that removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event").

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."  Butz v. Economou, 438 U.S. 478, 504 (1978).  "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts."  Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights.  But to ensure that fear of liability will not "unduly inhibit officials in the discharge of

their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982). That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."

Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227

(1991)(per curiam)). "If qualified immunity is to mean anything, it must mean that public

employees who are just doing their jobs are generally immune from suit." Lewis v. Tripp, 604

F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457

U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken

beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.

Saucier v. Katz, 533 U.S. 194, 205 (2001). When a defendant asserts qualified immunity, the

plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or

statutory rights; and (ii) that the right was clearly established at the time of the alleged

misconduct. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

1. **Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a

qualified immunity defense. In Pearson v. Callahan, the Supreme Court held that lower courts

"should be permitted to exercise their sound discretion in deciding which of the two prongs of

the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol that <u>Saucier v. Katz</u> outlined -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."  555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  <u>See</u> <u>Reichle v. Howards</u>, 132 S. Ct. 2088, 2093 (2012)(affirming <u>Pearson v. Callahan</u>'s procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  <u>See</u> <u>Cannon v. City & Cty. of Denver</u>, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided

by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-707. See Kerns v. Bader, 663 F.3d at 1181.[21] "Courts should think carefully before expending

---

[21]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that

the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5. On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:
>
>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . . The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that
>
>> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.
>
> 42 U.S.C. § 1983 (emphasis added). The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's]

clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." <u>Wood v. Strickland</u>, 420 U.S. 308, 322 (1975). In <u>Harlow v. Fitzgerald</u>, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test. <u>See</u> 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, <u>The Fourth Amendment at a Three-Way Stop</u>, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. <u>See</u> Christopher Slobogin, <u>Why Liberals Should Chuck the Exclusionary Rule</u>, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving . . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, <u>Constitutional Alternatives to the Exclusionary Rule</u>, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In <u>Hudson v. Michigan</u>, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. <u>See</u> 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

<u>Kerns v. Bd. of Comm'rs</u>, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), <u>abrogated on other grounds as recognized in</u> <u>Ysasi v. Brown</u>, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.). <u>See</u> Richard E. Myers, <u>Fourth Amendment Small Claims Court</u>, 10 OHIO ST. J. CRIM. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth

'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37). See Camreta v. Greene, 563 U.S. at 707 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").[22] The Tenth Circuit will remand a case to the district court for

_____

Amendment violations and award monetary judgments).

[22]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

> While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases. [563 U.S. at 707]. As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small." It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment. Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job. The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way. Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts. The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice. The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance. Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

> If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The

further consideration when the district court has given only cursory treatment to the clearly

established prong of the qualified immunity analysis. See Kerns v. Bader, 663 F.3d at 1182.

### 2. <u>Clearly Established Rights in the Qualified Immunity Analysis.</u>

To determine whether a right was clearly established, a court must consider whether the

right was sufficiently clear that a reasonable government employee in the defendant's shoes

would understand that what he or she did violated that right. See Casey v. W. Las Vegas Indep.

Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007). "A clearly established right is generally

---

three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012). In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation. See 132 S. Ct. at 2092, 2097. In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 S. Ct. at 1660, 1668. In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error. See 132 S. Ct. at 1241, 1250. The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant. See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention. A trial judge can overwork a "large" case. It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. at 741. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards,

132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741). "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183 (emphasis added). Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established. See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."). "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law." Casey v. City of Fed. Heights, 509 F.3d at 1284. Furthermore, "general statements of the law are not inherently

incapable of giving fair and clear warning . . . ."  Hope v. Pelzer, 536 U.S. 730, 741 (2002).

**LAW REGARDING SUPPLEMENTAL JURISDICTION**

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005).  Federal courts "possess only that power authorized by [the] Constitution and statute . . . ."  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction.  See 28 U.S.C. §§ 1331-32.

**1.     Supplemental Jurisdiction.**

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552.  The Supreme Court has long subscribed to the concept of supplemental jurisdiction recognized in two common-law doctrines -- pendent and ancillary jurisdiction.[23]  "Historically, courts tended to use the term 'pendent' to refer to non-federal, non-diversity claims asserted by the plaintiff in a federal question case.  And they tended to use 'ancillary' to refer to non-federal, non-diversity claims asserted in a diversity of citizenship case by parties *other* than the plaintiff."  13 Charles Alan Wright, Arthur R. Miller, Edward H.

---

[23]The Tenth Circuit has noted that Congress' intent in passing 28 U.S.C. § 1367 was to supersede the common-law doctrine of pendent jurisdiction: "Effective December 1, 1990, Congress enacted legislation, codified at 28 U.S.C. § 1367 (1976 & Supp. 1992), which supersedes the common law pendent jurisdiction doctrine."  Baker v. Bd. of Regents of State of Kan., 991 F.2d 628, 634 (10th Cir. 1993)(citing Whalen v. Carter, 954 F.2d 1087, 1097 (5th Cir. 1992), and Aschinger v. Columbus Showcase Co., 934 F.2d 1402 (6th Cir. 1991)).

Cooper, & Richard D. Freer, <u>Federal Practice and Procedure</u> § 3523, at 155-56 (3d ed. 2008)(emphasis in original)(footnote omitted). Federal courts may exercise pendent jurisdiction over state law claims when "state and federal claims . . . derive from a common nucleus of operative fact." <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 725 (1966). Ancillary jurisdiction gives federal courts the flexibility to "entertain[] a non-federal, non-diversity claim asserted by a party other than the plaintiff, usually in a diversity of citizenship case," although occasionally in admiralty cases as well. 13 Wright et. al., <u>supra</u>, § 3523, at 173 & n.45 (3d ed. 2008).

In 1988, Chief Justice William H. Rehnquist created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms. <u>See James v. Chavez</u>, 2011 WL 6013547, at * 5 (D.N.M. 2011)(Browning, J.)(citing 16 <u>Moore's Federal Practice</u> § 106.04[5], at 106-22 (Matthew Bender 3d ed. 2013)). In response to the Committee's findings regarding pendent and ancillary jurisdiction, Congress codified the application of the two doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence." Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), <u>reprinted in</u> 22 Conn. L. Rev. 733, 787 (1990). Congress codified both ancillary and pendent jurisdiction "under the generic rubric

'supplemental' jurisdiction" in 28 U.S.C. § 1367, although "courts and lawyers routinely continue to use 'ancillary' and 'pendent' as well as 'supplemental' interchangeably to refer to *any* situation in which a federal court entertains a claim or proceeding that by itself would not invoke an independent basis of federal subject matter jurisdiction."  13 Wright et. al., supra, § 3523, at 156 (emphasis in original).

## 2. **District Court Discretion.**

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction not as a litigant's right, but as a matter of judicial discretion.  See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).  In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction.  The traditional analysis, based on the Supreme Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial economy, convenience and fairness to litigants" when deciding whether to exercise supplemental jurisdiction.  383 U.S. at 726.  Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the court should consider:

(1)     the claim raises a novel or complex issue of State law,

(2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)     the district court has dismissed all claims over which it has original jurisdiction, or

(4)     in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).   In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness,

and comity . . . ." Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.

Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction. See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir. 1998)("[S]ection 1367 has indeed altered Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir. 1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); Executive Software N. Am. v. U.S. Dist. Court, 24 F. 3d 1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of Gibbs in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."), overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp., 533 F.3d 1087 (9th Cir. 2008); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir. 1994)("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c) . . . .")(emphasis in original); Bonadeo v. Lujan, No. CIV 08-0812 JB/ACT, 2009 WL 1324119, at *8 (D.N.M. April 30, 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists."); Gudenkauf v. Stauffer Commc'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan. 1995)(Crow, J.)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated.").

The Tenth Circuit has held that district courts should generally decline jurisdiction over state claims when federal claims no longer remain: "When all federal claims have been

dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." Koch v. City of Del City, 660 F.3d 1228, 1248 (10th Cir. 2011)(Ebel, J.)(quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998)). The Supreme Court has also recognized:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers of Amer. v. Gibbs, 383 U.S. at 726. The Court has previously stated that the Supreme Court and the Tenth Circuit have indicated that a district court should usually decline to exercise supplemental jurisdiction when 28 U.S.C. § 1367(c) applies. See Armijo v. New Mexico, No. CIV 08-0336, 2009 WL 3672828, at *4 (D.N.M. September 30, 2009)(Browning, J.)("The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it."). The Tenth Circuit has recognized that a district court does not "abuse [its] discretion" when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims over which it has original jurisdiction[.]'" Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished).

## ANALYSIS

C. Payne's Count I, in relevant part, alleges that Bucag violated her substantive and procedural due process rights under the United States Constitution by depriving her of custody and visitation of her children. See Complaint ¶¶ 22-28, at 4-6. Bucag asserts qualified immunity, and moves for summary judgment in his favor on Count I. See MSJ at 1. The Court concludes that, on this record of undisputed material facts, Bucag is entitled to qualified

immunity from liability for the conduct which C. Payne alleges violated her federal constitutional rights to substantive and procedural due process. The Court will thus grant Bucag's MSJ.

The Court further concludes that, having granted Bucag's MSJ, and also having already granted in part and denied in part Wilder's MSJ in the Wilder MOO, the only remaining claim in this case is C. Payne's claim sounding in the New Mexico Constitution's protections for procedural due process. See Wilder MOO at 1-2. Because the Court has thus entered judgment on the federal claims which support its jurisdiction to hear this case, the Court will -- by this Memorandum Opinion and Order -- remand C. Payne's remaining state claim against Wilder to the Twelfth Judicial District Court, County of Otero, State of New Mexico.

In essence, Bucag's MSJ contends that C. Payne has not alleged that he violated any of her clearly established constitutional rights. Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205. When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d at 1107. The Court will take each of C. Payne's allegations and consider whether the undisputed facts establish that Bucag is entitled to qualified immunity, because, either (i) Bucag did not commit a violation of C. Payne's rights; or (ii) the rights Bucag violated were not clearly established at the time of Wilder's conduct.

Taking the facts in the light most favorable to C. Payne, the Court concludes that Bucag did not violate C. Payne's substantive due process rights, and even if he committed a constitutional violation, the right was not clearly established.

I.    **BUCAG DID NOT VIOLATE C. PAYNE'S CLEARLY ESTABLISHED RIGHTS TO SUBSTANTIVE DUE PROCESS.**

C. Payne's relevant allegations against Bucag are that his conduct over the course of his child-abuse investigation -- particularly his conduct at his and Wilder's meeting with R. Payne, when he assented to Wilder's instruction to R. Payne to not let C. Payne take the children from R. Payne's home until the investigations into the child abuse allegations were closed -- violated her substantive due-process right to a familial relationship with her children.  See Response at 6-7.   Put differently, according to C. Payne, Bucag "virtually terminated" her access to her children, violating her substantive due-process rights.   Response at 10.   Bucag moves for summary judgment by arguing that "he acted reasonably during the CYFD portion of the investigation, and he is entitled to qualified immunity and summary judgment on Plaintiffs' substantive due process claim."  MSJ at 15.  Bucag asserts that

> [n]either the United States Supreme Court nor the Tenth Circuit have articulated any specific prohibition against a public official's statement about a parent's custody rights during a child abuse or neglect investigation.  Additionally, if there was any interference with Plaintiff's parental rights, the interference was minimal and Plaintiff's rights were outweighed by the risk that Plaintiff's children might be exposed to Plaintiff's methamphetamine use and the dangers associated with living with a wanted felon. . . .  Plaintiff's right[s] to familial relationship were substantially outweighed by the concern for the safety and well-being of Plaintiff's children and the State of New Mexico may temporarily interfere with Plaintiff's rights to ensure the health and safety of her children.

MSJ at 12.  In that regard, Bucag maintains that he did not commit a violation of C. Payne's substantive due process rights, and certainly did not violate a clearly established substantive due process right.  See MSJ at 11-12.  The Court agrees with Bucag's arguments.

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law . . . ." U.S. Const. amend. XIV, § 1. Children have a constitutionally protected liberty interest in a relationship with their parents, and vice versa.

> [C]hoices to enter into and maintain certain familial human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty.

Roberts v. U.S. Jaycees, 468 U.S. 609, 617-18 (1984). See Trujillo v. Bd. of County Comm'rs, 768 F.2d 1186, 1189 (10th Cir. 1985)(holding that a parental relationship is a constitutionally protected liberty interest). "'Th[e] right to familial association is grounded in the Fourteenth Amendment's Due Process Clause.'" Cordova v. City. of Albuquerque, 816 F.3d at 654 (quoting Lowery v. City of Riley, 522 F.3d 1086, 1092 (10th Cir. 2008)).

> To prevail on a familial-association claim, a plaintiff must make two showings: (1) that the defendants intended to deprive [him or her] of [his or her] protected relationship," and (2) that balancing the individual's interest in the protected familial relationship against the state's interests in its actions, defendants either "unduly burdened plaintiff['s] protected relationship, or effected an unwarranted intrusion into that relationship."

Cordova v. City. of Albuquerque, 816 F.3d at 654-55 (quoting Thomas v. Kaven, 765 F.3d 1183, 1196 (10th Cir. 2014))(alterations added). The Tenth Circuit has held, however, that "not every statement or act that results in an interference with the right of familial association is actionable. The conduct or statement must be directed at the familial relationship with knowledge that the statements or conduct will adversely affect that relationship." Cordova v. City. of Albuquerque, 816 F.3d at 654-55 (internal quotation marks and citation omitted). To satisfy the first prong of the familial-association substantive due-process test, then, a plaintiff must allege the defendant had the "intent to interfere" with a particular protected relationship. Cordova v. City. of

Albuquerque, 816 F.3d at 654-55 (internal quotation marks and citation omitted). As to the balancing analysis that the second prong requires, "'the court will consider, among other things, the severity of the infringement on the protected relationship, the need for defendants' conduct, and possible alternative courses of action.'" Cordova v. City. of Albuquerque, 816 F.3d at 654-55 (quoting Thomas v. Kaven, 765 F.3d at 1196).

> To determine whether a person's familial association rights have been violated in this factual setting, we must weigh two factors: the state's interests in investigating reports of child abuse, . . . [and] [the plaintiff's] interests in . . . familial right of association. Initially, we examine these factors objectively, that is, outside of the facts or subjective positions of the parties. Nonetheless, we do not evaluate constitutional rights in a vacuum. Ultimately, we must examine the parties' interests in light of the facts of this particular case.

Griffin v. Strong, 983 F.2d 1544, 1547 (10th Cir. 1993).

As to the first prong -- whether there was a constitutional violation -- Bucag maintains that he "did not interfere with Plaintiff's right to challenge any obstruction of those rights," and that "the facts thus indisputably establish that Defendant Bucag was acting in the best interest of Plaintiff's children, and not acting with the intent to interfere with Plaintiff's right to familial association." MSJ at 11. Accordingly, Bucag first argues:

> Plaintiff cannot show that Defendant Bucag intentionally or knowingly acted against her parental rights. Plaintiff at all material times, knew that law enforcement had a duty to investigate allegations of child abuse, and Defendant Bucag and Defendant Wilder were jointly investigating an anonymous tip regarding Plaintiff's drug use and possible abuse/neglect of her children. . . . The information provided in the tip was corroborated by Plaintiff's ex-husband who provided information to both Defendant Wilder and Defendant Bucag about Plaintiff's appearance and probable drug use. . . . Deputy Wilder also believed, based upon Plaintiff's appearance and demeanor, that she was using Methamphetamine. . . . Plaintiff confirmed in her deposition that she was, in fact[, u]sing drugs regularly throughout the relevant time period.

MSJ at 14 (citing J.B. v. Wash. Cnty., 127 F.3d at 922, 927-28)(considering a child abuse investigation where county officials removed a child for eighteen hours but eventually concluded

that, through the course of their investigation, there was no evidence of child abuse, and holding that, although removal of the child for eighteen hours practically interfered with her parent's rights of familial association, the officials committed no substantive due-process violation). Bucag contends that his "agreement with Deputy Wilder's statement did not violate Plaintiff's right to have control and custody of her children," Reply at 8, and, further, that should his assent to Wilder's statements to C. Payne constitute an interference, the risks described in the anonymous tip outweigh that interference, <u>see</u> Reply at 9. C. Payne, again, disagrees, arguing that Bucag "virtually terminated" her rights to her children by prohibiting her from having physical custody of her children until she allowed a search of the home at 10 Coyote Run. Response at 10.

The undisputed facts first establish that, "on July 8, 2015, both Defendant Wilder and Defendant Bucag went to Robert Payne's home." MSJ ¶ 23, at 5 (asserting this fact). <u>See</u> Response ¶ 21, at 4 (not disputing this fact). "During this visit, Defendant Bucag inspected Robert Payne's home, interviewed both children, and spoke with Robert Payne." MSJ ¶ 24, at 5 (asserting this fact). <u>See</u> Response ¶ 22, at 4 (not disputing this fact). "Defendant Wilder and Defendant Bucag were aware that there was a joint custody agreement between Mr. Payne and Plaintiff per a court custody order." MSJ ¶ 25, at 5 (asserting this fact). <u>See</u> Response ¶ 23, at 4 (not disputing this fact).

> After determining that the children were safe in the care of Mr. Payne, Defendant Wilder informed him to "hold onto the kids and we'll figure things out. At this point she [Plaintiff] is not cooperating with the investigation so we have to make sure there is a safe place for the kids to go."

MSJ ¶ 26, at 5 (asserting this fact). <u>See</u> Response ¶ 24, at 4 (not disputing this fact). Accordingly, "[o]n July 8, 2015, Deputy Wilder told Mr. Payne not to allow Plaintiff to have the children, and if Plaintiff tried to contact Mr. Payne, he was to contact Deputy Wilder who would

then advise Plaintiff to cooperate with the child abuse investigation."  MSJ ¶ 27, at 5 (asserting this fact).  See Response ¶ 25, at 4 (not disputing this fact).  "Defendant Bucag agreed with Deputy Wilder's decision to leave the children in the care of joint custodial parent Robert Payne, for the immediate safety of the children."  MSJ ¶ 28, at 5 (asserting this fact).  See Response ¶ 26, at 4 (not disputing this fact).  Regarding whether Wilder and Bucag told R. Payne about C. Payne's ability to visit the children, "he was told 'that's totally up to you.  You have a custody agreement.  If you want to allow her into the house to visit the kids that's totally up to you.'" MSJ ¶ 29, at 5 (asserting this fact)(citing Wilder Depo. at 28:13-17).  "When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff, who must" demonstrate that "(1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged unlawful activity."  Lundstrom v. Romero, 616 F.3d 1108, 1118 (10th Cir. 2010).

Turning, then, to the two-pronged familial-association substantive due-process analysis, the Court concludes that the undisputed facts entitle Bucag to qualified immunity, because C. Payne has not established that Bucag's conduct in this case constituted an "undue burden" on C. Payne's associational interests.  Griffin v. Strong, 983 F.2d at 1547.  See Cordova v. City of Albuquerque, 816 F.3d at 654-55.  Before reaching the legal test, it is important to recognize at the outset that C. Payne argues that Bucag "virtually terminated" her rights to familial association by assenting to a prohibition on her from having physical custody of her children until she allowed a search of the home at 10 Coyote Run, and, further, Wilder and Bucag based this prohibition upon an unreliable anonymous tip.  Response at 10.  C. Payne also does not allege that Bucag's conduct resulted in her inability to visit with the children while the investigation was ongoing.  See MSJ ¶ 29, at 5 (indicating that visitation was not barred).  Cf.

Plaintiff's Response to Defendant Wilder's Motion for Summary Judgment at 6, filed March 27, 2017 (Doc. 50)("Wilder Response")(establishing that C. Payne saw the children on two occasions between Wilder's directive and her eventual resumption of custody). In that regard, the Court must wrestle with the fact that the undisputed facts establish that C. Payne was not separated completely from her children, and that the allegedly unconstitutional conduct here concerns only Bucag's assent to Wilder's statements to R. Payne requesting he not allow C. Payne take the children away from his home; there is no allegation of direct, physical state intervention by removal of the children from C. Payne. See Complaint, passim; Response at 10. Nonetheless, in the context of R. Payne and C. Payne's custody agreement, the Court concludes that Wilder's and Bucag's conduct ultimately resulted in C. Payne's inability to have physical custody of her children at her home. See Response at 10. The Court also notes that, at the time when Wilder told R. Payne not to let C. Payne take the children, Wilder's statement was apparently an empty directive, because it was not C. Payne's turn to have the children anyway; regardless, the undisputed record facts reflect that C. Payne did not take physical custody of her children after the directive to R. Payne. C. Payne may have accomplished visitation of her children during that time period, and consequently she has not alleged that Wilder interfered with her ability in that regard, but visitation-only was not her custody agreement's structure. Ultimately, in light of these facts, the Court is convinced that Wilder -- and Bucag, because he assented to the directive -- interfered with C. Payne and her children's normal, everyday familial association, and that "it is evident that there was interference with plaintiff's rights of familial association," leaving the Court to then determine whether the interference is actionable under the prongs of the familial-association substantive due-process test. J.B. v. Washington Cnty., 905 F. Supp. 979, 988 (D. Utah 1995)(Greene, J.). See Cordova v. City of Albuquerque, 816 F.3d at

654 ("[N]ot every statement or act that results in an interference with the right of familial association is actionable. The conduct or statement must be directed at the familial relationship with knowledge that the statements or conduct will adversely affect that relationship.")(internal quotation marks and citation omitted)).

Concerning the first substantive due-process prong, the Court concludes that Bucag's conduct reflects that he had the requisite intent to interfere with C. Payne's rights to familial association. Indeed, as to the alleged unconstitutional conduct, the Court can discern no other intent on Bucag's behalf, because he directed his conduct in assenting to Wilder's statements to R. Payne at ensuring that some modicum of C. Payne's rights to familial association were ceded during his investigation of the child abuse allegations. Cf. J.B. v. Washington Cnty., 905 F. Supp. at 988 (concluding that an eighteen-hour removal of the child from parents' physical custody, for an interrogation regarding allegations of sexual abuse, was interference with plaintiffs' rights of familial association). Bucag maintains that his intent was only to investigate a child abuse allegation and not to interfere with C. Payne's associational rights, see MSJ at 14, but the Court is not persuaded that Bucag's and Wilder's conduct in their meeting with R. Payne did not accomplish both the furtherance of their investigation and an intentional attempt to interfere with C. Payne's associational rights. Bucag cites, in his defense, J.B. v. Washington Cnty., 127 F.3d at 927-28, where the Tenth Circuit provided:

> Plaintiffs recognize that the County officials had a duty to investigate the report of child sexual abuse. They do not allege that the officials were motivated by any other purpose apart from investigation. Rather, they claim that the officials failed to use the least disruptive procedure to interview the child.
>
> We agree with the district court that while the County's "objectives might have been accomplished within a shorter period, there is no evidence that [the County officials] intended or directed their conduct in this matter at the familial relationship of L.B. and J.B. with knowledge that such conduct would adversely affect the relationship as required by [this court]." [J.B. v. Washington Cnty.,]

905 F. Supp. at 988 (citing *Griffin [v. Strong]*, 983 F.2d at 1546, 1548). "Absent such evidence of wilfulness or intent," the district court appropriately determined that no genuine issue of material fact exists as to plaintiffs' substantive due process claims. *Id.* We similarly conclude that the County officials' conduct did not impermissibly interfere with plaintiffs' right of familial association.

J.B. v. Washington Cnty., 127 F.3d at 927-28 (quoting J.B. v. Washington Cnty., 905 F. Supp. at

988). The Court notes, however, that, in the preceding paragraphs, the Tenth Circuit also

provided:

> In evaluating these competing interests, we have observed that "[n]ot every statement or act that results in an interference with the rights of intimate association is actionable." *Griffin*, 983 F.2d at 1548. The conduct or statement must be directed "at the intimate relationship with knowledge that the statements or conduct will adversely affect that relationship." *Id.*

> Here, plaintiffs have sounded a constitutional claim by alleging that the conduct of the County officials was directed at the family relationship with knowledge that it would adversely affect that relationship. "[I]t is evident that there was interference with plaintiffs' rights of familial association" because "L.B. was physically removed from her home and from her parents for a period of almost 18 hours," which "included an overnight stay in a pre-arranged shelter home." [J.B. v. Washington Cnty.,] 905 F. Supp. at 988. Therefore, we proceed to "examine the evidence to determine the severity of the alleged infringement, the need for the defendant's conduct, and any possible alternatives." *Griffin*, 983 F.2d at 1548.

J.B. v. Washington Cnty., 127 F.3d at 927 (quoting Griffin v. Strong, 983 F.2d at 1548). In

essence, then, the Court concludes that the Tenth Circuit, in J.B. v. Washington Cnty., primarily

premised its holding in its analysis of the second prong of the familial-association substantive

due-process test, which entails a balancing of all of the competing interests at stake in the case.

The Court's review of Griffin v. Strong, a case upon which the Tenth Circuit relied for its

statements of the law in J.B. v. Washington Cnty., bolsters this conclusion. In Griffin v. Strong,

the Tenth Circuit considered allegations by a married couple against a detective who used

allegedly coercive tactics to obtain a confession of sexual abuse from the father, resulting in his

incarceration and separation from his wife and daughter. See Griffin v. Strong, 739 F. Supp.

1496, 1498 (D. Utah 1990)(Greene, J.). The Tenth Circuit overturned the verdict against the defendant for violating the plaintiff's substantive due-process rights, and held that "the infringement of familial rights of association in this case is slight," but, in the process also cited a case called Trujillo v. Bd. of Cty. Comm'rs of Santa Fe Cnty., 768 F.2d 1186, 1190 (10th Cir. 1985), for the proposition that, "to rise to the level of a constitutional claim, the defendant must direct his or her statements or conduct at the intimate relationship with knowledge that the statements or conduct will adversely affect that relationship." Griffin v. Strong, 983 F.2d at 1548. The context of that proposition is important in guiding the Court's analysis of this first prong, because, when the Tenth Circuit in Trujillo v. Bd. of Cty. Comm'rs of Santa Fe Cnty. held that "an allegation of intent to interfere with a particular relationship protected by the freedom of familial association is required to state a claim under section 1983," it was considering an inapposite scenario where the family of a deceased inmate at the Santa Fe County Jail brought their lawsuit for a deprivation "of their constitutional right of familial association under the First and Fourteenth Amendments." Trujillo v. Bd. of Cty. Comm'rs of Santa Fe Cnty., 768 F.2d at 1187. The first prong of the familial-association substantive due-process test is, in contrast, met in this case, because Wilder intended to interfere with C. Payne's right and did not merely interfere with that right as a byproduct of, for example, his causing of the negligent death of C. Payne's family member. Cf. Trujillo v. Bd. of Cty. Comm'rs of Santa Fe Cnty., 768 F.2d at 1187. The Court, accordingly, must proceed to the second substantive due-process prong, and consider, "among other things, the severity of the infringement on the protected relationship, the need for defendants' conduct, and possible alternative courses of action,'" Cordova v. City. of Albuquerque, 816 F.3d at 654-55 (quoting Thomas v. Kaven, 765 F.3d at 1196), to "ascertain whether a defendant's conduct constitutes an undue burden on the

plaintiff's associational rights," <u>PJ ex rel. Jensen v. Wagner</u>, 603 F.3d 1182, 1199 (10th Cir. 2010)(citing <u>Griffin v. Strong</u>, 983 F.2d at 1547).

The undisputed facts establish that Bucag, in tandem with Wilder, was investigating an allegation of child abuse against C. Payne.  In the course of Wilder's investigation, Wilder explained to C. Payne that he would need to search 10 Coyote Run so that he could ascertain whether the allegations of an unsafe living environment were accurate.  He alerted C. Payne that, should the allegations be untrue, the investigation would close and that he would no longer have an interest in keeping the children out of her home.  At no point did Wilder tell C. Payne that she could not otherwise challenge the allegations with CYFD or discourage her from filing the lawsuits she ultimately filed.  Indeed, at all times, it appears that Wilder's conduct in interfering with C. Payne's rights to familial association was narrowly focused on completing his investigation before C. Payne took physical custody of her children from R. Payne in accordance with their custody agreement.  Enter Bucag, then, who is alleged only to have assented to Wilder's statements to R. Payne regarding R. Payne not allowing C. Payne to have custody of the children.  Indeed, the presence of Bucag, a CYFD official, probably heightened the sense of authority that Wilder's statements might have carried from R. Payne's perception.  Yet, unlike in <u>J.B. v. Washington Cnty.</u>, where the Tenth Circuit concluded that an eighteen-hour removal of parents' child to interrogate that child about potential occasions of sexual abuse did not unduly burden the parents' substantive due-process rights, neither Wilder nor Bucag physically removed C. Payne's children from her personal custody.  <u>See</u> 127 F.3d at 927-28.  The infringement's severity, then, is not as serious as the actual physical removal in <u>J.B. v. Washington Cnty.</u>, because C. Payne indeed had the opportunity to comply with Wilder's and Bucag's investigation, and, nonetheless, still had access to visit her children at R. Payne's home during the pendency of

the investigation.   This interference was certainly an infringement, but the Court, in consideration of the aforementioned Tenth Circuit case law, concludes that the circumstances of this investigation tempered its severity enough to outweigh a conclusion that there was a substantive due-process violation.

Ultimately, Bucag's conduct appears to be allowing Wilder to impose some restrictions in accordance with what they each perceived was the proper path for investigating the allegations against C. Payne.   In that regard, the Court is persuaded by its analysis of the "need for defendants' conduct, and possible alternative courses of action," <u>Cordova v. City. of Albuquerque</u>, 816 F.3d at 654-55, that these factors weigh in favor of Bucag's conduct, particularly where C. Payne has not attempted to proffer any alternative courses of action.   As to the necessity of Bucag's conduct, the Court notes that the state of New Mexico has a strong interest in investigating allegations of child abuse, and that the undisputed facts here do not otherwise indicate that Wilder had some motive besides investigating the present allegation of child abuse.   <u>See</u> <u>Griffin v. Strong</u>, 983 F.2d at 1547   The Tenth Circuit, similarly, in <u>PJ ex rel. Jensen v. Wagner</u> addressed a parents' lawsuit against a doctor who diagnosed their child with cancer.   <u>See</u> 603 F.3d at 1190.   In short, a juvenile court ordered that the child be taken into state custody for chemotherapy treatment, because the parents refused.   <u>See</u> 603 F.3d at 1190-91. After a lengthy series of events, the state ultimately decided "that the state's interest in the case had shifted such that attempting to force chemotherapy treatment and placing the [parents] in jail would no longer be in P.J.'s best interest."   603 F.3d at 1192.   The Tenth Circuit considered the parents' lawsuit alleging a deprivation of their rights to familial association, and, in balancing the interests at stake, held:

> First, the [parents'] interest in associating with P.J. is unquestionably of
> paramount importance. . . .   Second, as discussed above, the state's interest in

protecting and safeguarding P.J.'s life is also significant. Finally, given these countervailing interests, the record demonstrates that the actual burden on the [parents]' right to associate with P.J. was minimal in this case. The [parents] correctly point out that the forced separation of parent from child, even for a short time, represents a serious impingement. . . . In this case, however, P.J. was never physically removed from the[ir] custody and the state afforded the[m] numerous opportunities to obtain treatment for P.J. before it even sought to remove him from their custody. Under these circumstances, the [parents] fail to show that any defendant imposed an undue burden on their relationship with P.J. and therefore fail to show a violation of their associational rights.

603 F.3d at 1199 (internal quotation marks and citations omitted)(emphasis added). C. Payne similarly does not show that Bucag imposed an undue burden on her relationship with her children, because he never physically removed the children from her custody, and his minimal interference in her relationship with the children -- by assenting to Wilder's suggestion to R. Payne that she could not take the children to 10 Coyote Run until Wilder or CYFD had searched that residence and closed the investigation -- was also accompanied by opportunities to comply with or challenge the investigation. The Court concludes that, on balance, the infringement of familial rights of association in this case is slight, resulting only in a minor disruption in C. Payne and her children's lives. Again, the right of intimate association is not absolute, and, viewed in the context of the minimal infringement that this record indicates, the Court concludes that Bucag's conduct did not unduly interfere with C. Payne's right of familial association with her children. Consequently, C. Payne has not demonstrated a constitutional violation of her substantive due-process rights to familial association, and has thus not met her burden in responding to Bucag's MSJ -- wherein he asserts his qualified immunity to her claims -- because on these undisputed facts Bucag is entitled to qualified immunity as a matter of law.

The Court, accordingly, need not rely upon the clearly established prong of the qualified immunity analysis to grant Bucag's MSJ as to C. Payne's substantive due-process claims. The Court notes, however, that there is no clearly established law making Bucag's conduct unlawful.

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." <u>Currier v. Doran</u>, 242 F.3d at 923. "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" <u>Holland ex rel. Overdorff v. Harrington</u>, 268 F.3d at 1186 (alteration in original)(quoting <u>Saucier v. Katz</u>, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." <u>Pierce v. Gilchrist</u>, 359 F.3d at 1298. The issue then is whether Wilder was on fair notice that, in his investigation of the child abuse allegations against C. Payne, his "described conduct was unconstitutional." <u>Pierce v. Gilchrist</u>, 359 F.3d at 1298. In answering that question, it is important to note that the clearly established prong of the qualified immunity test is a very high burden for C. Payne: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." <u>Ashcroft v. al-Kidd</u>, 563 U.S. at 741. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" <u>Reichle v. Howards</u>, 132 S. Ct. at 2093 (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. at 741). "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." <u>Anderson v. Creighton</u>, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is

clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205. In this substantive due-process/familial association context, the "[c]ourts have recognized that the constitutional right to familial integrity is amorphous and always must be balanced against the governmental interest involved." Martinez v. Mafchir, 35 F.3d at 1490. Indeed, the substantive due-process right to familial association "has never been deemed absolute or unqualified." Starkey v. Boulder Cnty. Soc. Servs., 569 F.3d at 1253 (quoting Martinez v. Mafchir, 35 F.3d at 1490).[24]

C. Payne has not alerted the Court in her Response -- or otherwise attempted to alert the Court -- to a case or statute which qualifies in relevant fashion the amorphous right which she alleges Bucag has violated. See Response passim. Accordingly, although the Court has already concluded that Bucag did not commit a constitutional violation of C. Payne's constitutional substantive due process rights, the right of which she complains was violated is nonetheless not clearly established; Bucag is entitled to qualified immunity regardless of which prong the Court analyzes. The Tenth Circuit has held that the law is not clearly established where "a distinction *might* make a constitutional difference." Kerns v. Bader, 663 F.3d at 1186-87 (emphasis in original). A single factual difference can make a difference here, making it difficult for there ever to be clearly established law in these factually dependent cases. The Court grants the MSJ and concludes that Bucag is entitled to qualified immunity from C. Payne's claims sounding in

_____

[24]The Court notes that, in the absence of the Tenth Circuit case law which squarely controls the Court's analysis in this case, the Court is uncertain it would reach the same conclusion that it reaches today in determining that there was no substantive due-process violation on these facts.

substantive due process.

## II. BUCAG VIOLATED C. PAYNE'S RIGHTS TO PROCEDURAL DUE PROCESS, BUT THOSE RIGHTS WERE NOT CLEARLY ESTABLISHED IN THIS CONTEXT.

C. Payne also alleges that Bucag violated her procedural due-process rights by depriving her of custody of her children without notice or any opportunity to be heard. See Complaint ¶ 25, at 8. Bucag moves for summary judgment on this claim, because he "did not violate Plaintiff's right to procedural due process under the Fourteenth Amendment when he participated in the CYFD investigation." MSJ at 12. Bucag does not refute that states generally may take children from parents only after fair process, but maintains that state officials "faced with 'emergency circumstances which pose an immediate threat to the safety of a child' . . . may 'temporarily deprive a parent of custody without parental consent or a court order.'" MSJ at 12 (quoting Hollingsworth v. Hill, 110 F.3d at 739). Bucag also maintains that the "Plaintiff cannot show that Defendant Bucag intentionally or knowingly acted against her parental rights," MSJ at 14, and that nonetheless C. Payne should have done more on her behalf to enforce her civil custody order, and that R. Payne was to blame for much of the alleged deprivation, because CYFD closed the investigation into the anonymous tip before R. Payne allowed the children to be in C. Payne's custody, see MSJ at 14-15. Bucag essentially contends that there were emergency circumstances posing an immediate threat to the safety of C. Payne's children should they be allowed into her custody, because Bucag and Wilder's joint investigation into possible abuse and neglect by C. Payne's drug use had ostensibly corroborated an anonymous tip to that effect, and that Bucag "had an interest in assuring the preservation and health of Plaintiff's children." Reply at 7-9 (citing Hollingsworth v. Hill, 110 F.3d at 739).

In her Response, C. Payne explains that "New Mexico has codified the precedents and has set out a simple statutory scheme for dealing with depriving parents of the custody or control of their children," and that "Section 32A-4-6 N.M. Stat. Annot. allows an officer to take a child into custody when the officer has evidence giving rise to reasonable grounds to believe that the child is abused or neglected and that there is an immediate threat to the child's safety . . . ." Response at 8. C. Payne also maintains that the anonymous tip and the other evidence upon which Wilder and Bucag rely to argue that there was imminent and immediate danger to C. Payne's children -- "concluding that Plaintiff was living with a wanted individual and a conclusion that Plaintiff was using drugs" -- is insufficient to meet this ambiguous emergency standard, and that, "[f]urther, there is no statutory provision in New Mexico that requires a subject of a child abuse investigation to allow searches of other people's property or that they speak with law enforcement or CYFD." Response at 10.

The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due-process rights are violated: (i) "Did the individual possess a protected property interest to which due process protection was applicable?"; and (ii) "Was the individual afforded an appropriate level of process?" Camuglia v. City of Albuquerque, 448 F.3d at 1219 (quoting Clark v. City of Draper, 168 F.3d at 1189 (internal quotation marks omitted)). Child custody, care, and control is an established, protected interest under the first step of the inquiry, see Spielman v. Hildebrand, 873 F.2d at 1385, and the state may thereby take children from parents only after fair process, which in this context requires "prior notice and a hearing, except in extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event," Gomes v. Woods, 451 F.3d at 1128. "These extraordinary situations include emergency circumstances which pose an immediate threat to the

safety of a child." 451 F.3d at 1128 (internal quotation marks and alterations omitted).

Regarding application of this principle, the Tenth Circuit has held:

> In our view, the reasonable suspicion standard appropriately balances the interests of the parents, the child, and the state. The failure to act when a child is in danger may have "unthinkable consequence[s]." *Jordan v. Jackson*, 15 F.3d 333, 350 (4th Cir. 1994). As a result, social workers should be afforded some discretion when they seek to protect a child whose safety may be at risk. . . . Following the majority approach, we conclude that state officials may remove a child from the home without prior notice and a hearing when they have a reasonable suspicion of an immediate threat to the safety of the child if he or she is allowed to remain there. We emphasize again that even in these instances in which emergency removal is justified, the state must afford the parents a prompt post-removal hearing.

Gomes v. Woods, 451 F.3d at 1130. Reasonable suspicion, the Court notes, does not include the mere possibility of danger. See Roska v. Peterson, 328 F.3d at 1245. Under that standard, state officials must have "'evidence giving rise to a reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse.'" Gomes v. Woods, 451 F.3d at 1129 (quoting Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 20 (1st Cir. 2001)). Further, when an agency removes a child before a hearing, the state remains obligated to provide a hearing post-removal. See Gomes v. Woods, 451 F.3d at 1128.

Accordingly, the Court must determine whether Bucag's assent to Wilder's statement to R. Payne about C. Payne's inability to have the children in her home while the investigation was pending constitutes a clearly established violation of her procedural due process rights. At the outset, again, the Court notes that C. Payne does not argue that the children were formally removed from her custody and control without process; she instead argues that her children were "virtually removed" from her custody and control without process, because Bucag's assent to Wilder's statements effectively barred her from custody, because R. Payne did not let her have them subsequent to Wilder's conduct. Response at 10. The Court is not persuaded that the

deprivation which C. Payne endured is the same as a full-fledged state removal of her children without process; indeed, even looking at the applicable law's language, the present scenario is not comparable to that in Gomes v. Wood, where the Tenth Circuit held that "state officials may remove a child from the home without prior notice and a hearing when they have a reasonable suspicion of an immediate threat to the safety of the child if he or she is allowed to remain there," because the children were not at 10 Coyote Run when Wilder and Bucag met with R. Payne. Of course, the meeting and statements appear to have had an enduring effect, as R. Payne -- before CYFD closed their investigation -- relied upon Wilder's and Bucag's authority, and allowed C. Payne to visit the children only at his home, and did not apparently allow C. Payne to take them with her to 10 Coyote Run in contravention of what Wilder and Bucag had directed. See Jojola v. Chavez, 55 F.3d at 493 ("The authority with which the defendant is allegedly 'clothed' may be either actual or apparent."). The Court does not have information about R. Payne and C. Payne's custody agreement, and only knows that it is undisputed that it exists. See MSJ ¶ 25, at 5. C. Payne does not tender to the Court the times when she was entitled to the children's physical custody. See Response, passim. Further, there was no actual, formal state deprivation of C. Payne's parental custody, distinguishing this case from the typical procedural due-process analyses where a state has physically removed children from an allegedly abusive living situation. See Gomes v. Woods, 451 F.3d at 1129 (quoting Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d at 20).

What C. Payne essentially requests is process at some point during the pendency of the investigation regarding Wilder's and Bucag's informal interference with her physical custody over her children, unless and until she complied with the investigation and a search of her residence. The Court must, therefore, first consider whether these statements constitute a

deprivation subject to due-process procedural protections. There do not appear to be, in the Court's review, any Tenth Circuit cases addressing circumstances such as those present here, where the State has not physically taken the child away from a parent, but otherwise gained the child's custody by, say, "refusing to release him or her after the parent has voluntarily granted temporary custody to the government or a third party. Such situations unquestionably also implicate the parent and child's procedural due process rights." Kia P. v. McIntyre, 235 F.3d 749, 760 (2d Cir. 2000)(citing Cecere v. City of N.Y., 967 F.2d 826, 830 (2d Cir. 1992)(holding that, when a parent voluntarily leaves a child with a third party, and the third party later refuses to return the child to the parent on basis of State authority, the parent is deprived of constitutionally protected liberty interest in the custody of her child at the moment of refusal to return that child); Duchesne v. Sugarman, 566 F.2d 817, 822-23, 828 (2d Cir. 1977)(holding that, even though a mother voluntarily left her children with a neighbor, when State officials assumed custody of the children from the neighbor and refused to return the children to the mother, the officials were required to initiate postdeprivation proceeding). Cf. Joyner by Lowry v. Dumpson, 712 F.2d 770, 782-83 (holding that parents who voluntarily relinquished their children to the State nonetheless possessed substantive due process rights with respect to the State's later refusal to return the children, and the State's practice of "strictly controlling visitation, thereby isolating the child and straining familial bonds")). Courts within the Second Circuit, in that regard, have developed a small body of caselaw providing guidance which the Court finds persuasive and which that circuit readily follows. For example, in Sundbye v. Ogunleye, 3 F. Supp. 2d 254 (E.D.N.Y. 1998)(Gleeson, J.), the district judge concluded that, even where there was not an actual deprivation of a parent's liberty interest in the custody and care of a child through a legal change in custody -- that parent in that case believed that a written agreement she

had signed allowing her daughter to live with family members was legally binding in the same way a voluntary placement instrument would have been -- a parent's mere reasonable belief of deprivation was sufficient to implicate their liberty interests.  See 3 F. Supp. 2d 254.  The district judge also concluded that the investigating agency's delay in filing a petition in Family Court did not meet due-process requirements, citing the Second Circuit decision in Gottlieb v. County of Orange, 84 F.3d 511, 520 (2d Cir. 1996).  Accordingly, the Court concludes that C. Payne suffered a deprivation of her custody rights, because she was effectively deprived of those rights when Wilder and Bucag -- authority figures acting on the state's behalf -- made it apparent to C. Payne and R. Payne that the children could not return to 10 Coyote Run until C. Payne submitted to a search of the home and ended the pending investigation.  C. Payne and R. Payne reasonably believed that there would be legal repercussions should she take the children.  The Court notes that Wilder testified that he told R. Payne that C. Payne could not have the children until he had searched 10 Coyote Run, and that it is undisputed that Wilder and Bucag had knowledge of the custody agreement, see MSJ ¶ 25, at 5, which signals to the Court that neither C. Payne nor R. Payne were somehow on notice that Wilder and Bucag did not have the authority to cancel the civil custody agreement in this manner.  The Court concludes that, as did the district judge in Sundbye v. Ogunleye, C. Payne effectively suffered a deprivation, albeit not a formal custody removal, at Bucag's hands by his conduct at the meeting with R. Payne.

Bucag nonetheless advances that the undisputed facts of this case indicate that he and Wilder were operating upon what they perceived to be reasonable grounds that, until they cleared 10 Coyote Run by a safety search, the available evidence suggested that C. Payne's children were at an imminent risk of abuse should they continue to live at 10 Coyote Run.  The Court disagrees with Bucag that the undisputed facts upon which Wilder acted objectively establish

reasonable articulable suspicion that the children would be subject to abusive neglect and inadequate living conditions -- living conditions that, should they be true, had inspired Wilder's and CYFD's assignment of this investigation -- while the children were in C. Payne's custody at 10 Coyote Run.  The Court first recognizes that, in New Mexico, a police officer or state official may hold or take a child into custody if they have

> evidence giving rise to reasonable grounds to believe that the child is abused or neglected and that there is an immediate threat to the child's safety; provided that the law enforcement officer contacts the department to enable the department to conduct an on-site safety assessment to determine whether it is appropriate to take the child into immediate custody, except that a child may be taken into custody by a law enforcement officer without a protective services assessment being conducted if:
>
> > (a) the child's parent, guardian or custodian has attempted, conspired to cause or caused great bodily harm to the child or great bodily harm or death to the child's sibling;
> >
> > (b) the child's parent, guardian or custodian has attempted, conspired to cause or caused great bodily harm or death to another parent, guardian or custodian of the child;
> >
> > (c) the child has been abandoned;
> >
> > (d) the child is in need of emergency medical care;
> >
> > (e) the department is not available to conduct a safety assessment in a timely manner; or
> >
> > (f) the child is in imminent risk of abuse . . . .

N.M. Stat. Ann. § 32A-4-6(A)(1).  In New Mexico, "[e]vidence that demonstrates that a child has been knowingly and intentionally exposed to the use of methamphetamine shall be deemed prima facie evidence of abuse of the child."  N.M. Stat. Ann. § 30-6-1(J).  Thus, Bucag contends that, in light of the undisputed facts in this case, at the times when he met with R. Payne there was no violation of C. Payne's procedural due-process rights, because C. Payne was not entitled to any additional predeprivation process from Wilder given that he was acting upon "'evidence

giving rise to a reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse,'" Gomes v. Woods, 451 F.3d at 1129 (quoting Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d at 20), with that evidence being, in New Mexico pursuant to N.M. Stat. Ann. § 30-6-1(J), "prima facie evidence of abuse." The evidence upon which Wilder acted in making his statements to R. Payne, and to which Bucag assented, was: (i) the information in the anonymous tip alleging C. Payne's drug use and cohabitation with a wanted felon at 10 Coyote Run, see MSJ ¶ 8, at 3; (ii) R. Payne's corroboration of the allegations in the anonymous tip, see MSJ at ¶ 11, at 3; and (iii) Wilder's impressions of C. Payne's association with methamphetamine use during and after his traffic stop, see MSJ at ¶ 15, at 4. By these items of evidence, the Court concludes that there was insufficient evidence to establish "'a reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse.'" Gomes v. Woods, 451 F.3d at 1129 (quoting Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d at 20). The Court first recognizes that, generally, Tenth Circuit cases involving reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse tend to be cases where, for example, children presented in hospitals with visible, physical injuries. See Gomes v. Woods, 451 F.3d at 1137. The Court does not read the Gomes v. Woods standard to be exclusive, however:

> Accordingly, we conclude that in determining whether state officials have a reasonable suspicion of an immediate threat to the safety of the child, we must consider all relevant circumstances, including the state's reasonableness in responding to a perceived danger, as well as the objective nature, likelihood, and immediacy of danger to the child. Ordinarily, the question of whether state officials had time to seek and obtain judicial authorization for the removal without jeopardizing the safety of the child will be an important consideration, and the failure to establish that judicial authorization was impracticable will undermine the contention that emergency circumstances existed. However, neither this factor, nor any other single factor, is necessarily dispositive.

Gomes v. Wood, 451 F.3d at 1131 (internal quotation marks and citation omitted). There is, then, a colorable argument that "[e]vidence that demonstrates that a child has been knowingly and intentionally exposed to the use of methamphetamine shall be deemed prima facie evidence of abuse of the child," N.M. Stat. Ann. § 30-6-1(J), could satisfy the Gomes v. Woods standard for imminent peril of abuse. The problem here, though, is that Wilder merely had evidence which suggested that C. Payne used methamphetamine, with no spatial or temporal qualifications. See MSJ ¶ 8, at 3; id. ¶ 11, at 3; id. ¶ 15, at 4. The Court cannot conclude that such evidence of alleged drug use -- particularly where the Court can contemplate times where C. Payne might use methamphetamine when she did not have the children's custody, but might not comport herself in that fashion whilst having custody -- satisfies the Gomes v. Wood standard. To conclude otherwise would give the state carte blanche authority to effect deprivations of child custody, without any predeprivation process, upon mere allegations of drug use while also being a parent. Accordingly, the Court concludes that C. Payne was owed predeprivation process under these circumstances before Wilder and Bucag took steps to effectuate deprivation of her children's custody, and that, in its consideration of Bucag's entitlement to qualified immunity, there is a constitutional violation of C. Payne's procedural due process. The Court next turns to analysis of the clearly established prong.

The Supreme Court has resolved that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. at 741. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards,

132 S. Ct. at 2093 (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. at 741). To determine whether C. Payne's right in this context was clearly established, the Court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right. See <u>Casey v. W. Las Vegas Indep. Sch. Dist.</u>, 473 F.3d 1323, 1327 (10th Cir. 2007). The Tenth Circuit has held that the law is not clearly established where "a distinction *might* make a constitutional difference." <u>Kerns v. Bader</u>, 663 F.3d at 1186-87 (emphasis in original).

Bucag contends that, in assenting to Wilder's approach to this investigation, they operated under reasonable suspicion that, on the basis of the anonymous tip and Wilder's interaction with C. Payne, the children were under imminent threat of child abuse, because C. Payne was allegedly using methamphetamine at 10 Coyote Run. The Court has already concluded that this evidence does not satisfy the <u>Gomes v. Wood</u> standard for negating predeprivation process in these circumstances, but the Court cannot further conclude that the Supreme Court or the Tenth Circuit has clearly established C. Payne's rights in these unique circumstances. Indeed, C. Payne has not cited any cases in her favor which suggest that it is clearly established that Bucag's conduct in this case of effectuating the deprivation of C. Payne's custody over her children is procedurally unconstitutional. <u>See</u> Response <u>passim</u> (making no argument regarding the clearly established prong and her allegations alleging violations of her procedural due process rights). Indeed, it appears that Wilder and Bucag considered themselves to have the authority to handle this issue in the manner in which he did. To borrow <u>Kerns v. Bader</u>'s language, the Court must consider "whether it was beyond debate" that Bucag's conduct in the course of his investigation "lacked legal justification." 663 F.3d at 1183. Qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of

law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205. The Court concludes that Bucag made a "reasonable, but mistaken belief[]" in the course of his child abuse investigation which resulted in a violation of C. Payne's procedural due process rights. Accordingly, because the law on these precise facts -- involving the proper strictures of Bucag's child abuse investigation and the means available to him to conduct his investigation -- was not clearly established at the time of Wilder's and Bucag's violation, the Court will afford Bucag qualified immunity to C. Payne's claims alleging a procedural due-process violation.

The Court also notes, for clarity, that the undisputed facts indicate that neither Wilder nor Bucag continued to instruct R. Payne to withhold custody from C. Payne. Instead, the undisputed facts indicate that, upon evidence giving Wilder and Bucag what they considered a reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse, Wilder made statements to R. Payne -- and Bucag agreed with those statements -- and the effect of the statements appears to have persisted beyond that period of time which R. Payne was, in accordance with his and C. Payne's custody agreement, entitled to custody over the children. See Response at 10. See also MSJ ¶ 39, at 6 (regarding whether C. Payne ever took custody of the children after Bucag's conduct, in accordance with her custody agreement, "[a]t the time Defendant Bucag completed his investigation on August 6, 2015, he believed that the children were safely residing with their father"). The Court also notes that Wilder was clear with C. Payne and R. Payne that his investigation was going to require him to search 10 Coyote Run to ensure the allegations in the anonymous tip were not true and that C. Payne did not comply with Wilder's wish to investigate the anonymous tip. See MSJ ¶ 39, at 6 (regarding whether C. Payne ever took custody of the children after Bucag's conduct in accordance with her custody

agreement, "[a]t the time Defendant Bucag completed his investigation on August 6, 2015, he believed that the children were safely residing with their father"). Wilder also appears to have followed up with C. Payne on a couple occasions, to no avail, in an attempt to complete what he considered to be a lawful safety search of 10 Coyote Run. See MSJ ¶ 40, at 6. CYFD and Bucag also, apparently because C. Payne would not cooperate, appear to have ended their investigation by mailing notice of as much to both C. Payne and R. Payne "[o]n September 3, 2015"; however, it is not clear whether such notice was received or effective, particularly considering that Wilder and Bucag had made the original meeting with R. Payne in person and orally. MSJ ¶ 42, at 6 ("On September 3, 2015 a letter entitled 'Notice of Results of Investigation' was sent to both Plaintiff and Mr. Payne to include noting that the physical abuse and neglect allegations were unsubstantiated."). The Court considers these facts to support the reasonableness of Bucag's conduct, regarding Bucag's thinking that his investigation was proceeding appropriately, and the Court thus takes note of those facts in making its conclusion that Bucag is entitled to qualified immunity.[25]

### III. THE COURT, HAVING GRANTED BUCAG'S MSJ, RECOGNIZES THAT THERE ARE NO LONGER ANY FEDERAL CLAIMS PENDING BEFORE IT AND WILL DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER C. PAYNE'S REMAINING STATE CLAIM AGAINST WILDER.

In its consideration of Wilder's MSJ, which the Court granted in part and denied in part in its Wilder MOO, the Court concluded that entry of summary judgment regarding C. Payne's

---

[25]Alternatively, and at the least, the Court also notes that C. Payne would have been owed some measure of formal postdeprivation process beyond the non-negotiable option of opening up the home for a search, should CYFD's investigation have proceeded further. See Duchesne v. Sugarman, 566 F.2d 817, 822-23, 828 (2d Cir. 1977)(holding that, even though a mother voluntarily left her children with a neighbor, when State officials assumed custody of the children from the neighbor and refused to return the children to the mother, the officials were required to initiate postdeprivation proceeding).

state procedural due-process claim in Count II of the Complaint was inappropriate on the record of undisputed material facts.  See Wilder MOO at 130.  Accordingly, the Court did not enter judgment on that claim, and further retained supplemental jurisdiction of the claim, because it had not yet had the opportunity to consider Bucag's MSJ -- meaning that there were still federal claims pending before the Court.  The Court now notes that, although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552.  "Historically, courts tended to use the term 'pendent' to refer to non-federal, non-diversity claims asserted by the plaintiff in a federal question case.  And they tended to use 'ancillary' to refer to non-federal, non-diversity claims asserted in a diversity of citizenship case by parties *other* than the plaintiff."  13 Wright et. al., supra, § 3523, at 155-56 (emphasis in original)(footnote omitted).  Federal courts may exercise pendent jurisdiction over state law claims when "state and federal claims . . . derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. at 725.  Ancillary jurisdiction gives federal courts the flexibility to "entertain[] a non-federal, non-diversity claim asserted by a party other than the plaintiff, usually in a diversity of citizenship case," although occasionally in admiralty cases as well.  13 Wright et. al., supra, § 3523, at 173 & n.45.

To account for these jurisdictional theories, Congress codified the application of the two doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the
> district courts shall have supplemental jurisdiction over all other claims that are so
> related to claims in the action within such original jurisdiction that they form part
> of the same case or controversy under Article III of the United States

Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence." Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. at 787. Congress codified both ancillary and pendent jurisdiction "under the generic rubric 'supplemental' jurisdiction" in 28 U.S.C. § 1367, although "courts and lawyers routinely continue to use 'ancillary' and 'pendent' as well as 'supplemental' interchangeably to refer to *any* situation in which a federal court entertains a claim or proceeding that by itself would not invoke an independent basis of federal subject matter jurisdiction."  13 Wright et. al., supra, § 3523, at 156 (emphasis in original).

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction not as a litigant's right, but as a matter of judicial discretion.  See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1165 (citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. at 173).  In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction.  The traditional analysis, based on the Supreme Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial economy, convenience and fairness to litigants" when deciding whether to exercise supplemental jurisdiction.  383 U.S. at 726.  Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the court should consider:

(1)     the claim raises a novel or complex issue of State law,

(2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)     the district court has dismissed all claims over which it has original jurisdiction, or

(4)     in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity . . . ."  Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.

Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction.  See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d at 447 ("[S]ection 1367 has indeed altered Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d at 985 ("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); Executive Software N. Am. v. U.S. Dist. Court, 24 F. 3d at 1557 ("By codifying preexisting applications of Gibbs in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."), overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp., 533 F.3d at 1087; Palmer v. Hosp. Auth., 22 F.3d at 1569 ("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c) . . . .")(emphasis in original); Bonadeo v. Lujan, 2009 WL 1324119, at *8 ("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. §

1367(c) exists.”); Gudenkauf v. Stauffer Commc’ns, Inc., 896 F. Supp. at 1084 (“[A]ny exercise

of discretion declining jurisdiction over pendent claims or parties cannot occur until ‘triggered’

by the existence of one of the four conditions enumerated.”).

      The Tenth Circuit has held that district courts should generally decline jurisdiction over

state claims when federal claims no longer remain: “When all federal claims have been

dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining

state claims.”  Koch v. City of Del City, 660 F.3d at 1248 (quoting Smith v. City of Enid ex rel.

Enid City Comm’n, 149 F.3d at 1156).  The Supreme Court has also recognized:

> Needless decisions of state law should be avoided both as a matter of comity and
> to promote justice between the parties, by procuring for them a surer-footed
> reading of applicable law.  Certainly, if the federal claims are dismissed before
> trial, even though not insubstantial in a jurisdictional sense, the state claims
> should be dismissed as well.

United Mine Workers of Amer. v. Gibbs, 383 U.S. at 726.  The Court has previously stated that

the Supreme Court and the Tenth Circuit have indicated that a district court should usually

decline to exercise supplemental jurisdiction when 28 U.S.C. § 1367(c) applies.  See Armijo v.

New Mexico, 2009 WL 3672828, at *4 (“The Supreme Court and the Tenth Circuit have not

only acknowledged such a result, they have encouraged it.”).  The Tenth Circuit has recognized

that a district court does not “abuse [its] discretion” when it declines to exercise supplemental

jurisdiction over a claim “under 28 U.S.C. § 1367(c)(3) . . . where it ‘has dismissed all claims

over which it has original jurisdiction[.]’”  Muller v. Culbertson, 408 F. App’x at 197.  Here, the

Court no longer has any pending federal claims for its consideration.  The Court, accordingly,

considers it necessary to decline to exercise its supplemental jurisdiction under 28 U.S.C. §

1367(a), and remand C. Payne’s remaining state procedural due-process claim against Wilder.

Having entered judgment on all of C. Payne’s federal claims, and having remanded C. Payne’s

remaining state procedural due-process claim against Wilder, the Court will enter Final Judgment.

**IT IS ORDERED** that: (i) Defendant Mayfritz Bucag's Motion for Summary Judgment on the Basis of Qualified Immunity, filed March 14, 2017 (Doc. 43), is granted; (ii) Plaintiff Cara Payne's remaining state claim in the Plaintiff's Amended Complaint for Damages and Petition for Declaratory and Injunctive Relief, filed April 19, 2016 (Doc. 1-2), identified in Count II and brought pursuant to the New Mexico Constitution's protections for procedural due process, <u>see</u> Article II, Section 18, is remanded to the Twelfth Judicial District Court, County of Otero, State of New Mexico; and (iii) Final Judgment will be entered.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Miguel Garcia
John R. Hakanson, P.C.
Alamogordo, New Mexico

     *Attorneys for the Plaintiff*

Damian L. Martinez
Holt Mynatt Martinez, P.C.
Las Cruces, New Mexico

     *Attorneys for Defendant Lee Wilder*

Lee M. Rogers
Carla Neush Williams
Atwood, Malone, Turner, & Sabin, P.A.
Roswell, New Mexico

     *Attorneys for Defendants David Ceballes and Mayfritz Bucag*